**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| LITTLE RIVER HEALTHCARE | § | Case No. 18-60526-rbk |
| HOLDINGS, LLC, *et al.* | § | |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 362(d)
AUTHORIZING RELIEF FROM THE AUTOMATIC STAY AND 11 USC § 363 TO
PERMIT ADVANCEMENT OF DEFENSE COSTS UNDER INSURANCE POLICIES**

**Expedited relief has been requested. Subject to court approval, a hearing will be conducted on this matter on September 4, 2018, at 2:00 p.m. via televideo conference at the United States Bankruptcy Court for the Western District of Texas, at the United States Courthouse located at 800 Franklin Avenue, Waco, Texas 76701.**

TO THE HONORABLE RONALD B. KING, UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") file this motion (the "***Motion***") pursuant to Sections 105(a), 362, and 363 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 4001, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 4001, 9013, and 9014 of the Local Court Rules of the United States Bankruptcy Court for the Western District of Texas (the "***Local Rules***"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***") authorizing relief from the automatic stay, to the extent it applies, to permit,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Compass Pointe Holdings, LLC (1142), Little River Healthcare Holdings, LLC (7956), Timberlands Healthcare, LLC (1890), King's Daughters Pharmacy, LLC (7097), Rockdale Blackhawk, LLC (0791), Little River Healthcare - Physicians of King's Daughters, LLC (5264), Cantera Way Ventures, LLC (7815), and Little River Healthcare Management, LLC (6688). The Debtors' mailing address is 1700 Brazos Ave, Rockdale, TX 76567.

but not require, the Insurer (as defined below) to advance Defense Costs[2] pursuant to a prepetition insurance policy issued to Little River Healthcare Holdings, LLC ("***LRH***").  In support of the Motion, the Debtors respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§  1408 and 1409.

## SUMMARY OF REQUESTED RELIEF

2.      By this Motion, the Debtors seek relief from the automatic stay, to the extent it applies, to permit National Union Fire Insurance Company of Pittsburgh, Pa. (the "***Insurer***") to make payments or advancements of the Debtors' Defense Costs  under the applicable Policy (as defined below) incurred in connection with the claims set forth herein.

## BACKGROUND

3.      On July 24, 2018 (the "***Petition Date***"), each of the Debtors commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.  On August 21, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "***Committee***") in the Chapter 11 Cases.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the 2016 Policy (defined below).

4.     A description of the Debtors' businesses and the reasons for commencing the Chapter 11 Cases is set forth in the *Declaration of Ronald Winters in Support of First Day Motions* [Doc. # 20] (the "**Winters Declaration**"), which was filed on the Petition Date.

## THE PAYOR DISPUTES

5.     As described in the Winters Declaration, the Debtors manage and operate several medical facilities in Central Texas.  To receive certain payments and reimbursements for medical services the Debtors' facilities provide to their clients, the Debtors contract with various third-party payors that provide health insurance to the Debtors' clients (individually, a "**Payor**," and collectively, the "**Payors**").  As further described in the Winters Declaration, the Debtors are currently engaged in various disputes with certain of these Payors (collectively, the "**Payor Disputes**").  The Debtors strongly contest the validity of any claims asserted by the Payors and have engaged counsel in connection with the Payor Disputes.[3]

6.     In March 2018, in response to a certain Payor (the "**Payor Counter-Claimant**") failing to comply with its contractual obligations to the Debtors, among other claims, the Debtors filed an arbitration action seeking recovery of specified damages (the "**Arbitration**").  In June 2018, the Payor Counter-Claimant filed certain counterclaims in the Arbitration.[4]  The Debtors, through their counsel, are continuing to engage in settlement dialogue with the remaining Payors in an effort to resolve the remaining Payor Disputes prior to litigation or arbitration. The Debtors believe their attorneys' fees, along with all other fees and expenses incurred in relation to the

---

[3] The Debtors have filed an application to retain Duane Morris, LLP as special counsel in connection with the Payor Disputes and Arbitration (as defined herein).
[4] On August 17, 2018, the Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. § 362(d) Authorizing Relief from the Automatic Stay to Continue Pending Confidential Arbitration* requesting the Court lift the automatic stay to permit the Arbitration to proceed during these Chapter 11 Cases.

Payor Disputes and Arbitration, and other losses, if any, that may result in connection thereto, are covered by certain of the Debtors' prepetition insurance policies.[5]

## ADVANCEMENT OF DEFENSE COSTS

7. As set forth in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business* (Docket No. 11), the Debtors' maintain prepetition primary directors, officers and private company liability coverage issued to LRH through Insurer via PrivateEdge Plus Policy Number 25467199 effective from November 1, 2016 to November 1, 2017 (the "***2016 Policy***"). A true and correct copy of the 2016 Policy is annexed hereto as **Exhibit B**. The 2016 Policy provides coverage for directors, officers and private company liability, employment practices liability, and crime losses during the policy period subject to a $1,000,000 limit of liability applicable to the D&O Coverage Section (defined below). The 2016 Policy was initially issued with D&O limits of $1,000,000, which were raised to $5,000,000 during the policy term by endorsement effective July 27, 2017.

8. For the policy period November 1, 2017 to November 1, 2018, the Debtors maintained primary directors, officers and private company liability coverage through Insurer via Policy Number 02-778-20-05 (the "***2017 Policy***" and together with the 2016 Policy, each a "***Policy***," and together, the "***Policies***"), issued to LRH, a true and correct copy of which is annexed hereto as **Exhibit C**. The 2017 Policy provides coverage for directors, officers and

---

[5] The Debtors and Insurer currently disagree regarding the applicable policy and limit of liability as they pertain to the claims discussed herein, but submit this motion for the purpose of allowing the stay to be lifted to the extent that Insurer agrees that Claims (as defined in the applicable Policy) are potentially covered.

private company liability, employment practices liability, and crime losses during the policy period subject to a $5,000,000 limit of liability applicable to the D&O Coverage Section (defined below).

9.      Clause 1 of each of the Policies' Directors, Officers and Private Company Liability Insurance Coverage Section (the "***D&O Coverage Section***") provides, in relevant part:

> This D&O Coverage Section shall pay the Loss of the Company arising from a: (i) Claim made against the Company . . . . The Insurer shall, in accordance with and subject to Clause 7 of this D&O Coverage Section, advance Defense Costs of such Claim prior to its final disposition.

10.      In December 2017 and January 2018, the Debtors provided notice of the Payor Disputes under both Policies, and subsequently requested advancement of Defense Costs pursuant to the D&O Coverage Section of each Policy.[6] The Debtors further provided notice of the Arbitration under both Policies, and requested advancement of additional Defense Costs. To date, the Debtors have received no advancements of Defense Costs under either Policy.

11.      The Debtors and Insurer dispute whether the claims discussed herein are covered by the 2016 Policy or 2017 Policy. Insurer asserts that only Claims (as defined in the 2016 policy) in connection with counterclaims asserted in the Arbitration and Claims articulated in pre-arbitration Demand Letters, as set forth in Insurer's coverage position letter of August 10, 2018, are covered by the 2016 Policy only, and that such Claims are subject to the 2016 Policy's $1,000,000 limit of liability. The Debtors believe that Claims in connection with the Payor Disputes and Arbitration may be covered by the 2017 Policy and subject to a $5,000,000 limit of liability. For purposes of this Motion, the Debtors seek relief from the automatic stay to permit,

---

[6] The D&O Coverage Section provides that it will pay the Loss arising from a Claim against the Company (the term "Company" is defined in the Policies to include LRH and any Subsidiary thereof) for any "Wrongful Act." The D&O Coverage Section broadly defines "Wrongful Act" to include "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a Company . . . ." The Debtors submit that the allegations set forth in the Payor Disputes and Arbitration pertain to alleged Wrongful Acts and accordingly fall within the coverage of the Policies.

at Insurer's option—*but not order or require*—Insurer to advance Defense Costs under either of the potentially applicable Policies, to the extent that Debtor and Insurer agree that such Policy applies.[7]

12. While reserving all rights under the 2016 Policy and applicable law, Insurer has agreed to advance Defense Costs for Claims in connection with counterclaims asserted in the Arbitration and Claims articulated in pre-arbitration Demand Letters, as set forth in Insurer's coverage position letter of August 10, 2018, pursuant to the 2016 Policy and subject to the $1,000,000 limit of liability, subject to Insurer's rights and remedies under the 2016 Policy, and the issuance of an order substantially in the form of the Proposed Order.[8] Because the proceeds of the Policies ("***Proceeds***") may be deemed assets of the Debtors' bankruptcy estates, Insurer has requested that the Debtors obtain an order from this Court lifting the automatic stay, to the extent it applies, or in the alternative, clarifying that advancement of Defense Costs incurred by the Debtors in connection with the Payor Disputes and the Arbitration will not constitute a violation of the automatic stay set forth in Section 362 of the Bankruptcy Code.

## **RELIEF REQUESTED**

13. By this Motion, and pursuant to Section 362(d) of the Bankruptcy Code and the Bankruptcy Rules and Local Rules referenced hereinabove, Debtors seek entry of the Proposed Order granting relief from the automatic stay, to the extent it applies, so that Insurer may advance the Debtors' Defense Costs incurred in connection with the Payor Disputes and the Arbitration under either Policy, to the extent Insurer deems such Policy to be applicable.

---

[7] For the avoidance of doubt, the Debtors are not requesting that the Court consider whether the 2017 Policy or the 2016 Policy are applicable to the claims discussed herein. The requested relief is sought solely for purposes of ensuring the Debtors' bankruptcy cases are not an obstacle to obtaining the Defense Costs under either Policy upon resolution of the dispute between the Debtors and Insurer.

[8] The Debtors and Insurer reserve all rights with respect to the coverage and applicable limit of liability of the Policies in connection with the Payor Disputes and the Arbitration.

14.     Further, while the Debtors believe the Proceeds are property of the Debtors'

estates pursuant to Section 541 of the Bankruptcy Code, should the Court determine that the

Proceeds are not estate funds (or choose not to rule on such matter), the Debtors request the

Court enter an order specifying that the Insurer's advancement of Defense Costs as contemplated

herein does not constitute a violation of the automatic stay pursuant to Section 362 of the

Bankruptcy Code.  Further, the Debtors seek authority so use such Proceeds under Section 363

of the Bankruptcy Code for the payment of Defense Costs.

### CAUSE EXISTS TO LIFT THE
### AUTOMATIC STAY, TO THE EXTENT THAT IT APPLIES

15.     The automatic stay as set forth in Section 362(a)(3) of the Bankruptcy Code

prohibits parties from taking any action to obtain or exercise control over property of a debtor's

estate. *See* 11 U.S.C. § 362. Here, the Debtors' have a direct interest in the Proceeds of the

Policy, as they are the ultimate beneficiary of the advancement of Defense Costs, and as such,

the Proceeds constitute property of the Debtors' estates. *See In re Cybermedica, Inc.*, 280 B.R.

12, 16 (Bankr. D. Mass. 2002) (discussing that insurance policies are generally property of the

estate, but insurance proceeds may only be property of the estate if the debtor has a direct interest

in the proceeds); *In re Sacred Heart Hosp.*, 182 B.R. 413, 419-420 (Bankr. E.D. Pa. 1995)

(holding that that since the D&O insurance policy provided liability coverage to the debtor itself,

the proceeds were property of the debtor's estate).[9]

16.     Section 362(d) provides that the Court may grant relief from the automatic stay on

request from a party in interest "for cause." 11 U.S.C. § 362(d). Whether cause exists involves

case-by-case scrutiny. *In re Omni Lion's Run, L.P.*, 578 B.R. 394, 397 (Bankr. W.D. Tex. 2017).

There is no mandatory standard for finding "cause" in the Fifth Circuit. *In re Choice ATM*

---

[9] For the avoidance of doubt, the Debtors believe the Insurer should be authorized to advance Defense Costs as contemplated herein regardless of whether the Court finds that the Proceeds are property of the estates.

*Enters.*, 2015 Bankr. LEXIS 689, at *12 (Bankr. N.D. Tex. Mar. 4, 2015); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 253 (5th Cir. 2006) ("[I]n the past we have noted that this lack of definition [of "cause" in the Code] affords 'flexibility to the bankruptcy courts,'" quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

17.     Courts in this Circuit and others often consider the relevant *Sonnax* factors[10] when assessing whether cause exists to lift the stay, including consideration of the impact of the stay on the parties and the balance of the harms. *See In re Fowler*, 259 B.R. 856, 858 n.1 (Bankr. E.D. Tex. 2001) (applying *Sonnax* factors).

18.     Here, "cause" exists for granting relief from the stay in order to permit Insurer to advance Defense Costs to the Debtors under the applicable Policy. As detailed above, the Policies each provide coverage directly to the Debtors, which have a present need for advancement of their Defense Costs in connection with the Payor Disputes and the Arbitration. Absent this Court granting Insurer authority to use the Proceeds to advance such Defense Costs, the Debtors will be obligated to pay the Defense Costs themselves, all at the expense of the Debtors' estates.

19.     Moreover, subject to its reservation of rights under the 2016 Policy and applicable law, Insurer has agreed to advance the Debtors' Defense Costs under the 2016 Policy in connection with the counterclaims asserted in the Arbitration and Claims articulated in pre-arbitration Demand Letters, as set forth in Insurer's coverage position letter of August 10, 2018,

---

[10] *See In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990) (setting forth 12 factors that may be considered, as relevant, in connection with a request to lift the automatic stay).

upon entry of an order by this Court authorizing such advancement.[11] Accordingly, lifting the stay to permit the Insurer to advance Defense Costs will benefit all parties in interest.

20.    Additionally, the Debtors seek authority for the Proceeds to be used to fund Defense Costs under Section 363 of the Bankruptcy Code as applicable.

## **CONCLUSION**

21.    For the foregoing reasons, the Debtors respectfully request relief from the automatic stay provision in Sections 362 and 363 of the Bankruptcy Code, to the extent applicable, in order to permit Insurer to advance the reasonable and necessary Defense Costs incurred by the Debtors in connection with the Payor Disputes and the Arbitration under the applicable Policy, subject to Insurer's full reservation of its rights under the Policies and applicable law. The Debtors further request that the Court's order be effective upon entry, and that the 14 day stay period provided under Rule 4001(a)(3) not apply.

*[Remainder of this page intentionally left blank.]*

---

[11] Insurer has agreed to advance Defense Costs only under the 2016 Policy. Because the Debtors believe the 2017 Policy may be applicable to the claims discussed herein, they request relief from the automatic stay for the advancement of Defense Costs under either Policy and reserve all rights and remedies with regard to the ultimately applicable policy and coverage limit.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

DATED:      August 27, 2018
                Austin, Texas

                                  Respectfully submitted,

                                  WALLER LANSDEN DORTCH & DAVIS, LLP

                                  By: */s/ Morris D. Weiss*
                                          Morris D. Weiss
                                          Texas Bar No. 21110850
                                          100 Congress Ave., Suite 1800
                                          Austin, Texas 78701
                                          Telephone:  (512) 685-6400
                                          Facsimile:  (512) 685-6417
                                          Email:  morris.weiss@wallerlaw.com

                                          -and-

                                          Tyler N. Layne (admitted *pro hac vice*)
                                          Courtney K. Stone (admitted *pro hac vice*)
                                          Texas Bar No. 24093208
                                          511 Union Street, Suite 2700
                                          Nashville, TN 37219
                                          Telephone: (615) 244-6380
                                          Facsimile: (615) 244-6804
                                          Email: tyler.layne@wallerlaw.com
                                                      courtney.stone@wallerlaw.com

                                          PROPOSED COUNSEL FOR DEBTORS

**Exhibit A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| LITTLE RIVER HEALTHCARE | § | Case No. 18-60526-rbk |
| HOLDINGS, LLC, *et al.* | § | |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

**ORDER GRANTING RELIEF**
**FROM THE AUTOMATIC STAY TO PERMIT ADVANCEMENT OF**
**DEFENSE COSTS UNDER INSURANCE POLICIES**

Upon consideration of the motion (the "***Motion***")[2] filed by the above-captioned Debtors;

and the Court having found that it has jurisdiction to consider the Motion and the relief requested

therein pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Bankruptcy Rules 4001,

9013, and 9014, and Local Rules 4001, 9013, and 9014; and the Court having found that

consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Compass Pointe Holdings, LLC (1142), Little River Healthcare Holdings, LLC (7956), Timberlands Healthcare, LLC (1890), King's Daughters Pharmacy, LLC (7097), Rockdale Blackhawk, LLC (0791), Little River Healthcare - Physicians of King's Daughters, LLC (5264), Cantera Way Ventures, LLC (7815), and Little River Healthcare Management, LLC (6688). The Debtors' mailing address is 1700 Brazos Ave, Rockdale, TX 76567.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

U.S.C. § 157(b); and the Court having found that venue of this proceeding in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the Motion as set forth therein is sufficient under the circumstances; and the Court having reviewed the Motion and having considered statements in support of the Motion at the hearing held before this Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS THEREFORE ORDERED:

1.　　The Motion is granted as set forth herein.

2.　　To the extent applicable, the automatic stay imposed by 11 U.S.C. § 362(a) in the respective proceedings is hereby modified solely to the extent necessary to allow, but not order or in any way require, Insurer to make payments and/or advancements pursuant to 11 U.S.C. § 363 under either the 2016 Policy or the 2017 Policy, as Insurer agrees to be applicable, on account of the Debtors' Defense Costs incurred in connection with the Payor Disputes and the Arbitration, subject to Insurer's determination that such Defense Costs are potentially covered under the applicable Policy, and further subject to a mutual reservation of rights by Insurer and the Insureds under each Policy and applicable law.

3.　　Nothing herein shall prejudice the current or future position of Insurer, the Debtors or any Insured, and the parties reserve all rights, with respect to (1) the appropriateness of any obligation on Insurer or restriction on the operation of the Policies contemplated by this Order; or (2) the appropriateness of any other obligation on Insurer or restriction on the operation of the Policies. The parties also reserve their rights to seek to modify this Order.

4.       Any and all advancements of Defense Costs by Insurer shall reduce the applicable Policy's applicable Limit of Liability, unless or until such amounts are repaid to Insurer.

5.       Nothing in this Order shall constitute (1) a waiver, modification or limitation of Insurer's reservation of all rights, remedies and defenses under the Policies and otherwise; (2) a waiver, modification or limitation of any of the terms or conditions of the Policies; or (3) a finding that any sums are due and owing, or in what amount, under the Policies. Similarly, nothing in this Order shall constitute a waiver, modification of limitation of any rights of the Debtors, or any other Insured under the Policies.

6.       Notwithstanding anything to the contrary herein, nothing in this Order authorizes the use of cash collateral or debtor-in-possession financing. Any payments authorized to be made pursuant to this Order shall be made only to the extent authorized under the cash collateral and debtor-in-possession financing order (as amended or extended, as the case may be) and the corresponding budget approved by the Court in effect as of the time such payment is to be made.

7.       This Order is immediately valid and fully effective upon its entry and the 14 day stay pursuant to Fed. R. Bankr. Proc. 4001(a) is hereby waived.

8.       This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# # #

Prepared and submitted by:

WALLER LANSDEN DORTCH & DAVIS, LLP
Morris D. Weiss
Texas Bar No. 21110850
100 Congress Ave., Suite 1800
Austin, Texas 78701
Telephone:  (512) 685-6400
Facsimile:  (512) 685-6417
Email:   morris.weiss@wallerlaw.com

PROPOSED COUNSEL FOR THE DEBTORS IN POSSESSION

**Exhibit B**

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).    The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.    You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producercompensation  or by calling1-800-706-3102.

91222 (4/13)

*November 1, 2016*

Dear Insured:

Congratulations on purchasing your employment practices liability insurance policy from AIG, one of the premier writers of commercial insurance. Your policy offers many outstanding features, including coverage for claims arising from violations of Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act (ADA); the Age Discrimination in Employment Act (ADEA); the Equal Pay Act of 1963 (EPA); and the Rehabilitation Act of 1973 (REHAB ACT).

As a AIG policyholder, you have the confidence of knowing that your claims will be handled by experienced claims professionals. In addition, our panel counsel is comprised of leaders in employment practices law throughout the country. The services of these law firms are available to you at preferred AIG rates.

Additionally, our package includes loss-control services included automatically for all eligible insureds through **EPL Pak<sup>®</sup> Premier.** This insurance offering features access to our online EPL Risk Manager located at www.EPLriskmanager.com, designed exclusively for AIG EPL insureds by the attorneys at Littler Mendelson, the nation's largest labor and employment law firm. This web link is exclusive to AIG EPL insurance policyholders and is available at no additional cost. To register, you can log into the site with your policy number. The site offers tools and resources including:

- Human Resources Form Library
- Sample Employee Handbooks
- Employment Law Email Alerts
- Employment Law Policies
- Hire & Fire Manual

- Employment Law Reference Manuals (5000 + pages)
- 50 State Analysis of Key Employment Laws
- Preventing Unlawful Harassment Guide
- Preventing Employment Class Actions Manual
- Discounts on Employment Law Training

All forms and materials may be downloaded and customized. To view a short video tour of the risk management products and services available, please visit: **http://eplriskmanager.com/take_tour.php.** As a AIG policyholder, you also receive ten free seats to Littler Mendelson's monthly webinar series on preventing harassment in the workplace and discounts on over 40 employment law training courses.  For additional information on these services you may contact Brian McMillan at Littler Mendelson at bmcmillan@littler.com or visit www.littler.com.

To complement these offerings, we continue to offer our risk management solutions provided by Jackson Lewis, LLP, a premier employment law firm with offices throughout the United States, including:

- Unlimited Access to the Jackson Lewis Toll Free Risk Management Hotline:  (866) 614-0744
- One hour legal consultation with a Jackson Lewis attorney on any topic
- Seminars on topical issues of employment law, recent litigation development, and training
- Email subscription to The Jackson Lewis Newsletter, which highlights employment practices developments and trends
- Email updates regarding significant legislative actions, judicial decisions, and other changes which may impact your business
- Access to a self-audit checklist and a pre-termination checklist, which will assist companies in identifying potential vulnerability to employment claims
- Attendance at CAAB 1825 sexual harassment training in California

To learn more, please contact Paul Siegel at siegelp@jacksonlewis.com , Wendy Melik at mellkw@jacksonlewis.com or view a free demonstration of training at www.jacksonlewis.com, or under the online training section or at www.workplaceanswers.com

Your decision to purchase coverage through AIG has provided your organization with powerful advantages in managing your business.  We thank you for choosing AIG and look forward to a continuing successful relationship. If you have any questions or would like additional information, please contact your broker, a AIG representative or email us at executiveliability@aig.com.

AIG is the marketing name for the worldwide property-casualty and general insurance operations of AIG Property Casualty Inc. For additional information, please visit our website at www.aig.com. All products are written by insurance company subsidiaries or affiliates of AIG Property Casualty Inc. Coverage may not be available in all jurisdictions and is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain coverage may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.





Financial Lines

# EPL Pak® Premier

## Employment Practices Training, Loss Prevention and Risk Management

Controlling employment practices liability exposures while keeping pace with employment litigation trends and regulatory changes is a major challenge for all employers. AIG gives its employment practices liability (EPL) policyholders a unique advantage with EPL Pak® Premier, industry-leading loss prevention offerings. The suite is a combination of training, loss control and risk management tools designed to help our clients manage employment practices risks. EPL Pak Premier's resources are exclusive to AIG, and provide our EPL policyholders with access to expertise and materials from two of the nation's foremost employment and labor law firms, Littler Mendelson, P.C. and Jackson Lewis LLP.

### Putting Experts By Your Side

EPL Pak Premier now includes instant access to www.eplriskmanager.com, which provides first-in-class risk management tools and resources from Littler Mendelson, a leading employment and labor law firm. Materials available include essentials to manage your workforce and reduce exposure to employment related liability including:

- **Handbooks and Policies:** Sample employee handbook and policies to help implement best employment practices, including supplemental information for all 50 states
- **Forms Library:** A library of commonly used human resource forms, which can be customized, to ease your administrative burden
- **Workforce Guides:** A hiring and firing guide to help employers mitigate the risks of these critical phases of the employment relationship and step-by-step guides to prevent harassment, including information to help address and resolve incidents and lessen potential liability
- **Legal Reference Materials:** Over 3,000 pages of employment law reference manuals providing insights on timely topics ranging from layoffs, downsizing, and furloughs, to workplace violence, discrimination, and employment class actions. Includes a state-by-state assessment of employment laws and regulations

EPL Pak Premier gives you access to expertise and resources from two of the nation's foremost employment and labor law firms, Littler Mendelson, P.C. and Jackson Lewis LLP.





Financial Lines

## EPL Pak® Premier

### State of the Art Enhancements

These state-of-the-art enhancements complement EPL Pak Premier's original package of risk management solutions from Jackson Lewis, LLP, which include:

- **Legal Consultation:** A one-hour legal consultation on human resources and employment law issues, such as how specific laws impact personnel decisions and potential exposure to liability
- **Liability Updates:** Access to the Jackson Lewis e-Newsletter and e-updates spotlighting important workplace law news and trends. Alerts on significant legislative actions, judicial decisions and other changes with potential impact on our insured's business
- **Checklists:** Self-audit and pre-termination checklists to help insureds identify vulnerabilities and safely navigate risky terrain
- **Special California State Training:** CA AB 1825 training, enabling companies with 50 or more employees in California to fulfill their mandate of providing sexual harassment training for supervisors every two years

EPL Pak Premier also includes Alternative Employment Dispute Resolution Programs from EDR Systems at preferred rates. EDR Systems will assist to resolve employee disputes internally and prevent time and money in litigation. The professionals at EDR Systems have more than 50 years of combined experience in human resource management, strategic planning, change management, and employee relations. They support a wide variety of businesses of all sizes, from national, multi-unit retail operations, to single-facility manufacturers, to professional firms.

---

To learn more about EPL Pak Premier services:

E-mail:
FinancialLines@aig.com

Visit:
www.aig.com

Contact:
Your insurance broker

 Bring on tomorrow

American International Group, Inc. (AIG) is a leading international insurance organization serving customers in more than 130 countries. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property- casualty networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com| YouTube: www.youtube.com/aig| Twitter: @AIG_LatestNews | LinkedIn: www.linkedin.com/company/aig

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.

**RiskTool for Crime Welcome Notice**

Congratulations on purchasing a Crime policy from AIG. We look forward to providing your company with the insurance coverage and access to risk management tools that will help you to prevent and control certain crime risks.

As an eligible Crime policyholder, you have access to **RiskTool for Crime,** an easy-to-use comprehensive web-based platform that helps to streamline the risk management process. The platform's content is customizable and can be tailored specifically to meet a number of risk management needs. With pre-populated training modules and sample policies, RiskTool for Crime can assist in raising awareness and creating procedures to help prevent human error from causing loss.

RiskTool for Crime is provided by RiskAnalytics, a leader in cyber security threat intelligence. These tools are exclusive to eligible AIG policyholders and are available at no additional cost. Go to: https://www.risktoolregistration.com to register. Enter your contact information and policy number, and a representative from RiskAnalytics will contact you or your broker within five business days to coordinate.

Your decision to purchase coverage through AIG has provided your organization with useful tools for managing your business.  We thank you for choosing AIG and look forward to a continuing successful relationship. If you have any questions or would like additional information, please contact your broker, an AIG representative or email us at  financiallines@aig.com.

American International Group, Inc. (AIG) is a leading international insurance organization serving customers in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property-casualty networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com | YouTube: www.youtube.com/aig | Twitter: @AIGInsurance | LinkedIn: http://www.linkedin.com/company/aig

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.

◊ All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, PA

A capital stock company

## PrivateEdge Plus

**POLICY NUMBER:** *25467199*        **REPLACEMENT OF POLICY NUMBER:** *23597238*

### Management Liability, Professional Liability, Crime Coverage and Kidnap And Ransom/Extortion Coverage for Private Companies

### DECLARATIONS

---

**NOTICES**

[THESE NOTICES ARE APPLICABLE TO ALL COVERAGE SECTIONS OTHER THAN THE CRIME COVERAGE SECTION AND KIDNAP AND RANSOM/EXTORTION COVERAGE SECTION]

COVERAGE WITHIN THIS POLICY IS GENERALLY LIMITED TO LOSS FROM CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER AS THE POLICY REQUIRES. DEFENSE COSTS REDUCE THE LIMITS OF LIABILITY (AND, THEREFORE, AMOUNTS AVAILABLE TO RESPOND TO SETTLEMENTS AND JUDGMENTS) AND ARE APPLIED AGAINST APPLICABLE RETENTIONS.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND UNLESS SUCH COVERAGE IS EXPRESSLY PROVIDED WITHIN A COVERAGE SECTION.  WHERE THE INSURER HAS NO DUTY TO DEFEND, IT WILL ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS OF THIS POLICY PRIOR TO THE FINAL DISPOSITION OF A CLAIM.  PLEASE REFER TO THE COVERAGE SECTIONS PURCHASED FOR DEFENSE RELATED DETAILS.

PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.

---

**ITEMS**

| | | | |
|---|---|---|---|
| 1 | NAMED ENTITY: | (the "Named Entity") | *Little River Healthcare Holdings, LLC* |
| | | MAILING ADDRESS: | *1700 BRAZOS AVE ROCKDALE, TX, 76567 2517* |
| | | STATE OF INCORPORATION/FORMATION: | *Texas* |
| 2 | POLICY PERIOD: | Inception Date: *November 1, 2016* | Expiration Date: *November 1, 2017* |
| | | 12:01 A.M. at the address stated in Item 1 | |

95862 (09/07)                    1                    © All rights reserved.

ITEMS (continued)

**3  COVERAGE SUMMARY**

| | Liability Coverage Section | Separate Limit of Liability | Shared Limit of Liability | Retention/ Deductible* | Continuity/ Retroactive Date | Premium |
|---|---|---|---|---|---|---|
| D&O | D&O Coverage Section | *$1,000,000* | *Inapplicable* | *$25,000* | *Continuity Date: April 7, 2011* | *$6,514* |
| EPL | Employment Practices Coverage Section | *$1,000,000* | *Inapplicable* | *$25,000* | *Continuity Date: April 7, 2011* | *$17,801* |
| FLI | Fiduciary Liability Coverage Section | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| MPL | Miscellaneous Professional Liability Coverage Section | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| | Professional Services: | | | | | |
| CCP | Employed Lawyers Coverage Section | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| Crime | Crime Coverage Section | See Section 5: | None | See Section 5: | N/A | *$6,327* |
| KRE | Kidnap And Ransom/ Extortion Coverage Section | See Section 6: | None | See Section 6: | N/A | *Coverage Section Not Purchased* |
| *With respect to the D&O, EPL, FLI and CCP Coverage Sections only, no Retention amount is applicable to Non-Indemnifiable Loss.  *No Retention amount is applicable to Costs of Investigation for Company Shareholder Derivative Investigations, Crisis Management Events, Voluntary Compliance Loss and HIPAA Penalties. | | | | | | N/A |

**4  TOTAL PREMIUM  *$30,642***

© All rights reserved.

| ITEMS (continued) |
|---|

*Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act, as amended (TRIA):$240 included in policy premium stated above. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows: 84% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.A copy of the TRIA disclosure sent with the original quote is attached hereto.*

## 5  CRIME LIMITS OF LIABILITY AND DEDUCTIBLES

| Insuring Agreement | Per Occurrence Limit of Liability | Deductible |
|---|---|---|
| Insuring Agreement 1.A.: "Employee Theft" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.B.: "Forgery or Alteration" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.C.: "Inside the Premises - Theft of Money or Securities" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.D.: "Inside the Premises - Robbery or Safe Burglary of Other Property" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.E.: "Outside the Premises" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.F.: "Computer Fraud" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.G.: "Funds Transfer Fraud" Loss | *$1,000,000* | *$10,000* |
| Insuring Agreement 1.H.: "Money Orders and Counterfeit Paper Currency" Loss | *$1,000,000* | *$10,000* |
| Coverage Endorsement "Clients Property" Loss | *Not Covered* | *Not Covered* |
| Coverage Endorsement "Guest Property  " Loss | *Not Covered* | *Not Covered* |

If "Not Covered" is inserted above opposite any specific Insuring Agreement, such Insuring Agreement in the Crime Coverage Section and any other reference thereto in this policy is hereby deleted.

**CANCELLATION OF PRIOR CRIME INSURANCE:** By acceptance of the Crime Coverage Section of this Policy, you give us notice of cancellation for the prior Policy Nos: *Not Applicable.* Such cancellation shall be effective at the time the Crime Coverage Section of this Policy becomes effective.

95862 (09/07)                                    3                          © All rights reserved.

ITEMS (continued)

**6  KRE LIMITS OF INSURANCE \ INSURED PERSON(S)**

| Loss Component: | Each Loss Component Limit | Annual Aggregate Limit |
|---|---|---|
| A. Ransom Monies: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| B. In-Transit/Delivery: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| C. Expenses: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| D. Consultant Expenses: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| E. Judgments, Settlements and Defence Costs: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |
| F. Death or Dismemberment: | *Coverage Section Not Purchased* | *Coverage Section Not Purchased* |

| | |
|---|---|
| Each Insured Event Limit: | *Coverage Section Not Purchased* |
| Coverage Section Aggregate: | *Coverage Section Not Purchased* |
| Deductible (Each Loss): | *Coverage Section Not Purchased* |

Insured Person(s): *Coverage Section Not Purchased*

---

**7  OTHER LIMITS OF LIABILITY**

| | |
|---|---|
| (a) POLICY AGGREGATE LIMIT OF LIABILITY (For all coverages combined other than the Crime and the KRE Coverage Sections): | *$2,000,000* |
| (b) Crisis Management Fund For D&O: | *$25,000* |
| (c) Punitive Damages Sublimit of Liability for D&O and/or EPL Coverage Sections:<br>☐ D&O Punitive Damages Sublimit of Liability:<br>☐ EPL Punitive Damages Sublimit of Liability:<br>☐ Shared Punitive Damages Sublimit of Liability (D&O and EPL):<br><br>☒ No Punitive Damages Sublimit of Liability for D&O or EPL | *Full Limit* |
| (d) Costs of Investigation Coverage Sublimit for D&O: | *$150,000* |
| (e) Voluntary Compliance Loss Sublimit of Liability for FLI: | |
| (f) HIPAA Penalties Sublimit of Liability for FLI: | |

**8  DISCOVERY PROVISIONS (Inapplicable to Crime and KRE Coverage Sections)**

| | |
|---|---|
| (a) Percentage of Full Annual Premium for; 1 Year: | *TBD* |
| (b) 2 Years: | *TBD* |
| (c) 3 Years: | *TBD* |
| (d) 4 Years: | *TBD* |
| (e) 5 Years: | *TBD* |
| (f) 6 Years: | *TBD* |
| (g) Percentage of Full Annual Premium for unlimited duration: | *TBD* |

95862 (09/07)                                           4                         © All rights reserved.

| ITEMS (continued) | |
|---|---|
| 9(a) | **NAME AND ADDRESS OF INSURER** |
| | *National Union Fire Insurance Company of Pittsburgh, PA*<br>*175 WATER STREET, NEW YORK, NY, 10038* |
| | This policy is issued only by the insurance company indicated in this Item 9(a). |
| 9(b) | **NOTICE OF CLAIMS AND CIRCUMSTANCES SEND TO:**<br>AIG, Financial Lines Claims<br>P.O. Box 25947<br>Shawnee Mission, KS, 66225 |
| | **Reference:** *25467199* |
| | Reference: **[Coverage Section]** |

PRODUCER: *R T SPECIALTY, LLC*

PRODUCER LICENSE NO.: On File with Carrier

ADDRESS: *12404 PARK CENTRAL DRIVE*
            *SUITE 380*
            *DALLAS, TX 75251*

95862 (09/07)                    5                    © All rights reserved.

**IN WITNESS WHEREOF**, the **Insurer** has caused this policy to be signed on the Declarations by its President, a Secretary and its duly authorized representative.

_____
PRESIDENT

_____
SECRETARY

_____
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE

_____
DATE

_____
COUNTERSIGNED AT

95862 (9/07)

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act:* The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *Little River Healthcare Holdings, LLC*

Policy Number: *25467199*
Policy Period Effective Date From: *November 1, 2016* To: *November 1, 2017*

96555 (1/15)
© 2015 National Association of Insurance Commissioners



## National Union Fire Insurance Company of Pittsburgh, PA

### PRIVATEEDGE PLUS

A capital stock company

### GENERAL TERMS AND CONDITIONS

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

### 1. TERMS AND CONDITIONS

These **General Terms and Conditions** shall be applicable to all **Coverage Sections** except: (i) the **KRE Coverage Section**; and (ii) the **Crime Coverage Section**. Terms appearing in these **General Terms and Conditions** which are defined in a **Coverage Section** shall have the meaning provided for such terms in such **Coverage Section** for purposes of coverage provided under such **Coverage Section**. Any reference in these **General Terms and Conditions** to "all **Coverage Sections**" shall not refer to the **KRE Coverage Section** or the **Crime Coverage Section**. The terms and conditions set forth in each **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

### 2. DEFINITIONS

(a) **"Application"** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy, employment practices liability policy, professional liability policy, employed lawyers policy or crime policy issued by the **Insurer**, or any of its affiliates, of which this policy is in whole or part a renewal or replacement or which it succeeds in time.

(b) **"Company"** means the **Named Entity** and any **Subsidiary** thereof. In the event a bankruptcy proceeding shall be instituted by or against a **Company**, the term **"Company"** shall also mean the resulting debtor-in-possession (or equivalent status outside the United States of America), if any.

(c) **"Continuity Date"** means the date set forth in Item 3 of the Declarations with respect to each **Coverage Section.**

(d) **"Coverage Section"** means each **Coverage Section** that is purchased by the **Insured** as indicated in Item 3 of the Declarations.

(e) **"Discovery Period"** means **Discovery Period**, as that term is defined in Clause 8 of these **General Terms and Conditions.**

(f) **"Domestic Partner"** means any natural person legally recognized as a domestic or civil union partner under: (i) the provisions of any applicable federal, state or local law; or (ii) the provisions of any formal program established by the **Company.**

(g) **"Insurer"** means the insurance company indicated in the Declarations.

(h) **"Management Control"** means: (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee of a joint venture or partnership, or the management board of a limited liability company.

(i) **"Named Entity"** means the entity listed in Item 1 of the Declarations.

(j) **"Policy Aggregate Limit of Liability"** means the **Policy Aggregate Limit of Liability** stated in Item 7(a) of the Declarations.

              © All rights reserved.

(k) **"Policy Period"** means the period of time from the inception date stated in Item 2 of the Declarations to the earlier of the expiration date stated in Item 2 of the Declarations or the effective date of cancellation of this policy.

(l) **"Related Wrongful Act(s)"** means **Wrongful Act(s)** which are the same, related or continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts. **Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.

(m) **"Separate Limit of Liability"** means the applicable **Separate Limit of Liability**, if any, stated in Item 3 of the Declarations.

(n) **"Shared Limit of Liability"** means the applicable **Shared Limit of Liability**, if any, stated in Item 3 of the Declarations, which limit of liability shall be shared between all of the **Coverage Sections** which are listed below such **Shared Limit of Liability** in the Declarations.

(o) **"Subsidiary"** means:

    (i) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** has or had **Management Control** ("Controlled Entity") on or before the inception date of the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**;

    (ii) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**; and

    (iii) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by a **Company**.

Notwithstanding the foregoing, coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** or any **Individual Insureds** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that the **Named Entity** obtained **Management Control** of such **Subsidiary** and prior to the time that such **Named Entity** ceased to have **Management Control** of such **Subsidiary**.

3. **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from any **Claim** made against: (i) the estates, heirs, or legal representatives of deceased **Individual Insureds**, and the legal representatives of **Individual Insureds** in the event of incompetency, insolvency or bankruptcy, who were **Individual Insureds** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; or (ii) the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or **Domestic Partner** of an **Individual Insured** for all **Claims** arising solely out of his or her status as the spouse or **Domestic Partner** of an **Individual Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Individual Insured** and the spouse or **Domestic Partner**, or property transferred from the **Individual Insured** to the spouse or **Domestic Partner**; provided, however, this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** of the spouse or **Domestic Partner**, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Individual Insured**, subject to the policy's terms, conditions and exclusions.

4. **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first

made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. Amounts incurred for **Defense Costs** shall be applied against the Retention.

5. **RETENTION CLAUSE**

The Retentions stated in the Declarations are separate Retentions pertaining only to the **Coverage Section** for which they are stated in the Declarations. The application of a Retention to **Loss** under one **Coverage Section** shall not reduce the Retention under any other **Coverage Section**.

In the event a **Claim** triggers a Retention in multiple **Coverage Sections**, then the following shall apply:

(a) with regard to **Loss** which is payable under any **Coverage Section** which is subject to a **Separate Limit of Liability**, the Retention applicable to such **Loss** pursuant to the Retention Clause of such **Coverage Section** (or pursuant to any applicable endorsement) shall apply separately to such **Loss**, and the applicable Retention for such **Coverage Section** shall not be reduced by payments of **Loss** made towards the Retention required under any other **Coverage Section**; and

(b) with regard to **Loss** which is payable under any **Coverage Sections** which are subject to a **Shared Limit of Liability**, the highest applicable Retention shall be deemed the Retention applicable to **Loss** arising from such **Claim**.

6. **NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the addressee and at the address identified in Item 9(b) of the Declarations. Notice shall include and reference this policy number as indicated in the Declarations, as well as the **Coverage Sections** under which the **Claim** is being noticed. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

The following shall apply:

(a) The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or a **Crisis Management Event** as soon as practicable after: (i) the **Company's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (ii) the **Crisis Management Event** commences, but in all events a **Claim** must be reported no later than either:

© All rights reserved.

(i)   anytime during the **Policy Period** or during the **Discovery Period** (if applicable); or

(ii)  within ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 6(a) above, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

(d) Any matter which could involve the payment of **Voluntary Compliance Loss** under the **FLI Coverage Section** shall be reported to the **Insurer** in the same manner as a **Claim** under Clause 6(a)(i) and 6(a)(ii) above.

## 7. CANCELLATION CLAUSE

This policy or any individual **Coverage Section** may be canceled by the **Named Entity** at any time by mailing prior written notice to the **Insurer** stating which **Coverage Sections** are to be canceled or that the entire policy is to be canceled and when thereafter such cancellation shall be effective, or by surrender thereof to the **Insurer** or its authorized agent. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the policy or applicable **Coverage Sections**.

This policy may be canceled by or on the behalf of the **Insurer** only in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified or other first class mail, at the **Named Entity's** address as stated in Item 1 of the Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy or any **Coverage Section** shall be canceled by the **Named Entity**, the **Insurer** shall retain the pro rata proportion of the applicable premium herein. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

If the period of limitation relating to the giving of notice as set forth above is also set forth in any law controlling the construction thereof, the period set forth above shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 8. DISCOVERY CLAUSE

If the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy or any **Coverage Section**, then, solely with regard to the policy or **Coverage Section** which was canceled or nonrenewed, the **Named Entity** shall have the right, upon payment of the applicable "**Additional Premium Amount**" described below, to a period of up to six (6) years or of unlimited duration following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**"), in which to give the **Insurer** written notice of **Claims** first made against any **Insured** during said **Discovery**

⊕ All rights reserved.

**Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by the canceled or nonrenewed policy or **Coverage Section**, as applicable. The rights contained in this Clause 8 shall terminate, however, unless written notice of such election together with the **Additional Premium Amount** due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for the elected **Discovery Period** shall be the **"Full Annual Premium"** (as defined below) multiplied by the applicable percentage amount indicated in Item 8 of the Declarations for the length time of elected for the **Discovery Period**. If the applicable subsection of Item 8 of the Declaration states "to be determined", then the **Additional Premium Amount** for such **Discovery Period** shall be an amount determined by the **Insurer** in its sole and absolute discretion.

As used herein, **"Full Annual Premium"** means:

(a) with regard to a canceled or nonrenewed policy, the total annual premium charged for this policy; or

(b) with regard to a canceled or nonrenewed **Coverage Section**, the total annual premium charged for such **Coverage Section**.

In the event of a **Transaction**, as defined in Clause 9 of these **General Terms and Conditions**, the **Named Entity** shall have the right, within thirty (30) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of up to six (6) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions and premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable, except that the **Insurer** may cancel the **Discovery Period** for non-payment of premium. This Clause 8 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

9. **CHANGE IN CONTROL OF NAMED ENTITY**

If during the **Policy Period**:

(a) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(b) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

(either of the above events herein referred to as the "**Transaction**"),

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**.

This policy and any purchased **Coverage Section** may not be canceled after the effective time of the **Transaction**. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 8 of these **General Terms and Conditions**.

The **Named Entity** shall give the **Insurer** written notice of the **Transaction** as soon as practicable, but not later than thirty (30) days after the effective date of the **Transaction**.

10. **SUBROGATION**

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to each **Insured's** rights of recovery thereof, and each **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of the **Insured**. In no event, however, shall subrogation be had against any **Individual Insured** under this policy, unless such **Individual Insured** has been convicted of a criminal act, or been determined by a final adjudication to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or  determined

95726 (9/07)
Page 5 of 7
GENERAL TERMS AND CONDITIONS
⊕ All rights reserved.

by a final adjudication to have obtained any profit or advantage to which such **Individual Insured** was not legally entitled.

In the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of an **Individual Insured**, the **Insurer's** subrogation rights shall include, but not be limited to, the assertion of indemnification or contribution rights with respect to any such payments it makes or advances. Additionally, upon the **Insurer** making any payment of **Loss** within the Retention, the **Insurer** shall have a direct contractual right under this policy to recover from the **Company**, or in the event of the bankruptcy of the **Company**, from the debtor-in-possession (or equivalent status outside the United States) such **Loss** which was paid within the Retention. Such direct contractual right of recovery against the **Company** shall be in addition to and independent of the **Insurer's** subrogation right pursuant to this Clause 10 and any other rights the **Insurer** may have under applicable law.

## 11. OTHER INSURANCE

With respect to all **Coverage Sections**, other than the **EPL Coverage Section**, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is expressly written to be excess over the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** provided by this policy. This policy specifically shall be excess of any other policy pursuant to which any other **Insurer** has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

Such insurance as is provided by the **EPL Coverage Section** shall be primary unless expressly written to be excess over other applicable insurance.

With respect to all **Coverage Sections**, in the event of a **Claim** against an **Insured** arising out of his or her service as an **Outside Entity Executive**, or a **Claim** against an **Insured** for the **Insured's** liability with respect to a leased **Employee** or independent contractor **Employee** as described in the definition of "**Employee**" in the applicable **Coverage Section**, coverage as is afforded by this policy shall be specifically excess of any: (i) indemnification provided by such **Outside Entity** or leasing company; and (ii) any other insurance provided to such **Outside Entity**, leasing company or independent contractor.

Further, in the event other insurance is provided to the **Outside Entity**, leasing company or independent contractor referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the **Insurer** or any member company of AIG Property Casualty Inc. ("AIG") (or would be provided but for the application of the Retention, exhaustion of the limit of liability or failure to submit a notice of a **Claim**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such other insurance policy issued by **AIG**, shall not exceed the greater of (i) the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** of this policy, or (ii) the limit of liability of such other **AIG** insurance policy.

## 12. NOTICE AND AUTHORITY

Except for the giving of a notice of **Claim**, which shall be governed by the provisions of Clause 6 of these **General Terms and Conditions**, all notices required under this policy to be given by the **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the address stated in Item 9(a) of the Declarations. It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and all **Insureds** with respect to the giving of notice of a **Claim**, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

## 13. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**, which consent shall be in the sole and absolute discretion of the **Insurer**.

## 14. DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, must first be submitted to the non-binding mediation process as set forth in this Clause.

The non-binding mediation will be administered by any mediation facility to which the **Insurer** and the **Named Entity** mutually agree, in which all implicated **Insureds** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the American Arbitration Association's ("**AAA**") then-prevailing Commercial Mediation Rules. The parties shall mutually agree on the selection of a mediator. The mediator shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator shall also give due consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy. In the event that such non-binding mediation does not result in a settlement of the subject dispute or difference:

(a) either party shall have the right to commence a judicial proceeding; or

(b) either party shall have the right, with all other parties consent, to commence an arbitration proceeding with the **AAA** that will be submitted to an arbitration panel of three (3) arbitrators as follows: (i) the **Insured** shall select one (1) arbitrator; (ii) the **Insurer** shall select one (1) arbitrator; and (iii) said arbitrators shall mutually agree upon the selection of the third arbitrator. The arbitration shall be conducted in accordance with the **AAA's** then prevailing Commercial Arbitration Rules.

Notwithstanding the foregoing, no such judicial or arbitration proceeding shall be commenced until at least ninety (90) days after the date the non-binding mediation shall be deemed concluded or terminated. Each party shall share equally the expenses of the non-binding mediation.

The non-binding mediation may be commenced in New York, Atlanta, Georgia, Chicago, Illinois, Denver, Colorado or in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**. The **Named Entity** shall act on behalf of each and every **Insured** in connection with any non-binding mediation under this Clause, the selection of arbitration or judicial proceeding or the selection of mediators or arbitrators.

## 15. ACTION AGAINST INSURER

Except as provided in Clause 14 above, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against the **Insured** or the **Company** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by the **Insured** or the **Company** or their legal representatives. Bankruptcy or insolvency of the **Company** or any **Insured** or of their estates shall not relieve the **Insurer** of any of its obligations hereunder.

## 16. WORLDWIDE TERRITORY

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

## 17. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

[The balance of this page is intentionally left blank.]

© All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, PA

### PrivateEdge Plus
A capital stock company

**Directors, Officers and Private Company Liability Insurance
("D&O COVERAGE SECTION")**

**Notice**: Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this D&O Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this D&O Coverage Section.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

### 1. INSURING AGREEMENTS

With respect to Coverage A, B and D and the Defense Provisions, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **D&O Coverage Section** affords the following coverage:

### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of an **Individual Insured** of the **Company** arising from a **Claim** made against such **Individual Insured** for any **Wrongful Act** of such **Individual Insured**, except when and to the extent that the **Company** has indemnified such **Individual Insured**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

### COVERAGE B: PRIVATE COMPANY INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of the **Company** arising from a:

(i) **Claim** made against the **Company**, or

(ii) **Claim** made against an **Individual Insured**,

for any **Wrongful Act**, but, in the case of Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

### COVERAGE C: CRISISFUND ® INSURANCE

This **D&O Coverage Section** shall pay the **Crisis Management Loss** of a **Company** solely with respect to a **Crisis Management Event** occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the **Crisis Management Fund**; provided that payment of any **Crisis Management Loss** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this **D&O Coverage Section** or at law. This Coverage C shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the **Claim** being first made.

### COVERAGE D: COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

This **D&O Coverage Section** shall pay the **Costs of Investigation** of the **Company** arising from a **Company Shareholder Derivative Investigation** in response to a **Derivative Demand**, up to the amount set forth in Item 7(d) of the Declarations. Payment of **Costs of Investigation** to a **Company** shall be made in accordance with and subject to Clause 8 of this **D&O Coverage Section**.

D&O COVERAGE SECTION
© All rights reserved.

**DEFENSE PROVISIONS**

The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **D&O Coverage Section** in accordance with and subject to Clause 7 of this **D&O Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Securities Claim** shall be made in accordance with Clause 9 of this **D&O Coverage Section**.

With respect to Coverage D above, it shall be the duty of the **Company** and not the duty of the **Insurer** to conduct, investigate and evaluate any **Company Shareholder Derivative Investigation** against its own **Executives**; provided, however, that the **Insurer** shall be entitled to effectively associate in the investigation and evaluation of, and the negotiation of any settlement of, any such **Company Shareholder Derivative Investigation**.

2. **DEFINITIONS**

    (a) **"Affiliate"** means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

    (b) **"Claim"** means:

        (i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

        (ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

            (1) service of a complaint or similar pleading;

            (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

            (3) receipt or filing of a notice of charges; or

        (iii) a civil, criminal, administrative or regulatory investigation of an **Individual Insured**:

            (1) once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition 2(b)(ii) may be commenced; or

            (2) in the case of an investigation by the Securities Exchange Commission ("**SEC**") or a similar state or foreign government authority, after:

                (a) the service of a subpoena upon such **Individual Insured**; or

                (b) the **Individual Insured** is identified in a written "Wells" or other notice from the **SEC** or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Individual Insured**.

    The term "**Claim**" shall also include any **Securities Claim** and any **Derivative Demand**.

    (c) **"Cleanup Costs"** means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

    (d) **"Company Shareholder Derivative Investigation"** means the investigation by the **Company** or, on behalf of the **Company** by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), as to whether or not the **Company** should bring the civil proceeding demanded in a **Derivative Demand**.

D&O COVERAGE SECTION
&#934; All rights reserved.

(e) **"Costs of Investigation"** means the reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** (including but not limited to attorney's fees and expert's fees but not including any settlement, judgment or damages and not including any compensation or fees of any **Individual Insured**) incurred by the **Company** or its board of directors (or any equivalent management body), or any committee of the board of directors (or any equivalent management body), solely in connection with a **Company Shareholder Derivative Investigation**.

(f) **"Crisis Management Event"** means **Crisis Management Event**, as that term is defined in Appendix D attached to this policy.

(g) **"Crisis Management Fund"** means the dollar amount set forth in Item 7(b) of the Declarations.

(h) **"Crisis Management Loss"** means **Crisis Management Loss**, as that term is defined in Appendix D attached to this policy.

(i) **"Crisis Management Services"** means **Crisis Management Services**, as that term is defined in Appendix D attached to this policy.

(j) **"D&O Punitive Damages Sublimit of Liability"** means the **D&O Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(k) **"Defense Costs"** means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(l) **"Derivative Demand"** means a written demand by shareholders upon the board of directors (or equivalent management body) of a **Company** requesting that it file, on behalf of the **Company**, a civil proceeding in a court of law against any **Executive** of the **Company** for a **Wrongful Act** of such **Executive** in order to obtain relief from damages arising out of such **Wrongful Acts**.

(m) **"Employee"** means any past, present or future employee, other than an **Executive** of a **Company**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(n) **"Executive"** means:

  (i) any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

  (ii) any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (n)(i); or

  (iii) any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity.**

(o) **"Financial Insolvency"** means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company;** (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

D&O COVERAGE SECTION
© All rights reserved.

(p) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(q) **"Foreign Policy"** means the **Insurer's** or any other company of AIG Property Casualty Inc.'s **("AIG")** standard executive managerial liability policy (including all mandatory endorsements, if any) approved by **AIG** to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this **D&O Coverage Section**. If more than one such policy exists, then **"Foreign Policy"** means the standard basic policy form typically offered for sale in that **Foreign Jurisdiction** for comparable risks by the **Insurer** or any other company of **AIG**. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

(r) **"Indemnifiable Loss"** means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(s) **"Individual Insured "** means any:

    (i) **Executive** of a **Company**;

    (ii) **Employee** of a **Company**; or

    (iii) **Outside Entity Executive**.

(t) **"Insured "** means:

    (i) an **Individual Insured** ; or

    (ii) a **Company**.

(u) **"Loss"** means damages, judgments, settlements, pre-judgment and post-judgment interest, **Crisis Management Loss** and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; or (iv) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (u)(i) through (u)(iv) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **D&O Coverage Section**, including, but not limited to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, punitive, exemplary and multiple damages. As more fully set forth in Clause 5. "LIMIT OF LIABILITY" of this **D&O Coverage Section**, coverage under this **D&O Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **D&O Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(v) **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

(w) **"Outside Entity"** means:

    (i) any not-for-profit organization; or

    (ii) any other corporation, partnership, joint venture or other organization listed as an **"Outside Entity"** in an endorsement to this **D&O Coverage Section**.

(x) **"Outside Entity Executive"** means any: (i) **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**; or (ii) any other person listed as an **Outside Entity Executive** in an endorsement to this **D&O Coverage Section**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **D&O Coverage Section** shall abide by the

D&O COVERAGE SECTION
© All rights reserved.

determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **D&O Coverage Section** shall apply as if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(y) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(z) **"Securities Claim"** means a **Claim** made against any **Insured**:

    (i) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

        (1) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**; or

        (2) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

    (ii) brought derivatively on the behalf of a **Company** by a security holder of such **Company**.

(aa) **"Shared Punitive Damages Sublimit of Liability"** means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(bb) **"Third Party Violation"** means any actual or alleged harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise) or unlawful discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability), or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**.

(cc) **"Wrongful Act"** means:

    (i) with respect to any **Executive** or **Employee** of a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such, or any matter claimed against such **Executive** or **Employee** of a **Company** solely by reason of his or her status as an **Executive** or **Employee** of a **Company**;

    (ii) with respect to a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company**; or

    (iii) with respect to service on an **Outside Entity**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Outside Entity Executive** in his or her capacity as such.

## 3. WORLDWIDE EXTENSION

For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; provided however, that this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre-authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this **D&O Coverage Section**. This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

D&O COVERAGE SECTION
© All rights reserved.

All premiums, limits, retentions, **Loss** and other amounts under this **D&O Coverage Section** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this **D&O Coverage Section** (subject to the terms, conditions and limitations of this **D&O Coverage Section**) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

4. **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to: (i) the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law if any final adjudication establishes that such Section 16(b) violation occurred; or (ii) the payment to any **Insured** of any remuneration without the previous approval of the stockholders of the **Company**, if any final adjudication establishes such payment was illegal;

(c) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal, deliberate fraudulent or dishonest act or willful violation of statute, rule or law was committed;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **D&O Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act(s)** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if any **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **D&O Coverage Section**.

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(h) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, the **Company**, or any **Executive** of the **Outside Entity** or the **Company**; provided, however, this exclusion shall not apply to:

(i) any **Claim** brought by an **Executive** of an **Outside Entity** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this **D&O Coverage Section**;

(ii) in any bankruptcy proceeding by or against an **Outside Entity**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Outside Entity**;

95727 (9/07) 6

D&O COVERAGE SECTION
♦ All rights reserved.

(iii) any **Claim** brought by any past **Executive** of an **Outside Entity** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Outside Entity** for at least four (4) years prior to such **Claim** being first made against any person; or

(iv) any **Claim** brought by an **Executive** of an **Outside Entity** formed and operating in a **Foreign Jurisdiction** against any **Outside Entity Executive** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(i) which is brought by or on behalf of a **Company** or any **Individual Insured**, other than an **Employee** of a **Company**; or which is brought by any security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

(i) any **Claim** brought by an **Individual Insured** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** which is covered by this policy;

(ii) in any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such  **Company**;

(iii) any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least four (4) years prior to such **Claim** being first made against any person; or

(iv) any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Company** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(j) alleging, arising out of, based upon or attributable to any public offering of securities by a **Company**, an **Outside Entity** or an **Affiliate** or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, this exclusion will not apply to:

(i) any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; provided, however, the **Named Entity** shall give the **Insurer** written notice of any public offering exempted pursuant to Section 3(b), together with full particulars and as soon as practicable, but not later than thirty (30) days after the effective date of the public offering;

(ii) any public offering of securities (other than a public offering described in subparagraph 4(j)(i) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within thirty (30) days prior to the effective time of such public offering: (1) the **Named Entity** shall give the **Insurer** written notice of such public offering together with full particulars and underwriting information required thereto; and (2) the **Named Entity** accepts such terms, conditions and additional premium required by the **Insurer** for such coverage. Such coverage is also subject to the **Named Entity** paying when due any such additional premium. In the event the **Company** gives written notice with full particulars and underwriting information pursuant to subpart 4(j)(ii)(1) above, then the **Insurer** must offer a quote for coverage under this paragraph; or

D&O COVERAGE SECTION
© All rights reserved.

(iii) any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("**IPO**") and which occurred at any time prior to 12:01 a.m. on the date the initial public offering commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however that the coverage otherwise afforded under this subparagraph (iii) shall be deemed to be void *ab initio* effective the **IPO Effective Time**; provided further, however, that coverage shall not be deemed void *ab initio* if (1) the **Claim** is first made and reported pursuant to Clause 6(a) of the **General Terms and Conditions** prior to the **IPO Effective Time**, and (2) a public company D&O policy is not applicable to such **Claim**;

(k) alleging, arising out of, based upon or attributable to the purchase by a **Company** of securities of a "**Publicly Traded Entity**" in a transaction which resulted, or would result, in such entity becoming an **Affiliate** or a **Subsidiary** of a **Company**; provided, however, this exclusion shall not apply in the event that within thirty (30) days prior to it becoming an **Affiliate** or **Subsidiary**, the **Named Entity** gives written notice of the transaction to the **Insurer** together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this **D&O Coverage Section** required by the **Insurer** relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to the transaction. An entity is a **Publicly Traded Entity** if any securities of such entity have previously been subject to a public offering;

(l) for bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Securities Claims**;

(m) for emotional distress or mental anguish, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any **Securities Claim**;

(n) for: (i) any actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to:

(1) **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**; or

(2) **Loss** in connection with a **Securities Claim**, other than **Loss** constituting **Clean-up Costs**;

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law;

(p) alleging, arising out of, based upon or attributable to the ownership, management, maintenance or control by the **Company** of any captive insurance company or entity, including, but not limited, to any **Claim** alleging the insolvency or bankruptcy of the **Named Entity** as a result of such ownership, operation, management or control;

(q) alleging, arising out of, based upon, or attributable to the employment of any individual or any employment practice, including, but not limited to, wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim;

(r) alleging, arising out of, based upon, or attributable to a **Third Party Violation**; provided, however, this exclusion shall not apply to a **Securities Claim**;

(s) alleging, arising out of, based upon, or attributable to:

(i) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign governmental or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated;

---

95727 (9/07)                                    8

D&O COVERAGE SECTION
◊ All rights reserved.

(ii) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, members, principal shareholders, owners or employees, or affiliates (as that term is defined in the Securities Exchange Act of 1934, including any of their officers, directors, agents, owners, partners, representatives, principal shareholders or employees) of any customers of the **Company** or any members of their family or any entity with which they are affiliated; or

(iii) political contributions, whether domestic or foreign; or

(t) with respect to Coverage B(i) only:

(i) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(ii) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(iii) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the **Company** or any other **Insured** under any express contract or agreement; provided, however, this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement; or

(iv) seeking fines or penalties or non-monetary relief against the **Company**; provided, however, that this exclusion shall not apply to any **Securities Claim**.

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 4(d), 4(e), 4(h), 4(i) and 4(t): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 5. LIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

### CRISISFUND® INSURANCE

The maximum limit of the **Insurer's** liability for all **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(b) of the Declarations as the **Crisis Management Fund**. This **Crisis Management Fund** shall be the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Crisis Management Loss**, regardless of the number of **Crisis Management Events** occurring during the **Policy Period**; provided, however, the **Crisis Management Fund** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

### COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

The maximum limit of the **Insurer's** liability for **Costs of Investigation** arising from all **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(d) of the Declarations (the "**Costs of Investigation Sublimit of Liability**"). The **Costs of Investigation Sublimit of Liability** is the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Costs of Investigation** regardless of the number of such **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), or the number of **Executives** subject to such **Company Shareholder Derivative Investigations**; provided, however, that the **Costs of Investigation Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

D&O COVERAGE SECTION
© All rights reserved.

**PUNITIVE DAMAGES SUBLIMIT OF LIABILITY**

If Item 7(c) of the Declarations indicates that the **D&O Punitive Damages Sublimit of Liability** was elected, then the **D&O Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **D&O Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **D&O Coverage Section** and the **EPL Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **D&O Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **D&O Coverage Section**. The **D&O Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

6. **RETENTION CLAUSE**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **D&O Coverage Section**, such Retention amount to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act(s)**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

No Retention amount is applicable to **Crisis Management Loss** or **Non-Indemnifiable Loss**.

7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 7; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** have been exhausted.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

D&O COVERAGE SECTION
© All rights reserved.

The **Insurer** shall have the right to fully and effectively associate with each and every **Insured** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Insured** agrees to provide such information as the **Insurer** may reasonably require and to give the **Insurer** full cooperation, including:

(a) cooperating with and helping the **Insurer**:

    (i) in making settlements, subject to subparagraph 7(b) below;

    (ii) in enforcing any legal rights the **Insured** may have against anyone who may be liable to the **Insured**;

    (iii) by attending depositions, hearings and trials; and

    (iv) by securing and giving evidence, and obtaining the attendance of witnesses; and

(b) taking such actions which, in such **Insured's** judgment, are deemed necessary and practicable to prevent or limit **Loss** arising from any **Wrongful Act**.

Additionally, the **Insured** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. If the **Insured** admits or assumes any liability in connection with any **Claim** without the consent of the **Insurer**, then the **Insurer** shall not have any obligation to pay **Loss** with respect to such **Claim**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this **D&O Coverage Section**. The **Insurer** shall not unreasonably withhold any consent required under this **D&O Coverage Section**, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 7, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **D&O Coverage Section**. In addition, the **Insured** shall not take any action, without the **Insurer's** written consent, which prejudices the **Insurer's** rights under this **D&O Coverage Section**.

This Clause 7 shall not be applicable to **Crisis Management Loss**.

## 8. COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND COVERAGE PROVISION

It is understood and agreed that the **Company** shall be entitled to payment under Coverage D of this **D&O Coverage Section** for reimbursement of its covered **Costs of Investigation** ninety (90) days after: (i) the **Company** has made its final decision not to bring a civil proceeding in a court of law against any of its **Executives**, and (ii) such decision has been communicated to the shareholders who made the **Derivative Demand** upon the **Company**. However, such payment shall be subject to an undertaking by the **Company**, in a form acceptable to the **Insurer**, that the **Company** shall return to the **Insurer** such payment in the event any **Company** or any shareholder of the **Company** brings a **Claim** alleging, arising out of, based upon or attributable to any **Wrongful Acts** which were the subject of the **Derivative Demand**.

Nothing in this **D&O Coverage Section**, including Coverage D, shall be construed to afford coverage under this **D&O Coverage Section** for any **Claim** brought by the **Company** against one or more of its own **Executives**, other than **Costs of Investigation** incurred in a covered **Company Shareholder Derivative Investigation**. Payment of any **Costs of Investigation** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law.

## 9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS

This Clause 9 applies only to **Securities Claims**.

Affixed as Appendix A hereto and made a part of this **D&O Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 7. of this **D&O Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Securities Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

95727 (9/07)               11

D&O COVERAGE SECTION
© All rights reserved.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Securities Claim** is brought. In the event a **Securities Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Securities Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Securities Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

## 10. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this **D&O Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **D&O Coverage Section** shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **D&O Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

## 11. ORDER OF PAYMENTS

In the event of **Loss** arising from any **Claim** for which payment is due under the provisions of this **D&O Coverage Section** but which **Loss**, in the aggregate, exceeds the remaining available **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section**, then the **Insurer** shall:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then with respect to whatever remaining amount of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** is available after payment of such **Loss**,

(b) then pay such **Loss** for which coverage is provided under Coverage B(ii) of this **D&O Coverage Section**, and

(c) then pay such **Loss** for which coverage is provided under Coverage B(i), C or D of this **D&O Coverage Section**.

In the event of **Loss** arising from a **Claim** for which payment is due under the provisions of this **D&O Coverage Section** (including those circumstances described in the first paragraph of this Clause 11), the **Insurer** shall at the written request of the **Named Entity**:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then

(b) either pay or hold payment for such **Loss** for which coverage is provided under Coverage B, C or D of this **D&O Coverage Section**.

D&O COVERAGE SECTION
© All rights reserved.

In the event that the **Insurer** withholds payment under Coverage B, C or D of this **D&O Coverage Section** pursuant to the above request, then the **Insurer** shall at any time in the future, at the request of the **Named Entity**, release such **Loss** payment to the **Company**, or make such **Loss** payment directly to the **Individual Insured** in the event of covered **Loss** under any **Claim** covered under this **D&O Coverage Section** pursuant to Coverage A of this **D&O Coverage Section**.

The **Financial Insolvency** of any **Company** or any **Individual Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this **D&O Coverage Section** pursuant to this Clause 11.

13

D&O COVERAGE SECTION
℗ All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, PA

A capital stock company

## PrivateEdge Plus

### Employment Practices Liability Insurance ("EPL COVERAGE SECTION")

**Notice**: Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this EPL Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this EPL Coverage Section.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

    With respect to the Insuring Agreement and the Defense Provisions of this Clause 1, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **EPL Coverage Section** affords the following coverage:

    This **EPL Coverage Section** shall pay the **Loss** of an **Insured** arising from a **Claim** first made against such **Insured** for any **Wrongful Act**. The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

    **DEFENSE PROVISIONS**

    The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **EPL Coverage Section** in accordance with Clause 6 of this **EPL Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Designated Employment Practices Claim** shall be made in accordance with Clause 7 of this **EPL Coverage Section**.

2. **DEFINITIONS**

    (a) **"Claim"** means:

        (i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

        (ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

            (1) service of a complaint or similar pleading;

            (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

            (3) receipt or filing of a notice of charges; or

        (iii) an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission (**"EEOC"**), or similar state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

        However, in no event shall the term **"Claim"** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

    (b) **"Defense Costs"** means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond)

EPL COVERAGE SECTION
© All rights reserved.

resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(c)  **"Designated Employment Practices Claim"** means a **Claim**: (i) alleging discrimination or **Retaliation**; or (ii) that is certified as, or which is seeking certification as, a class action.

(d)  **"EPL Punitive Damages Sublimit of Liability"** means the **EPL Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(e)  **"Employee"** means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company**, shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(f)  **"Employment Practices Violation"** means any actual or alleged:

    (i)  wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

    (ii)  harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

    (iii)  discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

    (iv)  **Retaliation**;

    (v)  employment-related misrepresentation(s) to an **Employee** of the **Company** or applicant for employment with the **Company** or an **Outside Entity**;

    (vi)  employment-related libel, slander, humiliation, defamation or invasion of privacy;

    (vii)  wrongful failure to employ or promote;

    (viii)  wrongful deprivation of career opportunity with the **Company**, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

    (ix)  wrongful discipline;

    (x)  failure to grant tenure; or

    (xi)  with respect to any of the foregoing items (i) through (x) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of a **Company** or an **Outside Entity**, or applicants for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

(g)  **"Executive"** means:

    (i)  any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

    (ii)  any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (g)(i); or

    (iii)  any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

95728 (9/07)                                                2

© All rights reserved.

(h) **"Financial Insolvency"** means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

(i) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States of America or any of its territories or possessions.

(j) **"Indemnifiable Loss"** means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(k) **"Individual Insured "** means any:

　(i) **Executive** of a **Company**;

　(ii) **Employee** of a **Company**; or

　(iii) **Outside Entity Executive**.

(l) **"Insured "** means:

　(i) an **Individual Insureds** ; or

　(ii) a **Company**.

(m) **"Loss"** means damages (including back pay and front pay), judgments, settlements, pre-and post-judgment interest and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; (iv) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (v) any liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; (vi) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (m)(i) through (m)(vi) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **EPL Coverage Section**, including, but not limited to, Exclusion 3(a) of this **EPL Coverage Section**, punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). As more fully set forth in Clause 4. "PUNITIVE DAMAGES SUBLIMIT OF LIABILITY" of this **EPL Coverage Section**, coverage under this **EPL Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **EPL Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(n) **"Outside Entity"** means:

　(i) any not-for-profit organization; or

　(ii) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy or **EPL Coverage Section**.

(o) **"Outside Entity Executive"** means any **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **EPL Coverage Section** shall abide by the determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **EPL Coverage Section** shall apply as

EPL COVERAGE SECTION
© All rights reserved.

if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(p) **"Retaliation"** means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Company** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Company** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (iv) strikes of an **Employee** of the **Company** or an **Outside Entity**.

(q) **"Settlement Opportunity"** means an **Insurer** recommended settlement that is within the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, and that is acceptable to the claimant.

(r) **"Shared Punitive Damages Sublimit of Liability"** means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(s) **"Third Party Violation"** means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs 2(f)(ii) and 2(f)(iii) of the definition of **Employment Practices Violation**, or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers.

(t) **"Wrongful Act"** means any actual or alleged (i) **Employment Practices Violation**, or (ii) **Third Party Violation**.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the **Insured** if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act was committed;

(b) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Acts** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **EPL Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(c) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) **EEOC** (or similar state, local or foreign agency) proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act** to that alleged in such pending or prior litigation or EEOC (or similar state, local or foreign agency) proceeding or investigation;

(d) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **EPL Coverage Section**;

(e) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(f) for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to, loss of use of or destruction of any tangible property;

EPL COVERAGE SECTION
Ⓒ All rights reserved.

(g) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(h) alleging, arising out of, based upon, attributable to or in any way relating to:

    (i) the refusal, failure or inability of any **Insured** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered (as opposed to tort-based back pay or front pay damages for torts other than conversion);

    (ii) improper payroll deductions taken by any **Insured** from any **Employee** or purported **Employee**; or

    (iii) failure to provide or enforce legally required meal or rest break periods;

    provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(i) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(j) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of any **Insured** under any express contract or agreement; provided, however, this exclusion shall not apply to:

    (i) liability which would have attached in the absence of such express contract or agreement; or

    (ii) **Loss** constituting **Defense Costs**;

(k) alleging, arising out of, based upon or attributable to any **Claim** brought by a securities holder of a **Company**, an **Outside Entity** or an affiliate of the **Named Entity** in their capacity as such in the form of a shareholder class, direct or derivative action on behalf of such **Company**, **Outside Entity** or affiliate.

    For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 3(b), 3(c), and 3(d): (i) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (ii) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 4. PUNITIVE DAMAGES SUBLIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

If Item 7(c) of the Declarations indicates that the **EPL Punitive Damages Sublimit of Liability** was elected, then the **EPL Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **EPL Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **EPL Coverage Section** and the **D&O Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **EPL Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **EPL Coverage Section**. The **EPL Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.

EPL COVERAGE SECTION
© All rights reserved.

5. **RETENTION CLAUSE**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **EPL Coverage Section**, such Retention amount to be borne by the **Company** or the **Insureds** and shall remain uninsured, with regard to all: (1) **Indemnifiable Loss**; or (2) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Defense Costs** and pay any other covered **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Defense Costs** and any other **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

6. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 6; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, has been exhausted, or after an **Insured's** rejection of (or failure or refusal to accept within the time prescribed in this Clause 6, below) a **Settlement Opportunity**.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 6, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this **EPL Coverage Section** to payment of such **Loss**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this **EPL Coverage Section**. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 6, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **EPL Coverage Section**.

The **Insurer** shall have the right to effectively associate with the **Company** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. The **Company** and the **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.

EPL COVERAGE SECTION
© All rights reserved.

In the event the **Insureds** do not consent to the first **Settlement Opportunity** within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity** (or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made), then, subject to the **Policy Aggregate Limit of Liability** and **Separate Limit of Liability** or **Shared Limit of Liability**, if any, the **Insurer**'s liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (2) eighty percent (80%) of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining twenty percent (20%) of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable Retention amount stated in Item 3 of the Declarations.

7. **PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED EMPLOYMENT PRACTICES CLAIMS**

This Clause applies only to **Designated Employment Practices Claims.**

Affixed as Appendix B hereto and made a part of this **EPL Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Designated Employment Practices Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 6 of this **EPL Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Designated Employment Practices Claim**, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Designated Employment Practices Claim** is brought. In the event a **Designated Employment Practices Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Designated Employment Practices Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-**Panel Counsel Firm** of the **Insurer's** choice in the jurisdiction in which the **Designated Employment Practices Claim** is brought to function as "local counsel" on the **Designated Employment Practices Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Designated Employment Practices Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix B without the consent of the **Named Entity**.

8. **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **EPL Coverage Section** shall be void *ab initio* as to any **Insured**

95728 (9/07)                                        7

⊕ All rights reserved.

who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **EPL Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

[The balance of this page is intentionally left blank. ]

EPL COVERAGE SECTION
Ⓟ All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, PA

A capital stock company

## PrivateEdge Plus℠
### Commercial Crime Insurance
### ("CRIME COVERAGE SECTION")

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, solely with respect to this **Crime Coverage Section**, the **Insurer** agrees as follows:

### 1. INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements for which a Per Occurrence Limit of Liability is shown on the Declarations and applies to loss that the **Insured** sustains resulting directly from an **Occurrence** taking place during the Policy Period shown in the Declarations, except as provided in Condition 6(a)(xv) or 6(a)(xvi), which is **Discovered** by the **Insured** during the Policy Period shown in the Declarations or during the period of time provided in Condition 6(a)(x):

#### A. EMPLOYEE THEFT

The **Insurer** will pay for loss of or damage to **Money, Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

#### B. FORGERY OR ALTERATION

(i) The **Insurer** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders to pay a sum certain in **Money** that are:

    (1) made or drawn by or drawn upon the **Insured**; or

    (2) made or drawn by one acting as the **Insured's** agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

(ii) If the **Insured** is sued for refusing to pay any instrument covered in Insuring Agreement 1.B.(i) above, on the basis that it has been forged or altered, and the **Insured** has the **Insurer's** written consent to defend against the suit, the **Insurer** will pay for any reasonable legal expenses that the **Insured** incurs and pays in that defense. The amount that the **Insurer** will pay is in addition to the Per Occurrence Limit of Liability applicable to this Insuring Agreement.

#### C. INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES

(i) The **Insurer** will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

    (1) resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

    (2) resulting directly from disappearance or destruction.

(ii) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(iii) The **Insurer** will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

95730 (9/07)                      1

Ⓒ All rights reserved.

D.  **INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY**

   (i)  The **Insurer** will pay for loss of or damage to **Other Property**:

     (1)  inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

     (2)  inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

   (ii)  The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** or **Safe Burglary** of **Other Property**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

   (iii)  The **Insurer** will pay for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

E.  **OUTSIDE THE PREMISES**

   (i)  The **Insurer** will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

   (ii)  The **Insurer** will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

F.  **COMPUTER FRAUD**

The **Insurer** will pay for loss of or damage to **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

   (i)  to a person (other than a **Messenger**) outside those **Premises**; or

   (ii)  to a place outside those **Premises**.

G.  **FUNDS TRANSFER FRAUD**

The **Insurer** will pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

H.  **MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

The **Insurer** will pay for loss resulting directly from the **Insured's** having accepted in good faith, in exchange for merchandise, **Money** or services:

   (i)  money orders issued by any post office, express company or bank that are not paid upon presentation; or

   (ii)  **Counterfeit Money** of any country that is acquired during the regular course of business.

2.  **DEFINITIONS**

  (a)  "**Banking Premises**" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

  (b)  "**Counterfeit Money**" means an imitation of **Money** that is intended to deceive and to be taken as genuine.

  (c)  "**Custodian**" means the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

  (d)  "**Discover**", "**Discovered**" or "**Discovery**" means the time when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime**

    2

CRIME COVERAGE SECTION
© All rights reserved.

**Coverage Section** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

**"Discover"**, **"Discovered"** or **"Discovery"** also means the time when the **Insured** first receives notice of an actual or potential claim in which it is alleged that the **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Crime Coverage Section**.

(e) **"Employee"** means:

    (i) any natural person:

        (1) while in the **Insured's** service and for sixty (60) days after termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**;

        (2) who the **Insured** compensates directly by salary, wages or commissions; and

        (3) who the **Insured** has the right to direct and control while performing services for the **Insured**;

    (ii) any natural person who is furnished temporarily to the **Insured**:

        (1) to substitute for a permanent **Employee**, as defined in subparagraph 2(e)(i) above, who is on leave; or

        (2) to meet seasonal or short-term work load conditions;

    while that person is subject to the **Insured's** direction and control and is performing services for the **Insured**, excluding, however, any such person while having care and custody of property outside the **Premises**; or

    (iii) any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary **Employee** as defined in subparagraph 2(e)(ii) above;

    (iv) any natural person who is:

        (1) a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **Employee Benefit Plan**; and

        (2) the **Insured's Manager** while that person is handling **Money** and **Securities** or **Other Property** of any **Employee Benefit Plan**.

    (v) any natural person who is a former **Employee**, partner, **Member, Manager**, director or trustee retained as a consultant while performing services for the **Insured**;

    (vi) any natural person who is a guest student or intern pursuing studies or duties;

    (vii) any **Employee** of an entity merged or consolidated with the **Insured** prior to the effective date of this **Crime Coverage Section**;

    (viii) any of the **Insured's Managers**, directors, trustees or non-compensated officers while:

        (1) performing acts within the scope of the usual duties of an **Employee**; or

        (2) acting as a member of any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf; or

    (ix) any non-compensated natural person other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**.

**"Employee"** does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in this Paragraph (e).

CRIME COVERAGE SECTION
© All rights reserved.

(f) **"Employee Benefit Plan"** means any welfare or pension benefit plan shown by Endorsement attached to this policy that the **Insured** sponsors and that is subject to the Employee Retirement Income Security Act of 1974 (**"ERISA"**) and any amendments thereto.

(g) **"Forgery"** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(h) *"Fraudulent Instruction "* means:

    (i) an electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Insured**, but which was, in fact, fraudulently transmitted by someone else without the **Insured's** knowledge or consent;

    (ii) a written instruction (other than those described in Insuring Agreement 1.B.) issued by the **Insured**, which was forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent, or which purports to have been issued by the **Insured**, but was, in fact, fraudulently issued without the **Insured's** knowledge or consent; or

    (iii) an electronic, computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee** but which was, in fact, fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent.

(i) **"Funds"** means **Money** and/or **Securities** in a **Transfer Account**.

(j) **"Insured"** means the **Named Entity**.

(k) **"Manager"** means a person serving in a directorial capacity for a limited liability company.

(l) **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(m) **"Messenger"** means the **Insured**, or a relative of the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

(n) **"Money"** means:

    (i) currency, coins and bank notes in current use and having a face value; and

    (ii) travelers checks, register checks and money orders held for sale to the public.

(o) *"Occurrence"* means:

    (i) as respects Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section**:

        (1) an individual act;

        (2) the combined total of all separate acts whether or not related; or

        (3) series of acts whether or not related;

    committed by the same **Employee** acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

    (ii) as respects Insuring Agreement 1.B., "FORGERY OR ALTERATION," of this **Crime Coverage Section**:

        (1) an individual act;

        (2) the combined total of all separate acts whether or not related; or

        (3) a series of acts whether or not related;

    committed by the same person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

4

CRIME COVERAGE SECTION
⊕ All rights reserved.

(iii) as respects all other Insuring Agreements of this **Crime Coverage Section**:

    (1) an individual act or event;

    (2) the combined total of all separate acts or events whether or not related; or

    (3) a series of acts or events whether or not related;

committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).

(p) **"Other Property"** means any tangible property other than **Money** and **Securities** that has intrinsic value. **"Other Property"** does not include intangible property, including, but not limited to, computer programs, electronic data or any other property excluded under this **Crime Coverage Section**.

(q) **"Pollution"** means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, soot, mold, spores, fungi, germs, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(r) **"Premises"** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

(s) **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has:

    (i) caused or threatened to cause that person bodily harm; or

    (ii) committed an obviously unlawful act witnessed by that person.

(t) **"Safe Burglary"** means the unlawful taking of:

    (i) property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

    (ii) a safe or vault from inside the **Premises**.

(u) **"Securities"** means negotiable and nonnegotiable instruments or contracts representing either **Money** or property and includes:

    (i) chips issued by the **Insured**, tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    (ii) evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**;

but does not include **Money**.

(v) **"Theft"** means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**. Solely with respect to Insuring Agreement 1.A., **Theft** shall also mean forgery.

(w) **"Transfer Account"** means an account maintained by the **Insured** at a financial institution from which the **Insured** can initiate the transfer, payment or delivery of **Funds**:

    (i) by means of electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

    (ii) by means of written instructions (other than those described in Insuring Agreement 1.B.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

(x) **"Watchperson"** means any person the **Insured** retains specifically to have care and custody of property inside the **Premises** and who has no other duties.

    5

CRIME COVERAGE SECTION
© All rights reserved.

3. **EXCLUSIONS**

This **Crime Coverage Section** does not apply to:

(a) Acts Committed By The Insured, The Insured's Partners Or The Insured's Members

Loss resulting from **Theft** or any other dishonest act committed by:

(i) the **Insured**; or

(ii) any of the **Insured's** partners or **Members**;

whether acting alone or in collusion with other persons.

(b) Acts Of Employees Learned Of By The Insured Prior To The Policy Period

Loss caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this **Crime Coverage Section** and the **Insured** or any of the **Insured's** partners, **Members, Managers**, officers, directors or trustees, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the Policy Period shown in the Declarations.

(c) Acts Of Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from **Theft** or any other dishonest act committed by any of the **Insured's Employees, Managers**, directors, trustees or authorized representatives:

(i) whether acting alone or in collusion with other persons; or

(ii) while performing services for the **Insured** or otherwise; except when covered under Insuring Agreement 1.A. of this **Crime Coverage Section**.

(d) Confidential Information

Loss resulting from:

(i) the unauthorized disclosure of the **Insured's** confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

(ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Insured** including, but not limited to, financial information, personal information, credit card information, identification information or similar non-public information.

(e) Governmental Action

Loss resulting from seizure or destruction of property by order of governmental authority.

(f) Indirect Loss

Loss that is an indirect result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money, Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

(g) Legal Fees, Costs And Expenses

Fees, costs and expenses incurred by the **Insured** which are related to any legal action, except when covered under Insuring Agreement 1.B.

(h) Nuclear Hazard

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

6                                   CRIME COVERAGE SECTION
Ⓒ All rights reserved.

(i) Pollution

Loss or damage caused by or resulting from **Pollution**.

(j) War and Military Action

Loss or damage resulting from:

(i) war, including undeclared or civil war;

(ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(k) Automatic Teller Machines:

Loss of **Money** and **Securities** contained in any automatic teller machine ("**ATM**") or while being transported to or from any **ATM**. Such loss is excluded regardless of the cause, event, act, omission or failure which contributes to the loss, including, but not limited to, (i) any dishonesty, theft, disappearance, destruction, forgery, alternation, robbery or computer fraud by any person (whether or not an **Employee**) acting alone or in collusion with other persons, or (ii) any actual or alleged failure, malfunction or inadequacy of the **ATM**.

In all events, coverage under this **Crime Coverage Section** does not apply to the loss of or damage to any **ATM**.

Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section** does not apply to:

(a) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

However, where the **Insured** establishes wholly apart from such computations that the **Insured** has sustained a loss, then the **Insured** may offer the **Insured's** inventory records and actual physical count of inventory in support of the amount of loss claimed.

(b) Trading

Loss resulting directly or indirectly from trading, whether in the **Insured's** name or in a genuine or fictitious account.

(c) Warehouse Receipts

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

Insuring Agreements 1.C., "INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES," 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES," of this **Crime Coverage Section** do not apply to:

(a) Accounting Or Arithmetical Errors Or Omissions

Loss resulting from accounting or arithmetical errors or omissions.

(b) Exchanges Or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

CRIME COVERAGE SECTION
© All rights reserved.

(c) Fire

Loss resulting from fire, however caused, except:

(i)  loss from damage to a safe or vault; and

(ii) loss of or damage to **Money** and **Securities.**

(d) Money Operated Devices

Loss of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

(e) Motor Vehicles Or Equipment And Accessories

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

(f) Transfer Or Surrender Of Property

Loss of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:

(i)  on the basis of unauthorized instructions;

(ii) as a result of a threat to do bodily harm to any person;

(iii) as a result of a threat to do damage to any property;

(iv) as a result of a threat to introduce a denial of service attack into the **Insured's** computer system;

(v) as a result of a threat to introduce a virus or other malicious instruction into the **Insured's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Insured's** computer system;

(vi) as a result of a threat to contaminate, pollute or render substandard the **Insured's** products or goods; or

(vii) as a result of a threat to disseminate, divulge or utilize:

(a)  the **Insured's** confidential information; or

(b)  weaknesses in the source code within the **Insured's** computer system.

Provided, however, this Exclusion does not apply under Insuring Agreement 1.E. of this **Crime Coverage Section** to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Insured**:

(1)  had no knowledge of any threat at the time the conveyance began; or

(2)  had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

(g) Vandalism

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

(h) Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from the **Insured**, or anyone acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

Insuring Agreement 1.F., "COMPUTER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Credit Card Transactions

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

95730 (9/07)                                           8

© All rights reserved.

(b) Computer losses due to:

    (i) loss of computer time or use;

    (ii) unintentional errors or omissions; or

    (iii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

(c) Inventory Shortages

    Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

    (i) an inventory computation; or

    (ii) a profit and loss computation.

Insuring Agreement 1.G., "FUNDS TRANSFER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Computer Fraud

    Loss resulting from the use of any computer to fraudulently cause a transfer of **Other Property**.

(b) Loss due to:

    (i) unintentional errors or omissions; or

    (ii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

## 4. PER OCCURRENCE LIMIT OF LIABILITY

The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** is the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage of this **Crime Coverage Section**, the most the **Insurer** will pay for such loss shall not exceed the largest Per Occurrence Limit of Liability available under any one of those Insuring Agreements or Coverages.

## 5. DEDUCTIBLE

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the applicable Deductible Amount shown in Item 5. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the applicable Per Occurrence Limit of Liability.

## 6. CONDITIONS

(a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION:

    (i) ADDITIONAL PREMISES OR EMPLOYEES

    If, while this **Crime Coverage Section** is in force, the **Insured** establishes any additional **Premises** or hire additional **Employees**, other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this **Crime Coverage Section**. Notice to the **Insurer** of an increase in the number of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

    (ii) CANCELLATION OF COVERAGE SECTION

        (1) The **Named Entity** shown in the Declarations may cancel this **Crime Coverage Section** by mailing or delivering to the **Insurer** advance written notice of cancellation.

        (2) The **Insurer** may cancel this **Crime Coverage Section** by mailing or delivering to the **Named Entity** written notice of cancellation at least:

CRIME COVERAGE SECTION
© All rights reserved.

(a) ten (10) days before the effective date of cancellation if the **Insurer** cancels for nonpayment of premium; or

(b) sixty (60) days before the effective date of cancellation if the **Insurer** cancels for any other reason.

(3) The **Insurer** will mail or deliver the **Insurer's** notice to the **Named Entity's** last mailing address known to the **Insurer.**

(4) Notice of cancellation of this **Crime Coverage Section** will state the effective date of cancellation. The Policy Period applicable to this **Crime Coverage Section** will end on that date.

(5) If this **Crime Coverage Section** is cancelled, the **Insurer** will send the **Named Entity** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the **Named Entity** cancels, the refund may be less than pro rata. The cancellation will be effective even if the **Insurer** has not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice .

(iii) CHANGES

This **Crime Coverage Section** contains all the agreements between the **Insured** and the **Insurer** concerning the insurance afforded. The **Named Entity** shown in the Declarations is authorized to make changes in the terms of this **Crime Coverage Section** with the **Insurer's** consent. This **Crime Coverage Section's** terms can be amended or waived only by endorsement issued by the **Insurer** and made a part of this **Crime Coverage Section.**

(iv) CONCEALMENT, MISREPRESENTATION OR FRAUD

This **Crime Coverage Section** is void in any case of fraud by the **Insured** as it relates to this policy at any time. This **Crime Coverage Section** is also void if the **Named Entity** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

(1) this **Crime Coverage Section;**

(2) the property covered under this **Crime Coverage Section;**

(3) the **Insured's** interest in the property covered under this **Crime Coverage Section;** or

(4) a claim under this **Crime Coverage Section.**

(v) CONSOLIDATION - MERGER OR ACQUISITION

If the **Insured** consolidates or merges with, or purchases or acquires the assets or liabilities of, another entity:

The **Insured** must give the **Insurer** written notice as soon as possible and obtain the **Insurer's** written consent to extend the coverage provided by this **Crime Coverage Section** to such consolidated or merged entity or such purchased or acquired assets or liabilities. If such consolidation, merger or purchase or acquisition of assets or liabilities increases the **Insured's** total assets by more than five percent (5%), the **Insurer** may condition the **Insurer's** consent by requiring payment of an additional premium; but for the first ninety (90) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this **Crime Coverage Section** shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

(vi) COOPERATION

The **Insured** must cooperate with the **Insurer** in all matters pertaining to this **Crime Coverage Section** as stated in its terms and conditions.

10

CRIME COVERAGE SECTION
Ⓒ All rights reserved.

(vii) DUTIES IN THE EVENT OF LOSS

(1) After the **Insured Discovers** a loss or a situation that may result in loss of or damage to **Money, Securities** or **Other Property** the **Insured** must:

(a) Notify the **Insurer** as soon as possible, but no later than sixty (60) days after **Discovery** of a loss or a situation that may result in loss of or damages to **Money, Securities** or **Other Property**. If the **Insured** has reason to believe that any loss (except for loss covered under Insuring Agreement 1.A. or 1.B.) involves a violation of law, the **Insured** must also notify the local law enforcement authorities.

(b) Submit to examination under oath at the **Insured's** request and give the **Insurer** a signed statement of the **Insured's** answers.

(c) Produce for the **Insured's** examination all pertinent records.

(d) Give the **Insurer** a detailed, sworn proof of loss within one hundred and twenty (120) days of the discovery of a loss or a situation that may result in loss of or damages to **Money, Securities** or **Other Property**, provided, however, that such proof of loss shall not be required solely in the event the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to Condition 6(a)(vii)(2) and such report is issued pursuant to the terms and conditions of that clause.

(e) Cooperate with the **Insurer** in the investigation and settlement of any claim.

(2) The Fidelity Research & Investigative Settlement Clause (FRISC)

The **Insured** may, with respect to such loss or situation that may result in loss or damage to **Money, Securities** or **Other Property**, elect to have an independent Investigative Specialist investigate the facts and determine the quantum of loss. The **Insured** and the **Insurer** shall jointly task and budget the Investigative Specialist regarding the scope and cost of the investigation to be performed. The final report issued by the Investigative Specialist will be definitive as respects the facts and the quantum of loss and shall be provided to both the **Insured** and the **Insurer**. After a joint review of the investigative report, if the **Insured** and the **Insurer** cannot agree upon the settlement of loss, then the **Insurer**, at the **Insured's** request, shall submit the dispute to arbitration, pursuant to the provisions of Clause 14. "DISPUTE RESOLUTION PROCESS" of the **General Terms and Conditions**. The **Insured** shall select an Investigative Specialist from the list of Investigative Specialists affixed as Appendix E and made part of this **Crime Coverage Section** located in the same jurisdiction in which the loss or situation that may result in loss or damage to **Money, Securities** or **Other Property** occurred. In the event such loss or situation that may result in loss or damage to **Money, Securities** or **Other Property** occurred in a jurisdiction not included on the list, the **Insured** shall select an Investigative Specialist in the listed jurisdiction which is the nearest geographic jurisdiction to the jurisdiction in which the loss or situation occurred or where the corporate headquarters of the **Insured** is located. No changes shall be made during the Policy Period to the list of Investigative Specialists attached as Appendix E unless the amendments are at the **Insured's** request.

The **Insured** shall notify the **Insurer** in writing of the above election to have an independent Investigative Specialist investigate the facts and determine the quantum of loss within thirty (30) days from the date on which the **Insured** first notifies the **Insurer** pursuant to Condition 6(a)(vii)(1). Notwithstanding subparagraph (iii) of the Exclusion entitled "Indirect Loss", all fees, costs and expenses of the investigation, including any fee charged by the Investigative Specialist, shall be paid as follows: fifty percent (50%) of such fees, costs and expenses shall be paid by the **Insured** and fifty percent (50%) shall be paid out of the applicable Per Occurrence Limit of Liability specified in Item 5 of the Declarations. No Deductible Amount shall apply to the fees, costs and expenses of the independent investigation, including any fee charged by the Investigative Specialist.

11

CRIME COVERAGE SECTION
◊ All rights reserved.

In addition, whether or not the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to the above terms and conditions, upon the Insurer's request, the **Insured** shall submit to examination by the **Insurer**, subscribe the same, under oath if required, give the **Insurer** a signed statement of the **Insured's** answers, and produce for the **Insurer's** examination all pertinent records, all at such reasonable times and places as the **Insurer** shall designate, and shall cooperate with the **Insurer** in all matters pertaining to loss or claims with respect thereto.

(viii) EMPLOYMENT BENEFIT PLAN

    (1) The **Employee Benefit Plans** shown by Endorsement attached to this **Crime Coverage Section** (hereafter referred to as **"Plan"**) are included as **Insureds** under Insuring Agreement 1.A.

    (2) If any **Plan** is **insured** jointly with any other entity under this policy, the **Insured** or the Plan Administrator must select a Per Occurrence Limit of Liability for Insuring Agreement 1.A. that is sufficient to provide a Per Occurrence Limit of Liability for each **Plan** that is at least equal to that required if each **Plan** were separately insured.

    (3) With respect to loss sustained or **Discovered** by any such **Plan**, Insuring Agreement 1.A. is replaced by the following:

    The **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

    (4) If the **Named Entity** is an entity other than a **Plan**, any payment the Insurer makes for loss sustained by any **Plan** will be made to the **Plan** sustaining the loss.

    (5) If two or more **Plans** are **insured** under this **Crime Coverage Section**, any payment the **Insurer** makes for loss:

      (a) sustained by two or more **Plans**; or

      (b) of commingled **Money**, **Securities** or **Other Property** of two or more **Plans**;

    resulting directly from an **Occurrence** will be made to each **Plan** sustaining loss by prorating the total applicable Per Occurrence Limit of Liability of all **Plans** based upon the proportion that the amount of loss for each **Plan** bears to the total amount of loss for all **Plans** sustaining loss.

    (6) The Deductible Amount applicable to Insuring Agreement 1.A. does not apply to loss sustained by any **Plan**.

(ix) EXAMINATION OF THE INSURED'S BOOKS AND RECORDS

The **Insurer** may examine and audit the **Insured's** books and records as they relate to this **Crime Coverage Section** at any time during the Policy Period and up to three (3) years afterward.

(x) EXTENDED PERIOD TO DISCOVER LOSS

The **Insurer** will pay for loss that the **Insured** sustained prior to the effective date of cancellation of this **Crime Coverage Section**, which is **Discovered** by the **Insured**:

    (1) No later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

    (2) No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(xi) INSPECTION AND SURVEYS

    (1) The **Insurer** has the right to:

Ⓟ All rights reserved.

(a) make inspections and surve ys at any time;

(b) give the **Insured** reports on the conditions the **Insurer** finds; and

(c) recommend changes.

(2) The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions the **Insurer** does undertake relate only to insurability and the premiums to be charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the **Insurer** does not warrant that conditions:

(A) are safe or healthful; or

(B) comply with laws, regulations, codes or standards.

(3) Conditions 6(a)(xi)(1) and 6(a)(xi)(2) above apply not only to the **Insurer**, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

(xii) JOINT INSURED

(1) If any additional **Insured** is added by Endorsement to this **Crime Coverage Section**, the **Named Entity** set forth in the Declarations will act for itself and for every other **Insured** for all purposes of this **Crime Coverage Section** (hereinafter "first **Named Entity**"). If the first **Named Entity** ceases to be covered, then the next **Named Entity** as set forth in such Endorsement will become the first **Named Entity**.

(2) If any **Insured**, or partner, **Member** or officer of that **Insured** has knowledge of any information relevant to this **Crime Coverage Section**, that knowledge is considered knowledge of every **Insured**.

(3) An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(4) If this **Crime Coverage Section** or any of its coverages is cancelled as to any **Insured**, loss sustained by that **Insured** is covered only if it is **Discovered** by the **Insured**:

(a) no later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date;

(b) no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(5) The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount the **Insurer** would pay if all such loss had been sustained by one **Insured**.

(6) Payment by the **Insurer** to the first **Named Entity** for loss sustained by any **Insured**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

(xiii) LEGAL ACTION AGAINST US

The **Insured** may not bring any legal action against the **Insurer** involving loss:

(1) unless the **Insured** has complied with all the terms of this **Crime Coverage Section** and policy;

(2) until ninety (90) days after the **Insured** has filed proof of loss with the **Insurer** or 90 days after the Investigative Specialist has submitted the report; and

(3) unless brought within two (2) years from the date the **Insured Discovered** the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

CRIME COVERAGE SECTION

◊ All rights reserved.

(xiv) LIBERALIZATION

If the **Insurer** adopts any revision that would broaden the coverage under this **Crime Coverage Section** without additional premium within forty-five (45) days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this **Crime Coverage Section**.

(xv) LOSS SUSTAINED DURING THE PRIOR INSURANCE ISSUED BY THE INSURER OR ANY AFFILIATE

(1) Loss Sustained Partly During This Policy And Partly During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place:

(a) partly during the Policy Period shown in the Declarations; and

(b) partly during any Policy Period of any prior cancelled insurance that the Insurer or any affiliate issued to the **Insured** or any predecessor in interest;

and this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss that the **Insured** sustained during this Policy Period. The **Insurer** will then settle the remaining amount of loss that the **Insured** sustained during any Policy Period of the prior insurance.

(2) Loss Sustained Entirely During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place entirely during any Policy Period of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Insured** or any predecessor in interest, the **Insurer** will pay for the loss, provided:

(a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

(b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

The **Insurer** will first settle the amount of loss that the **Insured** sustained during the most recent prior insurance. The **Insurer** will then settle any remaining amount of loss that the **Insured** sustained during any Policy Period of any other prior insurance.

(3) In settling loss subject to this Condition:

(a) The most the **Insurer** will pay for the entire loss is the highest single Per Occurrence Limit of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior insurance issued by the **Insurer**.

(b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this **Crime Coverage Section**. If no loss was sustained under this **Crime Coverage Section**, the **Insurer** will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this **Crime Coverage Section**, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

14 CRIME COVERAGE SECTION
Ⓟ All rights reserved.

Notwithstanding any of the above provisions of this Condition 6(a) (xv), no payment made for loss under either this Policy Period or any prior Policy Period shall exceed (i) the amount of the loss sustained during the respective Policy Period; and/or (ii) the Per Occurrence Limit of Liability of the respective Policy Period.

(xvi) LOSS SUSTAINED DURING PRIOR INSURANCE NOT ISSUED BY THE INSURER OR ANY AFFILIATE

(1) If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place during the Policy Period of any prior cancelled insurance that was issued to the **Insured** or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this **Crime Coverage Section**, provided:

(a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

(b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

(2) In settling loss subject to this Condition:

(a) The most the **Insurer** will pay for the entire loss is the lesser of the Limits of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior cancelled insurance.

(b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

(3) The insurance provided under this Condition is subject to the following:

(a) If loss covered under this Condition is also partially covered under Condition 6(a)(xv), the amount recoverable under this Condition is part of, not in addition to, the amount recoverable under Condition 6(a)(xv).

(b) For loss covered under this Condition that is not subject to Condition 6(a)(xvi)(3)(a) above, the amount recoverable under this Condition is part of, not in addition to, the Per Occurrence Limit of Liability applicable to the loss covered under this **Crime Coverage Section** and is limited to the lesser of the amount recoverable under:

(a) this **Crime Coverage Section** as of its effective date; or

(b) the prior cancelled insurance had it remained in effect.

(xvii) OTHER INSURANCE

If other valid and collectible insurance is available to the **Insured** for loss covered under this **Crime Coverage Section**, our obligations are limited as follows:

(1) Primary Insurance

When this policy is written as primary insurance, and:

(a) The **Insured** has other insurance subject to the same terms and conditions as this **Crime Coverage Section**, the **Insurer** will pay the **Insurer's** share of the covered loss. The **Insurer's** share is the proportion that the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations bears to the total limit of all insurance covering the same loss.

(b) The **Insured** has other insurance covering the same loss other than that described in Condition 6(a)(xvii)(1)(A) above, the Insurer will only pay for the amount of loss that exceeds:

(i) the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not; or

CRIME COVERAGE SECTION
© All rights reserved.

(ii) the Deductible Amount shown in the Declarations;

whichever is greater. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section**.

(2) Excess Insurance

(a) When this **Crime Coverage Section** is written excess over other insurance, the **Insurer** will only pay for the amount of loss that exceeds the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section** and policy.

(b) However, if loss covered under this **Crime Coverage Section** is subject to a Deductible, the **Insurer** will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

(xviii) OWNERSHIP OF PROPERTY; INTERESTS COVERED

The property covered under this **Crime Coverage Section** is limited to property:

(1) that the **Insured** owns or leases; or

(2) that the **Insured** holds for others whether or not the **Insured** is legally liable for the loss of such property.

However, this **Crime Coverage Section** is for the **Insured's** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Coverage Section** must be presented by the **Insured**.

(xix) PREMIUMS

The first **Named Entity** shown in the Declarations:

(1) is responsible for the payment of all premiums; and

(2) will be the payee for any return premiums the **Insurer** pays.

(xx) RECORDS

The **Insured** must keep records of all property covered under this **Crime Coverage Section** so the **Insurer** can verify the amount of any loss.

(xxi) RECOVERIES

(1) Any recoveries, whether effected before or after any payment under this **Crime Coverage Section**, whether made by the **Insurer** or the **Insured**, shall be applied net of the expense of such recovery:

(a) First, to the **Insured** in satisfaction of the **Insured's** covered loss in excess of the amount paid under this **Crime Coverage Section**;

(b) Second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Insured's** claim;

(c) Third, to the **Insured** in satisfaction of any Deductible Amount; and

(d) Fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Coverage Section**.

(2) Recoveries do not include any recovery:

(a) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

CRIME COVERAGE SECTION
© All rights reserved.

(b)  of original **Securities** after duplicates of them have been issued.

(xxii)  TERRITORY

This **Crime Coverage Section** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

(xxiii)  TRANSFER OF THE INSURED'S RIGHTS AND DUTIES UNDER THIS CRIME COVERAGE SECTION

(1)  The **Insured's** rights and duties under this **Crime Coverage Section** may not be transferred without the **Insurer's** written consent except in the case of death of an individual **Named Entity**.

(2)  If the **Insured** dies, the **Insured's** rights and duties will be transferred to the **Insured's** legal representative but only while acting within the scope of duties as the deceased **Insured's** legal representative. Until the **Insured's** legal representative is appointed, anyone having temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

(xxiv)  TRANSFER OF THE INSURED'S RIGHTS OF RECOVERY AGAINST OTHERS TO THE INSURER

The **Insured** must transfer to the **Insurer** all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the **Insurer** has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

(xxv)  VALUATION - SETTLEMENT

(1)  The value of any loss for purposes of coverage under this **Crime Coverage Section** shall be determined as follows:

(a)  Loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Insured's** option, pay for loss of **Money** issued by any country other than the United States of America:

(i)  at face value in the **Money** issued by that country; or

(ii)  in the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(b)  Loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at the **Insurer's** option:

(i)  pay the market value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the **Insurer** all the **Insured's** rights, title and interest in and to those **Securities**; or

(ii)  pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(1)  market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

(2)  the Per Occurrence Limit of Liability applicable to the **Securities**.

(c)  Loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

CRIME COVERAGE SECTION
© All rights reserved.

    (i)   the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

    (ii)  the amount the **Insured** actually spend that is necessary to repair or replace the lost or damaged property; or

    (iii)  the Per Occurrence Limit of Insurance applicable to the lost or damaged property.

With regard to subparagraphs (i) through (iii) above, the **Insurer** will not pay on a replacement cost basis for any loss or damage:

    (i)   until the lost or damaged property is actually repaired or replaced; and

    (ii)  unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

(2) The **Insurer** will, at the **Insured's** option, settle loss or damage to property other than **Money**:

    (a)  in the **Money** of the country in which the loss or damage occurred; or

    (b)  in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(3) Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

(b) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.A., "EMPLOYEE THEFT," OF THIS CRIME COVERAGE SECTION:

  (i)   TERMINATION AS TO ANY EMPLOYEE

Insuring Agreement 1.A. terminates as to any **Employee**:

(1) As soon as:

    (a)  the **Insured**; or

    (b)  any of the **Insured's** partners, **Members**, **Managers**, officers, directors, or trustees not in collusion with the **Employee**;

learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after becoming employed by the **Insured**; or

(2) On the date specified in a notice mailed to the first **Named Entity**. That date will be at least sixty (60) days after the date of mailing.

The **Insurer** will mail or deliver the **Insurer's** notice to the first **Named Entity's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

  (ii)  TERRITORY

The **Insurer** will pay for loss caused by any **Employee** while temporarily outside the territory specified in Condition 6(a)(xxii) for a period of not more than ninety (90) consecutive days.

(c) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.B., "FORGERY OR ALTERATION," OF THIS CRIME COVERAGE SECTION:

  (i)   DEDUCTIBLE AMOUNT

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement 1.B.

CRIME COVERAGE SECTION
© All rights reserved.

(ii) MECHANICAL SIGNATURES

The **Insurer** will treat signatures that are produced or reproduced mechanically the same as handwritten signatures.

(iii) PROOF OF LOSS

The **Insured** must include with the **Insured's** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

(iv) TERRITORY

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.B.

(d) CONDITIONS APPLICABLE TO INSURING AGREEMENTS 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES" OF THIS CRIME COVERAGE SECTION:

(i) ARMORED MOTOR VEHICLE COMPANIES

Under Insuring Agreement 1.E. of this **Crime Coverage Section**, the **Insurer** will only pay for the amount of loss the **Insured** cannot recover:

(1) under the **Insured's** contract with the armored motor vehicle company; and

(2) from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

(ii) SPECIAL LIMIT OF LIABILITY FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to:

(1) precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

(e) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.F., "COMPUTER FRAUD," OF THIS CRIME COVERAGE SECTION

(i) SPECIAL LIMIT OF INSURANCE FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

(ii) TERRITORY

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.F.

In witness whereof, the **Insurer** has caused this **Crime Coverage Section** to be executed on the Declarations.

[The balance of this page is intentionally left blank. ]

CRIME COVERAGE SECTION
℗ All rights reserved.

**APPENDIX   A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory.  To access the applicable online Panel Counsel Directory, please go to the website and click on the "Directors & Officers (Securities Claims)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Ⓒ All rights reserved.

**APPENDIX  B**
**EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory . To access the applicable online Panel Counsel Directory, please go to the website, click on the "Public and Private Companies (Employment Practices Liability)" link and then select the applicable Panel Counsel Directory, either the "4-97 Monoline/Public Companies" link or the "Private Edge" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)                    © All rights reserved.

**APPENDIX D**

**CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION**

## I. DEFINITIONS

(a) **"Crisis Management Event"** means one of the following events which, in the good faith opinion of the **Company**, did cause or is reasonably likely to cause a **Material Effect**:

1. Management Crisis:

   The death, incapacity or criminal indictment of any **Executive** of the **Company**, or any **Employee** on whom the **Company** maintains key person life insurance.

2. Employee Layoffs:

   The public announcement of layoffs of **Employees** of the Company.

3. Debt Default:

   The public announcement that the **Company** had defaulted or intends to default on its debt.

4. Bankruptcy:

   The public announcement that the **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

5. Mass Tort:

   The public announcement or accusation that a **Company** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

6. Regulatory Crisis:

   The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against a **Company**.

The descriptions in the headings of the **Crisis Management Events** are solely for convenience and form no part of the terms and conditions of coverage.

A **Crisis Management Event** shall first commence when the **Company** or any of its **Executives** shall first become aware of the event during the **Policy Period** and shall conclude at the earliest of the time when the **Crisis Management Firm** advises the **Company** that the crisis no longer exists or when the **Crisis Management Fund** has been exhausted.

(b) **"Crisis Management Firm"** means any public relations firm, crisis management firm or law firm listed below in Section III of this Appendix D. Any **"Crisis Management Firm"** may be hired by the **Company** or its **Executives** or **Employees** to perform **Crisis Management Services** without further approval by the Insurer.

(c) **"Crisis Management Loss"** means the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an Insured arising from the **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

(1) amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Company** arising from a **Crisis Management Event**; and

(2) amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by **Executives**, **Employees** or agents of the **Company** or the **Crisis Management Firm**, in connection with the **Crisis Management Event**.

(d) **"Crisis Management Services"** means those services performed by a **Crisis Management Firm** in advising the **Company** or any of its **Executives** or **Employees** on minimizing potential harm to the **Company** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring public confidence in the **Company**.

(e) **"Material Effect"** means the publication of unfavorable information regarding the **Company** which can reasonably be considered to lessen public confidence in the competence of the **Company**. Such publication must in occur in either:

(1) a daily newspaper of general circulation in the geographic area of the **Company**, or

(2) a radio or television news report on a **Company** received in the geographic area of the **Company**.

## II. EXCLUSIONS

The term **Crisis Management Event** shall not include any event relating to:

1. any pending or prior litigation as of the **Continuity Date** for the **D&O Coverage Section** indicated in Item 3 of the Declarations;

2. any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

3. the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

4. the hazardous properties of nuclear materials.

## III. PRE-APPROVED CRISIS FIRMS

For all Crisis Management Events, Crisis Management Firm(s) means any public relations firm listed in (1) - (8) below:

1. Abernathy MacGregor Group, Inc.
   501 Madison Avenue
   New York, New York 10022
   (212) 371-5999
   Contacts:  James T. MacGregor          (jtm@abmac.com)
              Rhoda Barnat                (rb@abmac.com)

2. Burson-Marsteller
   230 Park Avenue South
   New York, New York 10003-1566
   (212) 614-5236
   Contact:    Michael Claes             (Michael.Claes@bm.com)

3. Kekst and Company
   437 Madison Avenue
   New York, New York 10022
   (212) 521-4800
   Contacts:  Jim Fingeroth              (Jim-Fingeroth@kekst.com)
              Lissa Perlman              (Lissa-Perlman@kekst.com)

4. Patton Boggs, LLP
   2550 M Street, N.W.
   Washington D.C. 20037
   (202) 457-6040
   Contact:    Thomas Boggs, Esq.                    (tboggs@pattonboggs.com)

5. Reputation Partners, LLC
   105 West Adams Street, Suite 2220
   Chicago, IL 60603-6265
   (312) 222-9887
   Contacts:  Nick Kalm                              (nick@reputationpartners.com)
              Jane Devron                            (jane@reputationpartners.com)

6. Robinson Lerer & Montgomery
   1345 Avenue of the Americas, 4th Floor
   New York, New York 10105
   646-805-2000
   Contact:    Michael Gross                         (mgross@rlmnet.com)

7. Sard Verbinnen & Co.
   630 Third Avenue, 9th Floor
   New York, New York 10017
   (212) 687-8080
   Contacts:  George Sard                            (gsard@sardverb.com)
              Paul Verbinnen                         (pverbinnen@sardverb.com)

8. Sitrick And Company
   1840 Century Park East, Suite 800
   Los Angeles, CA 90067
   (310) 788-2850
   Contact:    Michael Sitrick                       (mike sitrick@sitrick.com)

**APPENDIX E**
**LIST OF INVESTIGATIVE SPECIALISTS/MEDIATORS AND ARBITRATORS**
**FOR F.R.I.S.C. List**
**(CRIME COVERAGE SECTION)**

| Names | Address | Telephone No. | Profession |
|---|---|---|---|
| **INVESTIGATIVE SPECIALISTS** | | | |
| | | | |
| **U.S.A.** | | | |
| | | | |
| Aksman & Aksman CPA | 509 Stillwells Corner Road Freehold, NJ 07728 Attention: Kenneth Aksman | (732) 462-8080 | Accountants |
| | | | |
| Charles R. Barstow, CPA | 15 Timothy Avenue San Anselmo, CA 94960 Attention: Chuck Barstow | (415) 455-0767 | Accountants |
| | | | |
| Harner Evans PLC | 7709 North 11th Avenue Phoenix, AZ 85021 Attention: Lamar Harner | (602) 395-1256 | Accountants |
| | | | |
| Kalchik, Pratt & Associates, LLC | 19710 Governors Highway Suite 12 Flossmoor, IL 60422 Attention: Donald R. Pratt,Jr. | (708) 647-0863 | Investigators |
| | | | |
| Kinsel Accountancy CPA's | 503 North Central Avenue Glendale, CA 91203 Attention: Stacy A. Kinsel | (818) 240-3300 | Accountants |
| | | | |
| Moody's Inc. | 7021 West 153rd Street Orlando Park, IL 69462 Attention: Bob Moody | (708) 535-1010 | Accountants |
| | | | |
| RGL Forensic Accountants | 300 Montgomery Street San Francisco, CA 94104 Attention: Steven Rosenthal | (800) 669-8323 | Accountants |
| Studler, Doyle & Co., LLC | 1444 Farnsworth Avenue Suite 500 Aurora, IL 60505 Attention: D.M. Studler | (630) 820-5770 | Accountants |
| | | | |

SYSLIB (01/2000)          ◊ All rights reserved.

| **CANADA** | | | |
|---|---|---|---|
| | | | |
| | | | |
| **Alberta:** | | | |
| Cunningham Lindsey | 807 Manning Road N.E., Suite 100 Calgary, Alberta T2E-7m8 Attention: Scott Stiles | (403) 269-2069 | General Adjusters |
| | | | |
| **British Columbia:** | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | Madison Centre, 1901 Rosser Ave., Suite 410 Burnaby, BC V5C-6R6 Attention: James O'Connor | (604) 742-9929 | Fidelity Adjusters |
| | | | |
| Schumka Craig & Moore | 600-1111 Melville Street Vancouver, BC V6E-3V6 Attention: Michael Parsons | (604) 681-6331 | General Adjusters |
| | | | |
| James P. Blatchford Consulting | 1311 Howe Street Suite 200 Vancouver, BC V6Z 2P3 Attention: James Blatchford | (604) 691-1777 | Accountants |
| | | | |
| **Manitoba:** | | | |
| Cunningham Lindsey | 631-B Marion Street Winnipeg, Manitoba R2J-0J9 Attention: Denis Rivard | (204) 985-1777 (Ext. 772) | General Adjusters |
| | | | |
| **Maritimes:** | | | |
| Cunningham Lindsey | Park Place Corporate Campus 238 A Brownlow Avenue, Suite 210 Dartmouth, Nova Scotia B3B-2B4 Attention: Nick MacDonald | (902) 421-1519 | General Adjusters |
| **Ontario:** | | | |
| | | | |
| | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | 3660 Hurontario Street 6th Floor Mississauga, ON L5B-3C4 Attention: Ted Baker | (905) 279-8880 Ext. 224 | Fidelity Adjusters |

SYSLIB (01/2000)          ◊ All rights reserved.

| | | | |
|---|---|---|---|
| LBC Int'l Investigative Accounting | 40 University Avenue Suite 1003 Toronto, ON M5J-1T1 Attention: Phil Turner | (416) 596-1000 | Accountants |
| | | | |
| **Quebec:** | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | 1200 Boulevard Chomedey Bureau 700 Laval, Quebec H7V-3Z3 Attention: Michel Prud'homme | (450) 688-3113 Ext. 225 | Fidelity Adjusters |
| | | | |
| LBC Int'l Investigative Accounting | 1440 St. Catherine Street West, Suite 710 Montreal, Quebec H3G-1R8 Attention: Emil Basilla | (514) 866-5431 | Accountants |
| | | | |
| **CENTRAL AND SOUTH AMERICA** | | | |
| | | | |
| Carranza, Cowheard & Associates | 3625 N.W. 82nd Avenue Building 2, Suite 306 Miami, FL. 33166 Attention: Luis O. Carranza | (305) 463-7978 | Accountants |
| | | | |
| Grant Thornton | 1101 Walnut Street Kansas City, MO 64106 Attention: Larry Redler | (816) 412-2426 | Accountants |
| | | | |
| **U.K. & EUROPE** | | | |
| | | | |
| Adjusting Services | 11 Baden Place, Crosby Row London, UK SE1 1YW Attention: David Ledger | 44 (20) 7357- 7631 | Adjusters & Accountants |
| | | | |
| LBC Int'l Investigative Accounting | Lloyds Avenue House 6 Lloyds Avenue London, UK EC3N 3AX Attention Oliver Tiemann | 44 (20) 7680-1131 | Accountants |
| | | | |
| Crawford & Company THG | Trinity Court 42 Trinity Square London, UK EC3N 4TH Attention: Suzanne Kearney, Esq. | 44 (20) 7625-4000 | Investigators |
| | | | |

SYSLIB (01/2000)          © All rights reserved.

| RGL Forensic Accountants and Consultants | 17 Devonshire Square London, UK EC2M 4SQ Attention: Anthony Levitt | 44 (20) 7247-4804 | Accountants |
|---|---|---|---|
| Grant Thornton | 1101 Walnut Street Kansas City, MO 64106 Attention: Larry Redler | (816) 412-2426 | Accountants |
| | | | |
| **MEDIATORS & ARBITRATORS** | | | |
| | | | |
| **U.S.A.** | | | |
| | | | |
| Anderson, McPharlin & Connors | 444 South Flower Street 31st Floor Los Angeles, CA 90071 Attention: David DiBiasi | (213) 236-1618 | Attorney |
| | | | |
| Beirne, Maynard & Parsons LLP | 1300 Post Oak Boulevard Suite 2500 Houston TX 77056-3000 Attention: Jeff Parsons | (713) 623-0887 | Attorney |
| | | | |
| Boult, Cummings, Connor & Berry | 414 Union Street, Suite 1600 Nashville, TN 37219 Attention: Rick Humbracht | (615) 525-2371 | Attorney |
| | | | |
| Clausen Miller P.C. | 10 South LaSalle Street Chicago, IL 60603-1098 Attention: Gil Schroeder | (312) 855-1010 | Attorney |
| | | | |
| Carlton Fields | 4000 International Place 100 S.E. Second Street Miami, FL 33131-9101 Attention: Patricia H. Thompson | (305) 539-7239 | Attorney |
| | | | |
| D'Amato & Lynch | 70 Pine Street New York, NY10270-0110 | (212) 269-0927 | Attorney |
| | Attention: Ken Sagat | | |
| John J. Petro, Esq. | 338 South High Street Columbus, OH 43125 Attention: John J. Petro | (614) 224-0531 | Attorney |

| | | | |
|---|---|---|---|
| Ropers Majewski | 515 South Flower Street<br>Los Angeles, CA 90071<br>Attention: Earnest Price | (213) 312-2024 | Attorney |
| | | | |
| Stradley, Ronan, Stevens & Young LLP | 2600 One Commerce Square<br>Philadelphia, PA 19103<br>Attention: Samuel J. Arena, Jr. | (215) 564-8093 | Attorney |
| | | | |
| Strassburger & Price | 901 Main Street<br>Dallas, TX 75202<br>Attention: Duncan Clore | (214) 651-4300 | Attorney |
| | | | |
| **CANADA** | | | |
| | | | |
| **Alberta:** | | | |
| Field LLP | 1900 First Canadian Center<br>350 7th Avenue, SW<br>Calgary, Alberta T2P 3N9<br>Attention: Ms. Jean VanderLee | (403) 260 8520 | Attorney |
| | | | |
| **British Columbia:** | | | |
| Borden Ladner Gervais LLP | 1200 Waterfront Centre<br>200 Burrand Street,<br>PO Box 49600<br>Vancouver, BC V7X 1T2<br>Attention: Ross McGowan | (604) 640-4173 | Attorney |
| | | | |
| **Ontario:** | | | |
| Bennett Jones LLP | 3400 One First Canadian Place<br>PO Box 130<br>Toronto, Ontario M5X 1A4<br>Attention: Jim Patterson | (416) 777-6250 | Attorney |
| | | | |
| Borden Ladner Gervais LLP | Scotia Plaza, 40 King Street West Toronto,<br>Ontario M5H 3Y4<br>Attention: Denise Bamborough | (416) 367-6121 | Attorney |
| | | | |
| Affleck Greene McMurtry | One First Canadian Place<br>100 King Street West,<br>Suite 840<br>Toronto, Ontario M5X 1E5 Attention: Peter Greene | (416) 360-2800 | Attorney |

 © All rights reserved.

| Quebec | | | |
|---|---|---|---|
| Borden Ladner Gervais LLP | 1000 de La Gauchetiere Street West Suite 900 Montreal, Quebec H3B 5H4 Attention: John Murphy | (514) 954-3155 | Attorney |
| Nicholl Paskell-Mede | 630 Boulevard Rene-Levesque Ouest Bureau 1700 Montreal, Quebec H3B 1S6 Attention: John Nicholl | (514) 843-3777 | Attorney |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

SYSLIB (01/2000)        © All rights reserved.

## EMPLOYMENT CRISISFUND APPENDIX

I. **DEFINITIONS**

(a) "**Crisis**" means an **Employment Practices Crisis**, **Employee Information Breach Crisis** or **Workplace Violence Crisis**, as applicable.

(b) "**Employment Practices Crisis**" means an **Allegation**, **Discovery** or **Media Report** of a **Wrongful Act** (specifically including, but not limited to, a hostile work environment), which, in the good faith opinion of the **Company's** General Counsel (or equivalent position), resulted or is reasonably likely to result, in any:

(1) civil action or compliance audit by the EEOC or any similar state agency or commission;

(2) civil or criminal action alleging sexual harassment or conduct by an executive officer;

(3) civil class action;

(4) civil action involving multiple plaintiffs; or

(5) civil action by a person alleging **Retaliation** by an **Insured** in response to such person's actions or threatened actions as a "whistleblower".

Provided, however, that the term **Crisis** shall not include any:

(1) revising or rewriting of personnel policies or procedures;

(2) sensitivity or awareness training; or

(3) accommodations made by the **Company** pursuant to the Americans With Disabilities Act.

(c) "**Employee Information Breach Crisis**" means a failure of an **Company** to prevent unauthorized access, to or use of data containing **Employee Information**, which, in the good faith opinion of the **Company**, can reasonably be expected to lessen public confidence in the competence of the **Company**.

(d) "**Workplace Violence Crisis**" means any intentional act involving the use of deadly force or the threat of deadly force with a deadly weapon which occurs on the **Company's** premises and involving at least one **Employee**.

(e) "**Crisis Loss**" means:

(1) **With Respect to an Employment Practices Crisis**:

Any of the following amounts incurred during the pendency of a **Employment Practices Crisis** for which an **Company** is legally liable:

(i) the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company**;
(ii) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and
(ii) (iii) travel costs incurred by **Executives**, employees or agents of an **Company** or of the **Crisis Firm**, arising from or in connection with the **Employment Practices Crisis**.

◎ All rights reserved.

**(2) With Respect to an Employee Information Breach Crisis**:

The reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company.**

**(3) With Respect to a Workplace Violence Crisis**:

The reasonable fees and expenses, or cost of:

(i) an independent security consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs;

(ii) an independent public relations consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs; and

(iii) onsite group counseling session(s) for **Employees** conducted by an independent consultant following a **Workplace Violence Crisis**.

(f) **"Crisis Management Services"** means:

**(1) With Respect to an Employment Practices Crisis**:

Those services performed by an **Crisis Firm** in advising the **Company** on minimizing potential harm to the **Company** arising from the **Employment Practices Crisis**; including, but not limited to, maintaining and restoring public and employee confidence in the **Company.**

**(2) With Respect to an Employee Information Breach Crisis**:

Reasonable and necessary costs and expenses incurred by an **Company** for a public relations firm, **Crisis Firm** or law firm agreed to by the **Insurer** to advise the **Company** on minimizing the harm to such **Company**, including, without limitation, maintaining and restoring public confidence in the **Company.**

(g) **"Crisis Firm"** means: means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at <u>AIG Panel Counsel Directory</u> under the "CrisisFund®" link. In the event the **Company** chooses to retain the services of an entity not listed, the **Company** must obtain the written consent of the **Insurer**, which shall not be unreasonably withheld.

(h) **"Employee Information"** means information regarding past, present of future **Employees** or applicant for employment with the **Company**, collected or stored by an **Company** for the purpose of establishing, maintaining or terminating the employment relationship

(i) **"Allegation"** means any complaint, whether written or verbal, communicated to the **Company's** human resources department by:

(1) an individual who believes that he or she was a victim of the alleged **Wrongful Act**; or

(2) such individual's direct or indirect supervisor, if: such supervisor is an **Employee** and that supervisor's conduct is not the subject matter of the alleged **Wrongful Act**.

◊ All rights reserved.

(j) **"Discovery"** means either:

    (1) an observation by any **Executive** or any human resources manager; or

    (2) an internal investigation conducted by the **Company**, at the **Company's** own expense, which concludes that there is a reasonable basis to believe that a **Wrongful Act** has occurred.

(k) **"Media Report"** means any of the following publications or reports received in the geographic area of the **Company**: (i) a daily newspaper of general circulation; (ii) a weekly, monthly or quarterly newsletter or magazine of general circulation; (iii) a newsletter or trade publication applicable to the **Company's** industry; or (iv) a radio or television newscast.

## II. <u>EXCLUSIONS</u>

The term **Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊘ All rights reserved.

### ENDORSEMENT# *2*

Product Name: *Private Edge Plus*
This endorsement, effective *12:01 AM*     *November 1, 2016*          forms a part of policy number   *25467199*
issued  to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ECONOMIC SANCTIONS ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made in full compliance with enforceable United Nations economic and trade sanctions and the trade and economic sanction laws or regulations of the European Union and the United States of America, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 002*

119679 (9/15)                    Page 1 of 1

ENDORSEMENT# *3*

Product Name: *Private Edge Plus*
This endorsement, effective     *12:01 AM     November 1, 2016*          forms a part of
policy number     *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, PA*

### FLSA AND RELATED EXCLUSIONS AMENDED
### (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), the policy is amended as follows:

1.   Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) is amended by deleting Exclusion (o) in its entirety.

2.   Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased) is amended by deleting Exclusions (g) and (h) in their entirety.

3.   In Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) and Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased), the following exclusion is added at the end thereof:

(FL-1)  for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.

It is acknowledged that **Claims** for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all **Claims** which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:

(1)   the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

(2)   improper deductions from pay taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**; or

(3)   failure to provide or enforce legally required meal or rest break periods;

Notwithstanding the foregoing, with respect to the **EPL Coverage Section**, this exclusion (FL-1) shall not apply to the extent that a **Claim** is for **Retaliation**.

Ⓟ All rights reserved.
*END 003*

97629 (3/08)                                    Page 1 of 2

**ENDORSEMENT#** *3*     (continued)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

*END 003*

97629 (3/08)                    Page 2 of 2

**ENDORSEMENT# *4***

Product Name: *Private Edge Plus*
This endorsement, effective      *12:01 AM      November 1, 2016*          forms a part of
policy number      *25467199*
issued to  *Little River Healthcare Holdings, LLC*


by      *National Union Fire Insurance Company of Pittsburgh, PA*

**NOTICE OF CLAIM**
**(REPORTING BY E-MAIL)**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.    *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of Claim Reporting under this policy, such notice may also be given in writing pursuant to the policy's other terms and conditions to the Insurer by email at the following email address: c-claim@aig.com

Your email must reference the policy number for this policy. The date of the Insurer's receipt of the emailed notice shall constitute the date of notice.

In addition to Notice of Claim Reporting via email, notice may also be given to the Insurer by mailing such notice to: AIG Property Casualty, Financial Lines Claims, P.O. Box 25947, Shawnee Mission, KS 66225 or faxing such notice to (866) 227-1750.

2.    *Definitions*: For this endorsement only, the following definitions shall apply:

(a)    "Insurer" means the "Insurer," "Underwriter" or "Company" or other name specifically ascribed in this policy as the insurance company or underwriter for this policy.

(b)    "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of loss" or other reference in the policy designated for reporting of claims, loss or occurrences or situations that may give rise or result in loss under this policy.

(c)    "Policy" means the policy, bond or other insurance product to which this endorsement is attached.

3.    This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage Section, if any, provided by this policy.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED


_____
AUTHORIZED REPRESENTATIVE


© All rights reserved.
*END 004*

99758 (8/08)                              Page 1 of 1

## ENDORSEMENT# 5

Product Name: *Private Edge Plus*
This endorsement, effective     *12:01 AM     November 1, 2016*          forms a part of
policy number     *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, PA*

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (ALL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A. alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

    (1) **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Company**, or discharged or dispersed therefrom; or

    (2) **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Company**; or

    (3) the furnishing by an **Insured** or the **Company** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

    (4) **Claims** for damage or other injury to the **Company** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**.

B. (1) which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or,

    (2) with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

**"Hazardous Properties "** include radioactive, toxic or explosive properties.

**"Nuclear Facility"** means:

    (a) any nuclear reactor;

    (b) any equipment or device designed or used for

        (1) separating the isotopes of uranium or plutonium,
        (2) processing or utilizing spent fuel, or
        (3) handling, processing or packaging wastes;

    (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material  if at any time the total amount of such material in the custody of the Insured at the

⊕ All rights reserved.
***END 005***

95737 (9/07)                              Page 1 of 2

ENDORSEMENT# *5*    (continued)

premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear Material"** means source material, special nuclear material or byproduct material.

**"Nuclear Reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**"Source Material," "Special Nuclear Material,"** and **"Byproduct Material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**"Spent Fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

**"Waste"** means any waste material (1) containing by product material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 005*

**ENDORSEMENT# 6**

Product Name: *Private Edge Plus*
This endorsement, effective    *12:01 AM     November 1, 2016*        forms a part of
policy number    *25467199*
issued to   *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**AMENDATORY ENDORSEMENT**
**TEXAS**

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS<sup>SM</sup>

This policy is amended as follows:

1. Clause 11. **OTHER INSURANCE** of the **General Terms and Conditions** is modified to the extent necessary to provide the following:

   If any other valid and collectible insurance is available to the **Insured** for a **Loss** covered by this policy, the **Insurer** shall not be liable under this policy for a greater proportion of such **Loss** than the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance against such **Loss**.

2. If the **KRE Coverage Section** is purchased, Clause 7. **GENERAL CONDITIONS** of the **KRE Coverages Section** is modified to add the following to the end thereof:

   CLAIMS HANDLING:

   (a) Within 15 days after the **Insurer** receives written notice of claim, the **Insurer** will:

      (i) Acknowledge receipt of the claim. If the **Insurer** does not acknowledge receipt of the claim in writing, the **Insurer** will keep a record of the date, method and content of the acknowledgment;

      (ii) Begin any investigation of the claim; and

      (iii) Request a signed, sworn proof of loss, specify the information the **Insured Person(s)** must provide and supply the **Named Entity** with the necessary forms. The **Insurer** may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   (b) The **Insurer** will notify the **Insured Person(s)** in writing as to whether:

      (i) The claim or part of the claim will be paid;

      (ii) The claim or part of the claim has been denied, and inform the **Insured Persons** of the reasons for denial;

      (iii) More information is necessary; or

      (iv) The **Insurer** needs additional time to reach a decision. If the **Insurer** needs additional time, the **Insurer** will inform you of the reasons for such need.

   (c) The Insurer will provide notification, as described in 2(a) through 2 (b) above, within 15 business days after the Insurer receives the signed, sworn proof of loss and all information the Insurer requested. If the Insurer has notified you that the Insurer

◊ All rights reserved.
*END 006*

95800 (9/07)                     Page 1 of 2

<u>**ENDORSEMENT#**</u>  *6*     (continued)

needs additional time to reach a decision, the Insurer must then either approve or deny the claim within 45 days of such notice.

(d)  The Insurer will pay for covered loss or damage within 5 business days after the Insurer has notified the Insured Person(s) that payment of the claim or part of the claim will be made on the amount of loss.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◎ All rights reserved.
*END 006*

95800 (9/07)                      Page 2 of 2

**ENDORSEMENT#** *7*

Product Name: *Private Edge Plus*
This endorsement, effective      *12:01 AM      November 1, 2016*      forms a part of
policy number      *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by      *National Union Fire Insurance Company of Pittsburgh, PA*

**TEXAS AMENDATORY ENDORSEMENT**
**CANCELLATION AND NONRENEWAL**

Wherever used in this endorsement: 1)"Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Organization, Named Sponsor, or Named Insured stated in the declarations page; and 3) "Liability insurance" means the following types of insurance: general liability, professional liability other than medical professional liability, commercial multi-peril coverage, and any other types of lines of liability insurance designated by the State Board of Insurance.

It is hereby agreed that the cancellation provision of this policy is deleted in its entirety and replaced by the following:

**CANCELLATION AND NONRENEWAL**

A. Cancellation

1.  This policy may be canceled by the Insured by surrender thereof to the Insurer or any of its authorized agents or by mailing to the Insurer written notice stating when thereafter the cancellation shall be effective.

2.  Except as provided by subsection A.3. below, the Insurer may not cancel this policy if it is:

    a)  a policy of liability insurance that is a renewal or continuation policy; or

    b)  a policy of liability insurance that is in its initial policy period after the 60th day following the date on which the policy was issued.

3.  The Insurer may cancel this policy at any time during the term of the policy for the following reasons:

    a)  fraud in obtaining coverage;

    b)  failure to pay premiums when due;

    c)  an increase in hazard within the control of the Insured or Other Insured(s) which would produce an increase in rate;

    d)  loss of the Insurer's reinsurance covering all or part of the risk covered by the policy; or

© All rights reserved.
*END 007*

74802 (7/11)                    Page 1 of 3

<u>ENDORSEMENT#</u> *7*   (continued)

    e) the Insurer being placed in supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver.

4.    The Insurer shall deliver or mail to the Insured first named in the Declarations written notice of cancellation at the address shown on the policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

5.    The Insurer may not cancel this policy based solely on the fact that the Insured is an elected official.

6.    If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the condominium Property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the First Named Insured thirty (30) days before the effective date of cancellation. The Insurer will also provide thirty (30) days written notice to each unit-owner to whom the Insurer issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to the Insurer.

B.  Nonrenewal

1.    The Insurer may refuse to renew this policy by delivering or mailing to the Insured first named in the Declarations written notice of nonrenewal at the address shown on the policy. Such written notice shall state the reason(s) for nonrenewal. The notice must be delivered or mailed not later than the 60th day before the date on which the policy expires. If the notice is delivered or mailed later than the 60th day before the date on which the policy expires, the coverage shall remain in effect until the 61 day after the date on which the notice is delivered or mailed. If notice is delivered or mailed, proof of delivery or mailing will be sufficient proof of notice. Earned premium for any period of coverage that extends beyond the expiration date of the policy shall be computed pro rata based on the previous year's rates.

2.    The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

3.    The Insurer may not refuse to renew this policy based solely on the fact that the Insured is an elected official.

4.    If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the condominium property contains at least one residence or the condominium

◊ All rights reserved.
*END 007*

**ENDORSEMENT#** *7*   (continued)

declarations conform with the Texas Uniform Condominium Act, then the Insurer will mail or deliver written notice of nonrenewal, at least thirty (30) days before the expiration or anniversary date of the policy, to:

a. The first Named Insured; and

b. Each unit-owner to whom the Insurer issued a certificate or memorandum of insurance.

The Insurer will mail or deliver such notice to each last mailing address known to the Insurer.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 007*

74802 (7/11)            Page 3 of 3

ENDORSEMENT#  *8*

Product Name: *Private Edge Plus*
This endorsement, effective at     *12:01 AM  November 1, 2016*     forms a part of
Policy number   *25467199*
Issued to:   *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, PA*

### INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 3. EXCLUSIONS of the **Crime Coverage Section**, the "Indirect Loss" exclusion is deleted its entirety and replaced with the following:

    Indirect or Consequential Loss

       Loss that is an indirect or a consequential result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money, Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 008*

## ENDORSEMENT# *9*

This endorsement, effective *12:01 AM* *November 1, 2016* forms a part of
policy number *25467199*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, PA*

### ADDITIONAL INSUREDS - LISTED AFFILIATES (CO-DEFENDANT)
### (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that coverage as is provided under the **D&O** and **EPL Coverage Sections, Clause 2.** Definition of "**Company**" of the **General Terms and Conditions**, shall include the following entity(ies), which is an (are) "**Affiliate(s)**" as defined in Clause 2. **DEFINITIONS**, paragraph (a) of the **D&O Coverage Section**, subject to each such **Affiliate's(s')** Continuity Date:

| AFFILIATE | CONTINUITY DATE |
|---|---|
| Rockdale Blackhawk, LLC, et al | 4/7/2014 |
| Rockdale Blackhawk, LLC DBA Little River Healthcare dba Little River Healthcare- Urgent Care Center | 4/7/2014 |
| Georgetown Diagnostic Imaging, LLC | 4/7/2014 |
| Bastrop Open MRI, LLP | 4/7/2014 |
| Little River Healthcare- Cameron | 4/7/2014 |
| Little River Healthcare- Rockdale | 4/7/2014 |
| Bastrop Open MRI, LP dba Little River Bastrop | 4/7/2014 |
| Bastrop MRI, LLP dba Lakeside Hospital at Bastrop | 4/7/2014 |
| Litte River Healthcare Family Care Center | 4/7/2014 |
| Little River Healthcare Westlake Clinic | 4/7/2014 |
| Little River Healthcare Meridian Surgery Center | 4/7/2014 |
| Little River Healthcare GT Orthopedics | 4/7/2014 |
| Little River Healthcare Austin Urology | 4/7/2014 |
| Little River Healthcare Georgetown Imaging | 4/7/2014 |
| Little River Healthcare Bastrop Imaging | 4/7/2014 |
| Little River Healthcare Round Rock Cardiology | 4/7/2014 |
| Little River Healthcare Business Office | 4/7/2014 |
| Little River Healthcare Sleep Lab Round Rock | 4/7/2014 |
| Little River Healthcare Sleep Lab Austin | 4/7/2014 |
| Little River Healthcare Sleep Lab San Antonio | 4/7/2014 |
| Little River Healthcare Specialty Clinic | 4/7/2014 |
| Little River Healthcare- Neurology | 4/7/2014 |
| Little River Healthcare- King's Daughter's Clinic Imaging Center | 4/7/2014 |
| Little River Healthcare- Physicians of King's Daughters, P.A. | 4/7/2014 |
| Little River Healthcare- King's Daughters Clinic dba Little River Healthcare- Cameron Hospital | 4/7/2014 |
| Little River Medical Group | 4/7/2014 |
| Little River Healthcare Central Texas LLC | 4/7/2014 |

97739 (03/08) © All rights reserved. **Page 1 of 3**

ENDORSEMENT# *9*  (Continued)

| | |
|---|---|
| Little River Healthcare Physicians of Temple Surgery Ctr | 4/7/2014 |
| Little River Healthcare - Sleep Disorder Clinic at Georgetown | 4/7/2014 |
| Little River Family Health Center of Bastrop | 10/1/2014 |
| CTH, Inc. | 11/1/2014 |
| Rockdale Blackhawk, LLC | 4/7/2014 |
| Little River Healthcare – Central Texas LLC | 4/7/2014 |
| Little River Medical Group | 4/7/2014 |
| Little River Healthcare – Tomball LLC | 4/7/2014 |
| Little River Healthcare – Sleep Disorder Center at Georgetown LLC | 4/7/2014 |
| Little River Healthcare – Meridian Surgery Center LLC | 4/7/2014 |

Coverage as is afforded under the **D&O** and **EPL Coverage Sections** with respect to a **Claim** made against such **Affiliate** or any **Individual Insured** thereof shall only apply if: (1) such **Claim** arises out of a covered **Claim** for a **Wrongful Act** actually or allegedly committed by an **Insured** (other than the above listed **Affiliate** or an **Individual Insured** thereof); and (2) an **Insured** (other than the above listed **Affiliate** or any **Individual Insured** thereof) is and remains a defendant in the action along with the above listed **Affiliate** or any **Individual Insured** thereof.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the **Affiliates** listed above and the **Company** will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that such **Affiliates** or the **Company** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company**. The **Affiliates** and the **Company** hereby agree to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against the **Affiliates** listed above or any **Clams** made against any **Individual Insured** of such **Affiliate** listed above:

    (1)    alleging, arising out of, based upon or attributable to, as of such **Affiliate's** respective **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, or alleging or derived from a **Related Wrongful Act** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; and

    (2)    alleging any **Wrongful Act** occurring prior to such **Affiliate's** respective **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

    © All rights reserved.    

<u>ENDORSEMENT#</u> *9* (Continued)

In all events, coverage as is afforded under this endorsement with respect to a **Claim** made against each respective **Affiliate(s)** listed above or any **Individual Insureds** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the respective time such **Affiliate** became an **Affiliate** and prior to the time that the such **Affiliate** ceased to be an **Affiliate** as defined in Clause 2. **DEFINITIONS**, paragraph (a) of the **D&O Coverage Section**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
**AUTHORIZED REPRESENTATIVE**

**ENDORSEMENT#** *10*

Product Name: *Private Edge Plus*
This endorsement, effective *12:01 AM* *November 1, 2016* forms a part of
policy number *25467199*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, PA*

**CONDUCT EXCLUSIONS AMENDED**
**(FINAL NON-APPEALABLE ADJUDICATION)**
**(D&O and EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is
amended as follows:

1. In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, paragraphs (a), (b) and (c) are deleted
   in their entirety and replaced with the following:

   (a) arising out of, based upon or attributable to the gaining of any profit or advantage to which
   any final non-appealable adjudication establishes that the **Insured** was not legally entitled;

   (b) arising out of, based upon or attributable to: (1) the purchase or sale by an **Insured** of
   securities of the **Company** within the meaning of Section16(b) of the Securities Exchange
   Act of 1934 and amendments thereto or similar provisions of any state statutory law if any
   final non-appealable adjudication establishes that such 16(b) violation occurred; or (2) the
   payment to any **Insured** of any remuneration without the previous approval of the
   stockholders of the **Company**, once any final non-appealable adjudication establishes that
   such payment was illegal;

   (c) arising out of, based upon or attributable to the committing of any deliberate criminal or
   deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if
   any final non-appealable adjudication establishes that such deliberate criminal, deliberate
   fraudulent or dishonest act or willful violation of statute, rule or law was committed;

2. In Clause 3. **EXCLUSIONS** of the **EPL Coverage Section**, paragraph (a) is deleted in its entirety
   and replaced with the following:

   (a) arising out of, based upon or attributable to the committing of any criminal or deliberate
   fraudulent act if any final non-appealable adjudication establishes that such criminal or
   deliberate fraudulent act was committed;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 010*

M112035                    1

## ENDORSEMENT# *11*

Product Name: *Private Edge Plus*
This endorsement, effective      *12:01 AM      November 1, 2016*      forms a part of
policy number     *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**FOR-PROFIT HEALTH CARE ORGANIZATION
AMENDATORY ENDORSEMENT
(ANTITRUST EXCLUSION AMENDMENT DELETED)
(D&O AND EPL COVERAGES)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

**I.   AMENDMENTS TO THE GENERAL TERMS & CONDITIONS SECTION**

The General Terms & Conditions Section is amended as follows:

   A.  In Clause 2. "DEFINITIONS" of the General Terms & Conditions Section, the definition of **Company** is amended to include the following at the end thereof:

   **Company** shall also include any auxiliary, guild or foundation formed solely for the benefit of the **Named Entity** and of which the book value of such entity's assets determined in accordance with Generally Accepted Accounting Principles totals less than 10% of the similarly calculated assets of the **Named Entity** as of the inception date of the **Policy Period.**

**II. AMENDMENTS TO THE D&O COVERAGE SECTION**

The D&O Coverage Section is amended as follows:

   A.  In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of **Individual Insured(s)** is amended to include the following at the end thereof:

   **Individual Insured(s)** shall also include any past, present or future member of any duly constituted committee; any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department; and any medical director, staff physician or faculty member of the **Company**, regardless of whether or not such person is directly employed by the **Company** or is considered to be an independent contractor.

   B.  In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of **Loss** is amended to include the following at the end thereof:

   1.  IRS Fines:

   **Loss** shall include **Defense Costs** incurred in connection with a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

⊚ All rights reserved.
*END 011*

M114007                                          1

## ENDORSEMENT# *11*

Section 4911 (tax on excess expenditures to influence legislation);
Section 4940 (a) (tax on net investment income of tax-exempt foundations);
Section 4941 (taxes on self-dealing);
Section 4942 (taxes on failure to distribute income);
Section 4943 (taxes on excess business holding);
Section 4944 (taxes on investments which jeopardize charitable purpose);
Section 4945 (taxes on taxable expenditures);
Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);
Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and
Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2. EMTALA AND HIPAA FINES AND PENALTIES

Notwithstanding the foregoing, **Loss** shall also include:

(1) civil fines and penalties assessed upon an **Insured** for a violation of **EMTALA**, subject to the **EMTALA Sub-limit of Liability**; and

(2) **HIPAA Penalties**, where insurable by law, subject to the **HIPAA Penalties Sublimit of Liability**.

3. GOVERNMENTAL FUNDING DEFENSE COST COVERAGE

Notwithstanding the foregoing, **Loss** shall not include the return of funds which were received from any federal, state or local governmental agency or any interest, fines or penalties arising out of the return of such funds; provided, however, that this policy shall pay **Defense Costs** in connection with any **Claim** made against an **Insured** for the return of such funds, subject to the **Government Funding Defense Costs Sublimit of Liability** and any co-insurance or separate retention provided for such coverage in this policy.

4. EXCESS BENEFIT PENALTY COVERAGE

"**Loss**" shall also include any "**Excess Benefits**" penalty assessed in the amount of 10% by the Internal Revenue Service ("**IRS**") against any **Insured(s)** for management's involvement in the award of an "**Excess Benefit**" and the **Defense Costs** attributable thereto. **Loss** shall specifically exclude: (1) any 25% penalty assessed by the **IRS** against an **Insured** deemed to have received an **Excess Benefit**; (2) **Defense Costs** incurred to defend any Insured if it has been in fact determined that such individual received an **Excess Benefit**; and (3) any 200% penalty assessed by the **IRS** for failure to correct the award of an **Excess Benefit**. In all events, the assessment by the **IRS** of a 200% penalty against any Insured shall void ab initio all coverage afforded pursuant to this paragraph.

C. In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of "**Wrongful Act**" is amended by adding the following to the end thereof:

(iv) any violation of the **EMTALA**.

(v) any violation of the **HIPAA Privacy Regulations**.

D. In Clause 4. "EXCLUSIONS" of the **D&O Coverage Section**, paragraph (l) is deleted in its entirety and replaced with the following:

◊ All rights reserved.
*END 011*

## ENDORSEMENT# *11*

(l) alleging, arising out of, based upon or attributable to bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to any **Securities Claim.**

E. The following additional exclusions are added to the end of Clause 2. "EXCLUSIONS" of the D&O Coverage Section:

(i) alleging, arising out of, based upon or attributable to any failure or omission on the part of the **Insureds** or the **Company** to effect or maintain adequate insurance;

(j) alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others;

F. Clause 5. "LIMIT OF LIABILITY" of the D&O Coverage Section is amended by inserting the following at the end thereof:

**EMTALA SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **Loss** in connection with all **EMTALA Claims** in the aggregate made and reported during the **Policy Period** or **Discovery Period** (if applicable) is $250,000 (hereinafter **"EMTALA Sublimit of Liability"**). The **EMTALA Sub-limit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability, Separate Limit of Liability** or **Shared Limit of Liability.**

**GOVERNMENT FUNDING DEFENSE COSTS SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **Defense Costs** in connection with a **Claim** for the return of funds which were received from any federal, state or local governmental agency or any interest, fines or penalties arising out of the return of such funds is $1,000,000 (the **"Government Funding Defense Costs Sublimit of Liability"**). The **Government Funding Defense Costs Sub-Limit of Liability** is part of and not in addition to the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability, Separate Limit of Liability** or **Shared Limit of Liability.** With respect to any such sublimited **Defense Costs**, it is further understood and agreed that the **Insurer** shall be liable to pay only 50% of such **Defense Costs**, excess of a retention in the amount of $1,000,000, up to the **Government Funding Defense Costs Sublimit of Liability.** It is a condition of this insurance that the remaining 50% of such **Defense Costs** shall be carried by the **Insureds** at their own risk and be uninsured.

**HIPAA PENALTIES SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **HIPAA Penalties** in the aggregate under this policy is $250,000 (the **"HIPAA Penalties Sublimit of Liability"**). The **HIPAA Penalties Sublimit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability, Separate Limit of Liability** or **Shared Limit of Liability.**

G. Clause 9. **PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

✪ All rights reserved.
*END 011*

<u>ENDORSEMENT# *11*</u>

9. **PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS**

This Clause 9 applies to all **Claims**.

Affixed as Appendix A hereto and made a part of this **D&O Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 7. of this **D&O Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Claim** is brought. In the event a **Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

III. **AMENDMENTS TO THE EPL COVERAGE SECTION**

The EPL Coverage Section is amended as follows:

A. In Clause 2. "DEFINITIONS" of the EPL Coverage Section, the definition of **Individual Insured(s)** is amended to include the following at the end thereof:

**Individual Insured(s)** shall also include any past, present or future member of any duly constituted committee; any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department; and any medical director, staff physician or faculty member of the **Company**, regardless of whether or not such person is directly employed by the **Company** or is considered to be an independent contractor.

B. In the definition of **Employment Practices Violation** in Clause 2. "DEFINITIONS" of the EPL Coverage Section, subparagraph (xi) is deleted in its entirety and replaced as follows:

(xi) defect in peer review or credentialing;

© All rights reserved.
*END 011*

M114007                                                    4

## ENDORSEMENT# *11*

(xii) with respect to any of the foregoing items (i) through (x) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

C. Paragraphs (f) and (j) of Clause 3. "EXCLUSIONS" of the EPL Coverage Section are deleted in their entirety and replaced with the following:

(f) alleging, arising out of, based upon or attributable to bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to any a Claim for Retaliation.

(j) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of any **Insured** under any express contract or agreement; provided, however, that this exclusion shall not apply to:

(1) the extent that any liability does not arise under such express contract or agreement;

(2) **Loss** constituting **Defense Costs** for express, written employment contracts; or

(3) **Claims** for **Loss** alleging **Wrongful Acts** of an **Insured(s)** with respect to hospital practice privileges, credentialing or peer review matters;

D. Clause 7. "**PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS**" of the **EPL Coverage Section** is deleted in its entirety and replaced with the following:

### 7. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

This Clause 9 applies to all **Claims**.

Affixed as Appendix A hereto and made a part of this **EPL Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 6. of this **EPL Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Claim** is brought. In the event a **Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

© All rights reserved.
### END 011

## ENDORSEMENT# *11*

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

E.  The following clause is inserted at the end of the EPL Coverage Section:

**HC-1 THIRD PARTY HUMAN CLINICAL TRIAL CLAIMS SUBLIMIT OF LIABILITY**

The following provisions shall apply in addition to the provisions of Clause 5. "LIMIT OF LIABILITY" of the General Terms and Conditions:

The aggregate limit of the **Insurer's** liability for all **Loss** under the EPL Coverage Section in connection with all **Third Party Human Clinical Trial Claims** in the aggregate is $250,000 (hereinafter called the "**Third Party Human Clinical Trial Claims Sublimit of Liability**").  The **Third Party Human Clinical Trial Claims Sublimit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the EPL Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**.

## IV. DEFINTIONS USED IN ENDORSMENT

As used in this endorsement, the following terms have the meanings set forth bel  ow:

HC-1  **"EMTALA"** means the Emergency Medical Treatment and Active Labor Act (**"EMTALA"**), 42 U.S.C., 1396dd *et seq.*, and any similar state or local statute.

HC-2  **"EMTALA Claim"** means any **Claim** alleging a violation of **EMTALA**, including, without limitation, any **Claim** seeking civil fines and penalties for a violation of **EMTALA**.

HC-3  **"Excess Benefits"** means an excess benefit as defined in the Taxpayer Bill of Rights Act, 2, 26 U.S.C. 4958.

HC-4  **"HIPAA Penalties"** means civil money penalties imposed upon an **Insured** for violation of the **HIPAA Privacy Regulations**.

HC-5  **"HIPAA Privacy Regulations"** means the privacy provisions of Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder, and amendments thereto, including, but not limited to, any amendment pursuant to the Health Information Technology for Economic and Clinical Health ("HITECH Act")

HC-6  **"Third Party Human Clinical Trial Claim"** means any **Third Party Violation** in connection with any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

*END 011*

M114007                                    6

ENDORSEMENT# *12*

Product Name: *Private Edge Plus*

This endorsement, effective    *12:01 AM    November 1, 2016*        forms a part of

policy number    *25467199*

issued to  *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**SEVERABILITY OF THE APPLICATION ENDORSEMENT
(NON-RESCINDABLE - FULL INDIVIDUAL SEVERABILITY;
TOP 3 COMPANY POSITIONS IMPUTED TO COMPANY)
(D&O AND EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.    Clause 10. **"REPRESENTATIONS AND SEVERABILITY"** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

   **10.    REPRESENTATIONS AND SEVERABILITY**

   In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this **D&O Coverage Section**.

   With respect to any statements, warranties and representations contained in the **Application**, and solely with respect to the issue of whether coverage shall be afforded under this endorsement pursuant to subparagraphs (1), (2) and (3) below, no knowledge possessed by an **Individual Insured** shall be imputed to any other **Individual Insured**. However, in the event that any of the statements, warranties or representations is not accurately and completely disclosed in the **Application** and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of the subject matter of any incomplete or inaccurate statements, warranties or representations under:

   (1)    Clause 1. **INSURING AGREEMENTS**, COVERAGE A, with respect to any **Individual Insured** who knew of such inaccurate or incomplete statements, warranties or representations;

   (2)    Clause 1. **INSURING AGREEMENTS**, Coverage B(ii), with respect to any **Company** to the extent it indemnifies any **Individual Insured** referenced in (1), above; and

   (3)    Clause 1. **INSURING AGREEMENTS**, Coverage B(i), with respect to any **Company** if any past or present chief executive officer, chief operating officer or chief financial officer of the **Company** knew of such inaccurate or incomplete statements, warranties or representations,

   whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

The **Insurer** shall not be entitled under any circumstances to rescind coverage under the Policy with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

© All rights reserved.
*END 012*

98966 (4/08)                                    Page 1 of 2

<u>ENDORSEMENT#</u> *12* (continued)

2. Clause 8. "**REPRESENTATIONS AND SEVERABILITY**" of the **EPL Coverage Section** is deleted in its entirety and replaced with the following:

8. **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

With respect to any statements, warranties and representations contained in the Application, and solely with respect to the issue of whether coverage shall be afforded under this endorsement pursuant to subparagraphs (1), (2) and (3) below, no knowledge possessed by an **Individual Insured** shall be imputed to any other **Individual Insured**. However, in the event that any of the statements, warranties or representations is not accurately and completely disclosed in the **Application** and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of subject matter of any incomplete or inaccurate statements, warranties or representations with respect to:

(1) any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application;

(2) any **Company** to the extent it indemnifies any **Individual Insured** referenced in subparagraph (1) above; and

(3) any **Company** if any past or present chief executive officer, chief operating officer or chief financial officer of the **Company** knew of such inaccurate or incomplete statements, warranties or representations,

whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

The **Insurer** shall not be entitled under any circumstances to rescind coverage under the Policy with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 012*

98966 (4/08) Page 2 of 2

ENDORSEMENT# *13*

Product Name: *Private Edge Plus*
This endorsement, effective *12:01 AM* *November 1, 2016* forms a part of policy number *25467199*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, PA*

**STATE AMENDATORY INCONSISTENT**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. In the event that there is an inconsistency between any: (a) state amendatory attached to this policy, or any other wording attached to this policy to comply with applicable law; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, subject to the limitations below, the Insurer will resolve the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2. This endorsement shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3. "Policyholder" means the first Named Entity, Named Organization, Named Corporation, Named Sponsor, Named Insured or other policyholder designated in Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 013*

94039 (5/07)                    Page 1 of 1

ENDORSEMENT#  *14*

Product Name: *Private Edge Plus*
This endorsement, effective  *12:01 AM*  *November 1, 2016*  forms a part of
policy number  *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by  *National Union Fire Insurance Company of Pittsburgh, PA*

## ANTITRUST COVERAGE ENDORSEMENT
### (SEPARATE RETENTION AND CO-INSURANCE)
### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  In Clause 4. "EXCLUSIONS" of the **D&O Coverage Section**, paragraph (t)(ii) is deleted in its entirety.

2.  Clause 6. "RETENTION/DEDUCTIBLE CLAUSE" of the **D&O Coverage Section** is amended by adding the following paragraphs at the end thereof:

    Notwithstanding the foregoing, with respect to any **Antitrust Claim** (as defined below), the **Insurer** shall only be liable for **Loss** arising from such **Antitrust Claim** which is in excess of a Retention amount of *$150,000* (the "**Antitrust Retention**"), such **Antitrust Retention** to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss;** and (ii) **Loss** of the **Company**. A single **Antitrust Retention** shall apply to **Loss** arising from all **Antitrust Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts.** In the event a **Claim** triggers more than one Retention amount under the policy, only the highest such amount shall apply, which amount shall apply to all  **Loss** under such **Claim.**

3.  Solely with respect to **Antitrust Claims**, it is hereby understood and agreed that the following Clause is added to the end of the  **D&O Coverage Section:**

    **AC-1. COINSURANCE CLAUSE**

    With respect to: (1) **Indemnifiable Loss**; and/or (2) **Loss** of the **Company**, the **Insurer** shall be liable to pay  *80*% of **Loss** excess of the applicable Retention amount, it being a condition of this insurance that the remaining  *20*% of each and every **Loss** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured.

4.  Solely with respect to the coverage provided by this endorsement for **Antitrust Claims**, Clause 2. "DEFINITIONS" of the **D&O Coverage Section** is amended by adding the following Definition to the end thereof:

    (AC-1)  "**Antitrust Claim**" means any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, including any violation of the Sherman Antitrust Act, the Clayton Act, the Robinson-Patman Act or any similar federal, state or local statutes or rules. "**Antitrust Claim**" also means any **Claim** alleging, arising out of, based upon or attributable to, or in  any way involving, either  directly or indirectly, any actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: business competition, unfair trade practices or tortious interference in another's business or contractual relationships.

◈ All rights reserved.
*END 014*

99484 (6/08)                                         Page 1 of 2

**ENDORSEMENT#** *14*    (continued)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 014*

**ENDORSEMENT#** *15*

Product Name: *Private Edge Plus*
This endorsement, effective    *12:01 AM    November 1, 2016*         forms a part of
policy number    *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**INSURED V. INSURED EXCLUSION**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4. EXCLUSIONS of the **D&O Coverage Section**, paragraph (i) is deleted in its entirety and replaced as follows:

(i)     which is brought by or on behalf of a **Company** or any **Individual Insured**, other than an **Employee** of a **Company**; or which is brought by any security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of any **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

(i)     any **Claim** brought by an **Individual Insured** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this policy;

(ii)    in any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator, or rehabilitator (or any assignee thereof) of such **Company**;

(iii)   any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least three (3) years prior to such **Claim** being first made against any person; or

(iv)    any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Organization** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(v)     any **Executive** engaging in any protected "whistleblower" activity specified in 18 U.S.C. 1514A(a) or any other similar "whistleblower" protection provided under any state, local or foreign securities laws.

The foregoing subparagraph shall not apply where the actions of any **Executive** includes the filing of any proceeding or voluntarily testifying, voluntarily participating in or voluntarily assisting (other than de minimus assistance) in the filing or prosecution of any proceeding against an **Insured** relating to any violation of any rule or regulation of the Securities and Exchange Commission or any similar provision of any federal, state, local or foreign rule or law relating to fraud against shareholders, other than such actions in connection with a

◈ All rights reserved.
*END 015*

105048 (4/10)                                    Page 1 of 2

ENDORSEMENT# *15*   (continued)

proceeding that is brought by the Securities and Exchange Commission, any similar state, local or foreign regulatory body that regulates securities, or any state, local or foreign law enforcement authority.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 015*

<u>ENDORSEMENT#</u>  *16*

Product Name: *Private Edge Plus*
This endorsement, effective      *12:01 AM      November 1, 2016*           forms a part of
policy number     *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, PA*

### MAJOR SHAREHOLDER EXCLUSION
### (D&O COVERAGE SECTION)

In consideration of the premium charged it is hereby understood and agreed that, solely with respect to **Loss** as may have otherwise been covered under the **D&O Coverage Section**, the **Insurer** shall not be liable to make any payment for any **Loss** in connection with any **Claim** made against any **Insured** which is brought by any (i) individual(s) or entity(ies) that own or control (whether beneficially, directly or indirectly)    5% or more of the outstanding voting stock of the **Company** (hereinafter **"Major Shareholder"**); or (ii) security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of any  **Major Shareholder**.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 016*

99178 (5/08)                                    Page 1 of 1

**ENDORSEMENT# *17***

Product Name: *Private Edge Plus*
This endorsement, effective *12:01 AM    November 1, 2016*    forms a part of
policy number *25467199*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

**SIDE A EXCESS LIMIT OF LIABILITY ENDORSEMENT**
**(EXCESS LIMIT APPLICABLE TO NON-INDEMNIFIABLE LOSS**
**UNDER THE D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to coverage for **Loss** provided under the **D&O Coverage Section**, the policy is hereby amended as follows:

1.    Item 7. of the Declarations is amended to include the following at the end thereof:

   (g)    **SIDE A EXCESS LIMIT OF LIABILITY:** *$500,000*, excess aggregate limit of liability for all **Non-Indemnifiable Loss** solely for **Executives** of a **Company** (including **Defense Costs**) under the **D&O Coverage Section** (herein the "**Side A Excess Limit of Liability**").

2.    Clause 4. **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)** of the **General Terms And Conditions** is deleted in its entirety and replaced with the following:

   4.    **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

   The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

   If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

   If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the

◊ All rights reserved.
*END 017*

<u>ENDORSEMENT#</u> *17* (continued)

Discovery Period (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

The **Side A Excess Limit of Liability** stated in Item 7(g) of the Declarations, as set forth by paragraph 1. of this endorsement above, is the aggregate limit of the **Insurer's** liability under the **D&O Coverage Section** excess of: (i) any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**; and (ii) any coverage for **Loss** (whether or not **Non- Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**, for all **Non-Indemnifiable Loss** under the **D&O Coverage Section** arising out of all **Claims** first made against an **Executive** of a **Company** during the **Policy Period** or the **Discovery Period** (if applicable). The **Side A Excess Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Side A Excess Limit of Liability** for the **Policy Period**. The **Side A Excess Limit of Liability** shall be in addition to the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**.

It is agreed that the **Insurer's** liability to pay **Non-Indemnifiable Loss** shall only attach to the **Side A Excess Limit of Liability** after:

(a)  the full amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted due to **Loss** paid thereunder; and

(b)  any coverage for **Loss** (whether or not **Non-Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted by reason of loss(es) paid thereunder.

The **Side A Excess Limit of Liability** provided by this endorsement shall "drop down" (continue in force as primary insurance) only in the event of (a) and (b) above and shall not drop down for any other reason.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. Amounts incurred for **Defense Costs** shall be applied against the Retention.

3.  Solely for purposes of the coverage as afforded by this endorsement, "**Non- Indemnifiable Loss**" means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Executive** of a **Company** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

© All rights reserved.
*END 017*

**ENDORSEMENT#** *17*   (continued)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕ All rights reserved.
*END 017*

99563 (7/08)                     Page 3 of 3

ENDORSEMENT# *18*

Product Name: *Private Edge Plus*
This endorsement, effective    *12:01 AM*    *November 1, 2016*    forms a part of
policy number    *25467199*
issued to  *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

## EMPLOYMENT EDGE EXTENSION ENDORSEMENT
## (EPL COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.    In Clause 1. "INSURING AGREEMENTS" of the **EPL Coverage Section**, the two paragraphs under the heading "INSURING AGREEMENTS" are deleted in their entirety and replaced with the following:

**INSURING AGREEMENTS**

Coverage granted for **Loss** under this policy is provided solely with respect to: (i) **Claims** first made against an **Insured**, and (ii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy, except to the extent coverage is extended pursuant to Clause 6(e) of the **General Terms and Conditions** of this policy to a **Claim** first made prior to the **Policy Period**. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

A.  *Employment Practices Liability Coverage*
    This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Employment Practices Violation**.

B.  *Third Party Violation Coverage*
    This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Third Party Violation**.

C.  *Wrongful Internet Activity Coverage*
    This **EPL Coverage Section** shall pay the **Loss** of a **Company** arising from any **Claim** made against such **Company** for its actual or alleged liability for any **Wrongful Internet Activity** of an **Employee**.

D.  *Employment Crisisfund® Coverage*
    This **EPL Coverage Section** shall pay the **Crisis Loss** of a **Company** in connection with an **Employment Practices Crisis**, a **Workplace Violence Crisis** or an **Employee Information Breach Crisis**, up to the amount of the **Employment CrisisFund®**; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

◊ All rights reserved.
*END 018*

108228 (8/12)                     Page 1 of 6

The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of any **Claim** or **Employment Practices Crisis** prior to its final disposition.

2.    In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of the terms "**Claim**," "**Employment Practices Violation**" and "**Wrongful Act**" are deleted and replaced with the following:

"**Claim**" means:

(1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process, or any request to toll or waive the statute of any limitations;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document (in the case of a criminal proceeding); or (c) receipt or filing of a notice of charges;

(3) an administrative or regulatory investigation by the **EEOC** which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**; or

(4) an administrative or regulatory investigation of violations of the Uniformed Services Employment and Reemployment Rights Act when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel and is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**.

However, in no event shall the term "**Claim**" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

"**EEOC**" means the Equal Employment Opportunity Commission, or any similar state, local or foreign agency.

"**Employment Practices Violation**" means any actual or alleged:

(i) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(ii) harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise, including "same-sex" sexual harassment);

(iii) discrimination (including, but not limited to, discrimination based upon age, gender, gender identity or expression, race, color, national origin, religion, sexual orientation or preference, genetic information, pregnancy, military status or disability);

(iv) **Retaliation**;

(v) employment-related misrepresentation(s) to an **Employee** of any **Company** or applicant for employment with any **Company** or any **Outside Entity**;

© All rights reserved.
*END 018*

ENDORSEMENT# *18*  (continued)

(vi)    employment-related libel, slander, humiliation, defamation or invasion of privacy;

(vii)   false arrest or false imprisonment;

(viii)  wrongful failure to employ or promote;

(ix)    wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(x)     wrongful discipline;

(xi)    failure to grant tenure; or

(xii)   with respect to any of the foregoing items (i) through (xii) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of or an applicant for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

"Wrongful Act" means any **Employment Practices Violation**, **Third-Party Violation** or **Wrongful Internet Activity**.

3.    In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of "**Loss**" is amended to include **Crisis Loss**.

4.    Clause 2. "DEFINITIONS" of the **EPL Coverage Section** is further amended by adding the following definitions at the end thereof:

"Administrative Claim" means an administrative or regulatory investigation:

(1) by the **EEOC** or similar federal, state or local agency; or

(2) of a violation of the Uniformed Services Employment and Reemployment Rights Act, when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel;

which, in either case, is commenced by the filing of a notice of charges or similar document of which notice has been given to an **Insured**.

The term "**Administrative Claim**" shall not mean or include any **Litigated Matter**.

"Crisis" has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

"Crisis Loss" has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

©All rights reserved.
*END 018*

ENDORSEMENT# *18*   (continued)

"**Employment CrisisFund®** " means in the case of all **Crisis Loss**, $25,000 for all **Crisis Loss** in the aggregate for all **Crises** first occurring during the **Policy Period** or any applicable **Discovery Period.**

"**Employment Practices Crisis**" has the meaning as defined in the Employment CrisisFund®Appendix attached to this policy.

"**Employee Information Breach Crisis**" has the meaning as defined in the Employment CrisisFund®Appendix attached to this policy.

"**Litigated Matter**" means any civil, criminal, administrative, regulatory or arbitration proceeding® for monetary, non-monetary or injunctive relief which is commenced by: (1) service of a complaint or similar pleading; or (2) return of an indictment, information or similar document (in the case of a criminal proceeding**).**

"**Prior AIG Policy**" means a valid and collectible policy providing substantially the same or similar coverage as is provided by this policy, issued to the **Named Entity** by the **Insurer** (or any other insurance company affiliate thereof), of which this policy is a continuous renewal.

"**Related Claim**" means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were alleged in another **Claim** made against an **Insured**.

"**Workplace Violence Crisis**" has the meaning as defined in the CrisisFund  Appendix attached to this policy.

"**Wrongful Internet Activity**" means any actual or alleged:                                          ®

  (1) **Employment Practices Violation** alleged by an **Employee**; or

  (2) **Third Party Violation,**

  when committed by an **Employee** by means of the internet, including, but not limited to, social networking activities, regardless of whether such internet activity is during or after work hours or on or off the work premises. For purposes of the application of this definition, an individual shall be deemed to be an **Employee** regardless of whether such individual was acting in his or her capacity as an **Employee.**

5.   Solely with respect to **the EPL Coverage Section**, Clause 6. "**NOTICE/CLAIM REPORTING PROVISIONS**" of the General Terms and Conditions is amended by adding the following at the end thereof:

  (e) **Claims Savings Clause for Employment Practices Claims**

© All rights reserved.
*END 018*

108228 (8/12)                              Page 4 of 6

**ENDORSEMENT# *18*** (continued)

1. Notwithstanding the foregoing, with respect to any **Claim** which (i) first becomes a **Litigated Matter** during the **Policy Period** or **Discovery Period** (if applicable); and (ii) is a **Related Claim** with respect to an **Administrative Claim** which was first made against an **Insured** prior to the **Policy Period**, the **Insurer** shall not deny coverage for such **Claim** based upon late notice of such **Claim** or based upon such **Claim** first being made prior to the **Policy Period**, provided that:

   (a) the **Claim** was first made against the **Insured** at a time during which the **Named Entity** was insured under a **Prior AIG Policy**;

   (b) upon the **Claim** first becoming a **Litigated Matter**, the **Claim** was reported in accordance with Clause 6(a) above; and

   (c) no **Insured** has made a monetary settlement offer to a claimant or responded to a monetary demand from or on behalf of a claimant with respect to such **Claim**.

2. Coverage under this policy for any **Claim** afforded coverage pursuant to this Clause 6(e) shall be the lesser of:

   (a) the coverage which would have been provided under this policy for such **Claim** had the **Claim** been made during the **Policy Period** and reported to the **Insurer** as required by this policy; or

   (b) the coverage, if any, which would have been provided under the **Prior AIG Policy** for such **Claim** if the **Insured** had properly provided notice of such **Claim** in accordance with the provisions of the **Prior AIG Policy**,

   taking into account all provisions of each policy, including, without limitation, applicable limits of liability (as reduced by payments made under such policy), retentions, exclusions and other restrictions contained in each policy;

   Notwithstanding the foregoing, nothing in this Clause 6(e) shall be construed to increase the **Limit of Liability** of this policy or to provide coverage under the **Prior AIG Policy**, nor shall this Clause 6(e) ever result in providing coverage under this policy for **Loss** for which coverage is in fact provided (or would be provided but for the exhaustion of the limit of liability) under the **Prior AIG Policy**.

3. This Clause 6(c) shall not apply to any **Claim** which:

   (a) prior to the **Policy Period** was a **Litigated Matter**; or

   (b) is a **Related Claim** with respect to a **Claim** which, prior to the Policy Period was a **Litigated Matter**.

6. The provisions of subparagraph (a) of Clause 6. "NOTICE/CLAIM REPORTING PROVISIONS" of the **General Terms and Conditions** shall apply to any **Crisis** in the same manner and effect as such provisions apply to any Claim.

◊All rights reserved.
*END 018*

ENDORSEMENT# *18*   (continued)

7.  Clause 3. "EXCLUSIONS," Clause 5. "RETENTION CLAUSE" and Clause 6. "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) of the **EPL Coverage Section** shall not apply to **Crisis Loss**.

8.  The maximum limit of the **Insurer's** liability under the **EPL Coverage Section** for all **Crisis Loss** arising from all **Crisis** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, is the **Employment CrisisFund**®. This **Employment CrisisFund**® shall be the maximum limit of the **Insurer** under this **EPL Coverage Section** for **Crisis Loss**, regardless of the number of **Crisis** occurring during the **Policy Period**; provided, however, the **Employment CrisisFund**® shall be  part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 018*

<u>ENDORSEMENT#</u>  *19*

Product Name: *Private Edge Plus*
This endorsement, effective    *12:01 AM    November 1, 2016*          forms a part of
policy number    *25467199*
issued to  *Little River Healthcare Holdings, LLC*


by     *National Union Fire Insurance Company of Pittsburgh, PA*

**ADD CREDIT, DEBIT OR CHARGE CARD FORGERY ENDORSEMENT
(CRIME COVERAGE SECTION ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that this endorsement modifies insurance provided under the **Crime Coverage Section**, and applies solely to Insuring Agreement B. **FORGERY OR ALTERATION**, as follows:

**A. Schedule**

| Per Occurrence Limit Of Liability | Covered Instruments | |
|---|---|---|
| *$1,000,000* | ☒ | Includes written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |
| | ☐ | Limited to written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |

**B. Provisions**

1. Covered Instruments either includes or is limited to, whichever is indicated as applicable in the Schedule, written instruments required in conjunction with any credit, debit or charge card issued to the **Insured** or any **Employee** for business purposes.

2. The most we will pay in any one **Occurrence** is the applicable **Per Occurrence Limit of Liability** shown in the Schedule.

3. The following exclusion is added to Clause 3. **EXCLUSIONS** at the end thereof:

Insuring Agreement B. **FORGERY OR ALTERATION**, of this **Crime Coverage Section** does not apply to loss arising from any credit, debit or charge card if the **Insured(s)** have not complied fully with the provisions, conditions or other terms under which the card was issued.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊘ All rights reserved.
*END 019*

96298 (10/07)                    Page 1 of 1

**ENDORSEMENT#** *20*

Product Name: *Private Edge Plus*
This endorsement, effective *12:01 AM      November 1, 2016*          forms a part of
policy number    *25467199*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, PA*

## IMPERSONATION FRAUD COVERAGE
## (CRIME COVERAGE SECTION)

It is agreed that in consideration of the additional premium of *$0*, the policy is hereby amended as follows:

1.    Clause G. **Funds Transfer Fraud** is amended by adding the following to the end thereof:

**Impersonation Fraud Coverage**

The **Insurer** will also pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

Notwithstanding the above requirement that the loss of **Funds** result directly from a **Fraudulent Instruction**, the **Insurer** will also pay for the loss of **Funds** resulting from the **Insured's** receipt of a fraudulent phone call or email from a purported vendor, which advises the **Insured** that the vendor's bank account information has been changed and the **Insured** suffers a loss of **Funds**, because the **Insured** issued a payment or payments to this fraudulent bank account, based upon the **Insured's** confirmation controls, the **Insured** believed the fraudulent instruction to change the vendor's bank account information to be valid.

2.    Solely with respect to the **Impersonation Fraud Coverage** provided by this endorsement, Clause 2. **DEFINITIONS**, the definition of **Fraudulent Instruction** is deleted in its entirety and replaced with the following:

**"Fraudulent Instruction"** means an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction communicated by the **Insured** or an **Employee** based upon an instruction received and relied upon by **Insured** or an **Employee** which was transmitted:

a.    by a purported director, officer, partner, member or sole proprietor of the **Insured's** or by another **Employee**-or by an individual acting in collusion with such purported director, officer, partner, member, sole proprietor or other **Employee**-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; or

b.    by a purported director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client**-or by an individual acting in collusion

◊ All rights reserved.
*END 020*

<u>ENDORSEMENT#</u> *20*  (continued)

with such purported director, officer or employee-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; provided, however, **Fraudulent Instruction** shall not include any such instruction transmitted by an actual director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client** who was acting in collusion with any third party in submitting such instruction.

3.  Solely for purposes of this endorsement, the following definitions are added:

**Vendor** means any entity, firm, company, organization, association or individual which has a legitimate pre-existing arrangement or written agreement to provide goods or services to the **Insured**.

**Client** means an entity, firm, company, organization, association or individual for which the **Insured** provides goods or services for a fee pursuant to a written contract.

4.  The **Insurer's** total liability for coverage provided by this endorsement for all loss arising from a single act or series of related acts is *$100,000* ("**Impersonation Fraud Limit**"). All amounts paid by the **Insurer** pursuant to this endorsement will be part of, and not in addition to, the applicable **Per Occurrence Limit of Liability** shown in the Declarations.

5.  Solely with respect to coverage provided by this endorsement, the applicable per occurrence Deductible Amount is *$25,000*.

6.  Solely for purposes of this endorsement, the following exclusion shall apply:

The coverage afforded by this endorsement does not apply to any loss of **Funds** resulting directly from a **Fraudulent Instruction** occurring prior to *November 1, 2015*, if as of such date the **Insured's** Corporate Insurance Risk Management Department, Internal Audit Department, Human Resources/Personnel Department or General Counsel, or any officer to whom they report, or any partner or owner of the **Insured**, knew or could have reasonably foreseen that such **Fraudulent Instruction** could lead to a loss of **Funds**.

7.  The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** under this endorsement is the **Impersonation Fraud Limit** shown in Section 4 above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

® All rights reserved.
*END 020*

M116957

Page 2 of 2

**ENDORSEMENT#** *21*

Product Name: *Private Edge Plus*
This endorsement, effective     *12:01 AM     November 1, 2016*          forms a part of
policy number     *25467199*
issued to   *Little River Healthcare Holdings, LLC*


by     *National Union Fire Insurance Company of Pittsburgh, PA*

**OMNIBUS NAMED INSURED - INCLUDING ERISA - EXCLUDING FI AND FOREIGN ENTITY
(CRIME COVERAGE SECTION)**

This endorsement modifies insurance provided under the Private Edge Plus policy form.

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to **Loss** as may otherwise have been covered under the Crime Coverage Section, the Item of the **DECLARATIONS** entitled **NAMED ENTITY** is amended by addition of the following:

> "and any interest hereafter owned, controlled or operated by any one of those named as **Insured**, subject, however, to Clause 6. **CONDITIONS,** Paragraph a. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION, subparagraph v. CONSOLIDATION - MERGER OR ACQUISITION; and any **Employee Benefit Plan** sponsored by the **Insured(s)** now existing or hereafter created or acquired and required to be bonded under the Employee Retirement Income Security Act of 1974, provided, however, the **Insured's** interest shall not include (i) any **Financial Institution,** as defined herein, or (ii) any entity operating in a **Foreign Jurisdiction,** as defined herein, unless an endorsement providing coverage outside the United States is attached to this **Crime Coverage Section.**"

As used in this endorsement, **"Financial Institution"** means any entity that is a bank (including but not limited to commercial banks and savings and loan institutions) or any entity which is a diversified financial institution (including but not limited to insurance companies, brokerage firms and investment companies).

As used in this endorsement, **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 021**

M112044                                      1

ENDORSEMENT# *22*

Product Name: *Private Edge Plus*
This endorsement, effective    *12:01 AM    November 1, 2016*       forms a part of
policy number    *25467199*
issued to   *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, PA*

### PROTECTED INFORMATION EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)
PRIVATE RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)
NOT-FOR-PROFIT RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that coverage under the **Crime Coverage Section** to this policy shall not apply to any loss resulting directly or indirectly from the: (a) theft, disappearance or destruction of; (b) unauthorized use or disclosure of; (c) unauthorized access to; or (d) failure to protect any:

(1) confidential or non-public; or

(2) personal or personally identifiable;

information that any person or entity has a duty to protect under any law, rule or regulation, any agreement or any industry guideline or standard.

This exclusion shall not apply to the extent that any unauthorized use or disclosure of a password enables a theft by an **Employee** of the **Insured** of money, securities or tangible property of the **Insured** or that the **Insured** is holding for a third party; provided, however, this exception shall not apply to the extent that such unauthorized use or disclosure of a password enables a theft of or disclosure of information.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 022*

113010 (10/12)                    Page 1 of 1

# TEXAS NOTICE

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the Company's toll-free telephone number for information or to make a complaint at:

### 1-877-541-9748

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

### 1-800-252-3439

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, TX 78714-9104
Fax: (512) 490-1007

Web:  http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim, you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part of the attached document.

## AVISO IMPORTANTE

Para obtener información o para presentar una queja:

Usted puede llamar al número de teléfono gratuito de la compania para obtener información o para presentar una queja al:

### 1-877-541-9748

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre companias, coberturas, derechos, o quejas al:

### 1-800-252-3439

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX 78714-9104
Fax: (512) 490-1007

Sitio web:  http://www.tdi.texas.gov

E-mail:  ConsumerProtection@tdi.texas.gov

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con el agente primero. Si la disputa no es resuelta, puede comunicarse con el Departamento de Seguros de Texas.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

94396 (5/15)                          Page 1 of 1

## NOTICE TO POLICYHOLDER OF

*National Union Fire Insurance Company of Pittsburgh, PA*

This notice is to inform you of our loss control programs available in the State of Texas.

We have Field Safety Representatives with the experience and expertise to provide accident/loss prevention services reasonably commensurate with the hazard, loss experience, size and nature of your business operation.

Our services may include loss prevention surveys, risk exposure analysis, staff training, counseling, accident and loss analysis, worker health and safety evaluations, risk improvement recommendations, educational material and literature related to your specific profession or industry.

In the event you decide not to utilize our loss control services and opt to use your own safety department or hire an outside contractor, the service must be provided by qualified loss prevention representatives who are recognized by the State of Texas.

If you elect not to utilize our loss control services we require you to provide us with the following information (on your company letterhead stationary, signed by an officer of your firm):

- Acknowledgement of our offer of loss control services and your written rejection.

- Your reasons for selection of an alternative.

- Your alternative loss control program, which must be reasonably commensurate with the risk.

- Verification of the qualification of those who will be performing your loss control services.

- Acknowledgment that quarterly summaries of activities outlined in your loss control program will be submitted to us for review.

If you have any questions or wish to discuss this matter, contact our Texas Loss Control Service Coordinating Unit at 1-800-221-0651.

53365 (7/96)                                    Page 1 of 1



## CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, PA*

Reported under Policy/Bond Number: *25467199*     Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*Little River Healthcare Holdings, LLC*

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *R T SPECIALTY, LLC*

Address: *12404 PARK CENTRAL DRIVE   SUITE 380*

Address: *DALLAS, TX 75251*

Contact: *James DiLoreto*     Phone: *(972) 437-8734* Ext

eMail: *James.DiLoreto@rtspecialty.com*

Send Notice of Claims to:   AIG                     Phone:   (888) 602-5246
                            Financial Lines Claims   Fax:     (866) 227-1750
                            P.O. Box 25947           Email:   c-Claim@AIG.com
                            Shawnee Mission, KS 66225



## CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company:  *National Union Fire Insurance Company of Pittsburgh, PA*

Reported under Policy/Bond Number:  25467199

Date of Discovery: _____ Estimated Amount of loss: _____

Cause of Loss:

| | | | | |
|---|---|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud | _____ |
| Funds Transfer | _____ | Robbery/Burglary | _____ |
| ID Theft | _____ | Forgery | _____ |
| Client Property | _____ | In Transit | _____ |
| ERISA | _____ | Credit Card Forgery | _____ |
| Other | _____ | if Other, describe: | _____ |

Send Notice Of Claims To:   AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone:  (888) 602-5246
Fax:     (866) 227-1750
Email:   c-Claim@AIG.com

## ENDORSEMENT# *23*

This endorsement, effective *12:01 am      July 27, 2017*          forms a part of
policy number   *02-546-71-99*
issued to *Little River Healthcare Holdings, LLC*


by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DELETION OF ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the following endorsement is deleted in its entirety:

Endorsement *#14 - ANTITRUST COVERAGE ENDORSEMENT*


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE


◊ All rights reserved.
*END 023*

94406 (4/07)                              Page 1 of 1

ENDORSEMENT# *24*

This endorsement, effective *12:01 am*  *July 27, 2017*  forms a part of policy number  *02-546-71-99*
issued to  *Little River Healthcare Holdings, LLC*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ANTITRUST COVERAGE ENDORSEMENT
### (SEPARATE SUBLIMIT, RETENTION AND CO-INSURANCE)
### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  In Clause 4. "EXCLUSIONS" of the **D&O Coverage Section**, paragraph (t)(ii) is deleted in its entirety.

2.  Clause 5. "LIMIT OF LIABILITY" of the **D&O Coverage Section** is amended by adding the following at the end thereof:

    **ANTITRUST SUBLIMIT OF LIABILITY**

    The aggregate limit of the **Insurer's** liability for all **Loss** under this **D&O Coverage Section** arising from all **Antitrust Claims** is $1,000,000 (hereinafter called the "**Antitrust Sublimit of Liability**"). This **Antitrust Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

3.  Clause 6. "RETENTION/DEDUCTIBLE CLAUSE" of the **D&O Coverage Section** is amended by adding the following paragraphs at the end thereof:

    Notwithstanding the foregoing, with respect to any **Antitrust Claim** (as defined below), the **Insurer** shall only be liable for **Loss** arising from such **Antitrust Claim** which is in excess of a Retention amount of $150,000 (the "**Antitrust Retention**"), such **Antitrust Retention** to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single **Antitrust Retention** shall apply to **Loss** arising from all **Antitrust Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**. In the event a **Claim** triggers more than one Retention amount under the policy, only the highest such amount shall apply, which amount shall apply to all **Loss** under such **Claim**.

4.  Solely with respect to **Antitrust Claims**, it is hereby understood and agreed that the following Clause is added to the end of the **D&O Coverage Section**:

AC-1. COINSURANCE CLAUSE

    With respect to: (1) **Indemnifiable Loss**; and/or (2) **Loss** of the **Company**, the **Insurer** shall be liable to pay 20% of **Loss** excess of the applicable Retention amount, it being a condition of this insurance that the remaining 80% of each and every **Loss** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured.

99486 (06/08)  ***END 24***

<u>ENDORSEMENT# *24*</u>     **(Continued)**

This endorsement, effective *12:01 am*     *July 27, 2017*          forms a part of
policy number  *02-546-71-99*
issued to   *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

5.  Solely with respect to the coverage provided by this endorsement for **Antitrust Claims**, Clause 2. "DEFINITIONS" of the **D&O Coverage Section** is amended by adding the following Definition to the end thereof:

    (AC-1)"**Antitrust Claim**" means any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, including any violation of the *Competition Act,* R.S.C. 1985, c. C-34, the Sherman Antitrust Act, the Clayton Act, the Robinson-Patman Act or any similar federal, state, provincial, territorial or local statutes or rules. "**Antitrust Claim**" also means any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, any actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: business competition, unfair trade practices or tortuous interference in another's business or contractual relationships.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

99486 (06/08)          *END 24*

**ENDORSEMENT# *25***

This endorsement, effective *12:01 am*     *July 27, 2017*          forms a part of
policy number   *02-546-71-99*
issued to    *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**RETENTION AMENDATORY ENDORSEMENT**
**(D&O COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that in Item 3.
**Coverage Summary** of the policy Declarations, the section applicable to the retention for
the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

| Liability Coverage Section | | Retention\Deductible* |
|---|---|---|
| **D&O** | **D&O Coverage Section** | $75,000 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 25*

105032 (04/10)

**ENDORSEMENT# *26***

This endorsement, effective *12:01 am      July 27, 2017*            forms a part of
policy number  *02-546-71-99*
issued to   *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DECLARATIONS PAGE AMENDED - ITEM 3
### (INCREASE SEPARATE D&O LIMIT)

In consideration of the additional premium of $13,500, it is hereby understood and agreed that the policy is amended as follows:

1. In Item 3. **"COVERAGE SUMMARY"** of the Declarations, the section applicable to the **Separate Limit of Liability** for the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

| 3 | COVERAGE SUMMARY | | |
|---|---|---|---|
| | **Liability Coverage Section** | | **Separate Limit of Liability** |
| | **D&O** | D&O Coverage Section | $5,000,000 |

2. Item 7(a) **"POLICY AGGREGATE LIMIT OF LIABILITY"** of the Declarations is deleted in its entirety and replaced with the following:

| 7 | **(a) POLICY AGGREGATE LIMIT OF LIABILITY (For all coverages, combined other than the Crime and the KRE Coverage Sections):** | $6,000,000 |
|---|---|---|

3. Solely with respect to the $4,000,000 excess of $1,000,000 of the **Separate Limit of Liability** applicable to the **D&O Coverage Section**, the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** (including but not limited to any derivative or representative class action(s)) made against any **Insured**:

   (1)   alleging, arising out of, based upon or attributable to, as of <u>07/27/2017</u>, any pending or prior: (1) litigation; or (2) administrative, or regulating proceeding or investigation, of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulating proceeding or investigation; or

   (2)   alleging any **Wrongful Act** occurring prior to <u>07/27/2017</u> if on or before such date an **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim** under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
***END 26***

M112195 (02/14)

**ENDORSEMENT#** *27*

This endorsement, effective *12:01 am      July 27, 2017*                    forms a part of
policy number   *02-546-71-99*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX (AMENDED)

In consideration of the premium charged, it is hereby understood and agreed that the "Forms Index"
Endorsement is amended to include the following:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 94406 | 04/07 | DELETION OF ENDORSEMENT |
| 99486 | 06/08 | ANTITRUST COVERAGE ENDORSEMENT |
| 105032 | 04/10 | RETENTION AMENDATORY ENDORSEMENT |
| M112195 | 02/14 | DECLARATIONS PAGE AMENDED - ITEM 3 |
| SYSLIB | 01/05 | FORMS INDEX (AMENDED) |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 027***

**Exhibit C**

# NOTIFICATION OF CLAIMS & POTENTIAL CLAIMS

Generally speaking, executive liability policies are claims-made policies specifying that an insured must provide prompt notice of a claim. Swift reporting of claims is the best way to ensure that you, the insured, are in compliance with the policy's notice requirements.

## WHEN TO NOTIFY THE INSURANCE COMPANY

It is imperative that you notify your insurance broker and the insurance company as soon as you receive notice that an individual, entity or enforcement or regulatory agency intends to make a claim or has made, filed or commenced a complaint, charge, subpoena, investigation, demand, or request for alternative dispute resolution. These are some, but not all examples, of matters that could trigger a claim. When in doubt, notify your insurance broker and insurance company of any communication against your organization, its executives, or its employees. Even if you are not sure whether the matter triggers coverage, it is best to provide your insurance broker with the information so that they may submit to the insurance company for their evaluation. Executive liability policies also have strict provisions concerning the notice of potential claims. Providing accurate notice of a potential claim can preserve important rights for you under the policy.

Please consult with your legal counsel or insurance professional to review the insurer notice provisions in your policy.



R-T Specialty, LLC (RT), a subsidiary of Ryan Specialty Group, LLC, provides wholesale brokerage and other services to agents and brokers. RT is a Delaware limited liability company based in Illinois. As a wholesale broker, RT does not solicit insurance from the public. Some products may only be available in certain states, and some products may only be available from surplus lines insurers. In California: R-T Specialty Insurance Services, LLC License #0G97516.

© 2017 Ryan Specialty Group, LLC

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.



## National Union Fire Insurance Company of Pittsburgh, Pa.®

A capital stock company

## PrivateEdge Plus

POLICY NUMBER: *02-778-20-05*          REPLACEMENT OF POLICY NUMBER: *02-546-71-99*

### Management Liability, Professional Liability, Crime Coverage and Kidnap And Ransom/Extortion Coverage for Private Companies
### DECLARATIONS

---

**NOTICES**

**[THESE NOTICES ARE APPLICABLE TO ALL COVERAGE SECTIONS OTHER THAN THE CRIME COVERAGE SECTION AND KIDNAP AND RANSOM/EXTORTION COVERAGE SECTION]**

**COVERAGE WITHIN THIS POLICY IS GENERALLY LIMITED TO LOSS FROM CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER AS THE POLICY REQUIRES. DEFENSE COSTS REDUCE THE LIMITS OF LIABILITY (AND, THEREFORE, AMOUNTS AVAILABLE TO RESPOND TO SETTLEMENTS AND JUDGMENTS) AND ARE APPLIED AGAINST APPLICABLE RETENTIONS.**

**THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND UNLESS SUCH COVERAGE IS EXPRESSLY PROVIDED WITHIN A COVERAGE SECTION. WHERE THE INSURER HAS NO DUTY TO DEFEND, IT WILL ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS OF THIS POLICY PRIOR TO THE FINAL DISPOSITION OF A CLAIM. PLEASE REFER TO THE COVERAGE SECTIONS PURCHASED FOR DEFENSE RELATED DETAILS.**

**PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.**

---

| ITEMS | | | |
|---|---|---|---|
| 1 | **NAMED ENTITY:** | (the "Named Entity") | *Little River Healthcare Holdings, LLC* |
| | | MAILING ADDRESS: | *1700 BRAZOS AVE* *ROCKDALE, TX 76567-2517* |
| | | STATE OF INCORPORATION/FORMATION: | *Texas* |
| 2 | **POLICY PERIOD:** | Inception Date: *November 1, 2017* | Expiration Date: *November 1, 2018* |
| | | 12:01 A.M. at the address stated in Item 1 | |

*1512966*

95862 (9/07)                    1                    ℗ All rights reserved.

ITEMS (continued)

**3** **COVERAGE SUMMARY**

| Liability Coverage Section | | Separate Limit of Liability | Shared Limit of Liability | Retention/ Deductible* | Continuity/ Retroactive Date | Premium |
|---|---|---|---|---|---|---|
| D&O | D&O Coverage Section | $5,000,000 | Inapplicable | $75,000 | Continuity: 04/07/2011 | $25,149 |
| EPL | Employment Practices Coverage Section | $1,000,000 | Inapplicable | $50,000 | Continuity: 04/07/2011 | $24,568 |
| FLI | Fiduciary Liability Coverage Section | $1,000,000 | Inapplicable | $0 | Continuity: 11/01/2017 | $1,742 |
| MPL | Miscellaneous Professional Liability Coverage Section Professional Services: | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased | Coverage Section Not Purchased |
| CCP | Employed Lawyers Coverage Section | $1,000,000 | Inapplicable | $10,000 | Retroactive: 11/01/2017 Continuity: 11/01/2017 | $6,881 |
| Crime | Crime Coverage Section | See Section 5: | None | See Section 5: | N/A | $6,929 |
| KRE | Kidnap And Ransom/ Extortion Coverage Section | See Section 6: | None | See Section 6: | N/A | Coverage Section Not Purchased |
| *With respect to the D&O, EPL, FLI and CCP Coverage Sections only, no Retention amount is applicable to Non-Indemnifiable Loss. *No Retention is applicable to Costs of Investigation for Company Shareholder Derivative Investigation, Crisis Management Events, Voluntary Compliance Loss and HIPAA Penalties. | | | | | | N/A |

**4** **TOTAL PREMIUM** $65,269

*1512966*

  ⊙ All rights reserved.

ITEMS (continued)

*Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act, as amended (TRIA):$509 included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows: 83% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.*

*A copy of the TRIA disclosure sent with the original quote is attached hereto.*

### 5. CRIME LIMITS OF LIABILITY AND DEDUCTIBLES

| Insuring Agreement | Per Occurrence Limit of Liability | Deductible |
|---|---|---|
| Insuring Agreement 1.A.: "Employee Theft" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.B.: "Forgery or Alteration" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.C.: "Inside the Premises - Theft of Money or Securities" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.D.: "Inside the Premises - Robbery or Safe Burglary of Other Property" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.E.: "Outside the Premises" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.F.: "Computer Fraud" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.G.: "Funds Transfer Fraud" Loss | $1,000,000 | $10,000 |
| Insuring Agreement 1.H.: "Money Orders and Counterfeit Paper Currency" Loss | $1,000,000 | $10,000 |

If "Not Covered" is inserted above opposite any specific Insuring Agreement, such Insuring Agreement in the Crime Coverage Section and any other reference thereto in this policy is hereby deleted.

**CANCELLATION OF PRIOR CRIME INSURANCE:** By acceptance of the Crime Coverage Section of this Policy, you give us notice of cancellation for the prior Policy Nos: *02-546-71-99*.  Such cancellation shall be effective at the time the Crime Coverage Section of this Policy becomes effective.

*1512966*

95862 (9/07)　　　　　　　　　　　3　　　　　◊ All rights reserved.

ITEMS (continued)

| 6 | KRE LIMITS OF INSURANCE \ INSURED PERSON(S) | | | |
|---|---|---|---|---|
| | Loss Component: | Each Loss Component Limit | | Annual Aggregate Limit |
| | A. Ransom Monies: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | B. In-Transit/Delivery: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | C. Expenses: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | D. Consultant Expenses: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | E. Judgments, Settlements and Defense Costs: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | F. Death or Dismemberment: | *Coverage Section Not Purchased* | | *Coverage Section Not Purchased* |
| | Each Insured Event Limit: | | | *Coverage Section Not Purchased* |
| | Coverage Section Aggregate: | | | *Coverage Section Not Purchased* |
| | Deductible (Each Loss): | | | *Coverage Section Not Purchased* |
| | Insured Person(s): *Coverage Section Not Purchased* | | | |

| 7 | OTHER LIMITS OF LIABILITY | |
|---|---|---|
| | (a) POLICY AGGREGATE LIMIT OF LIABILITY (For all coverages combined other than the Crime and the KRE Coverage Sections: | *$8,000,000* |
| | (b) Crisis Management Fund For D&O: | *$25,000* |
| | (c) Punitive Damages Sublimit of Liability for D&O and/or EPL Coverage Sections:<br>☐ D&O Punitive Damages Sublimit of Liability:<br>☐ EPL Punitive Damages Sublimit of Liability:<br>☐ Shared Punitive Damages Sublimit of Liability (D&O and EPL):<br>☒ No Punitive Damages Sublimit of Liability for D&O or EPL | <br>*$0*<br>*$0*<br>*$0*<br>*Full Limit* |
| | (d) Costs of Investigation Coverage Sublimit for D&O: | *$150,000* |
| | (e) Voluntary Compliance Loss Sublimit of Liability for FLI: | *$25,000* |
| | (f) HIPAA Penalties Sublimit of Liability for FLI: | *$25,000* |

| 8 | DISCOVERY PROVISIONS (Inapplicable to Crime and KRE Coverage Sections) | |
|---|---|---|
| | (a) Percentage of Full Annual Premium for; 1 Year: | *TBD* |
| | (b) 2 Years: | *TBD* |
| | (c) 3 Years: | *TBD* |
| | (d) 4 Years: | *TBD* |
| | (e) 5 Years: | *TBD* |
| | (f) 6 Years: | *TBD* |
| | (g) Percentage of Full Annual Premium for unlimited duration: | *TBD* |

*1512966*

© All rights reserved.

ITEMS (continued)

| | |
|---|---|
| **9(a)** | **NAME AND ADDRESS OF INSURER** |

National Union Fire Insurance Company of Pittsburgh, Pa.
175 Water Street
New York, NY 10038-4969


This policy is issued only by the insurance company indicated in this Item 9(a).

| | |
|---|---|
| **9(b)** | **NOTICE OF CLAIMS AND CIRCUMSTANCES SEND TO:** |

AIG, Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225


**Reference:**   02-778-20-05


PRODUCER:  R T SPECIALTY, LLC
PRODUCER LICENSE NO.: On File with Carrier
ADDRESS:    12404 PARK CENTRAL DRIVE
            SUITE 380
            DALLAS, TX 75251

1512966

◎ All rights reserved.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.


_____                                    _____
PRESIDENT                                                                          SECRETARY

                            _____
                            AUTHORIZED REPRESENTATIVE


_____    _____    _____
COUNTERSIGNATURE          DATE              COUNTERSIGNED AT


*1512966*

95862 (9/07)

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *Little River Healthcare Holdings, LLC*

Policy Number: *02-778-20-05*
Policy Period Effective Date From: *November 1, 2017*     To: *November 1, 2018*

© 2015 National Association of Insurance Commissioner

AIG

## National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

### PRIVATE EDGE PLUS

### General Terms and Conditions

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

**1. TERMS AND CONDITIONS**

These **General Terms and Conditions** shall be applicable to all **Coverage Sections** except: (i) the **KRE Coverage Section**; and (ii) the **Crime Coverage Section**. Terms appearing in these **General Terms and Conditions** which are defined in a **Coverage Section** shall have the meaning provided for such terms in such **Coverage Section** for purposes of coverage provided under such **Coverage Section**. Any reference in these **General Terms and Conditions** to "all **Coverage Sections**" shall not refer to the **KRE Coverage Section** or the **Crime Coverage Section**. The terms and conditions set forth in each **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

**2. DEFINITIONS**

(a) "**Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy, employment practices liability policy, professional liability policy, employed lawyers policy or crime policy issued by the **Insurer**, or any of its affiliates, of which this policy is in whole or part a renewal or replacement or which it succeeds in time.

(b) "**Company**" means the **Named Entity** and any **Subsidiary** thereof. In the event a bankruptcy proceeding shall be instituted by or against a **Company**, the term "**Company**" shall also mean the resulting debtor-in-possession (or equivalent status outside the United States of America), if any.

(c) "**Continuity Date**" means the date set forth in Item 3 of the Declarations with respect to each **Coverage Section**.

(d) "**Coverage Section**" means each **Coverage Section** that is purchased by the **Insured** as indicated in Item 3 of the Declarations.

(e) "**Discovery Period**" means **Discovery Period**, as that term is defined in Clause 8 of these **General Terms and Conditions**.

(f) "**Domestic Partner**" means any natural person legally recognized as a domestic or civil union partner under: (i) the provisions of any applicable federal, state or local law; or (ii) the provisions of any formal program established by the **Company**.

(g) "**Insurer**" means the insurance company indicated in the Declarations.

(h) "**Management Control**" means: (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee of a joint venture or partnership, or the management board of a limited liability company.

GENERAL TERMS AND CONDITIONS
Ⓒ All rights reserved.

(i) **"Named Entity"** means the entity listed in Item 1 of the Declarations.

(j) **"Policy Aggregate Limit of Liability"** means the **Policy Aggregate Limit of Liability** stated in Item 7(a) of the Declarations.

(k) **"Policy Period"** means the period of time from the inception date stated in Item 2 of the Declarations to the earlier of the expiration date stated in Item 2 of the Declarations or the effective date of cancellation of this policy.

(l) **"Related Wrongful Act(s)"** means **Wrongful Act(s)** which are the same, related or continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts. **Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.

(m) **"Separate Limit of Liability"** means the applicable **Separate Limit of Liability**, if any, stated in Item 3 of the Declarations.

(n) **"Shared Limit of Liability"** means the applicable **Shared Limit of Liability**, if any, stated in Item 3 of the Declarations, which limit of liability shall be shared between all of the **Coverage Sections** which are listed below such **Shared Limit of Liability** in the Declarations.

(o) **"Subsidiary"** means:

(i) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** has or had **Management Control ("Controlled Entity")** on or before the inception date of the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**;

(ii) any for-profit entity, whose securities are not publicly traded, of which the **Named Entity** acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**; and

(iii) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by a **Company**.

Notwithstanding the foregoing, coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** or any **Individual Insureds** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that the **Named Entity** obtained **Management Control** of such **Subsidiary** and prior to the time that such **Named Entity** ceased to have **Management Control** of such **Subsidiary**.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from any **Claim** made against: (i) the estates, heirs, or legal representatives of deceased **Individual Insureds**, and the legal representatives of **Individual Insureds** in the event of incompetency, insolvency or bankruptcy, who were **Individual Insureds** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; or (ii) the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or **Domestic Partner** of an **Individual Insured** for all **Claims** arising solely out of his or her status as the spouse or **Domestic Partner** of an **Individual Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Individual Insured** and the spouse or **Domestic Partner**, or property transferred from the **Individual Insured** to the spouse or **Domestic Partner**; provided, however, this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** of the spouse or **Domestic Partner**, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Individual Insured**, subject to the policy's terms, conditions and exclusions.

GENERAL TERMS AND CONDITIONS
℗ All rights reserved.

**4. LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability** or **Shared Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability** or **Shared Limit of Liability**. Amounts incurred for **Defense Costs** shall be applied against the Retention.

**5. RETENTION CLAUSE**

The Retentions stated in the Declarations are separate Retentions pertaining only to the **Coverage Section** for which they are stated in the Declarations. The application of a Retention to **Loss** under one **Coverage Section** shall not reduce the Retention under any other **Coverage Section**.

In the event a **Claim** triggers a Retention in multiple **Coverage Sections**, then the following shall apply:

(a) with regard to **Loss** which is payable under any **Coverage Section** which is subject to a **Separate Limit of Liability**, the Retention applicable to such **Loss** pursuant to the Retention Clause of such **Coverage Section** (or pursuant to any applicable endorsement) shall apply separately to such **Loss**, and the applicable Retention for such **Coverage Section** shall not be reduced by payments of **Loss** made towards the Retention required under any other **Coverage Section**; and

3

GENERAL TERMS AND CONDITIONS
© All rights reserved.

(b) with regard to **Loss** which is payable under any **Coverage Sections** which are subject to a **Shared Limit of Liability**, the highest applicable Retention shall be deemed the Retention applicable to **Loss** arising from such **Claim**.

## 6. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the addressee and at the address identified in Item 9(b) of the Declarations. Notice shall include and reference this policy number as indicated in the Declarations, as well as the **Coverage Sections** under which the **Claim** is being noticed. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

The following shall apply:

(a) The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or a **Crisis Management Event** as soon as practicable after: (i) the **Company's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (ii) the **Crisis Management Event** commences, but in all events a **Claim** must be reported no later than either:

(i) anytime during the **Policy Period** or during the **Discovery Period** (if applicable); or

(ii) within ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 6(a) above, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

(d) Any matter which could involve the payment of **Voluntary Compliance Loss** under the **FLI Coverage Section** shall be reported to the **Insurer** in the same manner as a **Claim** under Clause 6(a)(i) and 6(a)(ii) above.

## 7. CANCELLATION CLAUSE

This policy or any individual **Coverage Section** may be canceled by the **Named Entity** at any time by mailing prior written notice to the **Insurer** stating which **Coverage Sections** are to be canceled or that the entire policy is to be canceled and when thereafter such cancellation shall be effective, or by surrender thereof to the **Insurer** or its authorized agent. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the policy or applicable **Coverage Sections**.

This policy may be canceled by or on the behalf of the **Insurer** only in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by

95726 (9/07) 4

Ⓒ All rights reserved.

the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified or other first class mail, at the **Named Entity's** address as stated in Item 1 of the Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy or any **Coverage Section** shall be canceled by the **Named Entity**, the **Insurer** shall retain the pro rata proportion of the applicable premium herein. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

If the period of limitation relating to the giving of notice as set forth above is also set forth in any law controlling the construction thereof, the period set forth above shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

8. **DISCOVERY CLAUSE**

If the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy or any **Coverage Section**, then, solely with regard to the policy or **Coverage Section** which was canceled or nonrenewed, the **Named Entity** shall have the right, upon payment of the applicable "**Additional Premium Amount**" described below, to a period of up to six (6) years or of unlimited duration following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**"), in which to give the **Insurer** written notice of **Claims** first made against any **Insured** during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by the canceled or nonrenewed policy or **Coverage Section**, as applicable. The rights contained in this Clause 8 shall terminate, however, unless written notice of such election together with the **Additional Premium Amount** due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for the elected **Discovery Period** shall be the "**Full Annual Premium**" (as defined below) multiplied by the applicable percentage amount indicated in Item 8 of the Declarations for the length time of elected for the **Discovery Period**. If the applicable subsection of Item 8 of the Declaration states "to be determined", then the **Additional Premium Amount** for such **Discovery Period** shall be an amount determined by the **Insurer** in its sole and absolute discretion.

As used herein, "**Full Annual Premium**" means:

(a) with regard to a canceled or nonrenewed policy, the total annual premium charged for this policy; or

(b) with regard to a canceled or nonrenewed **Coverage Section**, the total annual premium charged for such **Coverage Section**.

In the event of a **Transaction**, as defined in Clause 9 of these **General Terms and Conditions**, the **Named Entity** shall have the right, within thirty (30) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of up to six (6) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions and premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

5 **GENERAL TERMS AND CONDITIONS**
Ⓡ All rights reserved.

The **Discovery Period** is not cancelable, except that the **Insurer** may cancel the **Discovery Period** for non- payment of premium. This Clause 8 and the rights contained herein shall not apply to any cancellation resulting from non- payment of premium.

## 9. CHANGE IN CONTROL OF NAMED ENTITY

If during the **Policy Period**:

(a) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(b) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

(either of the above events herein referred to as the "**Transaction**"),

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**.

This policy and any purchased **Coverage Section** may not be canceled after the effective time of the **Transaction**. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 8 of these **General Terms and Conditions**.

The **Named Entity** shall give the **Insurer** written notice of the **Transaction** as soon as practicable, but not later than thirty (30) days after the effective date of the **Transaction**.

## 10. SUBROGATION

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to each **Insured's** rights of recovery thereof, and each **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of the **Insured**. In no event, however, shall subrogation be had against any **Individual Insured** under this policy, unless such **Individual Insured** has been convicted of a criminal act, or been determined by a final adjudication to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or determined by a final adjudication to have obtained any profit or advantage to which such **Individual Insured** was not legally entitled.

In the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of an **Individual Insured**, the **Insurer's** subrogation rights shall include, but not be limited to, the assertion of indemnification or contribution rights with respect to any such payments it makes or advances. Additionally, upon the **Insurer** making any payment of **Loss** within the Retention, the **Insurer** shall have a direct contractual right under this policy to recover from the **Company**, or in the event of the bankruptcy of the **Company**, from the debtor- in- possession (or equivalent status outside the United States) such **Loss** which was paid within the Retention. Such direct contractual right of recovery against the **Company** shall be in addition to and independent of the **Insurer's** subrogation right pursuant to this Clause 10 and any other rights the **Insurer** may have under applicable law.

## 11. OTHER INSURANCE

With respect to all **Coverage Sections**, other than the **EPL Coverage Section**, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is expressly written to be excess over the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** provided by this policy. This policy specifically shall be excess of any other policy

GENERAL TERMS AND CONDITIONS
© All rights reserved.

pursuant to which any other **Insurer** has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

Such insurance as is provided by the **EPL Coverage Section** shall be primary unless expressly written to be excess over other applicable insurance.

With respect to all **Coverage Sections**, in the event of a **Claim** against an **Insured** arising out of his or her service as an **Outside Entity Executive**, or a **Claim** against an **Insured** for the **Insured's** liability with respect to a leased **Employee** or independent contractor **Employee** as described in the definition of **"Employee"** in the applicable **Coverage Section**, coverage as is afforded by this policy shall be specifically excess of any: (i) indemnification provided by such **Outside Entity** or leasing company; and (ii) any other insurance provided to such **Outside Entity**, leasing company or independent contractor.

Further, in the event other insurance is provided to the **Outside Entity**, leasing company or independent contractor referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the **Insurer** or any member company of AIG Property Casualty Inc. (**"AIG"**) (or would be provided but for the application of the Retention, exhaustion of the limit of liability or failure to submit a notice of a **Claim**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such other insurance policy issued by **AIG**, shall not exceed the greater of (i) the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** of this policy, or (ii) the limit of liability of such other **AIG** insurance policy.

## 12. NOTICE AND AUTHORITY

Except for the giving of a notice of **Claim**, which shall be governed by the provisions of Clause 6 of these **General Terms and Conditions**, all notices required under this policy to be given by the **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the address stated in Item 9(a) of the Declarations. It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and all **Insureds** with respect to the giving of notice of a **Claim**, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

## 13. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**, which consent shall be in the sole and absolute discretion of the **Insurer**.

## 14. DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, must first be submitted to the non-binding mediation process as set forth in this Clause.

The non-binding mediation will be administered by any mediation facility to which the **Insurer** and the **Named Entity** mutually agree, in which all implicated **Insureds** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the American Arbitration Association's (**"AAA"**) then-prevailing Commercial Mediation Rules. The parties shall mutually agree on the selection of a mediator. The mediator shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator shall also give due consideration to the general principles of the law of

7
GENERAL TERMS AND CONDITIONS
© All rights reserved.

the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy. In the event that such non-binding mediation does not result in a settlement of the subject dispute or difference:

(a) either party shall have the right to commence a judicial proceeding; or

(b) either party shall have the right, with all other parties consent, to commence an arbitration proceeding with the **AAA** that will be submitted to an arbitration panel of three (3) arbitrators as follows: (i) the **Insured** shall select one (1) arbitrator; (ii) the **Insurer** shall select one (1) arbitrator; and (iii) said arbitrators shall mutually agree upon the selection of the third arbitrator. The arbitration shall be conducted in accordance with the **AAA's** then prevailing Commercial Arbitration Rules.

Notwithstanding the foregoing, no such judicial or arbitration proceeding shall be commenced until at least ninety (90) days after the date the non-binding mediation shall be deemed concluded or terminated. Each party shall share equally the expenses of the non-binding mediation.

The non-binding mediation may be commenced in New York, Atlanta, Georgia, Chicago, Illinois, Denver, Colorado or in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**. The **Named Entity** shall act on behalf of each and every **Insured** in connection with any non-binding mediation under this Clause, the selection of arbitration or judicial proceeding or the selection of mediators or arbitrators.

## 15. ACTION AGAINST INSURER

Except as provided in Clause 14 above, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against the **Insured** or the **Company** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by the **Insured** or the **Company** or their legal representatives. Bankruptcy or insolvency of the **Company** or any **Insured** or of their estates shall not relieve the **Insurer** of any of its obligations hereunder.

## 16. WORLDWIDE TERRITORY

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

## 17. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

GENERAL TERMS AND CONDITIONS
⊕ All rights reserved.

**AIG**

## National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

# PrivateEdge Plus

### Fiduciary Liability Insurance
### ("FLI Coverage Section")

**Notice**: Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this **FLI Coverage Section**, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this **FLI Coverage Section**.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   Subject to the other terms, conditions and limitations of this policy, this **FLI Coverage Section** affords the following coverage:

   (a) Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **FLI Coverage Section** shall pay the **Loss** of an **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

   (b) Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **FLI Coverage Section** shall:

      (i) pay the **CAP Penalties** and **Delinquent Filer Penalties**; and

      (ii) reimburse the **Voluntary Fiduciary Correction Loss**,

      of an **Insured**, subject to the **Voluntary Compliance Loss Sublimit of Liability** set forth and defined under Clause 6. "LIMIT OF LIABILITY" of this **FLI Coverage Section**; provided that the **Insured** shall select a Panel Counsel Firm as provided in Clause 8 of this **FLI Coverage Section**.

      The payment of any **Voluntary Compliance Loss** under this **FLI Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

   (a) **INSURER'S DUTY TO DEFEND**

      Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

      The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** has been exhausted.

   (b) **INSURED'S OPTION TO ASSUME DEFENSE**

      Notwithstanding the above, the **Insureds** shall have the right to assume the defense of

95729 (9/07)                                     1                          FLI COVERAGE SECTION
⊚ All rights reserved.

any **Claim** made against them. This right shall be exercised in writing by the **Named Entity** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 6. of the **General Terms and Conditions**. Upon receipt of such written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re- assume the defense of the **Claim**. The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including, but not limited to, negotiating a settlement. Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including, but not limited, to negotiating a settlement of any **Claim**, the **Insurer**'s consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c) **GENERAL PROVISIONS (applicable to both 2(a) and 2(b) above)**

The **Insurer** shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this **FLI Coverage Section**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the terms and conditions of this **FLI Coverage Section**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this **FLI Coverage Section**.

The **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 8 of this **FLI Coverage Section** (if applicable).

3. **DEFINITIONS**

(a) **"Application"** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein, any other documents submitted in connection with the underwriting of this **FLI Coverage Section** or the underwriting of any other fiduciary liability policy (or equivalent policy) issued by the **Insurer**, or any of its affiliates, of which this **FLI Coverage Section** is a renewal or replacement of in whole or part or which it succeeds in time, any public documents filed by the **Named Entity** with any federal, state, local or foreign regulatory agency, and financial statements for all **Plans**, with investment portfolios.

The Definition of **Application** set forth in the **General Terms and Conditions** shall not apply to this **FLI Coverage Section**, which is subject to the above Definition only.

(b) **"Benefits"** means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

(c) **"Breach of Fiduciary Duty"** means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA**.

(d) **"Cafeteria Plan"** means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

(e) **"CAP Penalties"** means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue

Ⓡ All rights reserved.

Service ("**IRS**") pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the **IRS** during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal).

(f) "**Claim**" means:

    (i) a written demand for monetary, non-monetary or injunctive relief;

    (ii) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

        (1) service of a complaint or similar pleading;

        (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

        (3) receipt or filing of a notice of charges;

    (iii) a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or

    (iv) a fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or similar governmental agency which is located outside of the United States.

(g) "**Cleanup Costs**" means expenses, including, but not limited to, legal and professional fees incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(h) "**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

(i) "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of **Individual Insureds**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(j) "**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Individual Insureds** or employees of an **Insured**.

(k) "**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor ("**DOL**") or the **IRS** under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal).

(l) "**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

(m) "**Employee Benefit Law**" means **ERISA** or any similar common or statutory law of the

FLI COVERAGE SECTION
Ⓡ All rights reserved.

United States of America, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Solely with respect to subparagraph 3(kk)(2) of the Definition of **Wrongful Act** in this **FLI Coverage Section**, **Employee Benefit Law** shall also include **HIPAA Privacy Regulations** and any laws concerning unemployment insurance, Social Security, government-mandated disability benefits or similar law. Except as provided in the previous sentence, **Employee Benefit Law** shall not include any law concerning workers' compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

(n) **"ERISA"** means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), including any amendment or revision thereto.

(o) **"ESOP"** means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of or issued by (i) the **Company**, (ii) any acquired **Subsidiary**, or (iii) any parent of any acquired **Subsidiary**, or whose assets at any time within twelve (12) months prior to the inception date of this **FLI Coverage Section** were comprised of ten percent (10%) or more of securities of (i) the **Company**, (ii) any acquired **Subsidiary**, or (iii) any parent of any acquired **Subsidiary**.

(p) **"Fiduciary"** means a fiduciary as defined in an **Employee Benefit Law** (if applicable), with respect to a **Plan**, or a person or entity who exercises discretionary control as respects the management of a **Plan** or the disposition of its assets.

(q) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(r) **"Foreign Policy"** means the **Insurer's** or any other member company of AIG Property Casualty Inc.'s ("**AIG**") standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by **AIG** to be sold within a **Foreign Jurisdiction**, that provides coverage substantially similar to the coverage afforded under this **FLI Coverage Section**. If more than one such **FLI Coverage Section** or policy exists, then **Foreign Policy** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **Foreign Policy** shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

(s) **"Fringe Benefit"** means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

(t) **"HIPAA Penalties"** means civil money penalties imposed upon an **Insured** for violation of **HIPAA Privacy Regulations**.

(u) **"HIPAA Privacy Regulations"** means the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto.

(v) **"Indemnifiable Loss"** means **Loss** for which the **Company** has indemnified or is permitted or required to indemnify any **Individual Insured**.

(w) **"Individual Insured"** means any:

   (i) past, present or future natural person director, officer, governor, general partner, management committee member, **Pension Oversight Committee Member**, member of the board of managers or employee of a **Company** or, if applicable, of a **Plan**, and as

FLI COVERAGE SECTION
© All rights reserved.

to all of the above in his or her capacity as a **Fiduciary**, administrator or trustee of a **Plan**; or

(ii) past, present or future natural person in a position equivalent to a position listed in subparagraph (i) of this Definition in the event that the **Company** is operating in a **Foreign Jurisdiction**.

(x) "**Insured**" means:

(i) any **Individual Insured**;

(ii) any **Plan**;

(iii) the **Company**;

(iv) any **Pension Oversight Committee**; or

(v) any other person or entity in his, her or its capacity as a **Fiduciary**, administrator or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this **FLI Coverage Section**.

(y) "**Loss**" means damages, judgments (including pre and post-judgment interest on a covered judgment), settlements and **Defense Costs**; provided, however, **Loss** shall not include:

(1) civil or criminal fines or penalties imposed by law, except:

(i) to the extent set forth in Insuring Agreement 1(b) of this **FLI Coverage Section** for **Voluntary Compliance Loss**,

(ii) **UK Fines and Penalties**,

(iii) **HIPAA Penalties**, subject to the HIPAA Penalties Sublimit of Liability set forth under Clause 6. "LIMIT OF LIABILITY" of **this FLI Coverage Section**,

(iv) the five percent (5%) or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**,

(v) the twenty percent (20%) or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments;

(2) taxes or tax penalties;

(3) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**;

(4) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Individual Insured**; provided however, that **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** or loss in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of the **Named Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits"; or

(5) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (y)(1) through (y)(5) above of this Definition, subject to the other terms, conditions and exclusions of this **FLI Coverage Section**.

FLI COVERAGE SECTION
◇ All rights reserved.

Where permitted by law, **Loss** shall specifically include (subject to the policy's other terms, conditions and exclusions, including, but not limited to, exclusions 5(a) and 5(b) of this **FLI Coverage Section**), punitive or exemplary damages or the multiplied portion of multiplied damages imposed upon any **Insured**. The enforceability of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

**Loss** shall include **Voluntary Compliance Loss**.

(z) "**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan or excess benefit plan.

(aa) "**Pension Oversight Committee**" means any pension oversight committee duly formed by a **Trustee Company** and duly appointed to act as a trustee of the **Plan** or acting as a constructive trustee of the **Plan**.

(bb) "**Pension Oversight Committee Member**" means any duly elected or appointed member of a **Pension Oversight Committee**.

(cc) "**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

(dd) "**Plan**" means automatically any plan, fund, trust or program (including, but not limited to, any plan, fund, trust or program considered or created by the **Named Entity** during the **Policy Period**, any IRA-based Plan, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, **Non-qualified Plan**, or qualified **Pension Plan**), established anywhere in the world, which was, is or shall be sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees or the directors and officers of the **Company**, subject to the provisions set forth below:

(1) if such Plan is a **Pension Plan**, other than an **ESOP** or **Pension Plan** described in subparagraphs (dd)(5) and (dd)6 below, then the **Named Entity** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this **FLI Coverage Section**, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal;

(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this **FLI Coverage Section** the **Named Entity** shall have provided written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this **FLI Coverage Section** and pay any required premium relating to such **Plan**, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Entity** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP**, stock option plan or stock based compensation plan, this **FLI Coverage Section** shall only provide coverage for such plan upon written notice of such **Plan** to the **Insurer**, payment of any required premium, and such **Plan** has been added to the Definition of **Plan** by specific written endorsement attached to this policy;

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**) and:

(i) is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total less than twenty-five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this **FLI**

FLI COVERAGE SECTION

Ⓒ All rights reserved.

**Coverage Section**; or

(ii) is acquired during the **Policy Period** and such **Plan's** assets total less than twenty-five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this **FLI Coverage Section**;

then this **FLI Coverage Section** shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition). The **Named Entity** shall provide the **Insurer** with full particulars of such new **Plan** before the end of the **Policy Period**; or

(6) if such **Plan** is a **Pension Plan** (other than an **ESOP**) and:

(i) is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total more than twenty- five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this **FLI Coverage Section**; or

(ii) is acquired during the **Policy Period** and such **Plan's** assets total more than twenty- five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this **FLI Coverage Section**,

then, this **FLI Coverage Section** shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition), but only upon the condition that within ninety (90) days of its acquisition, the **Named Entity** shall have provided the **Insurer** with a completed **Application** for such new **Plan** and agreed to any additional premium or amendment of the provisions of this **FLI Coverage Section** required by the **Insurer** relating to such new **Plan**. This ninety (90) day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Named Entity** and the failure to report such **Plan** within the ninety (90) day reporting period was due to inadvertent omission by the **Named Entity** and upon discovery of such **Plan**, the **Named Entity** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: the following government- mandated programs: unemployment insurance, Social Security or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this **FLI Coverage Section**; and any other plan, fund or program which is included in the Definition of **Plan** by specific written endorsement attached to this **FLI Coverage Section**.

In no event, however, shall the definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

(ee) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(ff) **"UK Fines and Penalties"** means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom, by the Occupational Pensions Regulatory Authority in the United Kingdom, by the Pensions Regulator in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of this **FLI Coverage Section**.

(gg) **"Trustee Company"** means a corporate trustee company that is (1) established by a **Company** formed and operating in a **Foreign Jurisdiction**, or any predecessor of such

FLI COVERAGE SECTION
Ⓒ All rights reserved.

Company, and (2) duly appointed to act as a trustee of a **Plan** in a **Foreign Jurisdiction** and sponsored solely by such **Company**.

(hh) "**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

(ii) "**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the **DOL** Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this **FLI Coverage Section** is a continuous renewal), provided that such compliance with the **DOL's** Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the **DOL**; provided, however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this **FLI Coverage Section** or the first policy issued by the **Insurer** to the **Named Entity** of which this **FLI Coverage Section** is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(jj) "**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

(kk) "**Wrongful Act**" means:

(1) a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**;

(2) any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

(i) counseling employees, participants and beneficiaries;

(ii) providing interpretations;

(iii) handling of records;

(iv) activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**; or

(v) complying with **HIPAA Privacy Regulations**;

or any matter claimed against an **Insured** solely by reason of his, her or its status as an administrator, but only with respect to a **Plan**; and

(3) as respects an **Individual Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or administrator of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Company** and such multiemployer plan is added by specific written endorsement attached to this **FLI Coverage Section**, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this **FLI Coverage Section** extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than an **Individual Insured**.

◇ All rights reserved.

**4. WORLDWIDE EXTENSION**

For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; provided, however, this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre- authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this **FLI Coverage Section**. This paragraph shall not apply to excess provisions or policy provisions that address non- renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

All premiums, limits, retentions, **Loss** and other amounts under this **FLI Coverage Section** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this **FLI Coverage Section** (subject to the terms, conditions and limitations of this **FLI Coverage Section**) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer**'s obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

**5. EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to the committing of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law** by the **Insured** if any final adjudication establishes that such criminal or deliberate fraudulent act was committed;

(c) for discrimination in violation of any law; provided, however, this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this **FLI Coverage Section** is a renewal or replacement of in whole or part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; provided, however, this exclusion shall not apply to: (1) **Defense Costs**; or (2) the portion of **Loss** that is payable as a personal obligation of an **Individual Insured**;

FLI COVERAGE SECTION
© All rights reserved.

(g) alleging, arising out of, based upon or attributable to any act or omission of an **Insured** in his, her or its capacity as a **Fiduciary** or administrator of any plan, fund or program, other than a **Plan** as defined in this **FLI Coverage Section**, or by reason of his, her or its status as a **Fiduciary** or administrator of such other plan, fund or program;

(h) for bodily injury, sickness, disease, death or emotional distress of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**;

(i) alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Company** did not sponsor such **Plan** or when the **Individual Insured** was not a **Fiduciary**, administrator, trustee, **Pension Oversight Committee Member**, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Company** or, if applicable, a **Plan**;

(j) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to non-Indemnifiable **Loss** arising from a **Claim** alleging damage to a **Plan**, other than non-Indemnifiable **Loss** constituting **Cleanup Costs**;

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 5(d) and 5(e): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 6. LIMIT OF LIABILITY

The following provision shall apply in addition to the provisions of Clause 4. LIMIT OF LIABILITY of the **General Terms and Conditions**:

### VOLUNTARY COMPLIANCE LOSS SUBLIMIT OF LIABILITY

The maximum limit of the **Insurer's** liability for all **Voluntary Compliance Loss** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(e) of the Declarations ("**Voluntary Compliance Loss Sublimit of Liability**"). The **Voluntary Compliance Loss Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section**, and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

### HIPAA PENALTIES SUBLIMIT OF LIABILITY

The maximum limit of the **Insurer's** liability for all **HIPAA Penalties**, in the aggregate, shall be the amount set forth in Item 7(f) of the Declarations ("**HIPAA Penalties Sublimit of Liability**"). The **HIPAA Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section**, and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

## 7. RETENTION CLAUSE

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of

© All rights reserved.

the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 3 of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to (1) all **Indemnifiable Loss**; and (2) **Loss** of a **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

Notwithstanding the foregoing, no Retention is applicable to **Voluntary Compliance Loss** or **HIPAA Penalties**.

## 8. PRE-AUTHORIZED DEFENSE ATTORNEYS

This Clause 8 applies only to: (1) a **Claim** brought by any government entity; (2) a request for coverage for a **Voluntary Compliance Loss**; or (3) a **Claim** brought in the form of a class or representative action or which purports to be brought as a class or representative action.

Affixed as Appendix C hereto and made a part of this **FLI Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firm(s)**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** to which this Clause 8 applies and pursuant to the terms set forth in this Clause.

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this **FLI Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Entity**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Entity** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of this **FLI Coverage Section**, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Entity**. At the request of the **Named Entity**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non-**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

## 9. WAIVER OF RECOURSE

Except for the **Insurer's** subrogation rights set forth in Clause 10 of the **General Terms and Conditions**, the **Insurer** shall have no right of recourse against an **Insured** unless required pursuant to any **Employee Benefit Law**.

It is further provided that in the event of any recovery under this Clause 9, any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

 FLI COVERAGE SECTION
© All rights reserved.

## 10. ORDER OF PAYMENTS

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **FLI Coverage Section**, then the **Insurer** shall in all events:

(a) first, pay **Loss** for which coverage is provided under this **FLI Coverage Section** for any **Individual Insured**;

(b) second, only after payment of **Loss** has been made pursuant to Clause 10(a) above with respect to whatever remaining amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** is available after such payment, pay the **Loss** of any covered **Plan**; and

(c) then, only after payment of **Loss** has been made pursuant to Clause 10(a) and 10(b) above, with respect to whatever remaining amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **FLI Coverage Section** is available after such payment, shall payment for the **Company** be made for such other **Loss** for which coverage is provided under this **FLI Coverage Section**.

[The balance of this page is intentionally left blank.]

FLI COVERAGE SECTION
Ⓒ All rights reserved.



# National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

### PrivateEdge Plus<sup>SM</sup>

### Corporate Counsel Premier Insurance ("CCP Coverage Section")

<u>Notice</u>: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this CCP Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this CCP Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which form a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

Subject to the other terms, conditions and limitations of this **CCP Coverage Section**, solely with respect to **Claims** firstmade against an **Individual Insured** during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** pursuant to the terms of this policy, this **CCP Coverage Section** affords the following coverage:

### COVERAGE A: CORPORATE COUNSEL PROFESSIONAL LIABILITY

The **Insurer** shall pay amounts an **Individual Insured** is legally obligated to pay as **Loss** arising from any **Claim** made against such **Individual Insured** for **Wrongful Acts**, except when and to the extent that the **Company** has indemnified the **Individual Insured** for **Loss**.

### COVERAGE B: COMPANY INDEMNIFICATION OF INDIVIDUAL INSUREDS

The **Insurer** shall pay amounts the **Company** is legally obligated to pay as **Loss** arising from any **Claim** made against an **Individual Insured** for **Wrongful Acts**, but only to the extent that the **Company** has indemnified an **Individual Insured** for **Loss**.

### COVERAGE C: DEFENSE OF INSUREDS

(a) *The **Insurer's** Duty To Defend*: The **Insurer** has the right and duty to defend a **Claim** brought against an **Individual Insured** for **Wrongful Acts**, even if the **Claim** is groundless, false or fraudulent. The **Insurer** shall pay for **Defense Costs** incurred in the defense of a **Claim** for **Wrongful Acts**. The **Insurer** shall have no duty to defend a **Claim** insured by **D&O Coverage** or a **Securities Claim**.

(b) ***Defense Costs***: The **Insurer** shall indemnify for **Defense Costs** incurred in: (i) any **Securities Claim**; or (ii) in any **Claim** where the coverage afforded by this **CCP Coverage Section** is excess of **D&O Coverage**, provided that such **Defense Costs** are incurred with the **Insurer's** prior written consent in the defense of **Wrongful Acts**.

(c) *When the **Insurer's** Duty Ends*: The **Insurer's** duty to defend and any obligation to indemnify an **Individual Insured** shall end:

(i) once the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** has been exhausted by payment of **Defense Costs** or **Loss**; or

(ii) if the **Individual Insured** or, if applicable, a **Company**, fails or refuses to consent to a settlement that the **Insurer** recommends and the claimant will accept. The **Individual Insured** must then defend the **Claim** at their own expense. As a consequence of such failure or refusal to consent, the **Insurer's** liability for **Loss** shall not exceed the amount for which the **Insurer** could have settled such **Claim** had the **Individual**

CCP COVERAGE SECTION
© All rights reserved.

Insured or, if applicable, a **Company**, consented, plus **Defense Costs** incurred prior the time the **Insurer** made such recommendation, plus seventy percent (70%) of **Defense Costs** incurred with the **Insurer's** consent after the date of the **Individual Insured's** or, if applicable, a **Company's** refusal.

Provided, however, this subparagraph (c)(ii) shall not apply to the settlement of the following proceedings that are brought in connection with a **Securities Claim** when such settlement would require an **Individual Insured** to enter into a plea of guilty:

(1) criminal proceeding commenced by a return of an indictment, information, notice of charges or similar document; or

(2) a civil, administrative or regulatory investigation of an **Individual Insured** by the Securities and Exchange Commission, Department of Justice or a similar state or foreign government authority, commenced by the service of a subpoena on such **Individual Insured**.

## 2. DEFINITIONS

(a) "**Administrative Proceeding Claim**" means a judicial, administrative, bar association or other proceeding against a **Corporate Counsel** solely concerning the eligibility or license of such **Corporate Counsel** to practice law, or compliance with the Sarbanes-Oxley Act of 2002 and any rule or regulations promulgated thereunder or pursuant thereto.

(b) "**Claim**" means:

(i) a written demand for monetary, non-monetary or injunctive relief;

(ii) a written request to toll or waive a statute of limitations relating to a potential **Claim** against an **Individual Insured**;

(iii) a **Suit**;

(iv) an **Administrative Proceeding Claim**; or

(v) a **Securities Claim**.

(c) "**Corporate Counsel**" means any attorney at law admitted to the bar in or otherwise licensed to the practice of law in the United States of America or any of its territories, Canada or any other foreign jurisdiction, but solely while an **Employee** of a **Company**.

Notwithstanding the foregoing, "**Corporate Counsel**" shall not mean a **Secondment Attorney**.

(d) "**Defense Costs**" means all reasonable and necessary fees charged by attorneys designated by the **Insurer** and all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** if incurred by the **Insurer**, or by an **Individual Insured** with the **Insurer's** prior written consent, including the costs of appeal, attachment or similar bonds arising out of a covered judgment. The **Insurer** shall have no obligation to provide such bonds.

"**Defense Costs**" shall not include:

(i) compensation, fees, overhead or benefit expenses associated with an **Individual Insured** or an **Executive** or **Employee** of a **Company** in connection with the investigation, adjustment, defense and appeal of a **Claim**; or

(ii) fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Individual Insured**.

(e) "**Directors and Officers Coverage**" means any valid and collectible Directors and Officers liability insurance coverage available to an **Individual Insured** (or any excess coverage thereto), including, but not limited to, such coverage as provided under any policy or self

CCP COVERAGE SECTION
© All rights reserved.

insurance program for managerial liability, directors and officers liability, general partner liability, employment practices liability, catastrophe coverage or similar insurance ("**D & O Coverage**").

(f) "**Employee**" means any past, present or future employee, including any part-time, seasonal and temporary employee of a **Company**.

(g) "**Executive**" means any:

(i) past, present or future duly elected or appointed director, officer, partner, trustee or governor of a **Company**, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position) of a **Company**;

(ii) past, present or future General Counsel or Risk Manager (or equivalent position) of the **Named Entity**; or

(iii) past, present or future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in subparagraph (i) of this definition.

(h) "**Financial Insolvency**" means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii) as to both (i) or (ii), any equivalent events outside the United States of America.

(i) "**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

(j) "**Indemnifiable Loss**" means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

For the purposes of determining whether **Loss** constitute **Indemnifiable Loss**, unless a **Company** is unable to do so due to **Financial Insolvency**, a **Company** shall be conclusively deemed to have indemnified the **Individual Insured** to the maximum extent that a **Company** is permitted or required to provide such indemnification pursuant to law, common or statutory, or contract, or by the charter or by-laws of a **Company**, which are hereby deemed to incorporate the broadest provisions of the law which determines or defines such rights of indemnity.

(k) "**Individual Insured**" means any:

(i) **Corporate Counsel**;

(ii) **Employee** of a **Company** who supports a **Corporate Counsel** in the performance of **Legal Services**;

(iii) licensed attorney provided by an employment contractor or agency under a written agreement between a **Company** and the employment contractor or agency to perform **Legal Services** for or on behalf of a **Company**; and

(iv) any independent contractor that is an attorney at law admitted to the bar in or otherwise licensed to the practice of law in any of the United States of America or its territories, Canada or any other foreign jurisdiction, who, pursuant to a written agreement with a **Company**, has been retained to provide **Legal Services** for or on behalf of a **Company**.

Notwithstanding the foregoing, "**Individual Insured**" shall not mean a **Secondment**

3
CCP COVERAGE SECTION
Ⓒ All rights reserved.

**Attorney**.

(l) "**Insured**" means:

    (i) an **Individual Insured**; or

    (ii) a **Company**.

(m) "**Legal Services**" means any professional legal services that are rendered by:

    (i) a **Corporate Counsel** but solely in his or her capacity as an **Employee** of a **Company**;

    (ii) a **Corporate Counsel** but solely while a full time, permanent **Employee** of a **Company** (including **Moonlighting Services** and *pro bono* services); and

    (iii) any **Individual Insured** but solely while acting under the supervision of and at the direction of a **Corporate Counsel**.

"**Legal Services**" shall also include notarizing, certifying or acknowledging any signature rendered in connection with subparagraphs (i) through (iii) above.

(n) "**Loss**" means any amount that an **Individual Insured** shall be legally required to pay because of judgments, arbitration awards or settlements negotiated by the **Insurer** or by an **Individual Insured** in accordance with Coverage C.

"**Loss**" also means with respect to a covered judgment:

    (i) pre-judgment interest;

    (ii) post-judgment interest that accrues after entry of judgment and before the **Insurer** has paid, offered to pay or deposited in court that covered part of the judgment within the applicable Limit of Liability; and

    (iii) subject to this **CCP Coverage Section's** other terms, conditions, exclusions and other limitations, including, but not limited to, exclusions relating to profit or advantage, fraud or criminal acts:

        (1) punitive damages;

        (2) exemplary damages; and

        (3) multiple damages;

    the enforceability of this subparagraph (iii) of this definition shall be governed by the applicable law that most favors coverage for such punitive, exemplary and multiple damages.

Provided, however, "**Loss**" shall not mean, and this **CCP Coverage Section** shall not cover:

    (i) civil or criminal fines or penalties;

    (ii) taxes;

    (iii) any amounts for which an **Individual Insured** is not financially liable or which are without legal recourse to an **Individual Insured**;

    (iv) the costs and expenses of complying with any injunctive or other form of non-monetary relief; and

    (v) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(o) "**Moonlighting Services**" shall mean professional legal services, including, but not limited to, notarizing, certifying or acknowledging any signature, that are rendered by a

                  4

CCP COVERAGE SECTION
⊕ All rights reserved.

**Corporate Counsel** outside the scope of their employment with a **Company**; provided, however, **"Moonlighting Services"** shall not include such services performed by a **Corporate Counsel** in their capacity as owner, principal, partner or employee of an entity that is not a **Company**

(p) **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** has not indemnified an **Individual Insured**, either because of **Financial Insolvency** or because such **Company** is not permitted or required to indemnify the **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(q) **"Personal Injury Peril"** means any:

(i) false arrest, detention or imprisonment;

(ii) malicious prosecution;

(iii) libel or slander or other defamatory or disparaging materials;

(iv) publication or an utterance in violation of an individual's right to privacy;

(v) wrongful entry or eviction, or other invasion of the right to private occupancy; and

(vi) if arising out of (i) through (v) above, mental anguish, mental injury, shock, humiliation or emotional distress.

(r) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(s) **"Retroactive Date"** means the date set forth as such in Item 3 of the Declarations.

(t) **"Secondment Attorney"** means a non-**Employee** attorney that is employed by an outside law firm and is temporarily assigned by agreement between such law firm and a **Company** to perform **Legal Services** at the direction of a **Company**.

(u) **"Securities Claim"** means a **Claim** made against an **Individual Insured** arising from **Legal Services**:

(i) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of a **Company**; or

(2) brought by a security holder, purchaser or seller of securities of a **Company** with respect to such security holder's, purchaser's or seller's interest in securities of such **Company**; or

(ii) brought derivatively on behalf of the **Company** by a security holder of such **Company**.

**"Securities Claim"** shall also mean the following in connection with subparagraphs (i) or (ii) above:

(i) a criminal proceeding which is commenced by indictment, information, notice of charges or similar document; or

(ii) a civil, administrative or regulatory investigation of an **Individual Insured** by the Securities and Exchange Commission, Department of Justice or a similar state or foreign government authority, commenced by the service of a subpoena upon such **Individual Insured**.

CCP COVERAGE SECTION
© All rights reserved.

(v) **"Suit"** means:

    (i) a civil proceeding for monetary, non-monetary or injunctive relief which is commenced by service of a complaint or similar pleading; or

    (ii) a binding arbitration proceeding in which **Loss** are alleged and to which an **Individual Insured** must submit or does submit with the **Insurer's** prior consent.

(w) **"Transaction"** means for this **CCP Coverage Section** only, further to the definition provided for in Clause 9 of the **General Terms and Conditions**, the **D&O Coverage** being cancelled or nonrenewed and such cancellation or nonrenewal results in a lapse of coverage occurrence.

(x) **"Wrongful Act"** means any actual or alleged:

    (i) negligent act, error, omission, breach of duty, misstatement or misleading statement; or

    (ii) **Personal Injury Peril**.

    committed by an **Individual Insured** in the performance of **Legal Services**.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Individual Insured**:

(a) arising out of, based upon or attributable to:

    (i) with respect to all **Claims** other than **Securities Claims**, any: (1) dishonest, fraudulent, criminal or malicious act or omission (other than malicious prosecution), (2) intentional or knowing violation of the law, (3) profit, remuneration or pecuniary advantage to which an **Individual Insured** was not legally entitled, or (4) commingling, misappropriation, or improper use of funds; provided, however, the **Insurer** will defend a **Claim** against an **Individual Insured** alleging any of the foregoing conduct until there is a final judgment against, final adjudication against, adverse finding of fact against in a binding arbitration proceeding or plea of guilty or no contest by an **Individual Insured** as to such conduct, at which time the **Individual Insured** shall reimburse the **Insurer** for **Defense Costs**; or

    (ii) with respect to **Securities Claims**, any: (1) deliberate criminal or deliberate fraudulent act; or (2) profit, remuneration or pecuniary advantage to which an **Individual Insured** was not legally entitled; provided, however, the **Insurer** will defend a **Securities Claim** against an **Individual Insured** alleging any of the foregoing conduct until there is a final judgment against, final adjudication against, adverse finding of fact against or plea of guilty or no contest by an **Individual Insured** as to such conduct, at which time the **Individual Insured** shall reimburse the **Insurer** for **Defense Costs**;

For the purpose of determining the applicability of the foregoing Exclusion 3(a): (1) the facts pertaining to and knowledge possessed by any **Individual Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent positions) of a **Company** shall be imputed to a **Company**.

(b) alleging, arising out of, based upon, or attributable to employment of any individual or any employment practice (including but not limited to wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim); provided, however, this exclusion shall not apply to the **Legal Services** provided by an **Individual Insured** in connection with the employment of any individual or any employment practice, whether such **Legal Services** are provided to a third party or to a

CCP COVERAGE SECTION
© All rights reserved.

**Company**;

(c) alleging, arising out of, based upon or attributable to any **Wrongful Act** committed or omitted prior to the **Retroactive Date** or any **Related Wrongful Act** thereto, regardless of when such **Related Wrongful Act** is committed or omitted;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **CCP Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act(s)** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) alleging, arising out of, based upon or attributable to any bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property;

(g) against an **Individual Insured** that is brought, directly or indirectly, by or on behalf a **Company**; provided, however, this exclusion shall not apply to **Defense Costs** incurred in connection with such **Claim**;

(h) that is brought by a security holder or member of a **Company**, whether directly or derivatively, unless such security holder or member **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of an **Individual Insured**, a **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

   (i) any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least four (4) years prior to such **Claim** being first made against any person; or

   (ii) any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Company** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States of America, Canada or any other common law country (including any territories thereof);

(i) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA); provided, however, this exclusion shall not apply to **Claims** arising out of a **Corporate Counsel** providing **Legal Services** to an ERISA fiduciary;

(j) for violation(s) of any of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law;

It is further understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Individual Insured** alleging, arising out of, based upon, attributable to or in any way relating to:

7

CCP COVERAGE SECTION
© All rights reserved.

(i) the refusal, failure or inability of any **Individual Insured(s)**, **Employee**, **Executive** of the **Company** or **Company** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered (as opposed to tort-based back pay or front pay damages for torts other than conversion);

(ii) improper payroll deductions taken by any **Individual Insured(s)**, **Employee**, **Executive** of the **Company** or **Company** from any **Employee(s)** or purported **Employee(s)**; or

(iii) the failure to provide or enforce legally required meal or rest break periods.

(k) alleging, arising out of, based upon or attributable to any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission by an **Individual Insured** in any capacity other than when providing **Legal Services**;

(l) alleging, arising out of, based upon or attributable to; (i) any actual or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to **Claims** alleging any of the foregoing where the underlying **Legal Services** performed by an **Individual Insured** giving rise to such **Claim** were not the direct immediate cause of the foregoing;

(m) alleging, arising out of, based upon or attributable to any misappropriation of a trade secret;

(n) alleging, arising out of, based upon or attributable to any services performed by any contract, seasonal, part-time or leased lawyer other than **Legal Services** provided for the **Company** at the direction of **Corporate Counsel**;

(o) alleging, arising out of, based upon or attributable to any **Individual Insured** notarizing, certifying or acknowledging any signature not signed by such **Individual Insured** at the time of such notarization, certification or acknowledgment;

(p) alleging, arising out of, based upon or attributable to the return or restitution of fees, expenses or costs, or other disgorgement;

(q) alleging, arising out of, based upon or attributable to the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or assets of any entity is inadequate; provided, however, this exclusion shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith; or

(r) for compensation, salary, wages, fees, benefits, overhead, charges or expenses of any: (i) **Individual Insured**; (i) **Employee**; (iii) **Executive** of the **Company**; or (iv) **Company**.

**4. RETENTION**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the General Terms and Conditions:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for the **CCP Coverage Section**, such Retention amount to be borne by the **Company** and/or the **Individual Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**.

Notwithstanding anything in this **CCP Coverage Section** to the contrary, there shall be no **Retention** for **Securities Claims** that, pursuant to Clause 6. **OTHER INSURANCE**, this **CCP Coverage Section** applies only as excess.

CCP COVERAGE SECTION
© All rights reserved.

**5. WHAT YOU MUST DO IN THE EVENT OF A CLAIM**

(a) In addition to providing notice as required under this policy, each and every **Individual Insured** and **Company** must also:

    (i) send the **Insurer** copies of all demands, suit papers, other legal documents and invoices for **Defense Costs** received by such **Individual Insured**, as soon as practicable;

    (ii) immediately record the specifics of any **Claim** and the date such **Individual Insured** first received such **Claim**;

    (iii) upon the **Insurer's** request, furnish to the **Insurer** any and all documentation within the possession of the **Individual Insured**; and

    (iv) give to the **Insurer**, and to any counsel the **Insurer** selects to represent an **Individual Insured** in connection with a **Claim**, full cooperation and such information as the **Insurer** or the counsel may require, including, but not limited to, assisting the **Insurer** or the counsel in: (1) any investigation of a **Claim**, or other matter relating to the coverage afforded under this **CCP Coverage Section** (including submission to an examination by the **Insurer** or the **Insurer's** designee, under oath if required by the **Insurer**); (2) making settlements; (3) enforcing any legal rights any **Individual Insured** or the **Insurer** may have against any person or entity who may be liable to an **Individual Insured**; (4) attending depositions, hearings and trials; (5) securing and giving evidence, and obtaining the attendance of witnesses; and (6) any inspection or survey conducted by the **Insurer**.

(b) No **Individual Insured** or **Company** shall admit any liability, settle any **Claim**, assume any financial obligation or pay any money in connection with any **Claim** without the **Insurer's** prior written consent. If any **Individual Insured** or **Company** does, it will be at their own expense and such amounts shall not be applied to the applicable Retention.

(c) The **Insurer** shall have the right to associate fully and effectively with each and every **Individual Insured** and, with respect to Coverage B, the **Company**, in the defense of any **Claim** or any matter that involves or appears reasonably likely to involve, the **Insurer**, including, but not limited to, negotiating a settlement.

(d) This **CCP Coverage Section** affords no coverage for **Defense Costs** incurred by, settlements by or on behalf of, contractual obligations of, or judgments against any entity whether arising out of a **Claim** made against the **Company**, based upon any legal obligation to pay any amount that the **Company** has or may have to a claimant, or derived from the acts or omissions of **Individual Insureds**.

No **Company** is covered in any respect under Coverage A or Coverage C. The **Company** is covered, subject to this **CCP Coverage Section's** terms, conditions, exclusions and other limitations only with respect to its indemnification of **Individual Insureds** under Coverage B as respects a **Claim** against such **Individual Insured**.

(e) The following shall only apply to a **Securities Claims** and related **Claims** for which there is no other **D&O Coverage**:

Affixed as Appendix A hereto and made a part of this **CCP Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**"). The list provides the **Individual Insured** with a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of a **Claim** made against an **Individual Insured**.

For defense of **Claim(s)**, the **Individual Insured(s)** shall select a **Panel Counsel Firm** to defend such **Claim(s)** made against the **Individual Insured** in the jurisdiction in which the **Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, the **Individual Insured(s)** shall select a **Panel Counsel Firm** in the listed jurisdiction

CCP COVERAGE SECTION
© All rights reserved.

which is the nearest geographic jurisdiction to either where the **Claim** is brought or where the corporate headquarters of the **Named Entity** is located. In such instance the **Individual Insureds** and the **Insurer** shall jointly select a non-**Panel Counsel Firm** in the jurisdiction in which the **Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Claim**.

With the **Insurer's** express prior written consent, an **Individual Insured** may select a **Panel Counsel Firm** different from that selected by another **Individual Insured** defendant if such selection is required due to an actual conflict of interest. The list of **Panel Counsel Firms** may be amended from time to time, including during the **Policy Period**, at the **Insurer's** sole discretion.

(f) In all events, no **Individual Insured** shall intentionally take any action, or fail to take any required action, which prejudices the **Insurer's** rights.

## 6. OTHER INSURANCE

The following provision shall apply in addition to the provisions of Clause 11. OTHER INSURANCE of the General Terms and Conditions:

This **CCP Coverage Section** shall apply specifically as excess to any **D&O Coverage** and the **Insurer** shall have no duty to defend or obligation to pay **Loss** or **Defense Costs** until the applicable limits of all such **D&O Coverage** have been exhausted.

## 7. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this **CCP Coverage Section**, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **CCP Coverage Section** as being accurate and complete. All such statements and representations shall be deemed to be the basis of this **CCP Coverage Section** and are to be considered as incorporated into this **CCP Coverage Section**.

(a) Coverage A Non-Rescindable: The **Insurer** shall not be entitled, under any circumstances, to rescind Coverage A of this **CCP Coverage Section**.

(b) Full **Application** Severability: With respect to the statements, warranties and representations contained in any **Application** for this **CCP Coverage Section**, no knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage with respect to any **Claim** made against such other **Individual Insured**.

## 8. ORDER OF PAYMENTS

In the event of **Loss** arising from any **Claim** for which payment is due under the provisions of this **CCP Coverage Section** but which **Loss**, in the aggregate, exceeds the remaining available **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **CCP Coverage Section**, then the **Insurer** shall:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **CCP Coverage Section**, then with respect to whatever remaining amount of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** is available after payment of such **Loss**,

(b) then pay such **Loss** for which coverage is provided under Coverage B of this **CCP Coverage Section**.

In the event of **Loss** arising from a **Claim** for which payment is due under the provisions of this **CCP Coverage Section** (including those circumstances described in the first paragraph of this Clause 8), the **Insurer** shall at the written request of the **Named Entity**:

CCP COVERAGE SECTION
Ⓒ All rights reserved.

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **CCP Coverage Section**, then

(b) either pay or hold payment for such **Loss** for which coverage is provided under Coverage B of this **CCP Coverage Section**.

In the event that the **Insurer** withholds payment under Coverage B of this **CCP Coverage Section** pursuant to the above request, then the **Insurer** shall at any time in the future, at the request of the **Named Entity**, release such **Loss** payment to the **Company**, or make such **Loss** payment directly to the **Individual Insured** in the event of covered **Loss** under any **Claim** covered under this **CCP Coverage Section** pursuant to Coverage A of this **CCP Coverage Section**.

The **Financial Insolvency** of any **Company** or any **Individual Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this **CCP Coverage Section** pursuant to this Clause 8.


[The balance of this page is intentionally left blank.]

CCP COVERAGE SECTION
© All rights reserved.

# National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

### PrivateEdge Plus

### Directors, Officers and Private Company Liability Insurance ("D&O Coverage Section")

**Notice**: Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this D&O Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this D&O Coverage Section.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

With respect to Coverage A, B and D and the Defense Provisions, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **D&O Coverage Section** affords the following coverage:

### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of an **Individual Insured** of the **Company** arising from a **Claim** made against such **Individual Insured** for any **Wrongful Act** of such **Individual Insured**, except when and to the extent that the **Company** has indemnified such **Individual Insured**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

### COVERAGE B: PRIVATE COMPANY INSURANCE

This **D&O Coverage Section** shall pay the **Loss** of the **Company** arising from a:

(i) **Claim** made against the **Company**, or

(ii) **Claim** made against an **Individual Insured**,

for any **Wrongful Act**, but, in the case of Coverage B(ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

### COVERAGE C: CRISISFUND® INSURANCE

This **D&O Coverage Section** shall pay the **Crisis Management Loss** of a **Company** solely with respect to a **Crisis Management Event** occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the **Crisis Management Fund**; provided that payment of any **Crisis Management Loss** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this **D&O Coverage Section** or at law. This Coverage C shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the **Claim** being first made.

### COVERAGE D: COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

This **D&O Coverage Section** shall pay the **Costs of Investigation** of the **Company** arising from a **Company Shareholder Derivative Investigation** in response to a **Derivative Demand**,

D&O COVERAGE SECTION
© All rights reserved.

up to the amount set forth in Item 7(d) of the Declarations. Payment of **Costs of Investigation** to a **Company** shall be made in accordance with and subject to Clause 8 of this **D&O Coverage Section**.

**DEFENSE PROVISIONS**

The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **D&O Coverage Section** in accordance with and subject to Clause 7 of this **D&O Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Securities Claim** shall be made in accordance with Clause 9 of this **D&O Coverage Section**.

With respect to Coverage D above, it shall be the duty of the **Company** and not the duty of the **Insurer** to conduct, investigate and evaluate any **Company Shareholder Derivative Investigation** against its own **Executives**; provided, however, that the **Insurer** shall be entitled to effectively associate in the investigation and evaluation of, and the negotiation of any settlement of, any such **Company Shareholder Derivative Investigation**.

2. **DEFINITIONS**

(a) "**Affiliate**" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

(b) "**Claim**" means:

(i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

(ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(1) service of a complaint or similar pleading;

(2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

(3) receipt or filing of a notice of charges; or

(iii) a civil, criminal, administrative or regulatory investigation of an **Individual Insured**:

(1) once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition 2(b)(ii) may be commenced; or

(2) in the case of an investigation by the Securities Exchange Commission ("**SEC**") or a similar state or foreign government authority, after:

(a) the service of a subpoena upon such **Individual Insured**; or

(b) the **Individual Insured** is identified in a written "Wells" or other notice from the **SEC** or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Individual Insured**.

The term "**Claim**" shall also include any **Securities Claim** and any **Derivative Demand**.

(c) "**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

2

D&O COVERAGE SECTION
© All rights reserved.

(d) **"Company Shareholder Derivative Investigation"** means the investigation by the **Company** or, on behalf of the **Company** by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), as to whether or not the **Company** should bring the civil proceeding demanded in a **Derivative Demand**.

(e) **"Costs of Investigation"** means the reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** (including but not limited to attorney's fees and expert's fees but not including any settlement, judgment or damages and not including any compensation or fees of any **Individual Insured**) incurred by the **Company** or its board of directors (or any equivalent management body), or any committee of the board of directors (or any equivalent management body), solely in connection with a **Company Shareholder Derivative Investigation**.

(f) **"Crisis Management Event"** means **Crisis Management Event**, as that term is defined in Appendix D attached to this policy.

(g) **"Crisis Management Fund"** means the dollar amount set forth in Item 7(b) of the Declarations.

(h) **"Crisis Management Loss"** means **Crisis Management Loss**, as that term is defined in Appendix D attached to this policy.

(i) **"Crisis Management Services"** means **Crisis Management Services**, as that term is defined in Appendix D attached to this policy.

(j) **"D&O Punitive Damages Sublimit of Liability"** means the **D&O Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(k) **"Defense Costs"** means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(l) **"Derivative Demand"** means a written demand by shareholders upon the board of directors (or equivalent management body) of a **Company** requesting that it file, on behalf of the **Company**, a civil proceeding in a court of law against any **Executive** of the **Company** for a **Wrongful Act** of such **Executive** in order to obtain relief from damages arising out of such **Wrongful Acts**.

(m) **"Employee"** means any past, present or future employee, other than an **Executive** of a **Company**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(n) **"Executive"** means:

(i) any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

D&O COVERAGE SECTION
Ⓒ All rights reserved.

(ii) any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (n)(i); or

(iii) any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(o) **"Financial Insolvency"** means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

(p) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(q) **"Foreign Policy"** means the **Insurer's** or any other company of AIG Property Casualty Inc.'s (**"AIG"**) standard executive managerial liability policy (including all mandatory endorsements, if any) approved by **AIG** to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this **D&O Coverage Section**. If more than one such policy exists, then **"Foreign Policy"** means the standard basic policy form typically offered for sale in that **Foreign Jurisdiction** for comparable risks by the **Insurer** or any other company of **AIG**. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

(r) **"Indemnifiable Loss"** means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(s) **"Individual Insured"** means any:

(i) **Executive** of a **Company**;

(ii) **Employee** of a **Company**; or

(iii) **Outside Entity Executive**.

(t) **"Insured"** means:

(i) an **Individual Insured**; or

(ii) a **Company**.

(u) **"Loss"** means damages, judgments, settlements, pre-judgment and post-judgment interest, **Crisis Management Loss** and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; or (iv) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (u)(i) through (u)(iv) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **D&O Coverage Section**, including, but not limited to, exclusions 4(a), 4(b) and 4(c) of this **D&O Coverage Section**, punitive, exemplary and multiple damages. As more fully set forth in Clause 5. "LIMIT OF LIABILITY" of this **D&O Coverage Section**, coverage under this **D&O Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **D&O Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be

95727 (9/07)                                               4

D&O COVERAGE SECTION
⊕ All rights reserved.

governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(v) **"Non-Indemnifiable Loss"** means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

(w) **"Outside Entity"** means:

(i) any not-for-profit organization; or

(ii) any other corporation, partnership, joint venture or other organization listed as an **"Outside Entity"** in an endorsement to this **D&O Coverage Section**.

(x) **"Outside Entity Executive"** means any: (i) **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**; or (ii) any other person listed as an **Outside Entity Executive** in an endorsement to this **D&O Coverage Section**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **D&O Coverage Section** shall abide by the determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **D&O Coverage Section** shall apply as if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(y) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. "**Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(z) **"Securities Claim"** means a **Claim** made against any **Insured**:

(i) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**; or

(2) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

(ii) brought derivatively on the behalf of a **Company** by a security holder of such **Company**.

(aa) **"Shared Punitive Damages Sublimit of Liability"** means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(bb) **"Third Party Violation"** means any actual or alleged harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise) or unlawful discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability), or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**.

(cc) **"Wrongful Act"** means:

D&O COVERAGE SECTION
Ⓡ All rights reserved.

(i) with respect to any **Executive** or **Employee** of a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such, or any matter claimed against such **Executive** or **Employee** of a **Company** solely by reason of his or her status as an **Executive** or **Employee** of a **Company**;

(ii) with respect to a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company**; or

(iii) with respect to service on an **Outside Entity**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Outside Entity Executive** in his or her capacity as such.

## 3. WORLDWIDE EXTENSION

For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; provided however, that this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre-authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this **D&O Coverage Section**. This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, duty to defend, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

All premiums, limits, retentions, **Loss** and other amounts under this **D&O Coverage Section** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this **D&O Coverage Section** (subject to the terms, conditions and limitations of this **D&O Coverage Section**) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

## 4. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to: (i) the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law if any final adjudication establishes that such Section 16(b) violation occurred; or (ii) the payment to any **Insured** of any remuneration without the previous approval of the stockholders of the **Company**, if any final adjudication establishes such payment was illegal;

(c) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if any final adjudication establishes that such deliberate criminal, deliberate fraudulent or dishonest act or willful violation of statute, rule or law was committed;

D&O COVERAGE SECTION
© All rights reserved.

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **D&O Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act(s)** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if any **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **D&O Coverage Section**.

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(h) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, the **Company**, or any **Executive** of the **Outside Entity** or the **Company**; provided, however, this exclusion shall not apply to:

   (i) any **Claim** brought by an **Executive** of an **Outside Entity** in the form of a cross- claim or third- party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this **D&O Coverage Section**;

   (ii) in any bankruptcy proceeding by or against an **Outside Entity**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Outside Entity**;

   (iii) any **Claim** brought by any past **Executive** of an **Outside Entity** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Outside Entity** for at least four (4) years prior to such **Claim** being first made against any person; or

   (iv) any **Claim** brought by an **Executive** of an **Outside Entity** formed and operating in a **Foreign Jurisdiction** against any **Outside Entity Executive** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(i) which is brought by or on behalf of a **Company** or any **Individual Insured**, other than an **Employee** of a **Company**; or which is brought by any security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

   (i) any **Claim** brought by an **Individual Insured** in the form of a cross- claim or third- party claim for contribution or indemnity which is part of and results directly from a **Claim** which is covered by this policy;

**D&O COVERAGE SECTION**
© All rights reserved.

(ii) in any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Company**;

(iii) any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least four (4) years prior to such **Claim** being first made against any person; or

(iv) any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Company** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(j) alleging, arising out of, based upon or attributable to any public offering of securities by a **Company**, an **Outside Entity** or an **Affiliate** or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, this exclusion will not apply to:

(i) any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; provided, however, the **Named Entity** shall give the **Insurer** written notice of any public offering exempted pursuant to Section 3(b), together with full particulars and as soon as practicable, but not later than thirty (30) days after the effective date of the public offering;

(ii) any public offering of securities (other than a public offering described in subparagraph 4(j)(i) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within thirty (30) days prior to the effective time of such public offering: (1) the **Named Entity** shall give the **Insurer** written notice of such public offering together with full particulars and underwriting information required thereto; and (2) the **Named Entity** accepts such terms, conditions and additional premium required by the **Insurer** for such coverage. Such coverage is also subject to the **Named Entity** paying when due any such additional premium. In the event the **Company** gives written notice with full particulars and underwriting information pursuant to subpart 4(j)(ii)(1) above, then the **Insurer** must offer a quote for coverage under this paragraph; or

(iii) any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("**IPO**") and which occurred at any time prior to 12:01 a.m. on the date the initial public offering commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however that the coverage otherwise afforded under this subparagraph (iii) shall be deemed to be void *ab initio* effective the **IPO Effective Time**; provided further, however, that coverage shall not be deemed void *ab initio* if (1) the **Claim** is first made and reported pursuant to Clause 6(a) of the **General Terms and Conditions** prior to the **IPO Effective Time**, and (2) a public company D&O policy is not applicable to such **Claim**;

(k) alleging, arising out of, based upon or attributable to the purchase by a **Company** of securities of a "**Publicly Traded Entity**" in a transaction which resulted, or would result, in such entity becoming an **Affiliate** or a **Subsidiary** of a **Company**; provided, however, this exclusion shall not apply in the event that within thirty (30) days prior to it becoming an **Affiliate** or **Subsidiary**, the **Named Entity** gives written notice of the transaction to the **Insurer** together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this **D&O Coverage Section**

D&O COVERAGE SECTION
© All rights reserved.

required by the **Insurer** relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to the transaction. An entity is a **Publicly Traded Entity** if any securities of such entity have previously been subject to a public offering;

(l) for bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to **Securities Claims**;

(m) for emotional distress or mental anguish, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any **Securities Claim**;

(n) for: (i) any actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply to:

    (1) **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**; or

    (2) **Loss** in connection with a **Securities Claim**, other than **Loss** constituting **Clean-up Costs**;

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law;

(p) alleging, arising out of, based upon or attributable to the ownership, management, maintenance or control by the **Company** of any captive insurance company or entity, including, but not limited, to any **Claim** alleging the insolvency or bankruptcy of the **Named Entity** as a result of such ownership, operation, management or control;

(q) alleging, arising out of, based upon, or attributable to the employment of any individual or any employment practice, including, but not limited to, wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim;

(r) alleging, arising out of, based upon, or attributable to a **Third Party Violation**; provided, however, this exclusion shall not apply to a **Securities Claim**;

(s) alleging, arising out of, based upon, or attributable to:

    (i) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign governmental or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated;

    (ii) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, members, principal shareholders, owners or employees, or affiliates (as that term is defined in the Securities Exchange Act of 1934, including any of their officers, directors, agents, owners, partners, representatives, principal shareholders or employees) of any customers of the **Company** or any members of their family or any entity with which they are affiliated; or

                D&O COVERAGE SECTION
© All rights reserved.

(iii) political contributions, whether domestic or foreign; or

(t) with respect to Coverage B(i) only:

(i) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(ii) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(iii) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the **Company** or any other **Insured** under any express contract or agreement; provided, however, this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement; or

(iv) seeking fines or penalties or non-monetary relief against the **Company**; provided, however, that this exclusion shall not apply to any **Securities Claim**.

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 4(d), 4(e), 4(h), 4(i) and 4(t): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 5. LIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

### CRISISFUND® INSURANCE

The maximum limit of the **Insurer's** liability for all **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(b) of the Declarations as the **Crisis Management Fund**. This **Crisis Management Fund** shall be the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Crisis Management Loss**, regardless of the number of **Crisis Management Events** occurring during the **Policy Period**; provided, however, the **Crisis Management Fund** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

### COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND

The maximum limit of the **Insurer's** liability for **Costs of Investigation** arising from all **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 7(d) of the Declarations (the "**Costs of Investigation Sublimit of Liability**"). The **Costs of Investigation Sublimit of Liability** is the maximum limit of the **Insurer** under this **D&O Coverage Section** for **Costs of Investigation** regardless of the number of such **Company Shareholder Derivative Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), or the number of **Executives** subject to such **Company Shareholder Derivative Investigations**; provided, however, that the **Costs of Investigation Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

D&O COVERAGE SECTION
© All rights reserved.

**PUNITIVE DAMAGES SUBLIMIT OF LIABILITY**

If Item 7(c) of the Declarations indicates that the **D&O Punitive Damages Sublimit of Liability** was elected, then the **D&O Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **D&O Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **D&O Coverage Section** and the **EPL Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **D&O Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **D&O Coverage Section**. The **D&O Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

6. **RETENTION CLAUSE**

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **D&O Coverage Section**, such Retention amount to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act(s)**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

No Retention amount is applicable to **Crisis Management Loss** or **Non-Indemnifiable Loss**.

7. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 7; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of**

11 D&O COVERAGE SECTION
Ⓒ All rights reserved.

**Liability** or **Shared Limit of Liability** have been exhausted.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance, at the written request of the **Insured, Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

The **Insurer** shall have the right to fully and effectively associate with each and every **Insured** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Insured** agrees to provide such information as the **Insurer** may reasonably require and to give the **Insurer** full cooperation, including:

(a) cooperating with and helping the **Insurer**:

   (i) in making settlements, subject to subparagraph 7(b) below;

   (ii) in enforcing any legal rights the **Insured** may have against anyone who may be liable to the **Insured**;

   (iii) by attending depositions, hearings and trials; and

   (iv) by securing and giving evidence, and obtaining the attendance of witnesses; and

(b) taking such actions which, in such **Insured's** judgment, are deemed necessary and practicable to prevent or limit **Loss** arising from any **Wrongful Act**.

Additionally, the **Insured** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. If the **Insured** admits or assumes any liability in connection with any **Claim** without the consent of the **Insurer**, then the **Insurer** shall not have any obligation to pay **Loss** with respect to such **Claim**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this **D&O Coverage Section**. The **Insurer** shall not unreasonably withhold any consent required under this **D&O Coverage Section**, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 7, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **D&O Coverage Section**. In addition, the **Insured** shall not take any action, without the **Insurer's** written consent, which prejudices the **Insurer's** rights under this **D&O Coverage Section**.

This Clause 7 shall not be applicable to **Crisis Management Loss**.

**8. COSTS OF INVESTIGATION FOR DERIVATIVE DEMAND COVERAGE PROVISION**

It is understood and agreed that the **Company** shall be entitled to payment under Coverage D of this **D&O Coverage Section** for reimbursement of its covered **Costs of Investigation** ninety (90) days after: (i) the **Company** has made its final decision not to bring a civil proceeding in a court of law against any of its **Executives**, and (ii) such decision has been communicated to the shareholders who made the **Derivative Demand** upon the **Company**. However, such payment shall be subject to an undertaking by the **Company**, in a form acceptable to the **Insurer**, that the **Company** shall return to the **Insurer** such payment in the event any **Company** or any shareholder of the **Company** brings a **Claim** alleging, arising out of, based upon or attributable to any **Wrongful Acts** which were the subject of the **Derivative Demand**.

D&O COVERAGE SECTION
        ◎ All rights reserved.

Nothing in this **D&O Coverage Section**, including Coverage D, shall be construed to afford coverage under this **D&O Coverage Section** for any **Claim** brought by the **Company** against one or more of its own **Executives**, other than **Costs of Investigation** incurred in a covered **Company Shareholder Derivative Investigation**. Payment of any **Costs of Investigation** under this **D&O Coverage Section** shall not waive any of the **Insurer's** rights under this policy or at law.

## 9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS

This Clause 9 applies only to **Securities Claims**.

Affixed as Appendix A hereto and made a part of this **D&O Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 7. of this **D&O Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Securities Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Securities Claim** is brought. In the event a **Securities Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Securities Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Securities Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

## 10. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this **D&O Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **D&O Coverage Section** shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **D&O Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any

D&O COVERAGE SECTION
© All rights reserved.

**Insured** shall not be imputed to any other **Insured**.

**11. ORDER OF PAYMENTS**

In the event of **Loss** arising from any **Claim** for which payment is due under the provisions of this **D&O Coverage Section** but which **Loss**, in the aggregate, exceeds the remaining available **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section**, then the **Insurer** shall:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then with respect to whatever remaining amount of the applicable **Separate Limit of Liability** or **Shared Limit of Liability** is available after payment of such **Loss**,

(b) then pay such **Loss** for which coverage is provided under Coverage B(ii) of this **D&O Coverage Section**, and

(c) then pay such **Loss** for which coverage is provided under Coverage B(i), C or D of this **D&O Coverage Section**.

In the event of **Loss** arising from a **Claim** for which payment is due under the provisions of this **D&O Coverage Section** (including those circumstances described in the first paragraph of this Clause 11), the **Insurer** shall at the written request of the **Named Entity**:

(a) first pay such **Loss** for which coverage is provided under Coverage A of this **D&O Coverage Section**, then

(b) either pay or hold payment for such **Loss** for which coverage is provided under Coverage B, C or D of this **D&O Coverage Section**.

In the event that the **Insurer** withholds payment under Coverage B, C or D of this **D&O Coverage Section** pursuant to the above request, then the **Insurer** shall at any time in the future, at the request of the **Named Entity**, release such **Loss** payment to the **Company**, or make such **Loss** payment directly to the **Individual Insured** in the event of covered **Loss** under any **Claim** covered under this **D&O Coverage Section** pursuant to Coverage A of this **D&O Coverage Section**.

The **Financial Insolvency** of any **Company** or any **Individual Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this **D&O Coverage Section** pursuant to this Clause 11.

D&O COVERAGE SECTION
✪ All rights reserved.



## National Union Fire Insurance Company of Pittsburgh, Pa.®

A capital stock company

### PrivateEdge Plus℠

### Employment Practices Liability Insurance ("EPL Coverage Section")

**Notice**: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this EPL Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this EPL Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

**1. INSURING AGREEMENTS**

With respect to the Insuring Agreement and the Defense Provisions of this Clause 1, solely with respect to **Claims** first made during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this **EPL Coverage Section** affords the following coverage:

This **EPL Coverage Section** shall pay the **Loss** of an **Insured** arising from a **Claim** first made against such **Insured** for any **Wrongful Act**. The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

**DEFENSE PROVISIONS**

The **Insurer** does not assume any duty to defend; provided, however, the **Named Entity** may at its sole option tender to the **Insurer** the defense of a **Claim** for which coverage is provided by this **EPL Coverage Section** in accordance with Clause 6 of this **EPL Coverage Section**. Regardless of whether the defense is so tendered, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable Retention amount, prior to its final disposition. Selection of counsel to defend a **Designated Employment Practices Claim** shall be made in accordance with Clause 7 of this **EPL Coverage Section**.

**2. DEFINITIONS**

(a) **"Claim"** means:

  (i) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

  (ii) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

    (1) service of a complaint or similar pleading;

    (2) return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (3) receipt or filing of a notice of charges; or

  (iii) an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission (**"EEOC"**), or similar state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

© All rights reserved.

However, in no event shall the term **"Claim"** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

(b) **"Defense Costs"** means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of any **Individual Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(c) **"Designated Employment Practices Claim"** means a **Claim**: (i) alleging discrimination or **Retaliation**; or (ii) that is certified as, or which is seeking certification as, a class action.

(d) **"EPL Punitive Damages Sublimit of Liability"** means the **EPL Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(e) **"Employee"** means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such leased individual in the same manner as is provided to the **Company's** employees. Any other individual who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company**, shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as that provided to the **Company's** employees, pursuant to a written contract.

(f) **"Employment Practices Violation"** means any actual or alleged:

(i) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(ii) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(iii) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(iv) **Retaliation**;

(v) employment-related misrepresentation(s) to an **Employee** of the **Company** or applicant for employment with the **Company** or an **Outside Entity**;

(vi) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(vii) wrongful failure to employ or promote;

(viii) wrongful deprivation of career opportunity with the **Company**, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(ix) wrongful discipline;

(x) failure to grant tenure; or

(xi) with respect to any of the foregoing items (i) through (x) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

EPL COVERAGE SECTION
© All rights reserved.

but only if the **Employment Practices Violation** relates to an **Employee** of a **Company** or an **Outside Entity**, or applicants for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

(g) **"Executive"** means:

    (i) any past, present or future duly elected or appointed director, officer, management committee member or member of the Board of Managers;

    (ii) any past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (g)(i); or

    (iii) any past, present or future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(h) **"Financial Insolvency"** means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Company**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii), as to both (i) or (ii), any equivalent events outside the United States of America.

(i) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States of America or any of its territories or possessions.

(j) **"Indemnifiable Loss"** means **Loss** for which a **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(k) **"Individual Insured"** means any:

    (i) **Executive** of a **Company**;

    (ii) **Employee** of a **Company**; or

    (iii) **Outside Entity Executive**.

(l) **"Insured"** means:

    (i) an **Individual Insureds**; or

    (ii) a **Company**.

(m) **"Loss"** means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest and **Defense Costs**; provided, however, **Loss** shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; (iv) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (v) any liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; (vi) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (m)(i) through (m)(vi) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include, subject to the other terms, conditions and exclusions of this **EPL Coverage Section**, including, but not limited to, Exclusion 3(a) of this **EPL Coverage Section**, punitive, exemplary and multiple damages (including the multiple or

EPL COVERAGE SECTION

◊ All rights reserved.

liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). As more fully set forth in Clause 4. "PUNITIVE DAMAGES SUBLIMIT OF LIABILITY" of this **EPL Coverage Section**, coverage under this **EPL Coverage Section** for punitive, exemplary and multiple damages is subject to any applicable **EPL Punitive Damages Sublimit of Liability** or **Shared Punitive Damages Sublimit of Liability**. The enforceability of the first sentence of this paragraph shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

(n) "**Outside Entity**" means:

    (i) any not-for-profit organization; or

    (ii) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy or **EPL Coverage Section**.

(o) "**Outside Entity Executive**" means any **Executive** of the **Company** serving in the capacity as director, officer, trustee or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Company**. It is understood and agreed that, in the event of a disagreement between the **Company** and an individual as to whether such individual was acting "at the specific request or direction of the **Company**," this **EPL Coverage Section** shall abide by the determination of the **Company** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** is first reported to the **Insurer** pursuant to the terms of the policy. In the event no determination is made within such period, this **EPL Coverage Section** shall apply as if the **Company** determined that such **Individual Insured** was not acting at the **Company's** specific request or direction.

(p) "**Retaliation**" means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Company** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Company** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (iv) strikes of an **Employee** of the **Company** or an **Outside Entity**.

(q) "**Settlement Opportunity**" means an **Insurer** recommended settlement that is within the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, and that is acceptable to the claimant.

(r) "**Shared Punitive Damages Sublimit of Liability**" means the **Shared Punitive Damages Sublimit of Liability**, if any, stated in Item 7(c) of the Declarations.

(s) "**Third Party Violation**" means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs 2(f)(ii) and 2(f)(iii) of the definition of **Employment Practices Violation**, or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Individual Insured** or applicant for employment with the **Company** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers.

(t) "**Wrongful Act**" means any actual or alleged (i) **Employment Practices Violation**, or (ii) **Third Party Violation**.

**3. EXCLUSIONS**

EPL COVERAGE SECTION
© All rights reserved.

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the **Insured** if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act was committed;

(b) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Acts** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this **EPL Coverage Section** is a renewal or replacement of in whole or in part or which it may succeed in time;

(c) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation; or (ii) **EEOC** (or similar state, local or foreign agency) proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act** to that alleged in such pending or prior litigation or EEOC (or similar state, local or foreign agency) proceeding or investigation;

(d) with respect to an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **EPL Coverage Section**;

(e) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company**, or as an **Outside Entity Executive** of an **Outside Entity**;

(f) for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to, loss of use of or destruction of any tangible property;

(g) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(h) alleging, arising out of, based upon, attributable to or in any way relating to:

   (i) the refusal, failure or inability of any **Insured** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered (as opposed to tort- based back pay or front pay damages for torts other than conversion);

   (ii) improper payroll deductions taken by any **Insured** from any **Employee** or purported **Employee**; or

   (iii) failure to provide or enforce legally required meal or rest break periods;

   provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(i) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**;

(j) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of any **Insured** under any express contract or agreement; provided, however, this

EPL COVERAGE SECTION
© All rights reserved.

exclusion shall not apply to:

(i) liability which would have attached in the absence of such express contract or agreement; or

(ii) **Loss** constituting **Defense Costs**;

(k) alleging, arising out of, based upon or attributable to any **Claim** brought by a securities holder of a **Company**, an **Outside Entity** or an affiliate of the **Named Entity** in their capacity as such in the form of a shareholder class, direct or derivative action on behalf of such **Company**, **Outside Entity** or affiliate.

For the purpose of determining the applicability of the foregoing Exclusions, other than exclusions 3(b), 3(c), and 3(d): (i) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (ii) only facts pertaining to and knowledge possessed by any past, present or future chief executive officer, chief operating officer or chief financial officer (or equivalent positions) of the **Company** shall be imputed to the **Company**.

## 4. PUNITIVE DAMAGES SUBLIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. of the **General Terms and Conditions**:

If Item 7(c) of the Declarations indicates that the **EPL Punitive Damages Sublimit of Liability** was elected, then the **EPL Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability for punitive, exemplary and multiple damages under this **EPL Coverage Section**. If Item 7(c) of the Declarations indicates that a **Shared Punitive Damages Sublimit of Liability** was elected, then the **Shared Punitive Damages Sublimit of Liability** is the limit of the **Insurer's** liability under both this **EPL Coverage Section** and the **D&O Coverage Section** combined for punitive, exemplary and multiple damages. If Item 7(c) of the Declarations indicates that no sublimit of liability is applicable to punitive damages, then neither the **EPL Punitive Damages Sublimit of Liability** nor the **Shared Punitive Damages Sublimit of Liability** is applicable to punitive, exemplary and multiple damages under this **EPL Coverage Section**. The **EPL Punitive Damages Sublimit of Liability** and the **Shared Punitive Damages Sublimit of Liability**, if applicable, shall be a part of and not in addition to **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.

## 5. RETENTION CLAUSE

The following provision shall apply in addition to the provisions of Clause 5. RETENTION of the **General Terms and Conditions**:

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations for this **EPL Coverage Section**, such Retention amount to be borne by the **Company** or the **Insureds** and shall remain uninsured, with regard to all: (1) **Indemnifiable Loss**; or (2) **Loss** of the **Company**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**.

It is further understood and agreed that in the event the **Company** is unable to pay an applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Defense Costs** and pay any other covered **Loss** within the Retention; provided, however, that the **Insurer** shall be entitled to recover the amount of **Defense Costs** and any other **Loss** advanced within the Retention from the **Company** pursuant to Clause 10. SUBROGATION of the **General Terms and Conditions**.

EPL COVERAGE SECTION
© All rights reserved.

## 6. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of the **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 12 of the **General Terms and Conditions**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 6; provided, however, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**, if any, has been exhausted, or after an **Insured's** rejection of (or failure or refusal to accept within the time prescribed in this Clause 6, below) a **Settlement Opportunity**.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 6, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this **EPL Coverage Section** to payment of such **Loss**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this **EPL Coverage Section**. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 6, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this **EPL Coverage Section**.

The **Insurer** shall have the right to effectively associate with the **Company** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. The **Company** and the **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require.

In the event the **Insureds** do not consent to the first **Settlement Opportunity** within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity** (or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made), then, subject to the **Policy Aggregate Limit of Liability** and **Separate Limit of Liability** or **Shared Limit of Liability**, if any, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs**

7

© All rights reserved.

incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (2) eighty percent (80%) of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining twenty percent (20%) of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable Retention amount stated in Item 3 of the Declarations.

**7. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED EMPLOYMENT PRACTICES CLAIMS**

This Clause applies only to **Designated Employment Practices Claims**.

Affixed as Appendix B hereto and made a part of this **EPL Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Designated Employment Practices Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 6 of this **EPL Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Designated Employment Practices Claim**, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Designated Employment Practices Claim** is brought. In the event a **Designated Employment Practices Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Designated Employment Practices Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-**Panel Counsel Firm** of the **Insurer's** choice in the jurisdiction in which the **Designated Employment Practices Claim** is brought to function as "local counsel" on the **Designated Employment Practices Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Designated Employment Practices Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix B without the consent of the **Named Entity**.

**8. REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **EPL Coverage Section**

EPL COVERAGE SECTION
© All rights reserved.

shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this **EPL Coverage Section** shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

[The balance of this page is intentionally left blank.]

EPL COVERAGE SECTION
⊕ All rights reserved.

**AIG**

## National Union Fire Insurance Company of Pittsburgh, Pa. ®

A capital stock company

### PrivateEdge Plus℠

### Commercial Crime Insurance
### ("Crime Coverage Section")

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, solely with respect to this **Crime Coverage Section**, the **Insurer** agrees as follows:

**1. INSURING AGREEMENTS**

Coverage is provided under the following Insuring Agreements for which a Per Occurrence Limit of Liability is shown on the Declarations and applies to loss that the **Insured** sustains resulting directly from an **Occurrence** taking place during the Policy Period shown in the Declarations, except as provided in Condition 6(a)(xv) or 6(a)(xvi), which is **Discovered** by the **Insured** during the Policy Period shown in the Declarations or during the period of time provided in Condition 6(a)(x):

A. **EMPLOYEE THEFT**

The **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

B. **FORGERY OR ALTERATION**

(i) The **Insurer** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders to pay a sum certain in **Money** that are:

(1) made or drawn by or drawn upon the **Insured**; or

(2) made or drawn by one acting as the **Insured's** agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

(ii) If the **Insured** is sued for refusing to pay any instrument covered in Insuring Agreement 1.B.(i) above, on the basis that it has been forged or altered, and the **Insured** has the **Insurer's** written consent to defend against the suit, the **Insurer** will pay for any reasonable legal expenses that the **Insured** incurs and pays in that defense. The amount that the **Insurer** will pay is in addition to the Per Occurrence Limit of Liability applicable to this Insuring Agreement.

C. **INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES**

(i) The **Insurer** will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

(1) resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

(2) resulting directly from disappearance or destruction.

(ii) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting

CRIME COVERAGE SECTION
© All rights reserved.

directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(iii) The **Insurer** will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

D. **INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY**

(i) The **Insurer** will pay for loss of or damage to **Other Property**:

(1) inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

(2) inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

(ii) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** or **Safe Burglary** of **Other Property**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(iii) The **Insurer** will pay for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

E. **OUTSIDE THE PREMISES**

(i) The **Insurer** will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

(ii) The **Insurer** will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

F. **COMPUTER FRAUD**

The **Insurer** will pay for loss of or damage to **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

(i) to a person (other than a **Messenger**) outside those **Premises**; or

(ii) to a place outside those **Premises**.

G. **FUNDS TRANSFER FRAUD**

The **Insurer** will pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

H. **MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY**

The **Insurer** will pay for loss resulting directly from the **Insured's** having accepted in good faith, in exchange for merchandise, **Money** or services:

(i) money orders issued by any post office, express company or bank that are not paid upon presentation; or

(ii) **Counterfeit Money** of any country that is acquired during the regular course of business.

2. **DEFINITIONS**

(a) **"Banking Premises"** means the interior of that portion of any building occupied by a

CRIME COVERAGE SECTION
✦ All rights reserved.

banking institution or similar safe depository.

(b) **"Counterfeit Money"** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

(c) **"Custodian"** means the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

(d) **"Discover"**, **"Discovered"** or **"Discovery"** means the time when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Coverage Section** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

**"Discover"**, **"Discovered"** or **"Discovery"** also means the time when the **Insured** first receives notice of an actual or potential claim in which it is alleged that the **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Crime Coverage Section**.

(e) **"Employee"** means:

(i) any natural person:

(1) while in the **Insured's** service and for sixty (60) days after termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**;

(2) who the **Insured** compensates directly by salary, wages or commissions; and

(3) who the **Insured** has the right to direct and control while performing services for the **Insured**;

(ii) any natural person who is furnished temporarily to the **Insured**:

(1) to substitute for a permanent **Employee**, as defined in subparagraph 2(e)(i) above, who is on leave; or

(2) to meet seasonal or short-term work load conditions;

while that person is subject to the **Insured's** direction and control and is performing services for the **Insured**, excluding, however, any such person while having care and custody of property outside the **Premises**; or

(iii) any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary **Employee** as defined in subparagraph 2(e)(ii) above;

(iv) any natural person who is:

(1) a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **Employee Benefit Plan**; and

(2) the **Insured's Manager** while that person is handling **Money** and **Securities** or **Other Property** of any **Employee Benefit Plan**.

(v) any natural person who is a former **Employee**, partner, **Member**, **Manager**, director or trustee retained as a consultant while performing services for the **Insured**;

(vi) any natural person who is a guest student or intern pursuing studies or duties;

(vii) any **Employee** of an entity merged or consolidated with the **Insured** prior to the

CRIME COVERAGE SECTION
© All rights reserved.

effective date of this **Crime Coverage Section**;

(viii) any of the **Insured's Managers**, directors, trustees or non-compensated officers while:

    (1) performing acts within the scope of the usual duties of an **Employee**; or

    (2) acting as a member of any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf; or

(ix) any non-compensated natural person other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**.

*"Employee"* does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in this Paragraph (e).

(f) **"Employee Benefit Plan"** means any welfare or pension benefit plan shown by Endorsement attached to this policy that the **Insured** sponsors and that is subject to the Employee Retirement Income Security Act of 1974 (**"ERISA"**) and any amendments thereto.

(g) *"Forgery"* means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(h) *"Fraudulent Instruction"* means:

(i) an electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Insured**, but which was, in fact, fraudulently transmitted by someone else without the **Insured's** knowledge or consent;

(ii) a written instruction (other than those described in Insuring Agreement 1.B.) issued by the **Insured**, which was forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent, or which purports to have been issued by the **Insured**, but was, in fact, fraudulently issued without the **Insured's** knowledge or consent; or

(iii) an electronic, computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee** but which was, in fact, fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent.

(i) **"Funds"** means **Money** and/or **Securities** in a **Transfer Account**.

(j) **"Insured"** means the **Named Entity**.

(k) **"Manager"** means a person serving in a directorial capacity for a limited liability company.

(l) **"Member"** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(m) **"Messenger"** means the **Insured**, or a relative of the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

(n) **"Money"** means:

(i) currency, coins and bank notes in current use and having a face value; and

(ii) travelers checks, register checks and money orders held for sale to the public.

(o) *"Occurrence"* means:

CRIME COVERAGE SECTION
© All rights reserved.

(i) as respects Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section**:

(1) an individual act;

(2) the combined total of all separate acts whether or not related; or

(3) series of acts whether or not related;

committed by the same **Employee** acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(ii) as respects Insuring Agreement 1.B., "FORGERY OR ALTERATION," of this **Crime Coverage Section**:

(1) an individual act;

(2) the combined total of all separate acts whether or not related; or

(3) a series of acts whether or not related;

committed by the same person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(iii) as respects all other Insuring Agreements of this **Crime Coverage Section**:

(1) an individual act or event;

(2) the combined total of all separate acts or events whether or not related; or

(3) a series of acts or events whether or not related;

committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).

(p) **"Other Property"** means any tangible property other than **Money** and **Securities** that has intrinsic value. **Other Property** does not include intangible property, including, but not limited to, computer programs, electronic data or any other property excluded under this **Crime Coverage Section**.

(q) **"Pollution"** means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, soot, mold, spores, fungi, germs, fumes, acids, alkalis, chemicals and **Waste**. **Waste** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(r) **"Premises"** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

(s) **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has:

(i) caused or threatened to cause that person bodily harm; or

(ii) committed an obviously unlawful act witnessed by that person.

(t) **"Safe Burglary"** means the unlawful taking of:

(i) property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

(ii) a safe or vault from inside the **Premises**.

CRIME COVERAGE SECTION
◈ All rights reserved.

(u) *"Securities"* means negotiable and nonnegotiable instruments or contracts representing either **Money** or property and includes:

    (i) chips issued by the **Insured**, tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    (ii) evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**;

but does not include **Money**.

(v) *"Theft"* means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**. Solely with respect to Insuring Agreement 1.A., **Theft** shall also mean forgery.

(w) *"Transfer Account"* means an account maintained by the **Insured** at a financial institution from which the **Insured** can initiate the transfer, payment or delivery of **Funds**:

    (i) by means of electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

    (ii) by means of written instructions (other than those described in Insuring Agreement 1.B.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

(x) **"Watchperson"** means any person the **Insured** retains specifically to have care and custody of property inside the **Premises** and who has no other duties.

## 3. EXCLUSIONS

This **Crime Coverage Section** does not apply to:

(a) Acts Committed By The Insured, The Insured's Partners Or The Insured's Members Loss resulting from **Theft** or any other dishonest act committed by:

    (i) the **Insured**; or

    (ii) any of the **Insured's** partners or **Members**;

whether acting alone or in collusion with other persons.

(b) Acts Of Employees Learned Of By The Insured Prior To The Policy Period

Loss caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this **Crime Coverage Section** and the **Insured** or any of the **Insured's** partners, **Members**, **Managers**, officers, directors or trustees, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the Policy Period shown in the Declarations.

(c) Acts Of Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from **Theft** or any other dishonest act committed by any of the **Insured's** **Employees**, **Managers**, directors, trustees or authorized representatives:

    (i) whether acting alone or in collusion with other persons; or

    (ii) while performing services for the **Insured** or otherwise; except when covered under Insuring Agreement 1.A. of this **Crime Coverage Section**.

(d) Confidential Information

Loss resulting from:

    (i) the unauthorized disclosure of the **Insured's** confidential information including, but not

CRIME COVERAGE SECTION
© All rights reserved.

limited to, patents, trade secrets, processing methods or customer lists; or

(ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Insured** including, but not limited to, financial information, personal information, credit card information, identification information or similar non- public information.

(e) Governmental Action

Loss resulting from seizure or destruction of property by order of governmental authority.

(f) Indirect Loss

Loss that is an indirect result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

(g) Legal Fees, Costs And Expenses

Fees, costs and expenses incurred by the **Insured** which are related to any legal action, except when covered under Insuring Agreement 1.B.

(h) Nuclear Hazard

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

(i) Pollution

Loss or damage caused by or resulting from **Pollution**.

(j) War and Military Action

Loss or damage resulting from:

(i) war, including undeclared or civil war;

(ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(k) Automatic Teller Machines:

Loss of **Money** and **Securities** contained in any automatic teller machine ("**ATM**") or while being transported to or from any **ATM**. Such loss is excluded regardless of the cause, event, act, omission or failure which contributes to the loss, including, but not limited to, (i) any dishonesty, theft, disappearance, destruction, forgery, alternation, robbery or computer fraud by any person (whether or not an **Employee**) acting alone or in collusion with other persons, or (ii) any actual or alleged failure, malfunction or inadequacy of the **ATM**.

In all events, coverage under this **Crime Coverage Section** does not apply to the loss of

CRIME COVERAGE SECTION
✪ All rights reserved.

or damage to any **ATM**.

Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Section** does not apply to:

(a) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

However, where the **Insured** establishes wholly apart from such computations that the **Insured** has sustained a loss, then the **Insured** may offer the **Insured's** inventory records and actual physical count of inventory in support of the amount of loss claimed.

(b) Trading

Loss resulting directly or indirectly from trading, whether in the **Insured's** name or in a genuine or fictitious account.

(c) Warehouse Receipts

Loss resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

Insuring Agreements 1.C., "INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES," 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES," of this **Crime Coverage Section** do not apply to:

(a) Accounting Or Arithmetical Errors Or Omissions

Loss resulting from accounting or arithmetical errors or omissions.

(b) Exchanges Or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

(c) Fire

Loss resulting from fire, however caused, except:

(i) loss from damage to a safe or vault; and

(ii) loss of or damage to **Money** and **Securities**.

(d) Money Operated Devices Loss of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

(e) Motor Vehicles Or Equipment And Accessories

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

(f) Transfer Or Surrender Of Property

Loss of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:

(i) on the basis of unauthorized instructions;

(ii) as a result of a threat to do bodily harm to any person;

(iii) as a result of a threat to do damage to any property;

CRIME COVERAGE SECTION
✪ All rights reserved.

(iv) as a result of a threat to introduce a denial of service attack into the **Insured's** computer system;

(v) as a result of a threat to introduce a virus or other malicious instruction into the **Insured's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Insured's** computer system;

(vi) as a result of a threat to contaminate, pollute or render substandard the **Insured's** products or goods; or

(vii) as a result of a threat to disseminate, divulge or utilize:

(a) the **Insured's** confidential information; or

(b) weaknesses in the source code within the **Insured's** computer system.

Provided, however, this Exclusion does not apply under Insuring Agreement 1.E. of this **Crime Coverage Section** to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Insured**:

(1) had no knowledge of any threat at the time the conveyance began; or

(2) had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

(g) Vandalism

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

(h) Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from the **Insured**, or anyone acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

Insuring Agreement 1.F., "COMPUTER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Credit Card Transactions

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored- value or other cards or the information contained on such cards.

(b) Computer losses due to:

(i) loss of computer time or use;

(ii) unintentional errors or omissions; or

(iii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

(c) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

Insuring Agreement 1.G., "FUNDS TRANSFER FRAUD," of this **Crime Coverage Section** does not apply to:

(a) Computer Fraud

CRIME COVERAGE SECTION
◈ All rights reserved.

Loss resulting from the use of any computer to fraudulently cause a transfer of **Other Property**.

(b) Loss due to:

(i) unintentional errors or omissions; or

(ii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

## 4. PER OCCURRENCE LIMIT OF LIABILITY

The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** is the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage of this **Crime Coverage Section**, the most the **Insurer** will pay for such loss shall not exceed the largest Per Occurrence Limit of Liability available under any one of those Insuring Agreements or Coverages.

## 5. DEDUCTIBLE

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the applicable Deductible Amount shown in Item 5. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the applicable Per Occurrence Limit of Liability.

## 6. CONDITIONS

(a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION:

(i) ADDITIONAL PREMISES OR EMPLOYEES

If, while this **Crime Coverage Section** is in force, the **Insured** establishes any additional **Premises** or hire additional **Employees**, other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this **Crime Coverage Section**. Notice to the **Insurer** of an increase in the number of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

(ii) CANCELLATION OF COVERAGE SECTION

(1) The **Named Entity** shown in the Declarations may cancel this **Crime Coverage Section** by mailing or delivering to the **Insurer** advance written notice of cancellation.

(2) The **Insurer** may cancel this **Crime Coverage Section** by mailing or delivering to the **Named Entity** written notice of cancellation at least:

(a) ten (10) days before the effective date of cancellation if the **Insurer** cancels for nonpayment of premium; or

(b) sixty (60) days before the effective date of cancellation if the **Insurer** cancels for any other reason.

(3) The **Insurer** will mail or deliver the **Insurer's** notice to the **Named Entity's** last mailing address known to the **Insurer**.

(4) Notice of cancellation of this **Crime Coverage Section** will state the effective date of cancellation. The Policy Period applicable to this **Crime Coverage Section** will end on that date.

CRIME COVERAGE SECTION

© All rights reserved.

(5) If this **Crime Coverage Section** is cancelled, the **Insurer** will send the **Named Entity** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the **Named Entity** cancels, the refund may be less than pro rata. The cancellation will be effective even if the **Insurer** has not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

(iii) CHANGES

This **Crime Coverage Section** contains all the agreements between the **Insured** and the **Insurer** concerning the insurance afforded. The **Named Entity** shown in the Declarations is authorized to make changes in the terms of this **Crime Coverage Section** with the **Insurer's** consent. This **Crime Coverage Section's** terms can be amended or waived only by endorsement issued by the **Insurer** and made a part of this **Crime Coverage Section**.

(iv) CONCEALMENT, MISREPRESENTATION OR FRAUD

This **Crime Coverage Section** is void in any case of fraud by the **Insured** as it relates to this policy at any time. This **Crime Coverage Section** is also void if the **Named Entity** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

(1) this **Crime Coverage Section**;

(2) the property covered under this **Crime Coverage Section**;

(3) the **Insured's** interest in the property covered under this **Crime Coverage Section**; or

(4) a claim under this **Crime Coverage Section**.

(v) CONSOLIDATION - MERGER OR ACQUISITION

If the **Insured** consolidates or merges with, or purchases or acquires the assets or liabilities of, another entity:

The **Insured** must give the **Insurer** written notice as soon as possible and obtain the **Insurer's** written consent to extend the coverage provided by this **Crime Coverage Section** to such consolidated or merged entity or such purchased or acquired assets or liabilities. If such consolidation, merger or purchase or acquisition of assets or liabilities increases the **Insured's** total assets by more than five percent (5%), the **Insurer** may condition the **Insurer's** consent by requiring payment of an additional premium; but for the first ninety (90) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this **Crime Coverage Section** shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

(vi) COOPERATION

The **Insured** must cooperate with the **Insurer** in all matters pertaining to this **Crime Coverage Section** as stated in its terms and conditions.

(vii) DUTIES IN THE EVENT OF LOSS

(1) After the **Insured Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities** or **Other Property** the **Insured** must:

(a) Notify the **Insurer** as soon as possible, but no later than sixty (60) days after

CRIME COVERAGE SECTION
© All rights reserved.

**Discovery** of a loss or a situation that may result in loss of or damages to **Money**, **Securities** or **Other Property**. If the **Insured** has reason to believe that any loss (except for loss covered under Insuring Agreement 1.A. or 1.B.) involves a violation of law, the **Insured** must also notify the local law enforcement authorities.

(b) Submit to examination under oath at the **Insured's** request and give the **Insurer** a signed statement of the **Insured's** answers.

(c) Produce for the **Insured's** examination all pertinent records.

(d) Give the **Insurer** a detailed, sworn proof of loss within one hundred and twenty (120) days of the discovery of a loss or a situation that may result in loss of or damages to **Money**, **Securities** or **Other Property**, provided, however, that such proof of loss shall not be required solely in the event the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to Condition 6(a)(vii)(2) and such report is issued pursuant to the terms and conditions of that clause.

(e) Cooperate with the **Insurer** in the investigation and settlement of any claim.

(2) The Fidelity Research & Investigative Settlement Clause (FRISC)

The **Insured** may, with respect to such loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property**, elect to have an independent Investigative Specialist investigate the facts and determine the quantum of loss. The **Insured** and the **Insurer** shall jointly task and budget the Investigative Specialist regarding the scope and cost of the investigation to be performed. The final report issued by the Investigative Specialist will be definitive as respects the facts and the quantum of loss and shall be provided to both the **Insured** and the **Insurer**. After a joint review of the investigative report, if the **Insured** and the **Insurer** cannot agree upon the settlement of loss, then the **Insurer**, at the **Insured's** request, shall submit the dispute to arbitration, pursuant to the provisions of Clause 14. "DISPUTE RESOLUTION PROCESS" of the **General Terms and Conditions**. The **Insured** shall select an Investigative Specialist from the list of Investigative Specialists affixed as Appendix E and made part of this **Crime Coverage Section** located in the same jurisdiction in which the loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property** occurred. In the event such loss or situation that may result in loss or damage to **Money**, **Securities** or **Other Property** occurred in a jurisdiction not included on the list, the **Insured** shall select an Investigative Specialist in the listed jurisdiction which is the nearest geographic jurisdiction to the jurisdiction in which the loss or situation occurred or where the corporate headquarters of the **Insured** is located. No changes shall be made during the Policy Period to the list of Investigative Specialists attached as Appendix E unless the amendments are at the **Insured's** request.

The **Insured** shall notify the **Insurer** in writing of the above election to have an independent Investigative Specialist investigate the facts and determine the quantum of loss within thirty (30) days from the date on which the **Insured** first notifies the **Insurer** pursuant to Condition 6(a)(vii)(1). Notwithstanding subparagraph (iii) of the Exclusion entitled "Indirect Loss", all fees, costs and expenses of the investigation, including any fee charged by the Investigative Specialist, shall be paid as follows: fifty percent (50%) of such fees, costs and expenses shall be paid by the **Insured** and fifty percent (50%) shall be paid out of the applicable Per Occurrence Limit of Liability specified in Item 5 of the Declarations. No Deductible Amount shall apply to the fees, costs and expenses of the independent

Ⓡ All rights reserved.

investigation, including any fee charged by the Investigative Specialist.

In addition, whether or not the **Insured** elects to have an independent Investigative Specialist investigate the facts and determine the quantum of loss pursuant to the above terms and conditions, upon the Insurer's request, the **Insured** shall submit to examination by the **Insurer**, subscribe the same, under oath if required, give the **Insurer** a signed statement of the **Insured's** answers, and produce for the **Insurer's** examination all pertinent records, all at such reasonable times and places as the **Insurer** shall designate, and shall cooperate with the **Insurer** in all matters pertaining to loss or claims with respect thereto.

(viii) EMPLOYMENT BENEFIT PLAN

(1) The **Employee Benefit Plans** shown by Endorsement attached to this **Crime Coverage Section** (hereafter referred to as **Plan**) are included as **Insureds** under Insuring Agreement 1.A.

(2) If any **Plan** is **insured** jointly with any other entity under this policy, the **Insured** or the Plan Administrator must select a Per Occurrence Limit of Liability for Insuring Agreement 1.A. that is sufficient to provide a Per Occurrence Limit of Liability for each **Plan** that is at least equal to that required if each **Plan** were separately insured.

(3) With respect to loss sustained or **Discovered** by any such **Plan**, Insuring Agreement 1.A. is replaced by the following:

The **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(4) If the **Named Entity** is an entity other than a **Plan**, any payment the Insurer makes for loss sustained by any **Plan** will be made to the **Plan** sustaining the loss.

(5) If two or more **Plans** are **insured** under this **Crime Coverage Section**, any payment the **Insurer** makes for loss:

(a) sustained by two or more **Plans**; or

(b) of commingled **Money**, **Securities** or **Other Property** of two or more **Plans**;

resulting directly from an **Occurrence** will be made to each **Plan** sustaining loss by prorating the total applicable Per Occurrence Limit of Liability of all **Plans** based upon the proportion that the amount of loss for each **Plan** bears to the total amount of loss for all **Plans** sustaining loss.

(6) The Deductible Amount applicable to Insuring Agreement 1.A. does not apply to loss sustained by any **Plan**.

(ix) EXAMINATION OF THE INSURED'S BOOKS AND RECORDS

The **Insurer** may examine and audit the **Insured's** books and records as they relate to this **Crime Coverage Section** at any time during the Policy Period and up to three (3) years afterward.

(x) EXTENDED PERIOD TO DISCOVER LOSS

The **Insurer** will pay for loss that the **Insured** sustained prior to the effective date of cancellation of this **Crime Coverage Section**, which is **Discovered** by the **Insured**:

(1) No later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date

CRIME COVERAGE SECTION
ⓒ All rights reserved.

of any other insurance obtained by the **insured**, whether from the **insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(2) No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(xi) INSPECTION AND SURVEYS

(1) The **Insurer** has the right to:

(a) make inspections and surveys at any time;

(b) give the **Insured** reports on the conditions the **Insurer** finds; and

(c) recommend changes.

(2) The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions the **Insurer** does undertake relate only to insurability and the premiums to be charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the **Insurer** does not warrant that conditions:

(A) are safe or healthful; or

(B) comply with laws, regulations, codes or standards.

(3) Conditions 6(a)(xi)(1) and 6(a)(xi)(2) above apply not only to the **Insurer**, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

(xii) JOINT INSURED

(1) If any additional **Insured** is added by Endorsement to this **Crime Coverage Section**, the **Named Entity** set forth in the Declarations will act for itself and for every other **Insured** for all purposes of this **Crime Coverage Section** (hereinafter "first **Named Entity**"). If the first **Named Entity** ceases to be covered, then the next **Named Entity** as set forth in such Endorsement will become the first **Named Entity**.

(2) If any **Insured**, or partner, **Member** or officer of that **Insured** has knowledge of any information relevant to this **Crime Coverage Section**, that knowledge is considered knowledge of every **Insured**.

(3) An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(4) If this **Crime Coverage Section** or any of its coverages is cancelled as to any **Insured**, loss sustained by that **Insured** is covered only if it is **Discovered** by the **Insured**:

(a) no later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Section**, whether or not such other insurance provides coverage for loss sustained prior to its effective date;

(b) no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

(5) The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount the **Insurer** would pay if all such loss had been sustained by one

CRIME COVERAGE SECTION

14    © All rights reserved.

**Insured**.

(6) Payment by the **Insurer** to the first **Named Entity** for loss sustained by any **Insured**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

(xiii) LEGAL ACTION AGAINST US

The **Insured** may not bring any legal action against the **Insurer** involving loss:

(1) unless the **Insured** has complied with all the terms of this **Crime Coverage Section** and policy;

(2) until ninety (90) days after the **Insured** has filed proof of loss with the **Insurer** or 90 days after the Investigative Specialist has submitted the report; and

(3) unless brought within two (2) years from the date the **Insured Discovered** the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

(xiv) LIBERALIZATION

If the **Insurer** adopts any revision that would broaden the coverage under this **Crime Coverage Section** without additional premium within forty- five (45) days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this **Crime Coverage Section**.

(xv) LOSS SUSTAINED DURING THE PRIOR INSURANCE ISSUED BY THE INSURER OR ANY AFFILIATE

(1) Loss Sustained Partly During This Policy And Partly During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place:

(a) partly during the Policy Period shown in the Declarations; and

(b) partly during any Policy Period of any prior cancelled insurance that the Insurer or any affiliate issued to the **Insured** or any predecessor in interest;

and this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss that the **Insured** sustained during this Policy Period. The **Insurer** will then settle the remaining amount of loss that the **Insured** sustained during any Policy Period of the prior insurance.

(2) Loss Sustained Entirely During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place entirely during any Policy Period of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Insured** or any predecessor in interest, the **Insurer** will pay for the loss, provided:

(a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

(b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

The **Insurer** will first settle the amount of loss that the **Insured** sustained during the most recent prior insurance. The **Insurer** will then settle any remaining amount

CRIME COVERAGE SECTION
© All rights reserved.

of loss that the **Insured** sustained during any Policy Period of any other prior insurance.

(3) In settling loss subject to this Condition:

(a) The most the **Insurer** will pay for the entire loss is the highest single Per Occurrence Limit of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior insurance issued by the **Insurer**.

(b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this **Crime Coverage Section**. If no loss was sustained under this **Crime Coverage Section**, the **Insurer** will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this **Crime Coverage Section**, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

Notwithstanding any of the above provisions of this Condition 6(a) (xv),no payment made for lossunder either this Policy Period or any prior Policy Period shall exceed(i) the amount of the loss sustained during the respective Policy Period; and/or (ii) thePer Occurrence Limit of Liability of the respective Policy Period.

(xvi) LOSS SUSTAINED DURING PRIOR INSURANCE NOT ISSUED BY THE INSURER OR ANY AFFILIATE

(1) If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place during the Policy Period of any prior cancelled insurance that was issued to the **Insured** or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this **Crime Coverage Section**, provided:

(a) this **Crime Coverage Section** became effective at the time of cancellation of the prior insurance; and

(b) the loss would have been covered under this **Crime Coverage Section** had it been in effect at the time of the **Occurrence**.

(2) In settling loss subject to this Condition:

(a) The most the **Insurer** will pay for the entire loss is the lesser of the Limits of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Section** or was written under the prior cancelled insurance.

(b) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

(3) The insurance provided under this Condition is subject to the following:

(a) If loss covered under this Condition is also partially covered under Condition 6(a)(xv), the amount recoverable under this Condition is part of, not in addition to, the amount recoverable under Condition 6(a)(xv).

CRIME COVERAGE SECTION
© All rights reserved.

(b) For loss covered under this Condition that is not subject to Condition 6(a)(xvi)(3)(a) above, the amount recoverable under this Condition is part of, not in addition to, the Per Occurrence Limit of Liability applicable to the loss covered under this **Crime Coverage Section** and is limited to the lesser of the amount recoverable under:

(a) this **Crime Coverage Section** as of its effective date; or

(b) the prior cancelled insurance had it remained in effect.

(xvii) OTHER INSURANCE

If other valid and collectible insurance is available to the **Insured** for loss covered under this **Crime Coverage Section**, our obligations are limited as follows:

(1) Primary Insurance

When this policy is written as primary insurance, and:

(a) The **Insured** has other insurance subject to the same terms and conditions as this **Crime Coverage Section**, the **Insurer** will pay the **Insurer's** share of the covered loss. The **Insurer's** share is the proportion that the applicable Per Occurrence Limit of Liability shown in Item 5 of the Declarations bears to the total limit of all insurance covering the same loss.

(b) The **Insured** has other insurance covering the same loss other than that described in Condition 6(a)(xvii)(1)(A) above, the Insurer will only pay for the amount of loss that exceeds:

(i) the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not; or

(ii) the Deductible Amount shown in the Declarations;

whichever is greater. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section**.

(2) Excess Insurance

(a) When this **Crime Coverage Section** is written excess over other insurance, the **Insurer** will only pay for the amount of loss that exceeds the Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Section** and policy.

(b) However, if loss covered under this **Crime Coverage Section** is subject to a Deductible, the **Insurer** will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

(xviii) OWNERSHIP OF PROPERTY; INTERESTS COVERED

The property covered under this **Crime Coverage Section** is limited to property:

(1) that the **Insured** owns or leases; or

(2) that the **Insured** holds for others whether or not the **Insured** is legally liable for the loss of such property.

However, this **Crime Coverage Section** is for the **Insured's** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Coverage Section** must be presented by the **Insured**.

17 CRIME COVERAGE SECTION
© All rights reserved.

(xix) PREMIUMS

The first **Named Entity** shown in the Declarations:

(1) is responsible for the payment of all premiums; and

(2) will be the payee for any return premiums the **Insurer** pays.

(xx) RECORDS

The **Insured** must keep records of all property covered under this **Crime Coverage Section** so the **Insurer** can verify the amount of any loss.

(xxi) RECOVERIES

(1) Any recoveries, whether effected before or after any payment under this **Crime Coverage Section**, whether made by the **Insurer** or the **Insured**, shall be applied net of the expense of such recovery:

(a) First, to the **Insured** in satisfaction of the **Insured's** covered loss in excess of the amount paid under this **Crime Coverage Section**;

(b) Second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Insured's** claim;

(c) Third, to the **Insured** in satisfaction of any Deductible Amount; and

(d) Fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Coverage Section**.

(2) Recoveries do not include any recovery:

(a) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

(b) of original **Securities** after duplicates of them have been issued.

(xxii) TERRITORY

This **Crime Coverage Section** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

(xxiii) TRANSFER OF THE INSURED'S RIGHTS AND DUTIES UNDER THIS CRIME COVERAGE SECTION

(1) The **Insured's** rights and duties under this **Crime Coverage Section** may not be transferred without the **Insurer's** written consent except in the case of death of an individual **Named Entity**.

(2) If the **Insured** dies, the **Insured's** rights and duties will be transferred to the **Insured's** legal representative but only while acting within the scope of duties as the deceased **Insured's** legal representative. Until the **Insured's** legal representative is appointed, anyone having temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

(xxiv) TRANSFER OF THE INSURED'S RIGHTS OF RECOVERY AGAINST OTHERS TO THE INSURER

The **Insured** must transfer to the **Insurer** all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the **Insurer** has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

 CRIME COVERAGE SECTION
© All rights reserved.

(xxv) VALUATION - SETTLEMENT

(1) The value of any loss for purposes of coverage under this **Crime Coverage Section** shall be determined as follows:

(a) Loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Insured's** option, pay for loss of **Money** issued by any country other than the United States of America:

(i) at face value in the **Money** issued by that country; or

(ii) in the United States of America dollar equivalent determined by the rate of *The Wall Street Journal* exchange published in on the day the loss was **Discovered**.

(b) Loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at the **Insurer's** option:

(i) pay the market value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the **Insurer** all the **Insured's** rights, title and interest in and to those **Securities**; or

(ii) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(1) market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

(2) the Per Occurrence Limit of Liability applicable to the **Securities**.

(c) Loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

(i) the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

(ii) the amount the **Insured** actually spend that is necessary to repair or replace the lost or damaged property; or

(iii) the Per Occurrence Limit of Insurance applicable to the lost or damaged property.

With regard to subparagraphs (i) through (iii) above, the **Insurer** will not pay on a replacement cost basis for any loss or damage:

(i) until the lost or damaged property is actually repaired or replaced; and

(ii) unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

(2) The **Insurer** will, at the **Insured's** option, settle loss or damage to property other than **Money**:

(a) in the **Money** of the country in which the loss or damage occurred; or

CRIME COVERAGE SECTION
Ⓒ All rights reserved.

(b) in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange *The Wall Street Journal* published in on the day the loss was **Discovered**.

(3) Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

(b) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.A., "EMPLOYEE THEFT," OF THIS CRIME COVERAGE SECTION:

(i) TERMINATION AS TO ANY EMPLOYEE

Insuring Agreement 1.A. terminates as to any **Employee**:

(1) As soon as:

(a) the **Insured**; or

(b) any of the **Insured's** partners, **Members**, **Managers**, officers, directors, or trustees not in collusion with the **Employee**;

learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after becoming employed by the **Insured**; or

(2) On the date specified in a notice mailed to the first **Named Entity**. That date will be at least sixty (60) days after the date of mailing.

The **Insurer** will mail or deliver the **Insurer's** notice to the first **Named Entity's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

(ii) TERRITORY

The **Insurer** will pay for loss caused by any **Employee** while temporarily outside the territory specified in Condition 6(a)(xxii) for a period of not more than ninety (90) consecutive days.

(c) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.B., "FORGERY OR ALTERATION," OF THIS CRIME COVERAGE SECTION:

(i) DEDUCTIBLE AMOUNT

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement 1.B.

(ii) MECHANICAL SIGNATURES

The **Insurer** will treat signatures that are produced or reproduced mechanically the same as handwritten signatures.

(iii) PROOF OF LOSS

The **Insured** must include with the **Insured's** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

(iv) TERRITORY

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.B.

(d) CONDITIONS APPLICABLE TO INSURING AGREEMENTS 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES" OF THIS CRIME COVERAGE SECTION:

CRIME COVERAGE SECTION
© All rights reserved.

(i) ARMORED MOTOR VEHICLE COMPANIES

Under Insuring Agreement 1.E. of this **Crime Coverage Section**, the **Insurer** will only pay for the amount of loss the **Insured** cannot recover:

(1) under the **Insured's** contract with the armored motor vehicle company; and

(2) from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

(ii) SPECIAL LIMIT OF LIABILITY FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to:

(1) precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

(e) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.F., "COMPUTER FRAUD," OF THIS CRIME COVERAGE SECTION

(i) SPECIAL LIMIT OF INSURANCE FOR SPECIFIED PROPERTY

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

(ii) TERRITORY

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.F.

In witness whereof, the **Insurer** has caused this **Crime Coverage Section** to be executed on the Declarations.

[The balance of this page is intentionally left blank.]

◊ All rights reserved.

**APPENDIX C**

**EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY**
**PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows:   The information in our Panel Counsel lists/appendices is now accessible  through our online Panel Counsel Directory at AIG Panel Counsel Directory  http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Fiduciary Liability (ERISA and Non-ERISA)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**APPENDIX E**
**LIST OF INVESTIGATIVE SPECIALISTS/MEDIATORS AND ARBITRATORS**
**FOR F.R.I.S.C.**
**(CRIME COVERAGE SECTION ONLY)**

| Names | Address | Telephone No. | Profession |
|---|---|---|---|
| | | | |
| **INVESTIGATIVE SPECIALISTS** | | | |
| | | | |
| **U.S.A.** | | | |
| | | | |
| Aksman & Aksman CPA | 509 Stillwells Corner Road<br>Freehold, NJ 07728<br>Attention: Kenneth Aksman | (732) 462- 8080 | Accountants |
| | | | |
| Charles R. Barstow, CPA | 15 Timothy Avenue<br>San Anselmo, CA 94960<br>Attention: Chuck Barstow | (415) 455- 0767 | Accountants |
| | | | |
| Harner Evans PLC | 7709 North 11th Avenue<br>Phoenix, AZ 85021<br>Attention: Lamar Harner | (602) 395- 1256 | Accountants |
| | | | |
| Kalchik, Pratt &<br>Associates, LLC | 19710 Governors Highway<br>Suite 12<br>Flossmoor, IL 60422<br>Attention: Donald R. Pratt,Jr. | (708) 647- 0863 | Investigators |
| | | | |
| Kinsel Accountancy CPA's | 503 North Central Avenue<br>Glendale, CA 91203<br>Attention: Stacy A. Kinsel | (818) 240- 3300 | Accountants |
| | | | |
| Moody's Inc. | 7021 West 153rd Street<br>Orlando Park, IL 69462<br>Attention: Bob Moody | (708) 535- 1010 | Accountants |
| | | | |
| RGL Forensic Accountants | 300 Montgomery Street<br>San Francisco, CA 94104<br>Attention: Steven Rosenthal | (800) 669- 8323 | Accountants |
| Studler, Doyle & Co., LLC | 1444 Farnsworth Avenue<br>Suite 500<br>Aurora, IL 60505<br>Attention: D.M. Studler | (630) 820- 5770 | Accountants |
| | | | |

© All rights reserved.

| CANADA | | | |
|---|---|---|---|
| | | | |
| **Alberta:** | | | |
| Cunningham Lindsey | 807 Manning Road N.E. Suite 100 Calgary, Alberta T2E- 7m8 Attention: Scott Stiles | (403) 269- 2069 | General Adjusters |
| | | | |
| **British Columbia:** | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | Madison Centre, 1901 Rosser Ave., Suite 410 Burnaby, BC V5C- 6R6 Attention: James O'Connor | (604) 742- 9929 | Fidelity Adjusters |
| | | | |
| Schumka Craig & Moore | 600- 1111 Melville Street Vancouver, BC V6E- 3V6 Attention: Michael Parsons | (604) 681- 6331 | General Adjusters |
| | | | |
| James P. Blatchford Consulting | 1311 Howe Street Suite 200 Vancouver, BC V6Z 2P3 Attention: James Blatchford | (604) 691- 1777 | Accountants |
| | | | |
| **Manitoba:** | | | |
| Cunningham Lindsey | 631- B Marion Street Winnipeg, Manitoba R2J- 0J9 Attention: Denis Rivard | (204) 985- 1777 (Ext. 772) | General Adjusters |
| | | | |
| **Maritimes:** | | | |
| Cunningham Lindsey | Park Place Corporate Campus 238 A Brownlow Avenue, Suite 210 Dartmouth, Nova Scotia B3B-2B4 Attention: Nick MacDonald | (902) 421- 1519 | General Adjusters |
| **Ontario:** | | | |
| | | | |
| | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | 3660 Hurontario Street 6th Floor Mississauga, ON L5B- 3C4 Attention: Ted Baker | (905) 279- 8880 Ext. 224 | Fidelity Adjusters |

◈ All rights reserved.

| | | | |
|---|---|---|---|
| LBC Int'l Investigative Accounting | 40 University Avenue Suite 1003 Toronto, ON M5J- 1T1 Attention: Phil Turner | (416) 596- 1000 | Accountants |
| | | | |
| **Quebec:** | | | |
| Baker, Bertrand, Chasse & Goguen Claim Services | 1200 Boulevard Chomedey Bureau 700 Laval, Quebec H7V- 3Z3 Attention: Michel Prud'homme | (450) 688- 3113 Ext. 225 | Fidelity Adjusters |
| | | | |
| LBC Int'l Investigative Accounting | 1440 St. Catherine Street West, Suite 710 Montreal, Quebec H3G- 1R8 Attention: Emil Basilla | (514) 866- 5431 | Accountants |
| | | | |
| **CENTRAL AND SOUTH AMERICA** | | | |
| | | | |
| Carranza, Cowheard & Associates | 3625 N.W. 82nd Avenue Building 2, Suite 306 Miami, FL. 33166 Attention: Luis O. Carranza | (305) 463- 7978 | Accountants |
| | | | |
| Grant Thornton | 1101 Walnut Street Kansas City, MO 64106 Attention: Larry Redler | (816) 412- 2426 | Accountants |
| | | | |
| **U.K. & EUROPE** | | | |
| | | | |
| Adjusting Services | 11 Baden Place, Crosby Row London, UK SE1 1YW Attention: David Ledger | 44 (20) 7357- 7631 | Adjusters & Accountants |
| | | | |
| LBC Int'l Investigative Accounting | Lloyds Avenue House 6 Lloyds Avenue London, UK EC3N 3AX Attention Oliver Tiemann | 44 (20) 7680- 1131 | Accountants |
| | | | |
| Crawford & Company THG | Trinity Court 42 Trinity Square London, UK EC3N 4TH Attention: Suzanne Kearney, Esq. | 44 (20) 7625- 4000 | Investigators |
| | | | |

© All rights reserved.

| | | | |
|---|---|---|---|
| RGL Forensic Accountants and Consultants | 17 Devonshire Square London, UK EC2M 4SQ Attention: Anthony Levitt | 44 (20) 7247- 4804 | Accountants |
| | | | |
| Grant Thornton | 1101 Walnut Street Kansas City, MO 64106 Attention: Larry Redler | (816) 412- 2426 | Accountants |
| | | | |
| **MEDIATORS & ARBITRATORS** | | | |
| | | | |
| **U.S.A.** | | | |
| | | | |
| Anderson, McPharlin & Connors | 444 South Flower Street 31st Floor Los Angeles, CA 90071 Attention: David DiBiasi | (213) 236- 1618 | Attorney |
| | | | |
| Beirne, Maynard & Parsons LLP | 1300 Post Oak Boulevard Suite 2500 Houston TX 77056- 3000 Attention: Jeff Parsons | (713) 623- 0887 | Attorney |
| | | | |
| Boult, Cummings, Connor & Berry | 414 Union Street, Suite 1600 Nashville, TN 37219 Attention: Rick Humbracht | (615) 525- 2371 | Attorney |
| | | | |
| Clausen Miller P.C. | 10 South LaSalle Street Chicago, IL 60603- 1098 Attention: Gil Schroeder | (312) 855- 1010 | Attorney |
| | | | |
| Carlton Fields | 4000 International Place 100 S.E. Second Street Miami, FL 33131- 9101 Attention: Patricia H. Thompson | (305) 539- 7239 | Attorney |
| | | | |
| D'Amato & Lynch | 70 Pine Street New York, NY 10270- 0110 Attention: Ken Sagat | (212) 269- 0927 | Attorney |
| | | | |
| John J. Petro, Esq. | 338 South High Street Columbus, OH 43125 Attention: John J. Petro | (614) 224- 0531 | Attorney |

© All rights reserved.

| | | | |
|---|---|---|---|
| Ropers Majewski | 515 South Flower Street<br>Los Angeles, CA 90071<br>Attention: Earnest Price | (213) 312- 2024 | Attorney |
| | | | |
| Stradley, Ronan, Stevens & Young LLP | 2600 One Commerce Square<br>Philadelphia, PA 19103<br>Attention: Samuel J. Arena, Jr. | (215) 564- 8093 | Attorney |
| | | | |
| Strassburger & Price | 901 Main Street<br>Dallas, TX 75202<br>Attention: Duncan Clore | (214) 651- 4300 | Attorney |
| | | | |
| **CANADA** | | | |
| | | | |
| **Alberta:** | | | |
| Field LLP | 1900 First Canadian Center<br>350 7th Avenue, SW<br>Calgary, Alberta T2P 3N9<br>Attention: Ms. Jean VanderLee | (403) 260 8520 | Attorney |
| | | | |
| **British Columbia:** | | | |
| Borden Ladner Gervais LLP | 1200 Waterfront Centre<br>200 Burrand Street<br>PO Box 49600<br>Vancouver, BC V7X 1T2<br>Attention: Ross McGowan | (604) 640- 4173 | Attorney |
| | | | |
| **Ontario:** | | | |
| Bennett Jones LLP | 3400 One First Canadian Place<br>PO Box 130<br>Toronto, Ontario M5X 1A4<br>Attention: Jim Patterson | (416) 777- 6250 | Attorney |
| | | | |
| Borden Ladner Gervais LLP | Scotia Plaza<br>40 King Street West<br>Toronto, Ontario M5H 3Y4<br>Attention: Denise Bamborough | (416) 367- 6121 | Attorney |
| | | | |
| Affleck Greene McMurtry | One First Canadian Place<br>100 King Street West,<br>Suite 840<br>Toronto, Ontario M5X 1E5<br>Attention: Peter Greene | (416) 360- 2800 | Attorney |

© All rights reserved.

| **Quebec** | | | |
|---|---|---|---|
| Borden Ladner Gervais LLP | 1000 de La Gauchetiere Street West Suite 900 Montreal, Quebec H3B 5H4 Attention: John Murphy | (514) 954- 3155 | Attorney |
| | | | |
| Nicholl Paskell- Mede | 630 Boulevard Rene- Levesque Ouest Bureau 1700 Montreal, Quebec H3B 1S6 Attention: John Nicholl | (514) 843- 3777 | Attorney |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

◇ All rights reserved.

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website and click on the "Directors & Officers (Securities Claims)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)
© All rights reserved.

## APPENDIX B
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Public and Private Companies (Employment Practices Liability)" link and then select the applicable Panel Counsel Directory, either the "4- 97 Monoline/Public Companies" link or the "Private Edge" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)                    © All rights reserved.

**POLICYHOLDER NOTICE REGARDING**

**E- DISCOVERY CONSULTANT SERVICES**

You are hereby notified that the Insureds under the attached policy are entitled to retain the services of a pre- approved E- Consultant Firm from the E- DISCOVERY CONSULTING FIRMS listed below at the rates negotiated by the Insurer for any Claim covered under the policy in which E- Discovery is required or becomes necessary.

For the purpose of the E- Discovery Consultant Services discussed in this notice, the following definitions shall apply:

(a) "E- Consultant Firm" means any E- DISCOVERY CONSULTING FIRMS listed below. Any "E- Consultant Firm" may be hired by an Insured to perform E- Discovery Consultant Services without further approval by the Insurer.

(b) "E- Discovery" means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

(c) "E- Discovery Loss" means the reasonable and necessary consulting fees for the E- Discovery Consultant Services provided solely to the Insured(s) by an E- Consultant Firm.

Provided, however, E- Discovery Loss shall not include any costs of discovery other than E- Discovery Loss.

(d) "E- Discovery Consultant Services" means solely the following services performed by an E- Consultant Firm:

1. assisting the Insured with managing and minimizing the internal and external costs associated with E- Discovery;

2. assisting the Insured in developing or formulating an E- Discovery strategy which shall include interviewing qualified and cost effective E- Discovery vendors;

3. serving as project manager, advisor and/or consultant to the Insured, defense counsel and the Insurer in executing and monitoring the E- Discovery strategy; and

4. such other services provided by the E- Consultant Firm that the Insured, Insurer and E- Consultant Firm agree are reasonable and necessary given the circumstances of the Securities Claim.

PLEASE NOTE: The Insurer shall only be liable for the amount of E- Discovery Loss arising from a Claim (with the exception of a Securities Claim) under the attached policy that is in excess of the applicable Retention amounts stated in Item 4 of the Declarations. The E- DISCOVERY CONSULTANT SERVICES COVERAGE provided for Securities Claims shall be governed by the terms, conditions and exclusions set forth in the attached policy. In all events, the Insurer shall not waive any of the Insurer's rights under this policy or at law.

E- DISCOVERY CONSULTING FIRMS

The list of approved E- Consultant Firms is accessible through our online directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online E- Consultant Firm Directory, please go to the website and click on the "**e- Consultant Panel Members**" link.

References in this policy to the list of E- Consultant Firms or related appendices are deemed amended to refer to the applicable online E- Consultant Firm Directory at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

© All rights reserved.

APPENDIX D
**CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION**

I. <u>**DEFINITIONS**</u>

(a) "**Crisis Management Event**" means one of the following events which, in the good faith opinion of the **Company**, did cause or is reasonably likely to cause a **Material Effect**:

    1.  <u>Management Crisis</u>:
    The death, incapacity or criminal indictment of any **Executive** of the **Company**, or any **Employee** on whom the **Company** maintains key person life insurance.

    2.  <u>Employee Layoffs</u>:
    The public announcement of layoffs of **Employees** of the Company.

    3.  <u>Debt Default</u>:
    The public announcement that the **Company** had defaulted or intends to default on its debt.

    4.  <u>Bankruptcy</u>:
    The public announcement that the **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

    5.  <u>Mass Tort</u>:
    The public announcement or accusation that a **Company** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

    6.  <u>Regulatory Crisis</u>:
    The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against a **Company**.

The descriptions in the headings of the **Crisis Management Events** are solely for convenience and form no part of the terms and conditions of coverage.

A **Crisis Management Event** shall first commence when the **Company** or any of its **Executives** shall first become aware of the event during the **Policy Period** and shall conclude at the earliest of the time when the **Crisis Management Firm** advises the **Company** that the crisis no longer exists or when the **Crisis Management Fund** has been exhausted.

(b) "**Crisis Management Firm**" means any public relations firm, crisis management firm or law firm listed below in Section III of this Appendix D. Any "**Crisis Management Firm**" may be hired by the **Company** or its **Executives** or **Employees** to perform **Crisis Management Services** without further approval by the Insurer.

(c) "**Crisis Management Loss**" means the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an Insured arising from the **Crisis Management Event** and, in the case where a

**Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

    (1)   amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Company** arising from a **Crisis Management Event**; and

    (2)   amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by **Executives**, **Employees** or agents of the **Company** or the **Crisis Management Firm**, in connection with the **Crisis Management Event**.

(d)   "**Crisis Management Services**" means those services performed by a **Crisis Management Firm** in advising the **Company** or any of its **Executives** or **Employees** on minimizing potential harm to the **Company** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring public confidence in the **Company**.

(e)   "**Material Effect**" means the publication of unfavorable information regarding the **Company** which can reasonably be considered to lessen public confidence in the competence of the **Company**. Such publication must in occur in either:

    (1)   a daily newspaper of general circulation in the geographic area of the **Company**, or

    (2)   a radio or television news report on a **Company** received in the geographic area of the **Company**.

## II.   <u>EXCLUSIONS</u>

The term **Crisis Management Event** shall not include any event relating to:

1.   any pending or prior litigation as of the **Continuity Date** for the **D&O Coverage Section** indicated in Item 3 of the Declarations;

2.   any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

3.   the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

4.   the hazardous properties of nuclear materials.

## III.   <u>PRE- APPROVED CRISIS FIRMS</u>

For all **Crisis Management Events**, **Crisis Management Firm(s)** means any public relations firm listed in (1) - (8) below:

1.   Abernathy MacGregor Group, Inc.
    501 Madison Avenue
    New York, New York  10022
    (212) 371- 5999
    Contacts: James T. MacGregor    (jtm@abmac.com)
           Rhoda Barnat         (rb@abmac.com)

2.     Burson- Marsteller
230 Park Avenue South
New York, New York  10003- 1566
(212) 614- 5236
Contact:  Michael Claes        (Michael.Claes@bm.com)

3.     Kekst and Company
437 Madison Avenue
New York, New York  10022
(212) 521- 4800
Contacts: Jim Fingeroth       (Jim- Fingeroth@kekst.com)
             Lissa Perlman         (Lissa- Perlman@kekst.com)

4.     Patton Boggs, LLP
2550 M Street, N.W.
Washington D.C.  20037
(202) 457- 6040
Contact:  Thomas Boggs, Esq.     (tboggs@pattonboggs.com)

5.     Reputation Partners, LLC
105 West Adams Street, Suite 2220
Chicago, IL  60603- 6265
(312) 222- 9887
Contacts: Nick Kalm           (nick@reputationpartners.com)
             Jane Devron          (jane@reputationpartners.com)

6.     Robinson Lerer & Montgomery
1345 Avenue of The Americas, 4th Floor
New York, New York  10105
646- 805- 2000
Contact:  Michael Gross       (mgross@rlmnet.com)

7.     Sard Verbinnen & Co.
630 Third Avenue, 9th Floor
New York, New York  10017
(212) 687- 8080
Contacts: George Sard          (gsard@sardverb.com)
             Paul Verbinnen       (pverbinnen@sardverb.com)

8.     Sitrick And Company
1840 Century Park East, Suite 800
Los Angeles, CA  90067
(310) 788- 2850
Contact:  Michael Sitrick      (mike sitrick@sitrick.com)

**ENDORSEMENT#** *1*

This endorsement, effective *12:01 am    November 1, 2017*      forms a part of policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**AMENDATORY ENDORSEMENT**
**TEXAS**

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS [SM]

This policy is amended as follows:

1.  Clause 11. **OTHER INSURANCE** of the **General Terms and Conditions** is modified to the extent necessary to provide the following:

    If any other valid and collectible insurance is available to the **Insured** for a **Loss** covered by this policy, the **Insurer** shall not be liable under this policy for a greater proportion of such **Loss** than the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance against such **Loss**.

2.  If the **KRE Coverage Section** is purchased, Clause 7. **GENERAL CONDITIONS** of the **KRE Coverages Section** is modified to add the following to the end thereof:

    CLAIMS HANDLING:

    (a)  Within 15 days after the **Insurer** receives written notice of claim, the **Insurer** will:

    (i)  Acknowledge receipt of the claim. If the **Insurer** does not acknowledge receipt of the claim in writing, the **Insurer** will keep a record of the date, method and content of the acknowledgment;

    (ii)  Begin any investigation of the claim; and

    (iii)  Request a signed, sworn proof of loss, specify the information the **Insured Person(s)** must provide and supply the **Named Entity** with the necessary forms. The **Insurer** may request more information at a later date, if during the investigation of the claim such additional information is necessary.

    (b)  The **Insurer** will notify the **Insured Person(s)** in writing as to whether:

    (iv)  The claim or part of the claim will be paid;

    (v)  The claim or part of the claim has been denied, and inform the **Insured Persons** of the reasons for denial;

    (vi)  More information is necessary; or

    (vii)  The **Insurer** needs additional time to reach a decision. If the **Insurer** needs additional time, the **Insurer** will inform you of the reasons for such need.

◈ All rights reserved.
***END 001***

ENDORSEMENT#  *1*  (continued)

(c)  The **Insurer** will provide notification, as described in 2(a) through 2 (b) above, within 15 business days after the **Insurer** receives the signed, sworn proof of loss and all information the **Insurer** requested. If the **Insurer** has notified you that the **Insurer** needs additional time to reach a decision, the **Insurer** must then either approve or deny the claim within 45 days of such notice.

(d)  The **Insurer** will pay for covered loss or damage within 5 business days after the **Insurer** has notified the **Insured Person(s)** that payment of the claim or part of the claim will be made on the amount of loss.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

◈ All rights reserved.
*END 001*

ENDORSEMENT# *2*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**TEXAS AMENDATORY ENDORSEMENT**
**CANCELLATION AND NONRENEWAL**

Wherever used in this endorsement: 1)"Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Organization, Named Sponsor, or Named Insured stated in the declarations page; and 3) "Liability insurance" means the following types of insurance: general liability, professional liability other than medical professional liability, commercial multi-peril coverage, and any other types of lines of liability insurance designated by the State Board of Insurance.

It is hereby agreed that the cancellation provision of this policy is deleted in its entirety and replaced by the following:

**CANCELLATION AND NONRENEWAL**

A.    Cancellation

1.    This policy may be canceled by the Insured by surrender thereof to the Insurer or any of its authorized agents or by mailing to the Insurer written notice stating when thereafter the cancellation shall be effective.

2.    Except as provided by subsection A.3. below, the Insurer may not cancel this policy if it is:

a)  a policy of liability insurance that is a renewal or continuation policy; or

b)  a policy of liability insurance that is in its initial policy period after the 60th day following the date on which the policy was issued.

3.    The Insurer may cancel this policy at any time during the term of the policy for the following reasons:

a)  fraud in obtaining coverage;

b)  failure to pay premiums when due;

c)  an increase in hazard within the control of the Insured or Other Insured(s) which would produce an increase in rate;

d)  loss of the Insurer's reinsurance covering all or part of the risk covered by the policy; or

Ⓒ All rights reserved.

*END 002*

ENDORSEMENT# *2* (continued)

e) the Insurer being placed in supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver.

4. The Insurer shall deliver or mail to the Insured first named in the Declarations written notice of cancellation at the address shown on the policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

5. The Insurer may not cancel this policy based solely on the fact that the Insured is an elected official.

6. If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the condominium Property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the First Named Insured thirty (30) days before the effective date of cancellation. The Insurer will also provide thirty (30) days written notice to each unit-owner to whom the Insurer issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to the Insurer.

B. Nonrenewal

1. The Insurer may refuse to renew this policy by delivering or mailing to the Insured first named in the Declarations written notice of nonrenewal at the address shown on the policy. Such written notice shall state the reason(s) for nonrenewal. The notice must be delivered or mailed not later than the 60th day before the date on which the policy expires. If the notice is delivered or mailed later than the 60th day before the date on which the policy expires, the coverage shall remain in effect until the 61 day after the date on which the notice is delivered or mailed. If notice is delivered or mailed, proof of delivery or mailing will be sufficient proof of notice. Earned premium for any period of coverage that extends beyond the expiration date of the policy shall be computed pro rata based on the previous year's rates.

2. The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

3. The Insurer may not refuse to renew this policy based solely on the fact that the Insured is an elected official.

4. If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the

© All rights reserved.

*END 002*

74802 (7/11)

2

ENDORSEMENT# *2*    (continued)

condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the Insurer will mail or deliver written notice of nonrenewal, at least thirty (30) days before the expiration or anniversary date of the policy, to:

a.    The first Named Insured; and

b.    Each unit-owner to whom the Insurer issued a certificate or memorandum of insurance.

The Insurer will mail or deliver such notice to each last mailing address known to the Insurer.

All other terms, conditions and exclusions of the policy shall remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 002*

74802 (7/11)                                    3

ENDORSEMENT# *3*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### 502(c) ERISA PENALTY COVERAGE WITH SUBLIMIT ENDORSEMENT
### (FLI COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in the **FLI Coverage Section**, CLAUSE 3. DEFINITIONS (y) **"Loss"** is amended in part to include the civil penalties imposed upon an **Insured** under Section 502(c) of ERISA, with respect to covered settlements and judgments.

It is further understood and agreed that solely with respect to the coverage provided by this endorsement, the maximum limit of the **Insurer's** liability for all such civil penalties in the aggregate shall be $50,000 (**"Sublimit of Liability for 502(c) Civil Penalties"**). This **Sublimit of Liability for 502(c) Civil Penalties** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the FLI Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**. Solely with respect to the coverage provided by this endorsement, it is further understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *November 1, 2017*    or after the end of the **Policy Period**. This policy only provides coverage for **Wrongful Acts** occurring on or after *November 1, 2017*    and prior to the end of the **Policy Period** and otherwise covered by this policy. **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓒ All rights reserved.
**END 003**

ENDORSEMENT# *4*

This endorsement, effective *12:01 am    November 1, 2017*         forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**ABSOLUTE SEC EXCLUSION**
**(CCP COVERAGE SECTION)**

In consideration of the premium charged, it is hereby understood and agreed that, solely
with respect to the CCP Coverage Section, the policy is amended as follows:

1.   Notwithstanding any other provision of this policy (including any endorsement
     attached hereto, whether such endorsement precedes or follows this endorsement
     in time or sequence), this policy shall not provide coverage for **Defense Costs** or
     **Loss** arising out of any **Securities Claim(s)**. All sections of the policy which refer to
     coverage for **Securities Claims** are deleted in their entirety.

2.   Clause **2. DEFINITIONS**, Paragraph (b) is deleted in its entirety and replaced with the
     following:

     (b)   **"Claim"** means:

           (1)   a written demand for monetary, non-monetary or injunctive relief;
           (2)   a written request to toll or waive a statute of limitations relating to a
                 potential **Claim** against an **Individual Insured**;
           (3)   a **Suit**; or
           (4)   an **Administrative Proceeding Claim**

3.   Clause **3. EXCLUSIONS** is amended to include the following at the end thereof:

     AS-(a)   any purchase, sale, offer of or solicitation of an offer to purchase or sell
              securities, or violation of any securities law, including provisions of the
              Securities Act of 1933, or the Securities Exchange Act of 1934, as amended;
              or

     AS-(b)   regulation promulgated under the foregoing laws, or any federal, state, local
              or foreign laws (i) similar to the foregoing laws (including "Blue Sky" laws)
              or (ii) regulating the same or similar conduct or services, whether such law
              is statutory, regulatory or common law,

     including, without limitation, such actions described above brought by any
     government or regulatory or self-regulatory entity or authority.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 004*

100870 (1/09)                          Page 1 of 1

ENDORSEMENT# *5*

This endorsement, effective *12:01 am     November 1, 2017*     forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADD CREDIT, DEBIT OR CHARGE CARD FORGERY ENDORSEMENT
## (CRIME COVERAGE SECTION ONLY)

In consideration of the premium charged, it is hereby understood and agreed that this
endorsement modifies insurance provided under the **Crime Coverage Section**, and applies
solely to Insuring Agreement B. **FORGERY OR ALTERATION**, as follows:

**A. Schedule**

| Per Occurrence Limit Of Liability | Covered Instruments | |
|---|---|---|
| *$1,000,000* | [X] | Includes written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |
| | [ ] | Limited to written instruments required in conjunction with any credit, debit or charge card issued to the Insured or any Employee for business purposes. |

**B. Provisions**

1.     Covered Instruments either includes or is limited to, whichever is indicated as
applicable in the Schedule, written instruments required in conjunction with any
credit, debit or charge card issued to the **Insured** or any **Employee** for business
purposes.

2.     The most we will pay in any one **Occurrence** is the applicable **Per Occurrence Limit
of Liability** shown in the Schedule.

3.     The following exclusion is added to Clause 3. **EXCLUSIONS** at the end thereof:

Insuring Agreement B. **FORGERY OR ALTERATION**, of this **Crime Coverage Section** does
not apply to loss arising from any credit, debit or charge card if the **Insured(s)** have not
complied fully with the provisions, conditions or other terms under which the card was
issued.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 005*

96298 (10/07)                              Page 1 of 1

ENDORSEMENT# 6

This endorsement, effective *12:01 am* *November 1, 2017* forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADDITIONAL INSUREDS - LISTED AFFILIATES (CO-DEFENDANT)
### (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that coverage
as is provided under the **D&O** and **EPL Coverage Sections,** Clause 2. Definition of
**"Company"** of the **General Terms and Conditions**, shall include the following entity(ies),
which is an (are) **" Affiliate(s)"** as defined in Clause 2. **DEFINITIONS**, paragraph (a) of the
**D&O Coverage Section**, subject to each such **Affiliate's(s') Continuity Date**:

| AFFILIATE | CONTINUITY DATE |
|---|---|
| Rockdale Blackhawk, LLC, et al | 04/07/2014 |
| Rockdale Blackhawk, LLC DBA Little River Healthcare dba Little River Healthcare-Urgent Care Center | 04/07/2014 |
| Georgetown Diagnostic Imaging, LLC | 04/07/2014 |
| Bastrop Open MRI, LLP | 04/07/2014 |
| Little River Healthcare- Cameron | 04/07/2014 |
| Little River Healthcare- Rockdale | 04/07/2014 |
| Bastrop Open MRI, LP dba Little River Bastrop | 04/07/2014 |
| Bastrop MRI, LLP dba Lakeside Hospital at Bastrop | 04/07/2014 |
| Litte River Healthcare Family Care Center | 04/07/2014 |
| Little River Healthcare Westlake Clinic | 04/07/2014 |
| Little River Healthcare Meridian Surgery Center | 04/07/2014 |
| Little River Healthcare GT Orthopedics | 04/07/2014 |
| Little River Healthcare Austin Urology | 04/07/2014 |
| Little River Healthcare Georgetown Imaging | 04/07/2014 |
| Little River Healthcare Bastrop Imaging | 04/07/2014 |

***END 6***

**ENDORSEMENT# 6    (Continued)**

This endorsement, effective  *12:01 am*    *November 1, 2017*    forms a part of
policy number  *02-778-20-05*
issued to    *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Little River Healthcare Round Rock Cardiology | 04/07/2014 |
| Little River Healthcare Business Office | 04/07/2014 |
| Little River Healthcare Sleep Lab Round Rock | 04/07/2014 |
| Little River Healthcare Sleep Lab Austin | 04/07/2014 |
| Little River Healthcare Sleep Lab San Antonio | 04/07/2014 |
| Little River Healthcare Specialty Clinic | 04/07/2014 |
| Little River Healthcare- Neurology | 04/07/2014 |
| Little River Healthcare- King's Daughter's Clinic Imaging Center | 04/07/2014 |
| Little River Healthcare- Physicians of King's Daughters, P.A. | 04/07/2014 |
| Little River Healthcare- King's Daughters Clinic dba Little River Healthcare- Cameron Hospital | 04/07/2014 |
| Little River Medical Group | 04/07/2014 |
| Little River Healthcare Central Texas LLC | 04/07/2014 |
| Little River Healthcare Physicians of Temple Surgery Ctr | 04/07/2014 |
| Little River Healthcare - Sleep Disorder Clinic at Georgetown | 04/07/2014 |
| Little River Family Health Center of Bastrop | 04/07/2014 |
| CTH, Inc. | 04/07/2014 |

***END 6***

ENDORSEMENT# *6* (Continued)

This endorsement, effective *12:01 am* *November 1, 2017* forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Rockdale Blackhawk, LLC | 04/07/2014 |
| Little River Healthcare - Central Texas LLC | 04/07/2014 |
| Little River Medical Group | 04/07/2014 |
| Little River Healthcare - Tomball LLC | 04/07/2014 |
| Little River Healthcare - Sleep Disorder Center at Georgetown LLC | 04/07/2014 |
| Little River Healthcare - Meridian Surgery Center LLC | 04/07/2014 |

Coverage as is afforded under the **D&O** and **EPL Coverage Sections** with respect to a **Claim** made against such **Affiliate** or any **Individual Insured** thereof shall only apply if: (1) such **Claim** arises out of a covered **Claim** for a **Wrongful Act** actually or allegedly committed by an **Insured** (other than the above listed **Affiliate** or an **Individual Insured** thereof); and (2) an **Insured** (other than the above listed **Affiliate** or any **Individual Insured** thereof) is and remains a defendant in the action along with the above listed **Affiliate** or any **Individual Insured** thereof.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the **Affiliates** listed above and the **Company** will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that such **Affiliates** or the **Company** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company**. The **Affiliates** and the **Company** hereby agree to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against the **Affiliates** listed above or any **Clams** made against any **Individual Insured** of such **Affiliate** listed above:

**END 6**

**ENDORSEMENT# 6** (Continued)

This endorsement, effective *12:01 am* *November 1, 2017* forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

(1) alleging, arising out of, based upon or attributable to, as of such **Affiliate's** respective **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, or alleging or derived from a **Related Wrongful Act** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; and

(2) alleging any **Wrongful Act** occurring prior to such **Affiliate's** respective **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

In all events, coverage as is afforded under this endorsement with respect to a **Claim** made against each respective **Affiliate(s)** listed above or any **Individual Insureds** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the respective time such **Affiliate** became an **Affiliate** and prior to the time that the such **Affiliate** ceased to be an **Affiliate** as defined in Clause 2. **DEFINITIONS**, paragraph (a) of the **D&O Coverage Section**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

97739 (03/08) *END 6*

ENDORSEMENT# *7*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ANTITRUST COVERAGE ENDORSEMENT
### (SEPARATE SUBLIMIT, RETENTION AND CO-INSURANCE)
### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  In Clause 4. "EXCLUSIONS" of the **D&O Coverage Section**, paragraph (t)(ii) is deleted in its entirety.

2.  Clause 5. "LIMIT OF LIABILITY" of the **D&O Coverage Section** is amended by adding the following at the end thereof:

    **ANTITRUST SUBLIMIT OF LIABILITY**

    The aggregate limit of the **Insurer's** liability for all **Loss** under this **D&O Coverage Section** arising from all **Antitrust Claims** is *$1,000,000*    (hereinafter called the "**Antitrust Sublimit of Liability**"). This **Antitrust Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **D&O Coverage Section** as set forth in Item 3 of the Declarations.

3.  Clause 6. "RETENTION/DEDUCTIBLE CLAUSE" of the **D&O Coverage Section** is amended by adding the following paragraphs at the end thereof:

    Notwithstanding the foregoing, with respect to any **Antitrust Claim** (as defined below), the **Insurer** shall only be liable for **Loss** arising from such **Antitrust Claim** which is in excess of a Retention amount of *$150,000*    (the "**Antitrust Retention**"), such **Antitrust Retention** to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Indemnifiable Loss**; and (ii) **Loss** of the **Company**. A single **Antitrust Retention** shall apply to **Loss** arising from all **Antitrust Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**. In the event a **Claim** triggers more than one Retention amount under the policy, only the highest such amount shall apply, which amount shall apply to all **Loss** under such **Claim**.

4.  Solely with respect to **Antitrust Claims**, it is hereby understood and agreed that the following Clause is added to the end of the **D&O Coverage Section**:

    **AC-1. COINSURANCE CLAUSE**

    With respect to: (1) **Indemnifiable Loss**; and/or (2) **Loss** of the **Company**, the **Insurer** shall be liable to pay *80* % of **Loss** excess of the applicable Retention amount, it being a condition of this insurance that the remaining *20* % of each and every **Loss** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured.

5.  Solely with respect to the coverage provided by this endorsement for **Antitrust**

◈ All rights reserved.
*END 007*

ENDORSEMENT# *7* (continued)

**Claims**, Clause 2. "DEFINITIONS" of the **D&O Coverage Section** is amended by adding the following Definition to the end thereof:

(AC- 1) **"Antitrust Claim"** means any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, including any violation of the Sherman Antitrust Act, the Clayton Act, the Robinson- Patman Act or any similar federal, state or local statutes or rules. **"Antitrust Claim"** also means any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, any actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: business competition, unfair trade practices or tortious interference in another's business or contractual relationships.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 007*

**ENDORSEMENT#  *8***

This endorsement, effective at  *12:01 am    November 1, 2017*      forms a part of
Policy number  *02-778-20-05*
Issued to:  *Little River Healthcare Holdings, LLC*

By:  *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name:  *PrivateEdge Plus*

**CONDUCT EXCLUSIONS AMENDED
(FINAL NON-APPEALABLE ADJUDICATION)
(D&O and EPL COVERAGE SECTIONS)**

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. In Clause 4. **EXCLUSIONS** of the **D&O Coverage Section**, paragraphs (a), (b) and (c) are
   deleted in their entirety and replaced with the following:

   (a)    arising out of, based upon or attributable to the gaining of any profit or
          advantage to which any final non-appealable adjudication establishes that
          the **Insured** was not legally entitled;

   (b)    arising out of, based upon or attributable to: (1) the purchase or sale by an
          **Insured** of securities of the **Company** within the meaning of Section16(b) of
          the Securities Exchange Act of 1934 and amendments thereto or similar
          provisions of any state statutory law if any final non-appealable adjudication
          establishes that such 16(b) violation occurred; or (2) the payment to any
          **Insured** of any remuneration without the previous approval of the
          stockholders of the **Company**, once any final non-appealable adjudication
          establishes that such payment was illegal;

   (c)    arising out of, based upon or attributable to the committing of any deliberate
          criminal or deliberate fraudulent or dishonest act, or any willful violation of
          any statute, rule or law, if any final non-appealable adjudication establishes
          that such deliberate criminal, deliberate fraudulent or dishonest act or willful
          violation of statute, rule or law was committed;

2. In Clause 3. **EXCLUSIONS** of the **EPL Coverage Section**, paragraph (a) is deleted in its
   entirety and replaced with the following:

   (a)    arising out of, based upon or attributable to the committing of any criminal or
          deliberate fraudulent act if any final non-appealable adjudication establishes
          that such criminal or deliberate fraudulent act was committed;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓒ All rights reserved.

*END 008*

112035 (3/14)                                   Page 1 of 1

ENDORSEMENT#  *9*

This endorsement, effective *12:01 am    November 1, 2017*        forms a part of policy number  *02-778-20-05*
issued to  *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EMPLOYMENT EDGE EXTENSION ENDORSEMENT
## (EPL COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  In Clause 1. "INSURING AGREEMENTS" of the **EPL Coverage Section**, the two paragraphs under the heading "INSURING AGREEMENTS" are deleted in their entirety and replaced with the following:

### INSURING AGREEMENTS

Coverage granted for **Loss** under this policy is provided solely with respect to: (i) **Claims** first made against an **Insured**, and (ii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy, except to the extent coverage is extended pursuant to Clause 6(e) of the **General Terms and Conditions** of this policy to a **Claim** first made prior to the **Policy Period**. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

A. *Employment Practices Liability Coverage*
This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Employment Practices Violation**.

B. *Third Party Violation Coverage*
This **EPL Coverage Section** shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Third Party Violation**.

C. *Wrongful Internet Activity Coverage*
This **EPL Coverage Section** shall pay the **Loss** of a **Company** arising from any **Claim** made against such **Company** for its actual or alleged liability for any **Wrongful Internet Activity** of an **Employee**.

D. *Employment Crisisfund® Coverage*
This **EPL Coverage Section** shall pay the **Crisis Loss** of a **Company** in connection with an **Employment Practices Crisis**, a **Workplace Violence Crisis** or an **Employee Information Breach Crisis**, up to the amount of the **Employment CrisisFund**®; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

© All rights reserved.

*END 009*

108228 (8/12)                              1

ENDORSEMENT# *9* (continued)

The **Insurer** shall, in accordance with and subject to Clause 6 of this **EPL Coverage Section**, advance **Defense Costs** of any **Claim** or **Employment Practices Crisis** prior to its final disposition.

2. In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of the terms **"Claim," "Employment Practices Violation"** and **"Wrongful Act"** are deleted and replaced with the following:

**"Claim"** means:

(1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process, or any request to toll or waive the statute of any limitations;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document (in the case of a criminal proceeding); or (c) receipt or filing of a notice of charges;

(3) an administrative or regulatory investigation by the **EEOC** which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**; or

(4) an administrative or regulatory investigation of violations of the Uniformed Services Employment and Reemployment Rights Act when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel and is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**.

However, in no event shall the term **"Claim"** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

**"EEOC"** means the Equal Employment Opportunity Commission, or any similar state, local or foreign agency.

 **"Employment Practices Violation"** means any actual or alleged:

(i) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(ii) harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise, including "same-sex" sexual harassment);

(iii) discrimination (including, but not limited to, discrimination based upon age, gender, gender identity or expression, race, color, national origin, religion, sexual orientation or preference, genetic information, pregnancy, military status or disability);

(iv) **Retaliation**;

(v) employment-related misrepresentation(s) to an **Employee** of any **Company** or applicant for employment with any **Company** or any **Outside Entity**;

© All rights reserved.

*END 009*

ENDORSEMENT# *9* (continued)

(vi)     employment-related libel, slander, humiliation, defamation or invasion of privacy;

(vii)    false arrest or false imprisonment;

(viii)   wrongful failure to employ or promote;

(ix)    wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(x)     wrongful discipline;

(xi)    failure to grant tenure; or

(xii)   with respect to any of the foregoing items (i) through (xii) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of or an applicant for employment with a **Company** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

"**Wrongful Act**" means any **Employment Practices Violation**, **Third-Party Violation** or **Wrongful Internet Activity**.

3.    In Clause 2. "DEFINITIONS" of the **EPL Coverage Section**, the definition of "**Loss**" is amended to include **Crisis Loss**.

4.    Clause 2. "DEFINITIONS" of the **EPL Coverage Section** is further amended by adding the following definitions at the end thereof:

"**Administrative Claim**" means an administrative or regulatory investigation:

(1) by the **EEOC** or similar federal, state or local agency; or

(2) of a violation of the Uniformed Services Employment and Reemployment Rights Act, when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel;

which, in either case, is commenced by the filing of a notice of charges or similar document of which notice has been given to an **Insured**.

The term "**Administrative Claim**" shall not mean or include any **Litigated Matter**.

"**Crisis**" has the meaning as defined in the Employment CrisisFund[®] Appendix attached to this policy.

"**Crisis Loss**" has the meaning as defined in the Employment CrisisFund[®] Appendix attached to this policy.

© All rights reserved.

*END 009*

ENDORSEMENT# *9* (continued)

**"Employment CrisisFund®"** means in the case of all **Crisis Loss**, $25,000 for all **Crisis Loss** in the aggregate for all **Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

**"Employment Practices Crisis"** has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

**"Employee Information Breach Crisis"** has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

**"Employment Practices Crisis"** has the meaning as defined in the Employment CrisisFund® Appendix attached to this policy.

**"Litigated Matter"** means any civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (1) service of a complaint or similar pleading; or (2) return of an indictment, information or similar document (in the case of a criminal proceeding).

**"Prior AIG Policy"** means a valid and collectible policy providing substantially the same or similar coverage as is provided by this policy, issued to the **Named Entity** by the **Insurer** (or any other insurance company affiliate thereof), of which this policy is a continuous renewal.

**"Related Claim"** means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were alleged in another **Claim** made against an **Insured**.

**"Workplace Violence Crisis"** has the meaning as defined in the CrisisFund® Appendix attached to this policy.

**"Wrongful Internet Activity"** means any actual or alleged:

(1) **Employment Practices Violation** alleged by an **Employee**; or

(2) **Third Party Violation**,

when committed by an **Employee** by means of the internet, including, but not limited to, social networking activities, regardless of whether such internet activity is during or after work hours or on or off the work premises. For purposes of the application of this definition, an individual shall be deemed to be an **Employee** regardless of whether such individual was acting in his or her capacity as an **Employee**.

5.    Solely with respect to **the EPL Coverage Section**, Clause 6. **"NOTICE/CLAIM REPORTING PROVISIONS"** of the General Terms and Conditions is amended by adding the following at the end thereof:

(e) **Claims Savings Clause for Employment Practices Claims**

© All rights reserved.

*END 009*

**ENDORSEMENT#** *9* (continued)

1. Notwithstanding the foregoing, with respect to any **Claim** which (i) first becomes a **Litigated Matter** during the **Policy Period** or **Discovery Period** (if applicable); and (ii) is a **Related Claim** with respect to an **Administrative Claim** which was first made against an **Insured** prior to the **Policy Period**, the **Insurer** shall not deny coverage for such **Claim** based upon late notice of such **Claim** or based upon such **Claim** first being made prior to the **Policy Period**, provided that:

    (a) the **Claim** was first made against the **Insured** at a time during which the **Named Entity** was insured under a **Prior AIG Policy**;

    (b) upon the **Claim** first becoming a **Litigated Matter**, the **Claim** was reported in accordance with Clause 6(a) above; and

    (c) no **Insured** has made a monetary settlement offer to a claimant or responded to a monetary demand from or on behalf of a claimant with respect to such **Claim**.

2. Coverage under this policy for any **Claim** afforded coverage pursuant to this Clause 6(e) shall be the lesser of:

    (a) the coverage which would have been provided under this policy for such **Claim** had the **Claim** been made during the **Policy Period** and reported to the **Insurer** as required by this policy;  or

    (b) the coverage, if any, which would have been provided under the **Prior AIG Policy** for such **Claim** if the **Insured** had properly provided notice of such **Claim** in accordance with the provisions of the **Prior AIG Policy**,

    taking into account all provisions of each policy, including, without limitation, applicable limits of liability (as reduced by payments made under such policy), retentions, exclusions and other restrictions contained in each policy;

    Notwithstanding the foregoing, nothing in this Clause 6(e) shall be construed to increase the **Limit of Liability** of this policy or to provide coverage under the **Prior AIG Policy**, nor shall this Clause 6(e) ever result in providing coverage under this policy for **Loss** for which coverage is in fact provided (or would be provided but for the exhaustion of the limit of liability) under the **Prior AIG Policy**.

3. This Clause 6(c) shall not apply to any  **Claim** which:

    (a) prior to the **Policy Period** was a **Litigated Matter**; or

    (b) is a **Related Claim** with respect to a **Claim** which, prior to the Policy Period was a **Litigated Matter**.

6. The provisions of subparagraph (a) of Clause 6. "NOTICE/CLAIM REPORTING PROVISIONS" of the **General Terms and Conditions** shall apply to any **Crisis** in the same manner and effect as such provisions apply to any Claim.

© All rights reserved.

*END 009*

ENDORSEMENT# *9* (continued)

7.     Clause 3. "EXCLUSIONS," Clause 5. "RETENTION CLAUSE" and Clause 6. "DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) of the **EPL Coverage Section** shall not apply to **Crisis Loss**.

8.     The maximum limit of the **Insurer's** liability under the **EPL Coverage Section** for all **Crisis Loss** arising from all **Crisis** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, is the **Employment CrisisFund**®. This **Employment CrisisFund**® shall be the maximum limit of the **Insurer** under this **EPL Coverage Section** for **Crisis Loss**, regardless of the number of **Crisis** occurring during the **Policy Period**; provided, however, the **Employment CrisisFund**® shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in the Item 7(a) of the Declarations and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **EPL Coverage Section** as set forth in Item 3 of the Declarations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

---

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 009*

ENDORSEMENT# 10

This endorsement, effective *12:01 am    November 1, 2017*        forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EMPLOYMENT CRISISFUND APPENDIX**

## I.  DEFINITIONS

(a)  **"Crisis"** means an **Employment Practices Crisis**, **Employee Information Breach Crisis** or **Workplace Violence Crisis**, as applicable.

(b)  **"Employment Practices Crisis"** means an **Allegation**, **Discovery** or **Media Report** of a **Wrongful Act** (specifically including, but not limited to, a hostile work environment), which, in the good faith opinion of the **Company's** General Counsel (or equivalent position), resulted or is reasonably likely to result, in any:

(1)  civil action or compliance audit by the EEOC or any similar state agency or commission;

(2)  civil or criminal action alleging sexual harassment or conduct by an executive officer;

(3)  civil class action;

(4)  civil action involving multiple plaintiffs; or

(5)  civil action by a person alleging **Retaliation** by an **Insured** in response to such person's actions or threatened actions as a "whistleblower".

Provided, however, that the term **Crisis** shall not include any:

(1)  revising or rewriting of personnel policies or procedures;

(2)  sensitivity or awareness training;  or

(3)  accommodations made by the **Company** pursuant to the Americans With Disabilities Act.

(c)  **"Employee Information Breach Crisis"** means a failure of an **Company** to prevent unauthorized access, to or use of data containing **Employee Information**, which, in the good faith opinion of the **Company**, can reasonably be expected to lessen public confidence in the competence of the  **Company**.

(d)  **"Workplace Violence Crisis"** means any intentional act involving the use of deadly force or the threat of deadly force with a deadly weapon which occurs on the **Company's** premises and involving at least one **Employee**.

(e)  **"Crisis Loss"** means:

(1)  <u>**With Respect to an Employment Practices Crisis**</u>:

Any of the following amounts incurred during the pendency of a **Employment Practices Crisis** for which an **Company** is legally liable:

© All rights reserved.

*END 010*

<u>ENDORSEMENT#</u> *10* (continued)

(i) the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company**;

(ii) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

(iii) travel costs incurred by **Executives**, employees or agents of an **Company** or of the **Crisis Firm**, arising from or in connection with the **Employment Practices Crisis**.

(2) <u>**With Respect to an Employee Information Breach Crisis**</u>:

The reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Management Services** for an **Company**.

(3) <u>**With Respect to a Workplace Violence Crisis**</u>:

The reasonable fees and expenses, or cost of:

(i) an independent security consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs;

(ii) an independent public relations consultant for ninety (90) days following the date the **Workplace Violence Crisis** occurs; and

(iii) onsite group counseling session(s) for **Employees** conducted by an independent consultant following a **Workplace Violence Crisis**.

(f) **"Crisis Management Services"** means:

(1) <u>**With Respect to an Employment Practices Crisis**</u>:

Those services performed by an **Crisis Firm** in advising the **Company** on minimizing potential harm to the **Company** arising from the **Employment Practices Crisis**; including, but not limited to, maintaining and restoring public and employee confidence in the **Company.**

(2) <u>**With Respect to an Employee Information Breach Crisis**</u>:

Reasonable and necessary costs and expenses incurred by an **Company** for a public relations firm, **Crisis Firm** or law firm agreed to by the **Insurer** to advise the **Company** on minimizing the harm to such **Company**, including, without limitation, maintaining and restoring public confidence in the **Company**.

(g) **"Crisis Firm"** means: means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "CrisisFund⊛" link. In the event the **Company** chooses to retain the services of an entity not listed, the **Company** must obtain the written consent of the **Insurer**, which shall not be unreasonably withheld.

⊛ All rights reserved.

*END 010*

**ENDORSEMENT#** *10*   (continued)

(h) **"Employee Information"** means information regarding past, present of future **Employees** or applicant for employment with the **Company**, collected or stored by an **Company** for the purpose of establishing, maintaining or terminating the employment relationship.

(i) **"Allegation"** means any complaint, whether written or verbal, communicated to the **Company's** human resources department by:

(1) an individual who believes that he or she was a victim of the alleged **Wrongful Act**; or

(2) such individual's direct or indirect supervisor, if: such supervisor is an **Employee** and that supervisor's conduct is not the subject matter of the alleged   **Wrongful Act**.

(j) **"Discovery"** means either:

(1) an observation by any **Executive** or any human resources manager; or

(2) an internal investigation conducted by the **Company**, at the **Company's** own expense, which concludes that there is a reasonable basis to believe that a **Wrongful Act** has occurred.

(k) **"Media Report"** means any of the following publications or reports received in the geographic area of the **Company**: (i) a daily newspaper of general circulation; (ii) a weekly, monthly or quarterly newsletter or magazine of general circulation; (iii) a newsletter or trade publication applicable to the **Company's** industry; or (iv) a radio or television newscast.

## II. EXCLUSIONS

The term **Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

***END 010***

ENDORSEMENT# *11*

This endorsement, effective *12:01 am   November 1, 2017*   forms a part of policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FLSA AND RELATED EXCLUSIONS AMENDED
### (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), the policy is amended as follows:

1.  Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) is amended by deleting Exclusion (o) in its entirety.

2.  Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased) is amended by deleting Exclusions (g) and (h) in their entirety.

3.  In Clause 4. EXCLUSIONS of the **D&O Coverage Section** (if purchased) and Clause 3. EXCLUSIONS of the **EPL Coverage Section** (if purchased), the following exclusion is added at the end thereof:

(FL-1) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.

It is acknowledged that **Claims** for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all **Claims** which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:

(1)  the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

(2)  improper deductions from pay taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**; or

(3)  failure to provide or enforce legally required meal or rest break periods;

◈ All rights reserved.
### *END 011*

**ENDORSEMENT#**  *11*     (continued)

Notwithstanding the foregoing, with respect to the **EPL Coverage Section**, this exclusion (FL- 1) shall not apply to the extent that a **Claim** is for **Retaliation.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

◈ All rights reserved.
*END 011*

97629 (3/08)                    Page 2 of 2

ENDORSEMENT# *12*

This endorsement, effective at *12:01 am    November 1, 2017*        forms a part of
Policy number *02-778-20-05*
Issued to: *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

### FOR-PROFIT HEALTH CARE ORGANIZATION
### AMENDATORY ENDORSEMENT
### (ANTITRUST EXCLUSION AMENDMENT DELETED)
### (D&O AND EPL COVERAGES)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

## I.  AMENDMENTS TO THE GENERAL TERMS & CONDITIONS SECTION

The General Terms & Conditions Section is amended as follows:

  A. In Clause 2. "DEFINITIONS" of the General Terms & Conditions Section, the definition of **Company** is amended to include the following at the end thereof:

  **Company** shall also include any auxiliary, guild or foundation formed solely for the benefit of the **Named Entity** and of which the book value of such entity's assets determined in accordance with Generally Accepted Accounting Principles totals less than 10% of the similarly calculated assets of the **Named Entity** as of the inception date of the **Policy Period**.

## II. AMENDMENTS TO THE D&O COVERAGE SECTION

The D&O Coverage Section is amended as follows:

  A. In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of **Individual Insured(s)** is amended to include the following at the end thereof:

  **Individual Insured(s)** shall also include any past, present or future member of any duly constituted committee; any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department; and any medical director, staff physician or faculty member of the **Company**, regardless of whether or not such person is directly employed by the **Company** or is considered to be an independent contractor.

  B. In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of **Loss** is amended to include the following at the end thereof:

    1. <u>IRS Fines</u>:

    **Loss** shall include **Defense Costs** incurred in connection with a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise

© All rights reserved.

### *END 012*

ENDORSEMENT#  *12*   (continued)

taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

Section 4911 (tax on excess expenditures to influence legislation);
Section 4940 (a) (tax on net investment income of tax-exempt foundations);
Section 4941 (taxes on self-dealing);
Section 4942 (taxes on failure to distribute income);
Section 4943 (taxes on excess business holding);
Section 4944 (taxes on investments which jeopardize charitable purpose);
Section 4945 (taxes on taxable expenditures);
Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);
Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and
Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2. EMTALA AND HIPAA FINES AND PENALTIES

Notwithstanding the foregoing, **Loss** shall also include:

(1) civil fines and penalties assessed upon an **Insured** for a violation of **EMTALA**, subject to the **EMTALA Sub-limit of Liability**; and

(2) **HIPAA Penalties**, where insurable by law, subject to the **HIPAA Penalties Sublimit of Liability**.

3. GOVERNMENTAL FUNDING DEFENSE COST COVERAGE

Notwithstanding the foregoing, **Loss** shall not include the return of funds which were received from any federal, state or local governmental agency or any interest, fines or penalties arising out of the return of such funds; provided, however, that this policy shall pay **Defense Costs** in connection with any **Claim** made against an **Insured** for the return of such funds, subject to the **Government Funding Defense Costs Sublimit of Liability** and any co-insurance or separate retention provided for such coverage in this policy.

4. EXCESS BENEFIT PENALTY COVERAGE

"**Loss**" shall also include any "**Excess Benefits**" penalty assessed in the amount of 10% by the Internal Revenue Service ("**IRS**") against any **Insured(s)** for management's involvement in the award of an "**Excess Benefit**" and the **Defense Costs** attributable thereto.  **Loss** shall specifically exclude: (1) any 25% penalty assessed by the **IRS** against an **Insured** deemed to have received an **Excess Benefit**; (2) **Defense Costs** incurred to defend any Insured if it has been in fact determined that such individual received an **Excess Benefit**; and (3) any 200% penalty assessed by the **IRS** for failure to correct the award of an **Excess Benefit**.  In all events, the assessment by the **IRS** of a 200% penalty against any Insured shall void ab initio all coverage afforded pursuant to this paragraph.

C. In Clause 2. "DEFINITIONS" of the D&O Coverage Section, the definition of "**Wrongful Act**" is amended by adding the following to the end thereof:

© All rights reserved.

*END 012*

ENDORSEMENT# *12* (continued)

(iv) any violation of the **EMTALA**.

(v) any violation of the **HIPAA Privacy Regulations**.

D. In Clause 4. "EXCLUSIONS" of the **D&O Coverage Section**, paragraph (l) is deleted in its entirety and replaced with the following:

(l) alleging, arising out of, based upon or attributable to bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to any **Securities Claim**.

E. The following additional exclusions are added to the end of Clause 2. "EXCLUSIONS" of the D&O Coverage Section:

(i) alleging, arising out of, based upon or attributable to any failure or omission on the part of the **Insureds** or the **Company** to effect or maintain adequate insurance;

(j) alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others;

F. Clause 5. "LIMIT OF LIABILITY" of the D&O Coverage Section is amended by inserting the following at the end thereof:

**EMTALA SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **Loss** in connection with all **EMTALA Claims** in the aggregate made and reported during the **Policy Period** or **Discovery Period** (if applicable) is $250,000 (hereinafter "**EMTALA Sublimit of Liability**"). The **EMTALA Sub-limit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**.

**GOVERNMENT FUNDING DEFENSE COSTS SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **Defense Costs** in connection with a **Claim** for the return of funds which were received from any federal, state or local governmental agency or any interest, fines or penalties arising out of the return of such funds is $1,000,000 (the "**Government Funding Defense Costs Sublimit of Liability**"). The **Government Funding Defense Costs Sub-limit of Liability** is part of and not in addition to the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**. With respect to any such sublimited **Defense Costs**, it is further understood and agreed that the **Insurer** shall be liable to

© All rights reserved.

*END 012*

**ENDORSEMENT# *12*** (continued)

pay only 50% of such **Defense Costs**, excess of a retention in the amount of $1,000,000, up to the **Government Funding Defense Costs Sublimit of Liability**. It is a condition of this insurance that the remaining 50% of such **Defense Costs** shall be carried by the **Insureds** at their own risk and be uninsured.

**HIPAA PENALTIES SUBLIMIT OF LIABILITY**

The aggregate limit of the **Insurer's** liability for all **HIPAA Penalties** in the aggregate under this policy is $250,000 (the "**HIPAA Penalties Sublimit of Liability**"). The **HIPAA Penalties Sublimit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the D&O Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**.

G. Clause 9. **PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

**9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS**

This Clause 9 applies to all **Claims**.

Affixed as Appendix A hereto and made a part of this **D&O Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 7. of this **D&O Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Claim** is brought. In the event a **Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from

Ⓒ All rights reserved.

*END 012*

ENDORSEMENT # *12* (continued)

that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

## III. AMENDMENTS TO THE EPL COVERAGE SECTION

The EPL Coverage Section is amended as follows:

A. In Clause 2. "DEFINITIONS" of the EPL Coverage Section, the definition of **Individual Insured(s)** is amended to include the following at the end thereof:

**Individual Insured(s)** shall also include any past, present or future member of any duly constituted committee; any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department; and any medical director, staff physician or faculty member of the **Company**, regardless of whether or not such person is directly employed by the **Company** or is considered to be an independent contractor.

B. In the definition of **Employment Practices Violation** in Clause 2. "DEFINITIONS" of the EPL Coverage Section, subparagraph (xi) is deleted in its entirety and replaced as follows:

   (xi)   defect in peer review or credentialing;

   (xii)  with respect to any of the foregoing items (i) through (x) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

C. Paragraphs (f) and (j) of Clause 3. "EXCLUSIONS" of the EPL Coverage Section are deleted in their entirety and replaced with the following:

   (f)  alleging, arising out of, based upon or attributable to bodily injury, sickness, disease or death of any person, or damage to, loss of use of or destruction of any tangible property; provided, however, this exclusion shall not apply to any a Claim for Retaliation.

   (j)  alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of any **Insured** under any express contract or agreement; provided, however, that this exclusion shall not apply to:

      (1) the extent that any liability does not arise under such express contract or agreement;

      (2) **Loss** constituting **Defense Costs** for express, written employment contracts; or

© All rights reserved.

*END 012*

ENDORSEMENT# *12* (continued)

    (3) **Claims** for **Loss** alleging **Wrongful Acts** of an **Insured(s)** with respect to hospital practice privileges, credentialing or peer review matters;

D. Clause 7. "**PRE-AUTHORIZED DEFENSE ATTORNEYS FOR SECURITIES CLAIMS**" of the **EPL Coverage Section** is deleted in its entirety and replaced with the following:

**7. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS**
This Clause 9 applies to all **Claims**.

Affixed as Appendix A hereto and made a part of this **EPL Coverage Section** is a list of Panel Counsel law firms ("**Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** pursuant to the terms set forth in this Clause.

In the event the **Insurer** has assumed the defense pursuant to Clause 6. of this **EPL Coverage Section**, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. In the event the **Insureds** are already defending a **Claim**, then the **Insureds** shall select a Panel Counsel Firm to defend the **Insureds**.

The selection of the **Panel Counsel Firm**, whether done by the **Insurer** or the **Insureds**, shall be from the list of **Panel Counsel Firms** designated for the type of **Claim** and be from the jurisdiction in which the **Claim** is brought. In the event a **Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located. In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made during the **Policy Period** to the **Panel Counsel Firms** listed in Appendix A without the consent of the **Named Entity**.

E. The following clause is inserted at the end of the EPL Coverage Section:

**HC-1 THIRD PARTY HUMAN CLINICAL TRIAL CLAIMS SUBLIMIT OF LIABILITY**

The following provisions shall apply in addition to the provisions of Clause 5. "LIMIT OF LIABILITY" of the General Terms and Conditions:

© All rights reserved.

*END 012*

ENDORSEMENT# *12* (continued)

The aggregate limit of the **Insurer's** liability for all **Loss** under the EPL Coverage Section in connection with all **Third Party Human Clinical Trial Claims** in the aggregate is $250,000 (hereinafter called the **"Third Party Human Clinical Trial Claims Sublimit of Liability"**). The **Third Party Human Clinical Trial Claims Sublimit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the EPL Coverage Section, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**, **Separate Limit of Liability** or **Shared Limit of Liability**.

## IV. DEFINTIONS USED IN ENDORSMENT

As used in this endorsement, the following terms have the meanings set forth below:

HC-1 **"EMTALA"** means the Emergency Medical Treatment and Active Labor Act (**"EMTALA"**), 42 U.S.C., 1396dd *et seq.*, and any similar state or local statute.

HC-2 **"EMTALA Claim"** means any **Claim** alleging a violation of **EMTALA**, including, without limitation, any **Claim** seeking civil fines and penalties for a violation of **EMTALA**.

HC-3 **"Excess Benefits"** means an excess benefit as defined in the Taxpayer Bill of Rights Act, 2, 26 U.S.C. 4958.

HC-4 **"HIPAA Penalties"** means civil money penalties imposed upon an **Insured** for violation of the **HIPAA Privacy Regulations**.

HC-5 **"HIPAA Privacy Regulations"** means the privacy provisions of Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder, and amendments thereto, including, but not limited to, any amendment pursuant to the Health Information Technology for Economic and Clinical Health ("HITECH Act")

HC-6 **"Third Party Human Clinical Trial Claim"** means any **Third Party Violation** in connection with any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 012*

ENDORSEMENT# *13*

This endorsement, effective at *12:01 am   November 1, 2017*     forms a part of
Policy number *02-778-20-05*
Issued to: *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

## IMPERSONATION FRAUD COVERAGE
## (CRIME COVERAGE SECTION)

It is agreed that in consideration of the additional premium of *$0*, the policy is hereby amended as follows:

1.  Clause G. **Funds Transfer Fraud** is amended by adding the following to the end thereof:

    **Impersonation Fraud Coverage**

    The **Insurer** will also pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

    Notwithstanding the above requirement that the loss of **Funds** result directly from a **Fraudulent Instruction**, the **Insurer** will also pay for the loss of **Funds** resulting from the **Insured's** receipt of a **Fraudulent Instruction** from a purported **Vendor**, which advises the **Insured** that the **Vendor's** bank account information has been changed and the **Insured** suffers a loss of **Funds.**

2.  Solely with respect to the **Impersonation Fraud Coverage** provided by this endorsement, Clause 2. **DEFINITIONS**, the definition of **Fraudulent Instruction** is deleted in its entirety and replaced with the following:

    "**Fraudulent Instruction**" means an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction communicated by the **Insured** or an **Employee** based upon an instruction received and relied upon by **Insured** or an **Employee** which was transmitted:

    a.  by a purported director, officer, partner, member or sole proprietor of the **Insured's** or by another **Employee**-or by an individual acting in collusion with such purported director, officer, partner, member, sole proprietor or other **Employee**-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; or

    b.  by a purported director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client**-or by an individual acting in collusion with such purported director, officer or employee-but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge; provided, however, **Fraudulent Instruction** shall not

Ⓒ All rights reserved.

*END 013*

116957 (1/17)                          Page 1 of 2

ENDORSEMENT# *13* (continued)

include any such instruction transmitted by an actual director, officer, partner, member, sole proprietor or employee of the **Insured's Vendor** or **Client** who was acting in collusion with any third party in submitting such instruction.

3.  Solely for purposes of this endorsement, the following definitions are added:

    **Vendor** means any person, firm, company, organization, association or other entity that provides goods or services to the **Insured** pursuant to a legitimate relationship that pre-exists the loss that is the subject of the **Insured's** claim.

    **Client** means any person, firm, company, organization, association or other entity to whom the **Insured** provides goods or services for a fee pursuant to a legitimate written contract that pre-exists the loss that is the subject of the **Insured's** claim.

4.  The **Insurer's** total liability for coverage provided by this endorsement for all loss arising from a single act or series of related acts is *$100,000* ("**Impersonation Fraud Limit**"). All amounts paid by the **Insurer** pursuant to this endorsement will be part of, and not in addition to, the applicable **Per Occurrence Limit of Liability** shown in the Declarations.

5.  Solely with respect to coverage provided by this endorsement, the applicable per occurrence Deductible Amount is *$25,000*.

6.  Solely with respect to the Fraudulently-Induced Payment Coverage provided under Section 1(b) of this endorsement, the following exclusion shall apply:

    The Fraudulently-Induced Payment Coverage provided under Section 1(b) of this endorsement does not apply to any loss occurring prior to *November 1, 2015*.

7.  The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** under this endorsement is the **Impersonation Fraud Limit** shown in Section 4 above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 013*

116957 (1/17)                                    Page 2 of 2

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

## INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 3. EXCLUSIONS of the **Crime Coverage Section**, the "Indirect Loss" exclusion is deleted its entirety and replaced with the following:

Indirect or Consequential Loss

Loss that is an indirect or a consequential result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

113021 (10/12)                    *END 14*

ENDORSEMENT# *15*

This endorsement, effective *12:01 am   November 1, 2017*   forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## INSURED V. INSURED EXCLUSION
### (D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4. EXCLUSIONS of the **D&O Coverage Section**, paragraph (i) is deleted in its entirety and replaced as follows:

(i)   which is brought by or on behalf of a **Company** or any **Individual Insured**, other than an **Employee** of a **Company**; or which is brought by any security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of any **Company** or any **Executive** of a **Company**; provided, however, this exclusion shall not apply to:

   (i)   any **Claim** brought by an **Individual Insured** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** that is covered by this policy;

   (ii)   in any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator, or rehabilitator (or any assignee thereof) of such **Company**;

   (iii)   any **Claim** brought by any past **Executive** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for a **Company** for at least three (3) years prior to such **Claim** being first made against any person; or

   (iv)   any **Claim** brought by an **Executive** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Organization** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

   (v)   any **Executive** engaging in any protected "whistleblower" activity specified in 18 U.S.C. 1514A(a) or any other similar "whistleblower" protection provided under any state, local or foreign securities laws.

   The foregoing subparagraph shall not apply where the actions of any **Executive** includes the filing of any proceeding or voluntarily testifying, voluntarily participating in or voluntarily assisting (other than de minimus assistance) in the filing or prosecution of any proceeding against an **Insured** relating to any violation of any rule or regulation of the Securities and Exchange Commission or any similar provision of any federal, state, local or foreign rule or law relating to fraud against

❖ All rights reserved.
### *END 015*

ENDORSEMENT#  *15*   (continued)

shareholders, other than such actions in connection with a proceeding that is brought by the Securities and Exchange Commission, any similar state, local or foreign regulatory body that regulates securities, or any state, local or foreign law enforcement authority.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 015*

ENDORSEMENT# *16*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

## LIMITED MOONLIGHTING EXCLUSION ENDORSEMENT
## (CCP COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that Clause 3. **EXCLUSIONS** of the **CCP Coverage Section** is amended by adding the following paragraph to the end thereof:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Individual Insured**:

LM(a)  alleging, arising out of, based upon or attributable to any of the following types of **Moonlighting Services**: (i) criminal; (ii) matrimonial; (iii) intellectual property law; or (iv) estate/financial planning.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 016*

ENDORSEMENT# *17*

This endorsement, effective *12:01 am    November 1, 2017*      forms a part of
policy number   *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### MAJOR SHAREHOLDER EXCLUSION
### (D&O COVERAGE SECTION)

In consideration of the premium charged it is hereby understood and agreed that, solely with respect to **Loss** as may have otherwise been covered under the **D&O Coverage Section**, the **Insurer** shall not be liable to make any payment for any **Loss** in connection with any **Claim** made against any **Insured** which is brought by any (i) individual(s) or entity(ies) that own or control (whether beneficially, directly or indirectly)    *5* % or more of the outstanding voting stock of the **Company** (hereinafter "**Major Shareholder**"); or (ii) security holder of the **Company**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of any **Major Shareholder**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 017*

**ENDORSEMENT#** *18*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NOTICE OF CLAIM**
**(REPORTING BY E- MAIL)**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.  *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of Claim Reporting under this policy, such notice may also be given in writing pursuant to the policy's other terms and conditions to the Insurer by email at the following email address:

    c- claim@AIG.com

    Your email must reference the policy number for this policy. The date of the Insurer's receipt of the emailed notice shall constitute the date of notice.

    In addition to Notice of Claim Reporting via email, notice may also be given to the Insurer by mailing such notice to: AIG, Financial Lines Claims, P.O. Box 25947, Shawnee Mission, KS 66225 or faxing such notice to (866) 227- 1750.

2.  *Definitions*: For this endorsement only, the following definitions shall apply:

    (a)  "Insurer" means the "Insurer," "Underwriter" or "Company" or other name specifically ascribed in this policy as the insurance company or underwriter for this policy.

    (b)  "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of loss" or other reference in the policy designated for reporting of claims, loss or occurrences or situations that may give rise or result in loss under this policy.

    (c)  "Policy" means the policy, bond or other insurance product to which this endorsement is attached.

3.  This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage Section, if any, provided by this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓒ All rights reserved.
*END 018*

ENDORSEMENT# *19*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (ALL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A.   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

(1)   **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Company**, or discharged or dispersed therefrom; or

(2)   **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Company**; or

(3)   the furnishing by an **Insured** or the **Company** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

(4)   **Claims** for damage or other injury to the **Company** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**.

B.   (1)   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or,

(2)   with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

**"Hazardous Properties"** include radioactive, toxic or explosive properties.

**"Nuclear Facility"** means:

(a)   any nuclear reactor;

(b)   any equipment or device designed or used for

⟡ All rights reserved.
*END 019*

ENDORSEMENT# *19*  (continued)

(1)  separating the isotopes of uranium or plutonium,
(2)  processing or utilizing spent fuel, or
(3)  handling, processing or packaging wastes;

(c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear Material"** means source material, special nuclear material or byproduct material.

**"Nuclear Reactor"** means any apparatus designed or used to sustain nuclear fission in a self- supporting chain reaction or to contain a critical mass of fissionable material.

**"Source Material,"** **"Special Nuclear Material,"** and **"Byproduct Material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**"Spent Fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

**"Waste"** means any waste material (1) containing by product material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 019*

ENDORSEMENT# *20*

This endorsement, effective at *12:01 am   November 1, 2017*        forms a part of
Policy number *02-778-20-05*
Issued to: *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *PrivateEdge Plus*

## OMNIBUS NAMED INSURED - INCLUDING ERISA - EXCLUDING FI AND FOREIGN ENTITY (CRIME COVERAGE SECTION)

This endorsement modifies insurance provided under the Private Edge Plus policy form.

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to **Loss** as may otherwise have been covered under the Crime Coverage Section, the Item of the **DECLARATIONS** entitled **NAMED ENTITY** is amended by addition of the following:

> "and any interest hereafter owned, controlled or operated by any one of those named as **Insured**, subject, however, to Clause 6. **CONDITIONS,** Paragraph a. CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE SECTION, subparagraph v. CONSOLIDATION – MERGER OR ACQUISITION; and any **Employee Benefit Plan** sponsored by the **Insured(s)** now existing or hereafter created or acquired and required to be bonded under the Employee Retirement Income Security Act of 1974, provided, however, the **Insured's** interest shall not include (i) any **Financial Institution,** as defined herein, or (ii) any entity operating in a **Foreign Jurisdiction**, as defined herein, unless an endorsement providing coverage outside the United States is attached to this **Crime Coverage Section**."

As used in this endorsement, **"Financial Institution"** means any entity that is a bank (including but not limited to commercial banks and savings and loan institutions) or any entity which is a diversified financial institution (including but not limited to insurance companies, brokerage firms and investment companies).

As used in this endorsement, **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 020*

112044 (3/14)                    Page 1 of 1

This endorsement, effective *12:01 am    November 1, 2017*     forms a part of
policy number  *02-778-20-05*
issued to   *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PROTECTED INFORMATION EXCLUSION

This endorsement modifies insurance provided under the following:

PRIVATEEDGE PLUS POLICY (WITH CRIME COVERAGE SECTION)
PRIVATE RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)
NOT-FOR-PROFIT RISK PROTECTOR POLICY (WITH CRIME COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that coverage under the **Crime Coverage Section** to this policy shall not apply to any loss resulting directly or indirectly from the: (a) theft, disappearance or destruction of; (b) unauthorized use or disclosure of; (c) unauthorized access to; or (d) failure to protect any:

(1)   confidential or non-public; or

(2)   personal or personally identifiable;

information that any person or entity has a duty to protect under any law, rule or regulation, any agreement or any industry guideline or standard.

This exclusion shall not apply to the extent that any unauthorized use or disclosure of a password enables a theft by an **Employee** of the **Insured** of money, securities or tangible property of the **Insured** or that the **Insured** is holding for a third party; provided, however, this exception shall not apply to the extent that such unauthorized use or disclosure of a password enables a theft of or disclosure of information.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

113010 (10/12)           ***END 21***

ENDORSEMENT# *22*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PUBLIC SECURITIES EXCLUSION ENDORSEMENT
### (CCP COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that Clause 3. **EXCLUSIONS** of the **CCP Coverage Section** is amended to include the following paragraph at the end thereof:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Individual Insured**:

PS(a)    alleging, arising out of, based upon or attributable to any public offering of securities by a **Company** or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, this exclusion will not apply to any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; provided, however, the **Named Entity** shall give the **Insurer** written notice of any public offering exempted pursuant to Section 3(b), together with full particulars and as soon as practicable, but not later than thirty (30) days after the effective date of the public offering.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕ All rights reserved.
*END 022*

**ENDORSEMENT#** *23*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SEVERABILITY OF THE APPLICATION ENDORSEMENT
### (NON-RESCINDABLE - FULL INDIVIDUAL SEVERABILITY; TOP 3 COMPANY POSITIONS IMPUTED TO COMPANY) (D&O AND EPL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.   Clause 10. **"REPRESENTATIONS AND SEVERABILITY"** of the **D&O Coverage Section** is deleted in its entirety and replaced with the following:

**10.   REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this **D&O Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** for this **D&O Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **D&O Coverage Section** and are to be considered as incorporated into this **D&O Coverage Section**.

With respect to any statements, warranties and representations contained in the **Application**, and solely with respect to the issue of whether coverage shall be afforded under this endorsement pursuant to subparagraphs (1), (2) and (3) below, no knowledge possessed by an **Individual Insured** shall be imputed to any other **Individual Insured**. However, in the event that any of the statements, warranties or representations is not accurately and completely disclosed in the **Application** and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of the subject matter of any incomplete or inaccurate statements, warranties or representations under:

(1)   Clause 1. **INSURING AGREEMENTS**, COVERAGE A, with respect to any **Individual Insured** who knew of such inaccurate or incomplete statements, warranties or representations;

(2)   Clause 1. **INSURING AGREEMENTS**, Coverage B(ii), with respect to any **Company** to the extent it indemnifies any **Individual Insured** referenced in (1), above; and

(3)   Clause 1. **INSURING AGREEMENTS**, Coverage B(i), with respect to any **Company** if any past or present chief executive officer, chief operating officer or chief financial officer of the **Company** knew of such inaccurate or incomplete statements, warranties or representations,

whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

⊕ All rights reserved.
*END 023*

98966 (4/08)                                                    Page 1 of 2

ENDORSEMENT# *23*    (continued)

The **Insurer** shall not be entitled under any circumstances to rescind coverage under the Policy with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

2.  Clause 8. "**REPRESENTATIONS AND SEVERABILITY**" of the **EPL Coverage Section** is deleted in its entirety and replaced with the following:

**8.   REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this **EPL Coverage Section** as being accurate and complete. All such statements and representations are the basis of this **EPL Coverage Section** and are to be considered as incorporated into this **EPL Coverage Section**.

With respect to any statements, warranties and representations contained in the Application, and solely with respect to the issue of whether coverage shall be afforded under this endorsement pursuant to subparagraphs (1), (2) and (3) below, no knowledge possessed by an **Individual Insured** shall be imputed to any other **Individual Insured**. However, in the event that any of the statements, warranties or representations is not accurately and completely disclosed in the **Application** and materially affects either the acceptance of the risk or the hazard assumed by the **Insurer**, no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of subject matter of any incomplete or inaccurate statements, warranties or representations with respect to:

(1)   any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application;

(2)   any **Company** to the extent it indemnifies any **Individual Insured** referenced in subparagraph (1) above; and

(3)   any **Company** if any past or present chief executive officer, chief operating officer or chief financial officer of the **Company** knew of such inaccurate or incomplete statements, warranties or representations,

whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

The **Insurer** shall not be entitled under any circumstances to rescind coverage under the Policy with respect to any **Insured**, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 023*

**ENDORSEMENT#** *24*

This endorsement, effective *12:01 am    November 1, 2017*    forms a part of
policy number    *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SIDE A EXCESS LIMIT OF LIABILITY ENDORSEMENT
### (EXCESS LIMIT APPLICABLE TO NON-INDEMNIFIABLE LOSS UNDER THE D&O COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to coverage for **Loss** provided under the **D&O Coverage Section**, the policy is hereby amended as follows:

1.   Item 7. of the Declarations is amended to include the following at the end thereof:

   (g)   **SIDE A EXCESS LIMIT OF LIABILITY:** *$500,000*     , excess aggregate limit of liability for all **Non-Indemnifiable Loss** solely for **Executives** of a **Company** (including **Defense Costs**) under the **D&O Coverage Section** (herein the "**Side A Excess Limit of Liability**").

2.   Clause 4. **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)** of the **General Terms And Conditions** is deleted in its entirety and replaced with the following:

   4.   **LIMITS OF LIABILITY (FOR ALL LOSS IN THE AGGREGATE UNDER THIS POLICY AND UNDER EACH INDIVIDUAL COVERAGE SECTION - INCLUDING DEFENSE COSTS)**

   The **Policy Aggregate Limit of Liability** is the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) under all **Coverage Sections** combined arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**.

   If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. Each **Separate Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** as therein stated.

   If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** (other than **Non-Indemnifiable Loss** covered under the **Side A Excess Limit of Liability**) arising out of all **Claims** first made

◈ All rights reserved.
*END 024*

**ENDORSEMENT#** *24* (continued)

against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Shared Limit of Liability** for the **Policy Period**. Each **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

The **Side A Excess Limit of Liability** stated in Item 7(g) of the Declarations, as set forth by paragraph 1. of this endorsement above, is the aggregate limit of the **Insurer's** liability under the **D&O Coverage Section** excess of: (i) any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**; and (ii) any coverage for **Loss** (whether or not **Non-Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**, for all **Non-Indemnifiable Loss** under the **D&O Coverage Section** arising out of all **Claims** first made against an **Executive** of a **Company** during the **Policy Period** or the **Discovery Period** (if applicable). The **Side A Excess Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Side A Excess Limit of Liability** for the **Policy Period**. The **Side A Excess Limit of Liability** shall be in addition to the **Policy Aggregate Limit of Liability** and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section**.

It is agreed that the **Insurer's** liability to pay **Non-Indemnifiable Loss** shall only attach to the **Side A Excess Limit of Liability** after:

(a) the full amount of any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted due to **Loss** paid thereunder; and

(b) any coverage for **Loss** (whether or not **Non-Indemnifiable Loss**) under any policy of insurance specifically written as excess over any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to the **D&O Coverage Section** has been exhausted by reason of loss(es) paid thereunder.

The **Side A Excess Limit of Liability** provided by this endorsement shall "drop down" (continue in force as primary insurance) only in the event of (a) and (b) above and shall not drop down for any other reason.

Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 6(b) or 6(c) of these **General Terms and Conditions** is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** and subject to any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Policy Aggregate Limit of Liability** or any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Policy Aggregate Limit of Liability** for **Loss** and any applicable **Separate Limit of Liability**, **Shared Limit of Liability** or **Side A Excess Limit of Liability**. Amounts incurred for **Defense**

◊ All rights reserved.
*END 024*

ENDORSEMENT# *24*     (continued)

**Costs** shall be applied against the Retention.

3.     Solely for purposes of the coverage as afforded by this endorsement, "**Non-Indemnifiable Loss**" means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Executive** of a **Company** pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a **Company**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

◈ All rights reserved.

*END 024*

This endorsement, effective *12:01 am     November 1, 2017*     forms a part of
policy number *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

## STATE AMENDATORY INCONSISTENT

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. In the event that there is an inconsistency between any: (a) state amendatory attached to this policy, or any other wording attached to this policy to comply with applicable law; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, subject to the limitations below, the Insurer will resolve the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2. This endorsement shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3. "Policyholder" means the first Named Entity, Named Organization, Named Corporation, Named Sponsor, Named Insured or other policyholder designated in Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

ENDORSEMENT# *26*

This endorsement, effective *12:01 am    November 1, 2017*        forms a part of
policy number   *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## WRONGFUL ACT DEFINITION AMENDED
## (COBRA NOTICES)
## (FLI COVERAGE SECTION)

In consideration of the premium charged, it is hereby understood and agreed that the Definition of "**Wrongful Act**" in the **FLI Coverage Section** is hereby amended to include the following paragraph at the end thereof:

"**Wrongful Act**" also means, as respects an **Insured**, the failure to properly or timely provide COBRA notices, but only with respect to a **Plan**.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 026*

102508 (8/09)                          1

ENDORSEMENT# *27*

This endorsement, effective at *12:01 am    November 1, 2017*        forms a part of
Policy number *02-778-20-05*
Issued to: *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *PrivateEdge Plus*

## ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made
in full compliance with enforceable United Nations economic and trade sanctions and the
trade and economic sanction laws or regulations of the European Union and the United
States of America, including, but not limited to, sanctions, laws and regulations
administered and enforced by the U.S. Treasury Department's Office of Foreign Assets
Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 027*

<u>ENDORSEMENT#</u> *28*

This endorsement, effective at *12:01 am    November 1, 2017*      forms a part of
Policy number *02-778-20-05*
Issued to: *Little River Healthcare Holdings, LLC*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name:   *PrivateEdge Plus*

**EPL PAK PREMIER ENDORSEMENT**
**(Employment Practices, Loss Prevention and Risk Management Tools)**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

The **Insurer** provides the **Named Entity** with access during the **Policy Period** to EPL Pak® Premier, a suite of Employment Practices, Loss Prevention and Risk Management tools. EPL Pak® Premier is provided at no additional cost to the **Named Entity** and can be used by the **Named Entity** at its discretion during the **Policy Period**.

This preventive suite is a combination of employment related tools designed to help the **Named Entity** manage employment practices risks. EPL Pak® Premier's resources are exclusive to the **Insurer**, and provide policyholders with access to two of the nation's foremost law firms with a depth of experience in employment and workplace law: Littler Mendelson, P.C. and Jackson Lewis, P.C.

- **www.EPLRiskManager.com**. Partnering with Littler Mendelson, EPL Pak® Premier includes instant, free access, to an online Human Resource Center located at <u>www.EPLRiskManager.com</u>. Included within this site are a package of risk management products and resources designed to help the **Named Entity** manage the **Named Entity's** workforce and mitigate the **Named Entity's** exposure to employment-related litigation. All that is needed for access and registration to the site is the **Named Entity's** policy number.

Materials and services available online include the following essentials:

- **Online forms:** A collection of human resources forms, including handbooks, employment applications, checklists, performance evaluations and compliance tools, which can be customized, to ease the **Named Entity's** administrative burden.
- **Employment Law Reference Manuals:** A complete library of employment law manuals covering topics such as discrimination, disability, harassment, background screening, arbitration agreements, I-9 compliance manual and many more documents to help mitigate the risks of these critical phases of the employment relationship.
- **Government Forms and State Guides:** Essential employment-related forms and notices required by the federal government including state-by-state assessment of employment laws and regulations.
- **Littler Learning Points:** A library of instructional videos addressing employment issues including responding to complaints of discrimination and harassment; severance and release agreement, to name a few.
- **Littler GPS™:** Free access to an innovative and powerful online research tool that provides detailed information and analysis of recent legislative and regulatory developments. This comprehensive tool answers a broad range of employment law topics at the federal level and for all 50 states. The online database includes full-text content search and intuitive navigation, all tailored to the jurisdictions selected by the **Named Entity**.

Ⓞ All rights reserved.

***END 028***

124010 (4/17)                                Page 1 of 2

ENDORSEMENT# *28* (continued)

- **Littler Law Updates:**  Keep up to date on key employment law developments impacting the **Named Entity's** business with alerts from their ASAP® Newsletters.  To subscribe, simply click the "Subscribe Now" button within the website.

- **Seminars and Webinars:**  Policyholders will be invited to attend, at no cost, access to Littler's nationwide employment laws breakfasts briefing series and designated live webinars.

- **State of the Art Enhancements.** These state-of-the-art enhancements complement EPL Pak® Premier's original package of complimentary risk management solutions from Jackson Lewis, P.C. which include:

  - **Unlimited Access**: Jackson Lewis provides a Toll-Free Risk Management Helpline **Insureds** may access to discuss general questions about workplace issues: (866) 614-0744.
  - **Legal Consultation:** A two-hour legal consultation on human resources and employment law issues, such as how specific laws impact personnel decisions and potential exposure to liability anywhere in the U.S. or Puerto Rico.  The scope of the consultation may include legal services such as discrimination issues, reductions in force, affirmative action, disability management issues and employment contracts.
  - **Employment Policies, Forms and Procedures:**  The two-hour legal consultation may also include the assistance of Jackson Lewis attorneys in adopting appropriate employment forms, policies or procedures under federal or applicable state laws (including reviewing the **Named Entity's** employee handbook or policy manual).
  - **Global Employment Law Support:**  A one hour legal consultation on human resource and employment law issues for any country where there is a member firm of L&E Global, an international alliance of independent law firms of which Jackson Lewis is a founding member.
  - **Liability Updates:** Complimentary access to the Jackson Lewis newsletter and e-updates spotlighting important workplace law news and trends. The **Named Entity** may also subscribe to receive at no-cost, alerts about significant legislative actions, judicial decisions and other changes with potential business impact.
  - **Checklists:** Self-audit and pre-termination checklists to help insureds identify vulnerabilities and safely navigate risky terrain.
  - **Special California State Training:** CA AB 1825 training, (periodically scheduled at Jackson Lewis' California offices) to assist companies with 50 or more employees in California in fulfilling their mandate (required every two years) of providing sexual harassment training for supervisors.

EPL Pak® Premier also includes Alternative Employment Dispute Resolution Programs from EDR Systems at preferred rates. EDR Systems will assist to resolve employee disputes internally and prevent time and money in litigation. The professionals at EDR Systems have more than 50 years of combined experience in human resource management, strategic planning, change management, and employee relations. They support a wide variety of businesses of all sizes, from national, multi-unit retail operations, to single-facility manufacturers, to professional firms.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 028*

## ENDORSEMENT# *29*

This endorsement, effective *12:01 am    November 1, 2017*         forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 95862 | 09/07 | PRIVATEEDGE PLUS - NATIONAL UNION DEC |
| 96555 | 01/15 | TRIA DEC DISCLOSURE FORM |
| 95726 | 09/07 | PRIVATEEDGE PLUS - GENERAL TERMS & CONDITION |
| 95729 | 09/07 | FLI COVERAGE SECTION |
| 95732 | 09/07 | CCP COVERAGE SECTION |
| 95727 | 09/07 | D&O COVERAGE SECTION |
| 95728 | 09/07 | EPL COVERAGE SECTION |
| 95730 | 09/07 | CRIME COVERAGE SECTION |
| 99544 | 07/08 | EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY PANEL COUNSEL |
| 112236 | 03/14 | F.R.I.S.C. LIST |
|  | 06/08 | SECURITIES CLAIM PANEL COUNSEL LIST |
|  | 06/08 | EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL |
| 97886 | 04/08 | POLICYHOLDER NOTICE REGARDING E-DISCOVERY CONSULTANT SERVICES |
| 96311 | 02/08 | APPENDIX D - CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION |
| 95800 | 09/07 | TEXAS STATE AMENDATORY ENDORSEMENT |
| 74802 | 07/11 | TEXAS AMENDATORY ENDORSEMENT - CANCELLATION/NONRENEWAL |
| 95752 | 09/07 | 502(C) ERISA PENALTY COVERAGE WUTH SUBLIMIT ENDROSEMENT (FLI COVERAGE SECTION |
| 100870 | 01/09 | ABSOLUTE SEC EXCLUSION (CCP COVERAGE SECTION) |
| 96298 | 10/07 | ADD CREDIT, DEBIT OR CHARGE CARD FORGERY ENDORSEMENT (CRIME COVERAGE SECTION) |
| 97739 | 03/08 | ADDITIONAL INSUREDS - LISTED AFFILIATES (CO-DEFENDANT) |
| 99486 | 06/08 | ANTITRUST COVERAGE ENDORSEMENT - SEPARATE SUBLIMIT, RETENTION AND CO-INSURANCE (D&O COVERAGE SECTION) |

Ⓒ All rights reserved.

**END 029**

**ENDORSEMENT#** *29*

This endorsement, effective *12:01 am   November 1, 2017*          forms a part of
policy number  *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 112035 | 03/14 | CONDUCT EXCLUSIONS AMENDED (FINAL NON-APPEALABLE ADJUDICATION) (D&O AND EPL COVERAGE SECTIONS) |
| 108228 | 08/12 | EMPLOYMENT EDGE EXTENSION ENDORSEMENT (EPL COVERAGE SECTION) |
| 108229 | 05/11 | EMPLOYMENT EDGE CRISIS FUND APPENDIX |
| 97629 | 03/08 | FLSA AND RELATED EXCLUSIONS AMENDED (D&O AND EPL COVERAGE SECTIONS) |
| 114007 | 03/14 | FOR-PROFIT HEALTH CARE ORGANIZATION AMENDATORY ENDORSEMENT (ANTITRUST EXCLUSION AMENDMENT DELETED)  (D&O AND EPL COVERAGES) |
| 116957 | 01/17 | IMPERSONATION FRAUD ENDORSEMENT (CRIME COVERAGE SECTION) |
| 113021 | 10/12 | INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION |
| 105048 | 04/10 | INSURED V. INSURED EXCLUSION (D&O) (D&OS 3 YEARS) |
| 99656 | 07/08 | LIMITED MOONLIGHTING EXCLUSION ENDORSEMENT (CCP COVERAGE SECTION) |
| 99178 | 05/08 | MAJOR SHAREHOLDER EXCLUSION (D&O COVERAGE SECTION) |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| 95737 | 09/07 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (ALL COVERAGE SECTIONS) |
| 112044 | 03/14 | OMNIBUS NAMED INSURED - INCLUDING ERISA - EXCLUDINGFIAND FOREIGN ENTITY (CRIME COVERAGE SECTION) |
| 113010 | 10/12 | PROTECTED INFORMATION EXCLUSION |
| 99663 | 07/08 | PUBLIC SECURITIES EXCLUSION ENDORSEMENT (CCP COVERAGE SECTION) |
| 98966 | 04/08 | SEVERABILITY OF THE APPLICATION ENDORSEMENT (NON-RESCINDABLE - FULL INDIVIDUAL SEVERABILITY; TOP 3 COMPANY POSITIONS IMPUTED TO COMPANY) (D&O AND EPL COVERAGE SECTIONS) |
| 99563 | 07/08 | SIDE A EXCESS LIMIT OF LIABILITY ENDORSEMENT (EXCESS LIMIT APPLICABLE TO NON-INDEMNIFIABLE LOSS UNDER THE D&O COVERAGE SECTION) |
| 94039 | 05/07 | STATE AMENDATORY INCONSISTENT |

⬦

**END 029**

**ENDORSEMENT#** *29*

This endorsement, effective *12:01 am      November 1, 2017*                forms a part of
policy number   *02-778-20-05*
issued to *Little River Healthcare Holdings, LLC*


by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 102508 | 08/09 | WRONGFUL ACT DEFINITION AMENDED (COBRA NOTICES) (FLI COVERAGE SECTION) |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 124010 | 04/17 | EPL PAK PREMIER ENDORSEMENT (EMPLOYMENT PRACTICES, LOSS PREVENTION AND RISK MANAGEMENT TOOLS) |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| 53365 | 08/16 | TEXAS NOTICE - LOSS CONTROL |
| 94396 | 05/15 | TEXAS COMPLAINT NOTICE FOR ADMITTED PAPER CO. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 029*

**AIG TEXAS NOTICE - NOTIFICATION OF THE AVAILABILITY OF**

**LOSS CONTROL INFORMATION/SERVICES**

AIG is committed to providing loss control information/services at no charge to its Texas commercial automobile liability, general liability and professional liability policyholders in an effort to prevent and reduce potential claims and losses.

If you would like more information on services available or would like to request services, contact Casualty Risk Consulting via phone (1-800-221-0651) or via e-mail at: AIGStateServiceRequests@aig.com

**TEXAS NOTICE**

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
| To obtain information or make a complaint: | Para obtener información o para presentar una queja: |
| You may call the Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al número de teléfono gratuito de la compania para obtener información o para presentar una queja al: |
| 1-877-541-9748 | 1-877-541-9748 |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at: | Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre companias, coberturas, derechos, o quejas al: |
| 1-800-252-3439 | 1-800-252-3439 |
| You may write the Texas Department of Insurance: | Usted puede escribir al Departamento de Seguros de Texas a: |
| P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:    (512) 490-1007 | P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:    (512) 490-1007 |
| Web:   http://www.tdi.texas.gov | Sitio web:  http://www.tdi.texas.gov |
| E-mail: ConsumerProtection@tdi.texas.gov | E-mail: ConsumerProtection@tdi.texas.gov |

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim, you should contact the agent first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con el agente primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documen to adjunto.

94396  (5/ 15)

**AIG**

# CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _02-778-20-05_      Date: _____

Type of Coverage: D&O ———   E&O ———   Fidelity ———  (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*Little River Healthcare Holdings, LLC*

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

Insurance Broker/Agent: _R T SPECIALTY, LLC_

Address: _12404 PARK CENTRAL DRIVE, SUITE 380_

Address: _DALLAS, TX 75251_

Contact: _JAMES DILORETO_      Phone: _____

eMail: _James.DiLoreto@rtspecialty.com_

Send Notice of Claims to:    AIG                          Phone: (888) 602-5246
                             Financial Lines Claims       Fax:   (866) 227-1750
                             P.O. Box 25947               Email:  c-Claim@AIG.com
                             Shawnee Mission, KS 66225

AIG

# CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL

**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number:  02-778-20-05

Date of Discovery: _____     Estimated Amount of loss: _____

Cause of Loss:

| | | | |
|---|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud | _____ |
| Funds Transfer | _____ | Robbery/Burglary | _____ |
| ID Theft | _____ | Forgery | _____ |
| Client Property | _____ | In Transit | _____ |
| ERISA | _____ | Credit Card Forgery | _____ |
| Other | _____ | if Other, describe: | _____ |

Send Notice Of Claims To:    AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone:   (888) 602-5246
Fax:      (866) 227-1750
Email:   c-Claim@AIG.com

*centralized Customer Link and Information Management*