## Exhibit A

**Little River v. Blue Cross and Blue Shield of Texas**
**AAA Case No. 01-18-0001-0136**
**Final Award**
**May 6, 2020**

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

---

Case No:  01-18-0001-0136

In the Matter of the Arbitration between:

ROCKDALE BLACKHAWK, LLC d/b/a
LITTLE RIVER HEALTHCARE,

Claimant,

v.

BLUE CROSS AND BLUE SHIELD OF TEXAS,

Respondent.

---

### FINAL AWARD

---

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements between the Claimant and Counter-Respondent Rockdale Blackhawk, LLC d/b/a Little River Healthcare ("Little River"), and the Respondent and Counter-Claimant Blue Cross and Blue Shield of Texas ("BCBSTX") (collectively "the parties"), having been duly sworn, and having heard the proofs and allegations of the parties, do hereby issue this FINAL AWARD, as follows:

This arbitration is conducted under the Commercial Arbitration Rules of the American Arbitration Association (AAA), effective October 1, 2013.  By agreement of the parties, the hearing was held in Austin, Texas, between August 5-10, 2019 and August 12-16, 2019.  Little River appeared by its corporate representative Ryan Downton, and by counsel Brad Thompson, Jacob P. Arechiga, Meredith Mills Gregston and Lauren A. Appel, Duane Morris LLP.  Also in

attendance was the Little River Chapter 7 Bankruptcy Trustee, Mr. James Studensky. BCBSTX appeared by its corporate representative Bill Monroe, in-house counsel Matthew Barnes, and by counsel Martin J. Bishop, Bryan Webster, Will Sheridan, Peter Chassman, and Courtney B. Averbach, Reed Smith LLP. Megan Stonestreet and Pete Jackson also appeared on behalf of BCBSTX.

Witness testimony and documentary evidence were offered and admitted, and it was agreed that the stenographic recording would constitute the official record of the proceedings. At the conclusion of the hearing, the parties agreed that they would present an agreed set of official exhibits, together with additional evidence via email submission in the form of deposition designations and counter-designations, which the Tribunal timely received. The parties also agreed on a schedule for the submission of post-hearing briefs which, together with a stenographic recording of the proceedings, the Tribunal timely received on October 1, 2019.[1] At the conclusion of the hearing, the record was not closed and remained open pending issuance of an interim award and the submission of evidence relating to attorneys' fees and costs, pursuant to Panel Order No. 1, paragraph 8.

The Interim Award issued on January 21, 2020. Pursuant to the parties' agreement and Panel Order No. 1, the parties were afforded time to attempt to reach a stipulation on the issues of attorneys' fees and costs, calculations of interest, and to whom prompt-payment penalties would be paid. In the event a stipulation could not be reached, a briefing schedule was set under which the record would close on May 11, 2020 and a Final Award would issue on or before June

---

[1] The parties submitted hyperlinked post-hearing briefs electronically, and a stenographic transcript of the proceedings was submitted electronically as well. Due to technical electronic transmission problems, which the parties' counsel were diligent in helping to resolve, the briefs and transcript became fully accessible to the Tribunal on October 1, 2019.

10, 2020. The parties were unable to reach a stipulation, and submitted evidence and briefing on the remaining issues in an expedited manner. The hearing was declared closed on May 6, 2020.

## I. Final Award

NOW, THEREFORE, having carefully considered the evidence, briefing, and legal authorities presented, together with the arguments of the parties' outstanding counsel, the Tribunal ORDERS, AWARDS, ADJUDGES and DECREES as follows:

1.      BCBSTX breached the contracts in issue by failing to pay for laboratory services provided to BCBSTX members, improperly recouping funds previously paid to Little River for provided services, and failing to timely and appropriately adjudicate the laboratory claims submitted by Little River, for which it is liable to Little River for damages in the amount of $65,103,000.00. Little River is entitled to recover pre-judgment interest on this amount at the statutory rate of 5% for a total up to the scheduled June 10, 2020 final award date in the amount of $14,866,685.00, which amount shall be adjusted down to factor in the May 6, 2020 date of this Final Award. Little River is entitled to recover post-judgment interest from and after May 6, 2020 at the rate of 5%.

2.      BCBSTX's adjudication of Little River's claims violated the Texas Prompt Payment Laws, for which it is liable for penalties in the principal amount of $18,900,000.00 up until the hearing's commencement on August 5, 2019, together with statutory interest thereafter at $9,320.55 per day through the scheduled June 10, 2020 final award date in the amount of $2,889,370.00, for a total of $21,789,370. Little River is entitled to recover fifty percent (50%) of such amounts, and the Texas Department of Insurance is entitled to recover the remaining fifty percent (50%). Accordingly, Little River shall have and recover from BCBSTX the principal amount of $9,450,000.00 in penalties, together with $1,444,685.00 in interest through the

scheduled June 10, 2020 final award date, for a total award of $10,894,685.00 (which amount shall be adjusted down to factor in the May 6, 2020 date of this Final Award), with interest to accrue thereafter in the amount of $4,660.27 per day until paid. The Texas Department of Insurance is entitled to recover a like amount. The above amounts shall be adjusted down to factor in the May 6, 2020 date of this Final Award.

3.      Having prevailed on the foregoing claims, Little River is entitled to attorneys' fees and costs reasonably incurred in presenting them. Little River shall have and recover from BCBSTX its reasonable and necessary attorneys' fees in the amount of $5,092,308.35, allocated as follows:

| | | |
|---|---|---|
| a. | Duane Morris LLP | $2,937,432.55 |
| b. | Law Offices of Ryan Downton | $2,154,875.80 |
| c. | Law Office of James Studensky | $0 |

Little River shall also have and recover prejudgment interest on paid attorneys' fees in the amount of $238,057.00, and costs in the amount of $1,105,925.00.

4.      BCBSTX shall take nothing on its counterclaims and is entitled to no damage award in its favor.

5.      The administrative filing and case service fees of the American Arbitration Association totaling $45,200.00, and the compensation and expenses of the Arbitrator totaling $232,177.50, shall be borne by BCBSTX. *See* AAA R-47(c). Therefore, BCBSTX shall reimburse Little River the sum of $146,588.75.

This award disposes of the claims and counterclaims between the parties in this proceeding. Any claim that is not directly addressed in this Award is hereby denied.

The parties have requested the Tribunal to provide the reasons for this ruling, which are as follows.

## II.    Background

### A.  Procedural Background

6.      Little River was a rural healthcare provider that operated two hospitals in Milam County, Texas, including the Rockdale Hospital located in Rockdale, Texas, about 40 miles northeast of Austin.   BCBSTX is an unincorporated division of Health Care Services Corporation ("HCSC"), an Illinois Mutual Legal Reserve Company and an independent licensee of the Blue Cross Blue Shield Association, operating in Texas as Blue Cross Blue Shield of Texas.   BCBSTX provides a number of types of health insurance policies and health-benefit-administration services for group customers, including employers and governmental entities.

7.      The multiple contracts at issue in this proceeding between Little River and BCBSTX contain dispute resolution provisions requiring that disputes arising thereunder be submitted to final and binding arbitration administered by the AAA.   Little River formally initiated the pre-dispute resolution provisions of the contracts beginning on April 13, 2017. When all relevant pre-dispute resolution requirements were exhausted, this arbitration was filed on March 5, 2018.  The dispute is validly before the AAA, and the parties have no objections to the arbitrability of the claims asserted.   The contracts, and the substantive resolution of the disputes between the parties, are governed by the laws of the State of Texas.

8.      On September 17, 2018, Little River submitted its Confidential First Amended Demand for Arbitration to the Tribunal, which amended prior demands submitted on May 2, 2018, and March 5, 2018.  Trial Ex. 1.  Little River's Demand included thirteen distinct counts against BCBSTX:  I. Breach of Contract – Failure to Pay for Services provided to BCBSTX

Members; II. Breach of Contract – Improper Recoupment; III. Breach of Contract – Failure to Produce Documentation; IV. Breach of the Covenant of Good Faith and Fair Dealing; V. Violation of the Texas Prompt Pay Statute; VI. Unfair Claim Settlement Practices; VII. Violations of the Texas Free Enterprise and Antitrust Act; VIII. Deceptive Insurance Practices; IX. Deceptive Trade Practices; X. Fraudulent Inducement; XI. Money Had and Received (in the alternative); XII. Exemplary Damages; and XIII. Declaratory Judgment.  BCBSTX responded with a general denial.  Little River subsequently voluntarily withdrew Count IX alleging Deceptive Trade Practices.

9.      On June 29, 2018, BCBTX submitted its Counterclaim to Little River's Demand, alleging four counts:  I.  Breach of Contract; II.  Fraud; III. Fraudulent Inducement; and IV. Money Had and Received (in the alternative).  Trial Ex. 2.  Little River responded with a general denial.

10.      Thereafter, each party submitted two dispositive motions, responses to the others' motions, and replies to the respective responses—with extensive supporting exhibits.  On June 19, 2019, the Tribunal denied the motions but carried them with the case subject to reconsideration of the issues presented at the arbitration hearing.  Trial Ex. 12.  The final hearing was conducted over ten days in Austin, Texas.  Before the hearing commenced, and after resolving any objections asserted, the exhibits identified in the parties' Joint Exhibit List for Arbitration were admitted into evidence.  The parties also entered into evidence the testimony of multiple fact and expert witnesses, all of whom were made available for cross-examination.[2]

---

[2] The testimony of William Monroe, BCBSTX's executive in charge of investigations, was received at the arbitration hearing as a bill of exception pending a ruling on Little River's objection to his appearance as a witness. Trial Tr. (Day 6) at 283:22-24.  The Tribunal hereby overrules Little River's objection to Mr. Monroe's appearance, has considered the bill of exception as evidence in this proceeding, and in the issuance of this Interim Award has afforded such testimony the appropriate weight it is due.

## B. Factual Background

11.     Prior to its bankruptcy,[3] Little River operated the only hospital in Milam County certified as a Critical Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS")—the Rockdale Hospital.  In addition, it operated other rural hospitals, surgery centers, medical clinics and diagnostic imaging centers, and had an expansive physician network. Little River had also purchased additional land in Georgetown, Texas, on which it intended to construct a surgery center.

12.     To participate in BCBSTX's network, a provider must disclose the types of services it will be providing to BCBSTX members.  The contracts that BCBSTX offers in return are tailored to those services and contain reimbursement and payment rates based on the volume and mix of services the provider represents it will be providing.  Different types of providers are covered by different types of contracts.  Generally, hospitals contract under hospital contracts, reference laboratories under laboratory contracts, and physicians under professional contracts.

13.     The Old Contracts.  Little River and BCBSTX entered into a number of contracts with regard to the provision of healthcare services to BCBSTX members.  For purposes of the claims at issue in this proceeding, the contractual relationship between Little River and BCBSTX began in 2003 and 2004, with the signing of what the Parties refer to as the "Old Contracts":

- Hospital Contract for PPO/POS Business, effective on December 15, 2003 ("Old PPO Contract"), under which Little River was to be reimbursed at ▮▮▮▮ of eligible billed charges;

- Hospital Contract for Traditional Indemnity Business, effective on December 15, 2003 ("Old Indemnity Contract"), under which Little River was to be reimbursed at ▮▮▮▮ of eligible billed charges; and

[3] Little River filed for Chapter 11 bankruptcy on July 24, 2018.

- Hospital Agreement for HMO Network Participation, effective on September 15, 2004, under which Little River was to be reimbursed at ▮▮▮ of eligible billed charges ("Old HMO Contract").

Trial Exs. 57-59.  The contracts established Rockdale Hospital as an "in network" provider for BCBSTX members insured under the various plans.

14.    The Old Contracts were "percentage of charge" ("POC") contracts, meaning Little River was to be reimbursed based on an agreed percentage of the eligible charge for the service rather than on a fixed-fee schedule.  The charge upon which the percentage is based is reflected in the hospital's "charge master," which determines what to charge for a particular service based on a variety of factors.  As typically low-volume providers, rural hospitals are often contracted under the POC favorable rate structure because such contracts are easy to administer. Trial Tr. (Day 5) at 295:10-13; 296:8-297:25 (Cripe). In effect, POC contracts subsidize rural healthcare and account for the significant hospital overhead costs associated with such care.  This favorable rate structure is generally not available to higher-volume hospitals or independent reference labs, with whom BCBSTX generally contracts on a lower fixed-fee schedule.  The vast majority (approximately 98%) of the claims at issue in this proceeding fall under the Old PPO Contract and its ▮▮▮ of eligible billed charges reimbursement rates.  Trial Ex. 57.

15.    Like most rural healthcare providers, Rockdale Hospital struggled with difficult market conditions.  To offset the high costs of running a rural hospital, Little River embarked on an aggressive growth strategy between 2013 and 2016.  It expanded its provider network by adding surgery centers, diagnostic imaging centers, and over 50 physician practice locations. The expansion not only improved the hospital's financial situation, it also allowed the provision of services to patients that otherwise would not have been available in its rural hospital, such as

cardiology and orthopedics. Trial Tr. (Day 1) at 189-90 (Dr. Sheinberg). Little River planned to subsidize much of its growth through the development and expansion of an outreach testing laboratory.

16.     Hospitals often utilize third-party laboratories, known as "reference labs," to perform laboratory tests that the hospital itself is unable or unequipped to perform. The hospitals pay the laboratory for those services and bill the patient or the patient's insurance company. In 2006, when Little River took over the hospital's operations,[4] the hospital was utilizing reference labs for its relatively small volume of patients, and insurers, including BCBSTX, were paying for those services.

17.     In 2014, Little River created a way for physicians, who were ordering testing from out-of-network laboratories and facing resistance from commercial payors, to provide those services in-network through Little River's hospital contract. It began reaching out to physician offices and offering various types of testing, including advanced lipids and toxicology, as an in-network provider. Little River contracted with multiple independent providers and laboratories, including Boston Heart Diagnostics Corp., Pathway Genomics Corporation, True Health Diagnostics, Essential Testing, LLC, and Global Sleep Austin, LLP. Little River placed its employees in physicians' offices to collect the laboratory specimens. The collector would register each patient as an outpatient of the hospital, have the patient sign a consent form acknowledging that status and assigning benefits over to Little River, prepare the patient for collection, collect the specimen, prepare it for processing, and mark the chain of custody to the laboratory. Trial Tr. (Day 2) at 23-24 (Cook). Another Little River employee would receive the

---

[4] The hospital's operations were taken over by Rockdale Blackhawk, LLC, now Little River.

specimen and accession the patient in Little River's hospital electronic medical record.  The testing would then be performed at the hospital's laboratory facility or referred out to a reference lab.  The test results would then be provided to a Little River employee, who would enter the results into the hospital's records and communicate them back to the ordering provider, who would in turn convey them to the patient.

18.     Through referrals from Little River-employed physicians and other doctors who wanted to order such testing, Little River's laboratory volume grew dramatically.  As volume grew, Little River began to invest in its own hospital laboratory so that it could provide much of the testing it had been sending out to reference labs.  Through 2016, it proceeded to build out and run a laboratory at the hospital that could perform more testing on campus, including much of the advanced lipids testing, though some of the more complex components continued to be sent out to reference labs.  Little River built a wing onto its hospital located in Rockdale so that it could provide additional on-site laboratory testing, and it purchased the assets of a toxicology laboratory, Essential Testing, in 2016 so that it could expand its toxicology testing capabilities. By the summer of 2016, Little River was able to perform the majority of its testing with its expanded on-site laboratory.

19.     Pre-Payment Review.   In 2015, BCBSTX received a number of member complaints concerning Little River's billing practices, some saying they had never been to the hospital to receive the services billed and others stating that they had been to the hospital but did not receive the billed services.  BCBSTX began an investigation with its Special Investigations Department ("SID") focused on laboratory services, which demonstrated the significant volume increase in Little River's laboratory claims.  Based on preliminary findings, BCBSTX notified Little River by letter dated May 31, 2016 (effective June 7, 2016), that it was placing Little River

on pre-payment review on a detailed list of 122 "CPT" (Current Procedural Technology) codes, which are developed by the American Medical Association to describe the services and procedures performed.  Under pre-payment review, BCBSTX will not pay a claim until it reviews the underlying medical records from the provider in support.  BCBSTX investigated the specific patient complaints regarding Little River's laboratory services, determined that Little River's claims were valid, and paid the claims.

20.  The New Contracts.  Shortly after placing Little River on pre-payment review, BCBSTX terminated the Old Contracts "without cause," as the contracts allowed it to do.[5] Thereafter, the parties negotiated for new reimbursement rates.  Effective on or about November 15, 2016, the Old Contracts were replaced with what the parties collectively refer to as the "New Contracts," which are as follows:

- Hospital Agreement for Blue Advantage HMO Network Participation; Amendment Number 1 to Hospital Agreement for HMO Network Participation ("New HMO Contract").

- Amendment Number 2 to Hospital Agreement for Traditional Indemnity Business ("New Indemnity Contract");

- Amendment Number 2 to Hospital Agreement for PPO/POS Business ("New PPO Contract").

The New Contracts eliminated the POC pricing structure and implemented a substantially reduced fixed-fee schedule for diagnostic services.  The Old Contracts and the New Contracts will collectively be referred to herein as "the Contracts."

21.  Payment issues and attempts to resolve them continued, and on April 13, 2017, Little River invoked the contractual dispute resolution provisions.  BCBSTX completed its audit of Little River's claims and removed Little River from pre-payment review on May 25, 2017

---

[5] Under both the Old and New Contracts, either party could terminate the contract at any time without cause upon 90-days written notice.

(effective May 16, 2017).  Even so, BCBSTX continued to request medical records from Little River and payment problems continued, culminating in this proceeding.  Faced with severe cash flow problems, Little River filed for Chapter 11 Bankruptcy on July 24, 2018, which was then converted to a Chapter 7 bankruptcy proceeding on December 7, 2018.  *See In re: Little River Healthcare Holdings, LLC, et al.*, Case No. 18-60526-rbk (Bankr. W.D. Tex. 2018).

### C.  The Present Dispute

22.    Little River claims that BCBSTX owes it millions of dollars in damages and penalties related to denial or underpayment for laboratory services that were rendered to BCBSTX members.   Little River further contends BCBSTX's improper nonpayment and unilateral recoupment of payments already made damaged Little River's cash flow such that it was forced into bankruptcy and, ultimately, liquidation.  BCBSTX, on the other hand, contends Little River wrongfully obtained payment for laboratory services it did not provide and for services that were provided to BCBSTX members who were not Little River patients, for which it seeks to recover millions of dollars in damages.  The parties' respective claims are as follows.

### 1.  Little River's Claims

23.    Breach of Contract.   (Counts I, II, III & IV).  Little River claims it is entitled to payment for laboratory services provided to its BCBSTX-insured patients because the Contracts provided coverage for the provided services and it complied with all contractual requirements for payment.   According to Little River, BCBSTX breached the Contracts by failing to pay for the laboratory services that Little River provided (Count I), improperly recouping money that was paid to Little River (Count II), failing to respond in writing to Little River's requests for information (Count III) and violating implied contractual covenants of good faith and fair dealing (Count IV).

24.     Little River claims that it met all contractual notice requirements. According to Little River, its laboratory services grew as its practice locations and physician network grew, and every year Little River provided BCBSTX with written notice of both physicians' offices and facilities locations operating under its corporate umbrella and Tax ID number.  Many of these affiliated offices and facilities were located away from the hospital campus, and BCBSTX routinely paid for laboratory services provided to these off-campus patients.  Over time, Little River began to extend its provision of laboratory services from its owned and affiliated locations to non-affiliated physicians' offices by providing hospital-employed phlebotomists in such locations to collect patient specimens.  According to Little River, it was not required to notify BCBSTX of where its phlebotomists traveled to collect specimens because adding laboratory-draw locations is neither a change in the CAH "specialty" Little River provided nor a change in the "location" of the hospital, which are contractual trigger points for notification.  But even if this could be considered a change in "specialty provided" or "location," Little River claims, the addition of phlebotomist locations is not the type of change that would have a direct impact on the parties' ability to discharge their respective obligations under the contracts, which must be the case for notice to be required.  In any event, Little River argues, BCBSTX had actual notice of these locations through its review of medical records conducted before it paid Little River's claims.

25.     Little River contends it rendered services to BCBSTX-insured hospital outpatients covered by the Contracts.   According to Little River, by placing hospital-employed phlebotomists in physicians' offices to register patients as Little River hospital outpatients and physically drawing and processing the patients' specimens, the patients became covered "outpatients" of the hospital under the Contracts' express terms.  According to Little River, by

defining "outpatients" as members receiving covered services "not as an Inpatient," the Contracts intended the term to be broad and encompass "non-patients."  Little River contends BCBSTX's actions demonstrate it intended the Contracts to cover "non-patient" services as well.

26.     As for the use of reference labs, Little River argues nothing in the Contracts or BCBSTX Policy Manuals limit or prohibit how laboratory services will be provided to hospital patients. Hospitals routinely utilize reference labs when a provider orders a type of testing that the hospital laboratory cannot perform, Little River claims, and insurance companies typically pay for such services.  Little River contends the pass-through-billing prohibitions contained in the BCBSTX Policy Manual applied on their face only to physicians, not hospitals, and that subsequent revisions could not retroactively alter BCBSTX's prior payment obligations under the Old Contracts.  But even under the revised policy, Little River claims, it fit the described exceptions because the services Little River rendered were "provided by an employee" of the billing provider who provided a direct patient service by collecting the blood specimens, and/or because BCBSTX "otherwise approve[d]" reference-lab billing by knowingly paying for Little River's utilization of those services for over a decade.  Finally, Little River argues that any ambiguity in the pass-through-billing prohibition must be construed in its favor because, as the assignee of its patients' claims, it steps into the insureds' shoes and coverage ambiguities must be resolved in favor of the insured.

27.     Even if it does not prevail on the above issues, Little River argues that BCBSTX is nonetheless estopped from denying payment for Little River's claims because BCBSTX consistently paid Little River's laboratory claims after actually reviewing thousands of records that revealed the off-campus locations where the specimens were drawn and the use of reference labs, and after investigating specific patient complaints that revealed the same.  Moreover, Little

River contends, the New Contracts expressly allowed such billings and provided a much lower reimbursement rate in exchange. According to Little River, BCBSTX's consistent payment of laboratory claims with full knowledge of the material circumstances constitutes ratification of Little River's reference lab use as a covered service. Little River further claims the myriad alleged billing errors that BCBSTX identified for the first time when expert reports were exchanged in this arbitration may not be raised this late in the process. After reviewing thousands of medical records and paying those claims, Little River argues, BCBSTX is estopped from alleging new imperfections today that could have easily been corrected had they been timely raised. According to Little River, it detrimentally relied on BCBSTX's actions by continuing to provide laboratory services to its insureds, the nonpayment for which would be unconscionable.

28. <u>Improper Recoupment (Count II)</u>. Little River claims BCBSTX's recoupment of some $9.1 million in funds that had been paid to Little River violated Texas law. Specifically, Little River contends BCBSTX failed to provide statutorily required written notice of the reasons for the recoupment, together with an explanation of Little River's appeal rights, before its actual recoupment, as Texas law requires. Without the required legal notice, Little River argues that BCBSTX must repay the improperly recouped funds.

29. <u>Failure to Timely Adjudicate (Count III)</u>. Even if Little River was not contractually allowed to offer reference lab services to BCBSTX insureds, Little River contends, BCBSTX had a contractual duty to timely inform Little River that it was denying payment on that basis. Had it done so, BCBSTX would still have been obligated to pay Little River out-of-network rates, which would have afforded Little River the opportunity to collect any remaining balances from the insured members, all of whom signed financial-responsibility statements

before receiving Little River's services.  Because Little River was deprived of the opportunity to resubmit the claims to BCBSTX as out-of-network claims and to collect any deficiencies from the insureds, Little River contends it incurred damages of 100% of its billed charges.

30.    Violation of the Covenant of Good Faith and Fair Dealing (Count IV).  Little River further alleges that BCBSTX's unequal control over the claims process created a "special relationship" between the parties that supports an independent cause of action for breach of the duty of good faith and fair dealing, which BCBSTX breached by failing to adjudicate claims in a timely and accurate manner.  Little River contends the breach of this duty was an independent proximate cause of Little River's bankruptcy and subsequent liquidation, for which it seeks to recover its lost enterprise value in the amount of $371.3 million.

31.    Violation of Prompt Payment Laws (Count V).  Little River alleges BCBSTX violated the Texas Prompt Payment Laws in a number of ways, including the failure to pay, deny with written notice, or partially pay and partially deny, electronic clean claims within 30 days of receipt, the failure to timely process claims after receipt of medical records, and by placing an internal hold on processing claims without sending a written request for the remaining records. In addition, Little River alleges BCBSTX violated the process for conducting audits and recouping overpayments by failing to pay first and investigate later as the law requires. According to Little River, BCBSTX is liable for prompt-payment violations on both fully-insured and self-insured claims in the amount of $27 million.

32.    Insurance Code Violations (Count VI); Deceptive Insurance Practices (Count VIII).  Little River claims standing as an assignee of BCBSTX's insureds to assert claims under Chapters 541 and 542 of the Texas Insurance Code.  According to Little River, BCBSTX violated Section 541.060(a)(2)(A) by impermissibly pending and then denying more than 5,000

claims in 2017 when Little River was only billing for services performed on its own equipment, violated Section 541.060(a)(4)(A) by failing to act within a reasonable time to affirm or deny coverage of Little River's claims, violated Section 541.060(a)(7) by refusing to pay claims without conducting a reasonable investigation, and committed various violations of Sections 542.003(b)(2)-(4).

33.    Violation of the Texas Free Enterprise and Antitrust Act (Count VII).  Little River contends BCBSTX conspired with other third-party payors to impose coordinated restrictions on hospitals' use of reference labs.  According to Little River, BCBSTX worked with such payors to eliminate competition and reduce the supply and availability of third-party laboratories in central Texas, committing a per se price-fixing violation of Texas Business & Commerce Code section 15.05(a).    Little  River  also  alleged  BCBSTX  violated  section  15.05(b)  by  attempting  to monopolize laboratory business in rural Texas and shut down competing laboratories and force providers, like Little River, to use laboratories with BCBSTX contracts that contain lower reimbursement rates.  Such actions, Little River claims, were an independent proximate cause of its bankruptcy and liquidation, for which it is entitled to recover lost enterprise value.  Because it alleges BCBSTX's actions were willful and flagrant, Little River seeks treble damages and attorneys fees under section 15.21(a)(1).

34.    Deceptive Trade Practices (Count IX):  During the dispositive motion phase of this arbitration, Little River voluntarily withdrew its Count IX Deceptive Trade Practices claim. Accordingly, the Tribunal makes no finding on this count.

35.    Fraudulent  Inducement  (Count  X).    Little  River  claims  BCBSTX  had  full knowledge of Little River's laboratory billing practices and contract interpretation positions when it renegotiated the New Contracts at substantially reduced reimbursement rates, and chose

to re-contract under a hospital contract rather than insist on its newly-asserted position that an "ancillary services" contract for laboratory services was necessary. According to Little River, BCBSTX knew when it renegotiated the Old Contracts that Little River's cost-to-charge ratio was ███, and BCBSTX modeled and represented that a ███ ratio would apply to the New PPO Contract. Instead, a ████ contract was actually created which Little River claims was intended to "dis-incentivize" Little River from performing outreach laboratory operations by presenting a contract that would produce at best break-even returns. Little River claims that BCBSTX's subsequent expansion of its pre-payment review audit on laboratory claims without notifying Little River, its failure to follow audit procedures under Texas law to first pay then investigate, its refusal to pay after verifying that the testing was being performed on campus, its improper pending and mass denial of claims, and its improper accusations of fraudulent billing practices to CMS all indicate that BCBSTX never intended to pay for laboratory services under the renegotiated contracts unless the lab volume decreased to an arbitrary level that BCBSTX would accept. By entering into the fraudulently induced New Contracts, Little River alleges it suffered the loss of rates equal to 100% of billed charges as an out-of-network provider. Little River seeks recovery of $80.4 million under this count, together with $371.3 million in lost enterprise value.

36. <u>Money Had and Received (Count XI—in the alternative)</u>. Though believing its claims are covered by the Contracts, Little River contends that, to the extent they are not, it is equitably entitled to its full measure of damages under the common law doctrine of "money had and received" because it actually provided millions of dollars of testing to BCBSTX insureds for which it has never been paid, resulting in an unfair windfall to BCBSTX.

37.     <u>Exemplary Damages (Count XII)</u>.   Little River seeks an additional award of exemplary damages for what it contends are BCBSTX's actions constituting bad faith and malice, in an amount not to exceed two times economic damages.

38.     <u>Declaratory Judgment (Count XIII)</u>.   Finally, Little River seeks a declaratory judgment in its favor as to each of the foregoing claims, together with an award of attorneys' fees under the Texas Declaratory Judgment Act. TEX. CIV. PRAC. & REM. CODE § 37.009.

## 2.  BCBSTX Response and Counterclaims

39.     <u>BCBSTX Response</u>.   BCBSTX contends Little River failed to meet its burden to prove that the 28,000+ claims for which it seeks to recover are in fact payable.  Without proof that the claims were for covered services under a member's benefit plan, medically necessary, and supported by substantiating documentation, BCBSTX argues Little River failed to establish its entitlement to payment.   According to BCBSTX, the example claims that Little River introduced at the hearing were not shown to be statistically significant or representative of the total claims in dispute.

40.     BCBSTX further claims it established through the testimony of its expert, Kara McVey, that none of Little River's claims were payable due to improper coding, inadequate documentation, failure to meet BCBSTX's medical policies and other various defects. According to BCBSTX, it affirmatively established that Little River wrongfully billed for services it did not perform and for services that were provided to non-patients of the hospital in violation of the policy terms.  BCBSTX alleges Little River exploited loopholes in the Medicare system to bill as a laboratory under private hospital contracts for services that it did not render. Such alleged wrongful actions are asserted as a matter of avoidance and also form the basis of BCBSTX's counterclaims for affirmative relief, as follows.

41.    <u>Breach of Contract</u> (Count I).   BCBSTX contends Little River breached the Contracts in a number of respects:  (1) billing for services it did not provide and/or that were not provided at the Rockdale Hospital or an approved location; (2) billing for services provided to non-patients of the Rockdale Hospital; (3) failure to provide notice of a material change in specialty provided or location of services; (4) subcontracting with laboratory providers without BCBSTX's consent; and (5) billing for claims that were not covered, insufficiently documented, improperly coded, and/or failed to meet BCBSTX's medical policies.   For these reasons, BCBSTX seeks to recover $69 million in payments it made to Little River that it claims were not payable under the Contracts.

42.    Specifically, BCBSTX claims Little River violated the Contracts' prohibition on pass-through billing by submitting claims for laboratory services it did not render.  According to BCBSTX, Little River's use of third-party reference labs also violated the contractual provision that prohibits Little River from subcontracting or assigning its duty to provide medical services to BCBSTX members.   By contracting with and billing for tests performed by third-party laboratories, BCBSTX claims, Little River breached the terms of the hospital Contracts and the BCBSTX policies that the Contracts incorporated.

43.    BCBSTX also alleges Little River violated the Contracts' notification requirement by failing to provide notice of material changes in the specialty that Little River provided and the massive expansion of the patient population it intended to serve.   BCBSTX claims that by dispatching Little River-employed phlebotomists to physicians' offices for specimen collection and expanding its laboratory outreach, Little River transformed what had been a rural hospital into a large-scale reference lab.  According to BCBSTX, this resulted in a change in location and specialty that required Little River to provide written notice under the Contracts.

44.    BCBSTX further claims Little River breached the Contracts' requirement that it submit bills only for services that it rendered to Little River patients at its Rockdale Hospital campus.  Instead, BCBSTX claims, the services that Little River provided were to non-patients not encompassed within the Contracts' coverage for "outpatients" and "inpatients" of the Rockdale Hospital.  To qualify as an "outpatient," BCBSTX argues the patient must be "admitted to the Hospital" for services that do not require an overnight stay other than for observation.  According to BCBSTX, an outpatient must appear at the hospital and receive services there; BCBSTX members who appear at physicians' offices remote from Little River's Rockdale Hospital to have specimens drawn for testing by third-party laboratories are not "outpatients" of the hospital but "non-patients" outside of the Contracts' purview.

45.    To the extent any of the above contractual terms are ambiguous—and BCBSTX asserts they are not—BCBSTX contests Little River's position that they must be construed in its favor for three reasons:  (1) Little River is not an insured disputing coverage language in an insurance contract but a sophisticated commercial entity disputing hospital contract terms, (2) ambiguities must be resolved by contractual context, which supports BCBSTX's reading, and (3) to the extent Little River purports to stand in the insureds' shoes, its claims are preempted by ERISA.

46.    <u>Fraud (Count II)</u>.  BCBSTX alleges that Little River's laboratory billing scheme was fraudulent.  Specifically, BCBSTX claims Little River made specific representations and omissions in its claims submissions by coding claims to hide that the testing was not performed by Little River, and by obscuring who was actually performing the services in the medical records it submitted during pre-payment review. According to BCBSTX, Little River's nondisclosure that it was engaging in improper pass-through billing and developing its massive

laboratory outreach program constituted a misrepresentation of material fact on which BCBSTX relied by paying tens of millions of dollars in improper laboratory billing.

47. <u>Fraudulent Inducement (Count III)</u>. BCBSTX contends the above-described material misrepresentations and omissions fraudulently induced it to continue to pay claims for laboratory services at elevated rural hospital rates and to continue the parties' contractual relationship, which it would not have otherwise done.

48. <u>Money Had and Received (Count IV)</u>. Finally, BCBSTX contends Little River's improper conduct resulted in its unjust enrichment of money that equitably belongs to BCBSTX and which would be unfair for Little River to retain.

### III. Reasons For the Award

### A. Preliminary Issues

49. The central issue in this proceeding is the extent to which, if any, the Contracts covered Little River's provision of laboratory services between 2014 and 2017 to BCBSTX members whose laboratory specimens were drawn by Little River-employed collectors at locations remote from the hospital and analyzed by third-party reference labs. Each of the parties assert multiple claims and raise several points that they contend inform the issues, which will be addressed first: (1) the role of the Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA") and related CMS regulations in interpreting the Contracts; (2) the legal effect of BCBSTX's claims payment over the course of many years after having conducted a review of the underlying records; (3) the documented presence of corruption in reference lab billing by other rural hospitals; (4) the extent to which, if any, the Contracts must be construed in Little River's favor as the insureds' assignee; and (5) the role of equity in awarding the parties' respective claims for money had and received.

### 1. MIPPA and accompanying regulations do not apply to the private-party contracts before the Tribunal.

50.     Medicare provides reimbursement for diagnostic laboratory tests on CAH outpatients at 101 percent of reasonable cost. *See* MEDICARE BENEFIT POLICY MANUAL, CHAPTER 6. The CMS defines an "outpatient" as "a person who has not been admitted as an inpatient but who is registered on the hospital or CAH records as an outpatient and receives services (rather than supplies alone) directly from the hospital or CAH." 42 CFR § 410.2. Little River, a CAH, registered those persons from whom a sample was collected by a Little River employee as outpatients on the hospital records. As for whether those persons received the hospital's services "directly," the Medicare processing manual explains:

> In order for the individual to be receiving services directly from the CAH, the individual must either be receiving outpatient services in the CAH on the same day the specimen is collected, *or the specimen must be collected by an employee of the CAH.*

MEDICARE CLAIMS PROCESS MANUAL, CH. 4, § 250.6 (emphasis added). Because off-campus laboratory specimens were collected by Little River employees, the persons from whom the specimens were drawn received services "directly from [Little River]" and qualified as "outpatients" under MIPPA. For services on or after July 1, 2009, the regulations specifically state that "an individual is no longer required to be physically present at the CAH at the time the specimen is collected." *Id.* at Ch. 16, § 40.3. The federal government thus chose to subsidize critical access hospitals by increased Medicare reimbursements for some off-campus laboratory patients.

51.     The private Contracts at issue do not specifically define how laboratory services are to be provided or under what circumstances they are considered provided on an "outpatient" basis. It is not unusual for those in the healthcare industry to look to Medicare for guidance

when policies are silent or unclear on an issue, and healthcare insurers often use variations of the Medicare system for payment. Trial Ex. 35 at 0013-14 (Fay Expert Report). BCBSTX itself refers to CMS provisions in the Contracts and in its own internal policies. For example, it requires billing on CMS-approved forms for physicians (CMS-1500) and hospitals (UB-04). *See* PPO MANUAL, SECTION F. Little River claims it was reasonable for it to rely on the CMS model to expand its outreach laboratory program because Medicare allowed the type of services Little River was providing at off-campus locations, the Contracts did not address the issue, and over the course of many years BCBSTX routinely paid Little River for such claims. Little River readily acknowledges that MIPPA, which was enacted after execution of the Old Contracts, did not change BCBSTX's contractual obligations but contends it should inform what are, at best, unclear or ambiguous contract terms.

52.     There is nothing in MIPPA to indicate the federal government intended for private payors to be bound by its provisions or accompanying regulations when contracting for outpatient laboratory services. The Contracts at issue are between private parties and are governed by their express terms. That Little River may have relied on MIPPA and accompanying regulations in crafting its outreach laboratory program is some indication of its motivation, but it is immaterial when construing the terms of the parties' Contracts here.

### 2. BCBSTX's payment of claims does not waive its right to contest coverage, operate as an estoppel or constitute ratification.

53.     Prominent in Little River's briefing and the evidence it presented is its position that, through 2015, BCBSTX knowingly and consistently paid for laboratory services that were provided to off-campus patients and conducted by third-party reference labs. Even after reviewing medical records and conducting investigations that revealed such practices on individual claims, BCBSTX continued to pay the claims. Little River took this to mean that

BCBSTX agreed with Little River's interpretation of the Contracts, at least until the volume of Little River's patients grew beyond what BCBSTX considered acceptable. According to Little River, BCBSTX's payments ratified Little River's position and waived its own, Little River reasonably relied on BCBSTX's course of conduct in the provision and expansion of its laboratory services, and BCBSTX is now estopped from asserting a contrary view.

54.     BCBTX contends Little River's argument that BCBSTX acquiesced to its billing practices by paying claims fails for two reasons. One, BCBSTX was not on notice because the review was for medical necessity only and, in light of the volume of claims BCBSTX processes, such records would not have drawn its attention. Two, BCBSTX's post-review payment did not waive its right to notification of Little River's expanded laboratory outreach because the Contracts contain clear non-waiver provisions and the equitable voluntary-payment doctrine does not apply.

55.     The Tribunal agrees with BCBSTX on the latter point. The Contracts contain clear and unambiguous non-waiver provisions. The PPO Contract specifically provides as follows:

> [t]he failure of either party to insist upon strict performance of any of the terms of this Contract shall not be construed as waiver of its respective rights or remedies with respect to any subsequent breach of or default in any of the terms of this Contract.

Trial Ex. 57 at 0006. BCBSTX is one of the largest insurers in Texas and processes some 375,000 claims per day. Trial Tr. (Day 6) at 377:8-15 (Monroe). BCBSTX's payment of a claim after conducting a review of the underlying records is some indication of its knowledge as to how Little River was billing a particular claim. But the non-waiver provision precludes any argument that, by paying some of Little River's laboratory claims, BCBSTX is somehow precluded from contesting Little River's compliance with the conditions for coverage or payment

of other claims under the Contracts. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (stating that "engaging in the very conduct disclaimed as a basis for waiver is insufficient as a matter of law to nullify the nonwaiver provision."). However, because the non-waiver provision applies "with respect to any *subsequent* breach," it does not apply to payments that were made during the time period before BCBSTX issued the prepayment-review notice.

56.     The extensive prior course of dealing between Little River and BCBSTX does demonstrate, however, that BCBSTX routinely paid for Little River's utilization of reference labs for over a decade before this dispute arose.  When Little River began advanced lipid testing in April 2015, BCBSTX began requesting medical records for a significant number, 50% of the claims, before paying them.  Trial Ex. 312.  BCBSTX consistently paid such claims through 2015 regardless of the patients' location or the use of reference labs.  Trial Exs. 312, 3003-3283. This continued during the pre-payment review period, during which BCBSTX did not deny Little River's claims based on the location of the patient or partial use of a reference lab.  Trial Exs. 3302-3325.  And even BCBSTX's denials in the Spring of 2017, when the New Contracts were in place, did not object to the patients' location or the use of a reference lab.  Trial Exs. 1165-67; 1169; 1173; 1179; 1185; 1204; 1209.  By paying such claims, BCBSTX did not waive its right to subsequently contest coverage based on the patients' location or reference-lab use, but the record does reflect a course of dealing between the parties that is consistent with Little River's contractual interpretation.

### 3. The laboratory billing practices of other rural hospitals are not before the Tribunal and are immaterial to this proceeding.

57.     Little River was not the only struggling rural hospital that attempted to increase revenue by developing and expanding outreach laboratory programs.  Evidence was presented generally referencing various laboratory schemes in which other rural hospitals had engaged,

some of which resulted in civil actions and even criminal indictments. BCBSTX points to these other instances of misconduct in an attempt to paint the same picture with Little River. However, the manner and means of other hospitals' laboratory billings differed in various material respects and are not relevant to resolution of the issues before the Tribunal, which have been decided solely on the Contracts, evidence, authorities and arguments presented in this proceeding.

### 4. The Contracts are not ambiguous.

58.      Little River argues that, to the extent coverage under the Contracts or BCBSTX's policy manuals is ambiguous, Little River's interpretation should prevail because it is reasonable and Little River stands in the shoes of BCBSTX's insureds by virtue of their assignments. BCBSTX counters that Little River is a sophisticated commercial entity disputing hospital contract terms and, as such, is not entitled to the interpretational protections that are afforded an insured disputing coverage language in an insurance contract. The Tribunal finds that the contractual provisions at issue are not ambiguous, and thus does not need to address this issue.

### 5. The Contracts preclude claims for money had and received.

59.      A claim for money had and received is equitable in nature. *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162 (Tex. 2007). A party may not pursue equitable theories of recovery when a valid, express contract governs the dispute. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Because the Contracts before the Tribunal are valid and govern the subject matter of the dispute, the parties' respective claims for money had and received are precluded as a matter of law.

60.      Having resolved these points, the Tribunal now turns to the claims at issue and the parties' respective defenses thereto.

### B. Little River's Claims

### 1. BCBSTX Breached The Contracts.
### (Counts I, II, III & IV)

61.     <u>The plan documents</u>.  At the heart of this dispute is the question of coverage under

BCBSTX's insurance plan documents.  The relevant provisions of the Contracts are generally as

follows.

- **Contracting Parties.**  The PPO and Indemnity Contracts state that they are between BCBSTX "and <u>Richards Memorial Hospital</u>, a hospital located at <u>Milam</u> County, Texas . . . ."  Trial Ex. 57-0001; Trial Ex. 59-0001 (underline in original).  The HMO Contract refers to "<u>Richard Memorial Hospital</u> on behalf of each of the individual Hospitals and Provider IDs listed herein in Attachment C."  Trial Ex. 58-0005 (underline in original).

- **"Covered Services."**  The PPO and Indemnity Contracts describe the services that are covered as "those acute care inpatient and outpatient hospital services for which benefits are available under a Subscriber's health care benefit plan."  Trial Ex. 0057-0001; Trial Ex. 59-0001.  The HMO Contract covers "those health services specified and defined as Covered Services under the terms of a Member's Health Plan."  Trial Ex. 58-0006.

- **"Billing; Rules and Regulations."**  The PPO and Indemnity Contracts provide that the hospital "agrees to abide by rules, regulations and procedures pertaining to functions encompassed in this Contract BCBSTX may from time to time adopt in policy statements, newsletters or other communications to [the hospital]."  Trial Ex. 57-0003; Trial Ex. 59-0003.

- **"Payment of Benefits."**   Under the PPO and Indemnity Contracts, BCBSTX agreed to pay the contracted benefits "[u]pon completion by [the hospital] of the billing requirements of this Contract."  Trial Ex. 57-0003; Trial Ex. 59-0003.

62.     There is no question that the Contracts provide coverage for laboratory services.

Nor does there appear to be any disagreement that the laboratory services at issue were

performed upon orders made by physicians, the specimens were drawn from BCBSTX members,

the testing was performed on the specimens that were drawn, and the results were provided to the

ordering providers and patients.  The key issues are whether Little River's billing for laboratory

testing that was performed by third-party reference labs violated BCBSTX's prohibition on "pass through billing," and whether the Contracts required laboratory specimens to be procured from patients who were physically present at the Rockdale Hospital.

### a. Little River's use of reference labs did not violate the Contracts' prohibition on pass-through billing.

63. The Old Contracts contain no limit or prohibition on the hospital's use of reference labs, nor do they mention or define the term "pass through billing." They do provide that the hospital "agrees to abide by rules, regulations and procedures pertaining to functions encompassed in this Contract that BCBSTX may from time to time adopt in policy statements, newsletters or other communications to the [Hospital]." Trial Ex. 57 at 0003. On January 1, 2015, BCBSTX added a provision on "pass through billing" to its PPO Provider Manual with the following definition:

> Pass through billing is not permitted by BCBSTX. *Pass-through billing occurs when the ordering provider requests and bills for a service, but the service is not performed by the ordering provider.* The performing provider should bill for these services unless otherwise approved by BCBSTX.
>
> BCBSTX does not consider the following scenarios to be pass-through billing:
>
> 1) The service of the performing provider is performed at the place of service of the ordering provider and is billed by the ordering provider, or
>
> 2) The service is provided by an employee of a physician or professional provider, e.g., Physician Assistant, Surgical Assistant, Advanced Practice Nurse, Clinical Nurse Specialist, Certified Nurse Midwife and Registered First Assistant, who is under the direct supervision of the ordering provider and the service is billed by the ordering provider.

Trial Ex. 152 at 0024 (emphasis added).

64.     Only physicians or other licensed professionals can order a laboratory test.  *See, e.g.,* Trial Ex. 47 at 266:11-23 (Wilmington Deposition).  Accordingly physicians, not hospitals, are generally considered "ordering providers." *See, e.g.,* Trial Ex. 35 at 0019 (Fay Expert Report).  Likewise, the articulated exceptions to the pass-through-billing prohibition relate to when a physician can bill for services provided by another professional assistant under the physician's supervision.  The Manual definition of pass-through billing thus appears to have been designed to preclude doctors from profiting from laboratory referrals.  As such, they are directed at physicians, not hospitals. *See* Trial Ex. 36 at 14-15 (Fay Rebuttal Report).

65.     In early June, 2016, Little River received a letter notifying it that BCBSTX was putting Little River on pre-payment review for a list of 122 CPT codes, principally involving toxicology and sleep study.  Trial Ex. 1062 (the "pre-payment review letter").  On June 8, 2016, Ryan Downton, Little River's Chief Legal Officer, contacted Alma Willis, a BCBSTX senior investigator, about the letter.  Ms. Willis, for the first time, conveyed BCBSTX's concern that Little River was engaged in prohibited pass-through billing.  She directed Mr. Downton to the above-referenced Provider Manual.  Trial Ex. 152 at 0024.  After reviewing the Manual, Mr. Downton phoned Ms. Willis and explained his view that the term "pass-through billing" did not apply to hospital use of a reference lab.  According to Ms. Willis's notes regarding the phone calls, she relayed to Mr. Downton her policy interpretation that Little River could only bill for laboratory services provided "under TIN of LRHC umbrella."  Trial Ex. 1072.  Mr. Downton informed her that Little River would be acquiring the assets of Essential Testing LLC in Illinois, and that services thereafter would be "under the LRH TIN." *Id*.  He also informed her that Little River planned "to market outside of Texas for laboratory services."  Trial Ex. 1073.  Each party

was thus notified of Little River's then-existing outreach laboratory services and those that it planned in the future, and the other's position regarding the same.

66.     Thereafter, BCBSTX requested a meeting with Little River to discuss its billing and the high volume of its laboratory services.  On July 20, 2016, Mr. Downton and Jeff Madison (Little River's CEO) met with BCBSTX representatives David Cripe (Vice President over Little River's region) and Elsa Wilmington (BCBTX's Network Manager).   Their respective views on pass-through billing were discussed.  BCBSTX communicated its position that hospitals typically bill for reference lab tests only when the hospital performs some of the tests itself or provides non-laboratory services to the patient on the same day, and Little River indicated that, going forward, it would comply with that policy.[6]   Trial Tr. (Day 3) at 65:1-12 (Downton).  At that meeting, BCBSTX hand delivered to Little River a notice terminating the Old Contracts, prompting a renegotiation.  The notice did not allege any wrongdoing by Little River and was "without cause."

67.     After the meeting, Mr. Downton followed up with an email to Ms. Willis describing the conversation at the above meeting as follows:

> [w]e recently met with your Vice President for our region and he affirmed to us that hospitals are permitted to use (and bill for) reference lab services (as we have been doing).  I reviewed the policy on 'pass through billing' that was provide [sic] to us and it clearly does not apply in this situation.  The policy appears to be from a manual on professional fee billing and states that

---

[6] This comports with the policy of BlueCross BlueShield of Oklahoma (BCBSOK), which states:

> If a hospital renders any service(s) for either (a) an inpatient or (b) an outpatient receiving other hospital services in addition to the lab services, the hospital should bill all of the lab services, along with the other hospital services, on the hospital's claim.  This is the proper protocol in such cases even when the hospital does not provide all of the lab services (i.e., if the hospital utilizes a reference lab for services [it is] unable to provide for its patient).  In these instances, BCBSOK should not receive a separate claim from another provider for the lab services.

Trial. Ex. 1083-0003 (underline in original).  The following question and answer section states that if the hospital collects the sample and performs at least one of the laboratory services, it should submit a claim for all of the laboratory services.  *Id*. at 1083-0005.  Though BCBSOK's policies do not apply to Texas, there was no contrary written policy for Texas and Mr. Cripe's understanding mirrored that of BCBSOK.

a ordering provider may not bill for services he/she orders, but does not provide. As you know, a hospital does not order services – it merely provides them to hospital patients after the services have been ordered by physician. The physician is not permitted to bill for such services – instead, the hospital must bill for them. I will work on getting the dates you requested, but after (1) reviewing Medicare policies; (2) reviewing the BCBS policy provided to us; and (3) discussing the matter with your Vice President, it appears to me that our reference services previously provided to BCBS insured patients are completely consistent with both the law and our contract with BCBS. *If you have a different perspective, I would appreciate if you would explain it in writing.*

Trial Ex. 1116 at 004 (emphasis added). Mr. Cripe communicated Little River's position within BCBSTX, noting that Mr. Downton considered Little River's actions proper and stating that the dispute concerned what Mr. Cripe considered a "very gray area." Trial Ex. 1096. BCBSTX never provided a written explanation of "a different perspective" in response to Mr. Downton's request.

68.    While the contract renegotiations were underway, BCBSTX alluded to Little River's use of reference labs not as illegal, fraudulent, or a contractual breach, but as a "loophole" that the New Contracts "plugged." Trial Exs. 272; 1227 at 002, 006. It also distinguished Little River's practices from those of other providers, some of whose problems were described as "operational" and some "fraud related." Trial Ex. 1094 at 0001. In contrast, Little River's practices were described as "excessive reimb do [sic] to old contracts…[s]uch as Little River Hospital and I spoke with Dave, and he had already sch [sic] a meeting (which occurred yesterday) with them to lower rates or term them if necessary." *Id.*

69.    The negotiations ultimately resulted in the New Contracts. Those contracts expressly covered "Diagnostic Services," which were defined to mean that "the sole purpose for an Outpatient Admission is the use of . . . laboratory and other testing capabilities." In exchange, a separate, significantly lower payment scale for "Diagnostic Services" was agreed upon which

"reflect[ed] the appropriate reimbursement rates for [Little River's] business."  Trial Ex. 2.

BCBSTX acknowledges that "[Little River's] uptrend in laboratory billing was a factor regarding

the addition of the definition of "'Diagnostic Services' to the New Contracts."  Trial Ex. 26 at

0011.

> 70.    Around the time that BCBSTX put Little River on pre-payment review, the

BCBSTX Policy Manual was updated as follows:

> If services are rendered directly by the **Blue Choice PPO** physician,
> professional provider, facility or ancillary provider, the services must be
> billed by the **Blue Choice PPO** physician, professional provider, facility or
> ancillary provider.    However, if the **Blue Choice PPO** physician,
> professional provider, facility or ancillary provider does not directly
> perform the service and the service is rendered by another provider, only
> the rendering provider can bill for those services.
>
> Notes:
>> 1) This does not apply to services provided by an employee of a
>> **Blue Choice PPO** physician, professional provider, facility or
>> ancillary provider e.g. Physician Assistant, Surgical Assistant,
>> Advanced Practice Nurse, Clinical Nurse Specialist, Certified Nurse
>> Midwife and Registered Nurse First Assistant, who is under the direct
>> supervision of the billing physician, professional provider, facility or
>> ancillary provider.

Trial Ex. 164 at 0002 (June 21, 2016 update).   Over a year later, on September 15, 2017,

BCBSTX again updated its Policy Manual with the following definition of pass-through billing:

> **Pass-through billing** occurs when the ordering physician, professional
> provider, facility, or ancillary provider requests and bills for a service,
> but the service is not performed by the ordering physician,
> professional provider, facility, or ancillary provider.

Trial Ex. 102 at 001.  These updates occurred at a time when Little River was not billing for

reference lab services unless it was performing the majority of the test at the hospital laboratory,

which comported with BCBSTX's interpretation of the pass-through billing policy as it was

communicated to Mr. Downton.  Trial Tr. (Day 3) at 65:1-12 (Downton); Trial Tr. (Day 2) at

53:10-15 (Cook)(testifying the new equipment was operational and running specimens in June, July of 2016). On August 22, 2016, Mr. Downton notified Ms. Willis: "All vendors stopped providing services on behalf of [Little River] on receipt of your June 2016 letter."  Trial Ex. 1116 at 002.

71.     The Tribunal finds that BCBSTX's initial pass-through billing policy did not prohibit Little River's use of reference labs.  As BCBSTX's expert witness, Kara McVey, explained:

> BCBSTX has not and did not disallow the use of a reference laboratory by a hospital.  The only requirement that BCBSTX has is that the claim for services be submitted correctly, with the appropriate modifiers that disclose the use of the reference laboratory and the appropriate type of bill for that patient receiving reference laboratory services.

Trial Ex. 41 at 0034 (McVey Expert Report). This comports with the testimony of various other witnesses, who uniformly testified that hospitals routinely bill insurance companies for reference lab services.  *See* Trial Tr. (Day 8) at 87:15-20 (Benton); Trial Tr. (Day 7) at 247:12-25 (McVey); Trial Tr. (Day 2) at 277:22-278:1 (Downton); Trial Tr. (Day 4) at 192:3-193:10 (Herbers); Trial Tr. (Day 9) at 13:20-14:1 (Smittle) ("Q. And when your hospitals use a reference lab, do they bill for those services?  A. If we obtain the specimen, then we bill for it. It's our rule of thumb.").

72.     Even if the policy manuals' updated definitions prohibited pass-through billing as BCBSTX claims, they cannot be applied retroactively to alleviate BCBSTX's contractual payment obligations that were incurred before the updates.  After the updates, Little River was conducting testing on its collected samples at the hospital laboratory and only sending out those components for which it was not equipped, which was in keeping with the New Contracts.  Little River did not violate the Contracts' prohibition on pass-through billing.

### b.  Little River's use of reference labs did not violate the contractual prohibition against assignment or subcontracting.

73.  The Contracts contain the following provision:

> Neither [Little River] nor BCBSTX shall assign, subcontract, merge, sell, change ownership, or transfer any right, financial obligation, benefit or duty created by this contract without the prior written consent of the other party.

Trial Ex. 57 at 0006, Art. 13 (PPO Contract); Trial Ex. 59 at 0005-6, Art. 13 (Traditional Contract); Trial Ex. 5 at 0016, Art. X (C) (HMO Contract).  BCBSTX asserts that Little River's contracting with reference labs to perform testing that Little River's laboratory was unable to perform violates this prohibition.  However, nothing in this provision indicates that Little River may not utilize non-employed personnel and/or entities to assist in the provision of patient care to BCBSTX members.  Use of a reference lab does not constitute an "assignment" or the "subcontracting" of a duty that Little River owes to BCBSTX.  Indeed, the evidence demonstrated that hospitals routinely utilize reference labs, and insurers generally pay for those services.  BCBSTX itself acknowledged that "subcontracting for services that Little River was not capable of providing directly—as in the typical reference lab scenario—always could be done with proper notice and coding."  BCBSTX Post-Hearing Brief at 19.  This comports with the report of BCBSTX's expert witness, Ms. McVey, who averred that "BCBSTX has not and did not disallow the use of a reference laboratory by a hospital."  Trial Ex. 41 at 0034 (McVey Expert Report).  In utilizing reference labs, Little River did not violate the contractual prohibition against assignment or subcontracting.

### c.  The off-campus patients from whom hospital employees collected specimens for laboratory testing received "outpatient hospital services" under the Contracts.

74.    Little River provided various services, including the collection of specimens for testing, at various locations beyond the Rockdale Hospital itself, including physicians' offices and facilities operating under Little River's corporate umbrella and Tax ID number.  It also at times employed providers to render services at locations Little River did not own or operate.  For example, it sent its employed surgeons to operate at non-affiliated hospitals and surgery centers. It also operated a clinic at four school campuses in Rockdale, where a Little River nurse practitioner and assistant went to each campus one day a week and saw faculty, staff and students.  Trial Tr. (Day 2) at 135:9-21 (Zinn).  It also provided services at nearly 100 nursing homes where Little River-employed nurses and other personnel took care of patients, and at non-affiliated physician offices where Little River-employed phlebotomists took and processed patient samples for testing.  BCBSTX paid Little River for these services, including laboratory services, provided at the above-described locations.  Trial Tr. (Day 2) at 271:21-24; 255:20-24; 253: 7-24 (Downton).

75.    The PPO Contract defines "Covered Services" as "inpatient and outpatient hospital services for which benefits are available under a Subscriber's health care benefit plan." Trial Ex. 57 at 0001.  The Old PPO and Indemnity Contracts provide coverage for "outpatient hospital services," but do not define the term.  Trial Ex. 0057-0001; Trial Ex. 59-0001.  The HMO Contract defines an "outpatient" as "a Member receiving Covered Services but not as an Inpatient."  Trial Ex. 58 at 0007.  BCBSTX's Online Glossary defines "outpatient care" as "[t]reatment that is provided to a patient who is able to return home after care without an overnight stay in a hospital or other inpatient facility."  Trial Ex. 275 at 0013.  Under the New Contracts, "Outpatient Services" are defined to mean the subscriber "is admitted to [the] Hospital

for services which are rendered in one day (24 hours) or overnight observation." Trial Ex. 60 at 0005; Trial Ex. 61 at 0004; Trial Ex. 62 at 0005.

76.    It is undisputed that the BCBSTX members from whom Little River-employed collectors obtained specimens returned home without an overnight stay and the services were rendered in one day.   To this extent, those members fit the contractual definition of an "outpatient."  BCBSTX contends, however, that to qualify as an "outpatient" the member must be "admitted to [the] Hospital," meaning the member must appear at the hospital and receive services there.   Otherwise, BCBSTX argues, the member is a "non-patient" and any services rendered to non-patients are not covered under the Contracts.  BCBSTX points to the absence of any reference to coverage for "nonpatients" of the hospital, or to services to be performed at other locations, as an indication that there was no intent that BCBSTX would pay for such services.

77.    The term "non-patient" does not appear in the Contracts, which speak only in terms of "inpatients" and "outpatients."   The CMS distinguishes between "outpatients" and "nonpatients," paying different rates for each depending upon the specific interaction between the hospital and patient.  CMS defines an "outpatient" as "a person who has not been admitted as an inpatient but who is registered on the hospital or CAH records as an outpatient and receives services (rather than supplies alone) directly from the hospital or CAH."  42 CFR § 410.2.  For dates of service on or after July 1, 2009, CMS regulations provide that "an individual is no longer required to be physically present at the CAH at the time the specimen is collected."  *Id*. at Ch. 16, section 40.3; Trial Ex. 0036 at 0013-14.[7]  CMS defines a "nonpatient" as a person with

---

[7] According to Ms. McVey, to qualify as a laboratory-service outpatient the patient must be "receiving services from a facility that met provider-based rules," which require that the services be received from a facility located within a 35-mile radius of the hospital campus that is the main provider.  Trial Ex. 40 at 25 (McVey Report).  However, the

whom the CAH has no direct interaction, that is, the patient is not on the CAH campus and a CAH employee does not collect the patient's laboratory specimen.[8]  For laboratory tests provided to CMS "non-patients," Medicare pays an amount based on the clinical diagnostic laboratory fee schedule.  *Id*. at section 40.3.1.  When there is direct interaction between the CAH and the patient, such as when a CAH-employee collects a patient specimen, CMS pays 101% of the CAH's allowable cost.  Thus, the hospital receives payment for the services provided to both "outpatients" and "non-patients," only under different payment terms.  Under CMS regulations, the off-campus patients from whom Little River-employed collectors obtained specimens would be considered "outpatients."

78.    BCBSTX does not rely on the CMS definition of "non-patient" but employs the term in the ordinary sense, which it claims means the BCBSTX member has not been "admitted to [the] Hospital" when he or she does not receive services there.  BCBSTX's position regarding coverage for the provision of services at non-Rockdale Hospital locations has not been consistent.  In its summary judgment motion, BCBSTX claimed that the Contracts covered only services provided at the Rockdale Hospital campus itself.  *See* BCBSTX Motion for Partial Summary Judgment at 14 (contending Little River "breached the contracts by billing for services performed at locations other than [Little River's] Rockdale hospital.").  Its current position is that BCBSTX agreed to pay "for services performed at the Rockdale hospital *and approved locations* . . . ."  BCBSTX Post-Hearing Brief at 1 (emphasis added).

---

provider-based rules to which Ms. McVey refers, 42 CFR § 413.65, have no application to the definition of a hospital outpatient, 42 CFR § 410.2. *See* Trial Ex. 36 at 8 n. 27 (Fay Rebuttal Report).

[8] The National Uniform Billing Committee (NUBC), an entity that defines patient types under Medicare, categorizes services provided to "non-patients" as "outpatient services.' *See* Trial Ex. 249 at 188 (Listing type of bill 014x: "Hospital – Laboratory Services Provided to Non-Patients" as an "OP" service).

79.    Every year, Little River notified BCBSTX of physicians' offices and facilities operating under Little River's corporate umbrella and Tax ID number, and requested BCBSTX to "please add such providers and/or locations to our existing contract." *See, e.g.*, Trial Exs. 245 at 0001; 244 at 0001; 246.  If a particular provider could not be added, Little River requested that BCBSTX add the provider or location as "out-of-network services." *Id*.  BCBSTX did not respond to these letters, though it appears to now agree with Little River that it routinely added those locations to the Contracts.  Trial Exs. 244-246; Trial Tr. (Day 2) at 271:21-24; 255:20-24; 253:7-24 (Downton).  And BCBSTX routinely paid Little River for services provided at those locations regardless of their distance from the Rockdale Hospital, including facilities located in Georgetown, Austin, Bastrop, San Antonio, Waco and Temple, among others, an indication that it was not a patient's physical distance from the Rockdale Hospital main campus that determined the patient's status but the nature of the hospital's interaction with the patient.  Trial Ex. 245 at 3-4; Trial Ex. 246 at 3.  The direct nature of that interaction for the claims at issue indicates that the services Little River provided fit within the contractual "outpatient" designation.  The patients from whom samples were collected were registered as outpatients of Little River and maintained on the hospital records as such, and it was a Little River employee who directly collected the laboratory specimen.  Trial Tr. (Day 2) at 184:2-11 (Downton).  The BCBSTX Glossary of terms defines a "direct care provider" as "an individual or organization that offers care directly to the member," and provides as an example "a lab that performs the blood draw from a patient."  Trial Ex. 275 at 007.  According to the Glossary, "[t]he direct care provider should file claims to [BCBSTX]." *Id*.

80.    The contractual definition of "outpatients" as members receiving covered services "not as an Inpatient" is an indication the term was meant to be broad.  The Contracts could have

expressly defined, and excluded, "non-patients" along the parameters BCBSTX now urges, but they do not. Indeed, BCBSTX routinely paid nearly all Little River claims that were submitted under type of bill "141," which is only used to file "non-patient" laboratory claims. Trial Ex. 54 at 266:1-4 (McVey deposition). Such claims were paid under both the Old and New Contracts[9] and, even after this arbitration was filed, BCBSTX acknowledged that these bill types "were submitted correctly" and it is not seeking money back on any of these claims.

81.     The Tribunal concludes that Little River's laboratory claims for off-campus members who were registered as outpatients of the hospital and from whom a Little River-employed collector drew and processed the specimen reflect "outpatient hospital services" and are "covered services" under the Contracts.

### d.  Little River did not breach the contractual notification provision.

82.     The Contracts contain the following notification requirement:

**ARTICLE 10 – Notification of [Hospital] or BCBSTX Status Change**

A. The [Hospital] or BCBSTX shall notify the other in writing of any actions, policies, determinations, or internal or external developments which may have a direct impact on the [Hospital's] or BCBSTX's ability to discharge its obligations under this Contract as soon as the [Hospital] or BCBSTX is aware of them.

B. Actions requiring notification by the [Hospital] or BCBSTX include, but are not limited to, any (1) change in ownership, specialty provided, or location . . . .

Trial Exhibits 57 at 0004; 59 at 0004.

83.     BCBSTX contends Little River's expansion into physicians' offices constituted a change in location, and its expansion from a rural hospital into a large-scale reference lab constituted a change in specialty, either of which required notification under the Contracts. *Id.*

---

[9] Between 2010 and 2016, not accounting for those patients who were not BCBSTX insureds, BCBSTX paid more than 96% of bill type 141 (non-patient) claims, more than 95% of such claims in 2017 and 2018, and more than 3,000 claims after this arbitration was filed. Trial Ex. 42 at 00027; Trial Ex. 421; Claimant's Demonstrative 9.

Little River's position is that providing additional laboratory draw locations is neither a change in specialty provided, as Little River remained a critical access hospital, nor a change in location, as Little River's main hospital remained in Rockdale, Texas. But even if it were, Little River contends, neither is a change that would "have a direct impact on [Little River's] or BCBSTX's ability to discharge its obligations" under the Contracts. In any event, Little River argues, BCBSTX is estopped from relying on the notification provision because, through its medical-records review of Little River claims, BCBSTX had actual notice of the remote locations at which Little River employees were collecting specimens and paid the claims without objection.

84.     The Tribunal does not view Little River's expansion as a "change" in specialty or location, but an increase in the volume of patients it intended to serve. By Little River's annual letters, BCBSTX was on notice that Little River's provider network was rapidly expanding and that it intended to provide services well beyond its main campus. *See* Trial Exs. 245 at 0001; 244 at 0001; 246 (notifying BCBSTX of locations in Georgetown, Austin, Bastrop, San Antonio, Waco and Temple). BCBSTX neither lodged an objection nor provided written responses to Little River's notification letters, and by its most recent position in this proceeding does not appear to contest the services provided at what it now terms these "approved" off-campus locations. BCBSTX Post-Hearing Brief at 1. And though BCBSTX's review and payment of Little River's other off-campus claims does not waive its right to complain, *see* III.A.2, *supra*, it is noteworthy that Little River's billing practices were transparent; it did not attempt to hide or obscure the patients' locations or the reference labs that were performing the testing.[10] The reference lab logos appear on the medical records that Little River submitted for review, as do the physicians' offices where the specimens were drawn.

---

[10] The thousands of records that BCBSTX reviewed in 2015 contained information regarding the patients' locations and the use of a reference lab. And BCBSTX paid the claims after actually reviewing the records in support. Trial Exs. 3202, 3320, 3315, 3317, 3318, 3324.

85.     BCBSTX acknowledges that the Contracts contain no volume limitations and characterizes Little River's volume increase as "a symptom of the problem" of its misuse of reference labs and provision of services to non-patients.  BCBSTX Post-Hearing Response Brief at 12.  The Tribunal has concluded, however, that Little River did not misuse reference labs and that the services it provided to off-campus patients qualified as "outpatient hospital services" under the Contracts.  But even if Little River's expansion could be considered a "change" in specialty or location as BCBSTX contends, the Tribunal concludes that it was not shown to be the type of development that would directly impact either party's ability to discharge their respective contractual obligations, which is the required trigger for notification.  *Id*.  Little River did not breach the Contracts' notification requirements.

### e.  Little River met its initial burden to demonstrate that the underlying claims were payable.

86.     BCBSTX argues Little River failed to meet its burden to demonstrate that the underlying claims for which it seeks to recover were, in fact, payable.  Specifically, BCBSTX claims Little River presented no evidence that any of the alleged underpaid claims were (1) covered services eligible for payment under a member's benefit plan, (2) medically necessary, or (3) supported by Little River documentation to substantiate the services.  BCBSTX contends that for claims billed before July 2016, when Little River was able to perform some of the tests at its hospital laboratory, Little River failed to prove that it performed the services billed.  And for claims billed thereafter, BCBSTX argues that the evidence was anecdotal and insufficient to prove it is entitled to recover on all 28,000+ claims that were submitted.

87.     The Tribunal finds that, with the exception of $1,935,643.25 in billed charges to persons BCBSTX alleges are not its insureds and $529,072.44 in billed charges that BCBSTX alleges were not medically necessary (collectively "the exceptions"), Little River met its initial

burden to demonstrate that the services for which it billed were provided to BCBSTX insureds,

met the requirements for medical necessity, and were supported by Little River documentation

sufficient to substantiate the services.  In reaching this conclusion, the Tribunal has reviewed and

adopts the analysis of Little River's expert, Tony Fay.  *See* Trial Ex. 35 at 0018-22 (Fay Expert

Report); Trial Ex. 36 at 0039-42 (Fay Expert Rebuttal Report).  As for the exceptions, if

BCBSTX denied the claims in a timely and appropriate manner, Little River could have pursued

alternative avenues for collection and/or appealed the medical-necessity determinations and thus

mitigated its damages.11  Accordingly, whether the exceptions should apply depends upon the

disposition of Little River's claim that BCBSTX failed to timely and appropriately adjudicate the

claims.  *See* III.B.1.h, *infra*.

### f.  The coding errors BCBSTX alleges do not alleviate
### its contractual payment obligations.

88.     To be payable under the Contracts, the claims must be complete and accurate

regarding the services performed.  Relying on the testimony of its expert, Ms. McVey, BCBSTX

contends Little River's claims are not payable due to various billing errors (such as incorrect

coding, missing or incorrect modifiers) and incomplete documentation (such as missing

physician signatures or dates).  The alleged billing errors outlined in Ms. McVey's Reports were

first raised with Little River when the parties exchanged their expert reports in this proceeding

on April 15, 2019.  The Tribunal questions BCBSTX's ability to raise these issues at this late

stage with no prior notice.  There is nothing to indicate that had such errors been raised with

Little River before, during, or immediately after the pre-payment review period, they could not

have been corrected and the claims resubmitted.  If the claims had then been ultimately denied,

Little River could presumably have timely invoked avenues of appeal, sought to recover out-of-

---

11 BCBSTX stipulated that it would not raise the failure to appeal or exhaust any administrative remedy as a defense
in this proceeding.  Trial Tr. (Day 8) at 158:19-159 (Andersen testimony).

network benefits and/or pursued patient responsibility. The Tribunal thus has serious concerns regarding estoppel. Nonetheless, the Tribunal finds that the alleged errors in coding or incorrect application of modifiers do not alleviate BCBSTX's payment obligations.

89. Though Ms. McVey lodges a number of complaints, they primarily center on whether the claims Little River submitted properly alerted BCBSTX as to who provided the particular service and where it was provided. Specifically, the CMS-1450 claim form, also known as a UB-04, is the standardized billing form for services provided by a hospital. Trial Ex. 40 at 0030 (McVey Expert Report); Trial Ex. 36 at 0021 (Fay Rebuttal Report). Detailed instructions for billing on the UB-04 form are contained in the National Uniform Billing Committee's (NUBC) Official UB-04 Data Specification Manual. Trial Ex. 249. The form contains a series of numbered boxes for the hospital to complete with claim data. Box 4, labeled "Type of Bill," requires entry of a three-digit code. The first digit reflects the "type of facility," which for a hospital is "1." The second digit reflects "type of care," for which a "3" indicates outpatient laboratory services and a "4" indicates other. Trial Ex. 249 at 0018; Trial Ex. 36 at 0022 (Fay Rebuttal Report). The third digit codes are immaterial to the issues in this arbitration.

90. Ms. McVey contends Little River was required to bill for the services at issue here using type of bill 141 because the patients from whom specimens were collected off-campus were "nonpatients."[12] By using type of bill 131 instead of 141, Ms. McVey opines, Little River intended to hide the fact that the testing was not performed by the Rockdale Hospital. Trial Ex. 40 at 0029 (McVey Expert Report). However, the Tribunal has concluded that Little River was providing outpatient hospital services when its employees registered off-campus patients as hospital outpatients with their consent and drew and processed their specimens. *See* III.B.1.c.

---

[12] The NUBC categorizes services provided to "non-patients" as "outpatient services." *See* Trial Ex. 249 at 188 (Listing type of bill 014x: "Hospital – Laboratory Services Provided to Non-Patients" as an "OP" service).

*supra.* And Ms. McVey acknowledges that "[a] hospital is entitled to file claims for services that the hospital renders on an outpatient basis as long as those services meet the criteria of an outpatient service." *Id.* Moreover, if Little River submitted a claim with bill type 131 when it should have used bill type 141, the claim should have been denied using the appropriate code to indicate why, in which event Little River could have resubmitted the claim using bill type 141. Trial Ex. 474. Little River's use of bill type 131 was neither improper nor intended to deceive.[13]

91.    Ms. McVey also claims Little River should have appended a 90-modifier to the relevant CPT code to notify BCBSTX that a reference lab was the service provider. However, the 90 modifier is used by independent laboratories, not hospitals, to indicate use of a reference lab by the independent laboratory. Trial Tr. (Day 2) at 205:7-207:13; 224:18-227-25 (Downton); Trial Exs. 202, 331, 332. A portion of the claims Little River submitted from 2010-2014 did append the 90-modifier to CPT codes that had been referred to a reference lab, from which Ms. McVey surmises that Little River knew how to correctly submit such a claim and intended to deceive BCBSTX by not using the modifier for the claims at issue here. However, the evidence showed that, except for a brief one-month period in 2014 in which one Little River billing person utilized the 90 modifier before being corrected, Little River stopped appending the 90 modifier in June 2012 when its CERNER electronic medical records system was implemented. Trial Tr. (Day 2) at 224:18-22725 (Downton). The Tribunal concludes that Little River's failure to append the 90 modifier to its laboratory claims was not improper or intended to deceive.

92.    Having carefully reviewed the multiple alleged billing and coding errors identified by Ms. McVey, and the rebuttal of such claims by Little River's experts, the Tribunal

---

[13] It is noteworthy that in 2017 and 2018, when Little River no longer employed phlebotomists in physicians' offices, Little River submitted thousands of claims using "type of bill" 141 and BCBSTX paid over 95% of those claims at a time when the claims were submitted during or after pre-payment review related to Little River's laboratory program. Trial Ex. 41; Trial Ex. 36 at 0024 (Fay Rebuttal Report); Little River Demonstrative No. 9.

accepts the evidence presented by Messrs. Fay and Herbers on these points and concludes that the alleged errors do not alleviate BCBSTX's contractual payment obligations.

### g.     BCBSTX improperly recouped payments that were made to Little River.

93.     The Contracts afford BCBSTX the right to recover overpayments. *See, e.g.*, Trial Ex. 57 at 0003, Art. 6(D).  The BCBSTX Provider Manual describes the process that applies when BCBSTX identifies and seeks to recoup an overpayment that has been made to a payee. Specifically, BCBSTX is required to (1) provide a refund request letter, (2) explain the reason for the refund, (3) include a remittance form and a postage-paid return envelope, and (4) send a follow-up letter if a response is not received within 45 days.  Trial Ex. 101 at 0042.  Within 45 days of the payee's receipt of the initial refund request letter, the provider may request a review of the overpayment determination by submitting a Claim Review form.  *Id.*  According to the Policy Manual, BCBSTX may recoup the overpayment "after the later of the expiration of the Overpayment Review Deadline or the completion of the Claim Review Process provided that the [provider] has submitted the Claim Review form within the Overpayment Review Deadline."  *Id.*

94.     The process described in BCBSTX's Policy Manual comports with Texas law, which provides that a refund due to overpayment or completion of an audit may be recovered if the insurer (1) timely notifies the provider in writing, (2) includes the specific claims and amounts for which a refund is due, (3) for each claim, includes the basis and specific reasons for the refund request, (4) includes notice of the provider's right to appeal, and (5) describes the methods by which it intends to recover the refund. 28 TEX. ADMIN. CODE § 21.2818 (Trial Ex. 550-47); TEX. INS. CODE § 1301.132 (Trial Ex. 548-30).  If a provider disagrees with a recovery request, the insurer must afford the provider an opportunity to appeal, and "the insurer may not attempt to recover the overpayment until all appeal rights are exhausted.     TEX. INS. CODE §

1301.132 (Trial Ex. 548-30). Further, the Texas Department of Insurance prohibits electronic recoupment without the provider receiving any other notification. Trial Ex. 551-12. The foregoing requirements do not affect an insurer's "ability to recover an overpayment in the case of fraud or a material misrepresentation by a [provider]." 28 TEX. ADMIN. CODE § 21.2818 (Trial Ex. 550-48).

95. For those claims that BCBSTX paid Little River and later reversed that payment, BCBSTX recouped approximately $9.1 million. Trial Ex. 37 at 0028 (Herbers Expert Report). The evidence demonstrated that BCBSTX failed to comply with the contractual and legal notice requirements necessary for BCBSTX to proceed with recoupment. BCBSTX's corporate representative designated on the subject of recoupment was unable to answer any questions on the topic. Trial Ex. 49 at 118:13-20 (Andersen deposition testimony). Moreover, BCBSTX failed to demonstrate that Little River engaged in fraud or made material misrepresentations with respect to the claims that BCBSTX recouped such that it was excused from complying with its contractual and legal recoupment obligations. The Tribunal accepts the Herbers Expert Report on this point and concludes that BCBSTX's recoupment of the above amounts was improper. However, the monies that BCBSTX recouped are not an additional element of damages as they are already included in Little River's shortfall damage calculation. Trial Ex. 37 at 0026 (Herbers Expert Report). The improper recoupment did, however, contribute to Little River's cash-flow problems. *Id.*

### h. BCBSTX failed to timely or appropriately adjudicate Little River's claims.

96. The claims Little River submitted to BCBSTX listed the tests that were performed using CPT codes to describe the procedures and services performed. The claims were transmitted via a standard electronic format that hospitals use to submit healthcare claims, known

in the industry as "837 Files." Each claim included a CPT code for each test ordered, with a separate line item and corresponding charge listed. BCBSTX would respond to each claim on a line-by-line basis via an electronic format known as "835 Files," indicating any adjustment to the payment and the CPT code affected by the adjustment. To explain how a particular claim was adjudicated, BCBSTX used what are known in the industry as Claim Adjustment Reason Codes ("CARC Code") and Remittance Advice Reason Codes ("RARC Code").

97.     The evidence showed that BCBSTX's adjudication of Little River's claims during and after pre-payment review was inconsistent and, at times, inscrutable. For example, BCBSTX's pre-payment review letter provided Little River with a detailed list of 122 CPT codes for which Little River would be required to submit medical records before payment could occur. Trial Ex. 1062. Thereafter, BCBSTX added codes without notifying Little River that further payment locks had been implemented. The locks were ultimately expanded to include all laboratory billing, which Little River did not learn until nearly a year later. Trial Tr. (Day 3) at 185:8-10 (Downton). Twenty-two of the non-noticed CPT codes comprised 42.2% of BCBSTX's adjustments. Trial Ex. 37 at 0017 (Herbers Expert Report). Little River's ability to gather the appropriate medical records was constrained by BCBSTX's failure to notify Little River of the types of claims that would be subject to pre-payment review. *Id*.

98.     Another confusing and inconsistent adjudication involved the use of CARC code CO-252. A CO-252 denial indicates that "an attachment/other documentation is required to adjudicate this claim/service." Trial Ex. 37 at 0022 (Herbers Expert Report); Trial Tr. (Day 3) at 143 (Downton). Additional information may merely require correcting previously submitted information, or, if requested, supplying medical-record support for the billed charge. Trial Ex. 37 at 0022 (Herbers Expert Report). Once medical records are provided, the claim must be

48

reprocessed and either paid or denied for a valid reason. BCBSTX left a substantial number of claims permanently denied based only on a medical-records request, even though the records had been provided. *Id*.

99.     The CO-252 adjustment code itself provides limited information of BCBSTX's request. *Id*. at 0040. Such an adjustment must be accompanied by a RARC code identifying the type of documentation that is required, absent which the provider must be sent written notification identifying what documents are needed to process the claim. *Id*. BCBSTX must reprocess the claim once the information is received, and must either pay the claim or deny it with a valid reason. *Id*. On numerous occasions, BCBSTX failed to provide Little River with notice of the information it needed to process the claim. *Id*. at 0022.

100.     Another example concerns CARC code OA-216. The use of this code indicates that the denial is based on the finding of a review organization after medical records have been requested, provided, reviewed, and it has been determined the treatment was not medically necessary. Code OA-216 was often used to deny payment before BCBSTX had requested medical records from Little River, meaning a "review organization" could not have properly made a medical-necessity determination before denying the claim. *Id*. at 0022-0024; Trial Tr. (Day 3) at 142-143 (Downton).

101.     The use of CARC code CO-45 provides another example. This adjustment code means the billed charge exceeds the amount the insurer has negotiated to pay the provider. Trial Ex. 37 at 0022 (Herbers Expert Report); Trial Tr. (Day 3) at 137-38 (Downton). For Little River's POC Contracts, a ███CO-45 adjustment would be appropriate on every claim to indicate the difference between the 100% cost and the negotiated ███of billed-charges rate. *Id*. BCBSTX's own remittance 835 files to Little River indicated that "[t]his adjustment amount

cannot equal the total service or claim charge amount." Trial Ex. 37 at 0022 (Herbers Expert Report); Trial Tr. (Day 3) at (Downton). Nonetheless, BCBSTX applied an improper CO-45 100% reduction to many of Little River's claims, with $0 payment. Due to the typical healthcare billing process, BCBSTX's improper use of the CO-45 adjustment was difficult for Little River to ascertain. Trial Ex. 3 at 0023 (Herbers Expert Report); Trial Tr. (Day 3) at 165-66 (Downton); Trial Ex. 1155 at 0001 (Wilmington email) ("[t]he reason that [Little River] did not know that the claims [sic] denied for medical necessity was that they came back with a CO-45 code which was contractual allowable.").

102. The evidence demonstrated additional examples of confusing, inconsistent and inappropriate adjudications by BCBSTX, many of which are further described in the Expert Report of Mark Herbers and which the Tribunal accepts for this purpose. Trial Ex. 37 at 0021-26 (Herbers Expert Report).

103. BCBSTX responds that the claims-processing issues Little River presents are "entirely beside the point" because the claims are not payable under the Contracts. Because the claims at issue are not payable, BCBSTX argues, "any issues with how they were processed is of no moment." BCBSTX also contends the examples that Little River presented are not statistically significant and are therefore insufficient to support its claims. For the reasons already explained, the Tribunal does not agree that the claims at issue were not payable or that BCBSTX's claims-processing issues are "of no moment." The numerous examples that Little River provided of these and other problems with BCBSTX's claims adjudication were sufficiently significant to support Little River's claim. BCBSTX's inconsistent and confusing adjudication of claims and use of adjustment codes made it difficult for Little River to ascertain what BCBSTX considered to be acceptable or objectionable, and inhibited Little River's ability

to respond to or address BCBSTX's concerns.  *See, e.g.*, Trial Ex. 1173 (April 10, 2017, email from Little River billing manager to Ms. Wilmington indicating inconsistent, incorrect, and confusing adjudications); Trial Ex. 1175 (April 11, 2017, BCBSTX internal email:  "[a]s to claims that did not deny for medical records from the March remit, I have found a few that don't make sense – no denials, no payment, no patient share . . . .").  The burden on Little River of producing the voluminous medical records that BCBSTX requested was substantial.  Trial Tr. (Day 3) at 186-189; 192 (Downton); Trial Ex. 1173 ("[w]e have had to engage additional resources and staffing to manage this activity, so in addition to not receiving payment for the services provided to BCBS patients, we've incurred additional expenses in response to your denials and apparent delays in payments.").

104.    BCBSTX also breached the Contracts by failing to respond in writing to Little River's requests for information.  In addition to its failure to provide a written response to Mr. Downton's inquiry as to whether it had "a different perspective" on his pass-through billing position, ¶ 67, *supra*, it failed to respond when Little River invoked the contractual dispute resolution procedures by written notice to BCBSTX on April 13, 2017.  Little River provided BCBSTX with a detailed explanation of some of the problems it was experiencing with BCBSTX's claims adjudication.  Trial Exs. 1181 & 1183.  Under the dispute resolution procedures, BCBSTX was required to provide a written response within 45 days:

> Art. 11A.  If the HOSPITAL disagrees with BCBSTX regarding a Contract interpretation, the HOSPITAL will contact the BCBSTX provider contracting representative assigned to the HOSPITAL in writing and state the basis of the disagreement.  BCBSTX must respond promptly in writing but no later than forty-five (45) days after receipt of the HOSPITAL's letter and inform the HOSPITAL of BCBSTX's position.

BCBSTX failed to respond in violation of the Contracts' terms.  Trial Tr. (Day 3) at 202:23-24; 203:11-17 (Downton); Trial Tr. (Day 6) at 212:3-6 (Cripe).

i.      **The covenant of good faith and fair dealing does not apply to the parties' relationship (Count IV).**

105.    Little River alleges an independent cause of action for breach of the duty of good faith and fair dealing, claiming the parties had a "special relationship" as a result of BCBSTX's unequal control over the claims adjudication process.  However, the relationship between BCBSTX and Little River does not give rise to the type of duty of good faith and fair dealing that has been recognized under Texas law.  *See, e.g., Hux v. S. Methodist Univ.*, 819 F.3d 776, 781-82 (5th Cir. 2016) (stating "Texas courts have refused to impose a duty of good faith and fair dealing on any of the following relationships: . . . insurance company—third-party claimant.").  Accordingly, Little River may not prevail on this claim.

2.      **BCBSTX violated Texas prompt payment laws (Count V).**

106.    The Texas Insurance Code contains detailed requirements for the proper submission of eligible healthcare claims and their subsequent processing by insurance companies.  TEX. INS. CODE § 843.336 *et seq.* (for HMOs); TEX. INS. CODE § 1301.101 *et seq.* (for PPOs) (collectively the "Texas Prompt Pay Laws" or "TPPL").  The Texas Department of Insurance, as the administrative agency that regulates health insurance companies operating in Texas, implements regulations that further detail the TPPL requirements.  28 TAC § 21.2801 *et seq.*  The TPPL statutory and regulatory requirements are non-waivable. 28 TAC § 21.2817.  To invoke the TTPL's reimbursement deadlines, the claims that the provider submits must be "clean."  TEX. INS. CODE §§ 843.336, 1301.131.

107.    Little River submitted its claims to BCBSTX electronically.  Under the TPPL, an insurer has 30 days after receipt of an electronic clean claim to take one of the following actions:

> (1) pay the total amount of the clean claim as specified in the contract between the preferred provider and the [insurer];

(2) deny the clean claim in its entirety after a determination that the [insurer] is not liable for the clean claim and notify the preferred provider in writing why the clean claim will not be paid;

(3) notify the preferred provider in writing that the entire clean claim will be audited and pay 100 percent of the contracted rate on the claim to the preferred provider; or

(4) pay the portion of the clean claim for which the [insurer] acknowledges liability as specified in the contract between the preferred provider and the [insurer], and:

    A. deny the remainder of the clean claim after a determination that the [insurer] is not liable for the remainder of the clean claim and notify the preferred provider in writing why the remainder of the clean claim will not be paid; or

    B. notify the preferred provider in writing that the remainder of the clean claim will be audited and pay 100 percent of the contracted rate on the unpaid portion of the clean claim to the preferred provider.

28 TAC §§ 21.2802, 21.2807; TEX. INS. CODE §§ 843.338, 843.346, 1301.103.  If the insurer needs additional information to determine whether it is liable for a claim, such as a patient's medical records, it may request additional information from the treating provider within 30 days of receiving the claim and must act on the claim within 15 days of receiving the information.  28 TAC §§ 21.2804.  If the claim is not properly adjudicated within the later of 30 days of filing or 15 days of the insurer's receipt of medical records, the insurer must pay statutory penalties.  TEX. INS. CODE §§ 843.342, 1301.137; 28 TAC §§ 21.2815.

108.    An insurer that wishes to audit a claim must notify the provider in writing and pay the provider 100% of the contracted rate.  28 TAC §§ 21.2802, 21.2807; TEX. INS. CODE §§ 843.338, 843.346, 1301.103.  Pursuant to the TPPL audit provisions, the insurer has 180 days to investigate the claim.  TEX. INS. CODE §§ 843.340, 1301.105.  If the insurer determines that no payment is owed, it may recover the overpayment if it timely (within 180 days of the provider's receipt of payment) notifies the provider of the basis for and specific reasons for the request, and

the provider does not timely (within 45 days) make arrangements for repayment. Tex. Ins. Code §§ 843.350, 1301.132; 28 TAC § 21.2818. If the provider disagrees with the insurer's request for recovery, the insurer must afford the provider an opportunity to appeal and may not recoup the overpayment until all appeal rights are exhausted. *Id.* An insurer that fails to provide the requisite notice and payment may not use the statutory audit procedures. TAC § 21.2809(c). The above requirements do not affect an insurer's ability to recover an overpayment in the case of a provider's fraud or material representation. *Id.*

109. Little River contends BCBSTX violated the TPPL by failing to pay claims on a timely basis and by conducting an unauthorized pre-payment review audit. BCBSTX contests Little River's entitlement to recovery under the TPPL on a number of grounds: (a) Little River failed to differentiate between fully-insured claims, to which the TPPL applies, and those that are excluded from the TPPL as a matter of law; (b) Little River failed to meet its burden to show that the claims for which it seeks to recover penalties were in fact clean; and (c) Little River's fraud and/or material representations preclude the application of TPPL penalties.

### a. Little River may only recover TPPL penalties for fully-insured claims that are not subject to ERISA.

110. The TPPL applies only to healthcare claims that are fully insured and not subject to ERISA. *See Health Care Services Corp. v. Methodist Hospital of Dallas*, 814 F.3d 242 (5th Cir. 2016); *see also North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare,* 781 F.3d 182, 201 (5th Cir. 2015)*; Houston Methodist Hosp. v. Humana Ins. Co.,* 266 F.Supp.3d 939, 959-60 (S.D. Tex. 2017). Little River contends the above authorities are distinguishable and the TPPL should apply to all of its claims because the Contracts bound BCBSTX to comply with the same TPPL reimbursement deadlines and terms for all plans, and because BCBSTX acted not solely as an administrator in this case but as an insurer by using its own health insurance policy to deny

coverage for laboratory services rather than that of the self-insured member's plan.  The statutory framework, however, does not support Little River's position.

111.    The TPPL applies to plans in which "an insurer provides, *through the insurer's health insurance policy*, *for the payment* of a level *of coverage* that is different depending on whether an insured uses a preferred provider or a nonpreferred provider."  *See* TEX. INS. CODE § 1301.0041 (emphasis added).  Whether or not BCBSTX contractually agreed to abide by the TPPL for all subscribers or acted as an "insurer" when using its own insurance policy to deny coverage for laboratory services, there is no evidence that BCBSTX bore the risk of loss through its policy when, acting as an administrator, it paid claims on behalf of a self-funded plan.  *See Methodist*, 814 F.3d at 248 (Chapter 1301 is not applicable to BCBSTX's activities as administrator of the self-funded plans . . . .).  The same is true for claims submitted under federal and state government plans, and for the processing of claims under the BlueCard program.  *Id*. at 248, 251, 253-55.  Accordingly, Little River may not seek an award of TPPL penalties based on claims that are not fully insured, non-ERISA claims.

### b. The claims Little River submitted to BCBSTX for payment were clean.

112.    An electronic submission is considered a clean claim if "the claim is submitted using the Institutional 837 (ASC X12N 837) format . . ." and all information included in the claim is "complete, legible, and accurate."  TEX. INS. CODE §§ 843.336(c), 1301.131(b) and (d); 28 TAC §§ 21.2803(g).  To be considered clean, the claim must include all of the required data elements.  TEX. INS. CODE §§ 843.336, 1301.131.  Little River submitted the claims in dispute to BCBSTX electronically using the UB-04 dataset known as the Institutional 837, and per BCBSTX's direction Little River used the BCBSTX Availity Clearinghouse, which automatically rejects claims unless all of the required fields are populated.

113.    BCBSTX argues that the acceptance by Availity means only that the required fields were populated, not that they were populated correctly.  According to BCBSTX, in order to be clean a claim must be payable.  Relying on the testimony of Ms. McVey, BCBSTX contends those claims submitted with incorrect bill types in box 4 of the claim form are not payable and therefore not clean.  For various other alleged coding errors and shortcomings identified by Ms. McVey, BCBSTX contends a statistically valid sample indicates that none of the claims were payable and therefore none were clean.  Without this prerequisite, BCBSTX argues, Little River may not invoke the TPPL protections.

114.    Whether or not a claim is ultimately payable is a separate inquiry from whether or not it is clean.  A claim that is submitted using the 837 format and containing all of the necessary data elements is considered clean. TEX. INS. CODE §§ 843.338, 1301.137.  Once a clean claim is submitted, it is up to the insurer to determine whether it is obligated to pay and the timelines for making that determination are activated. TEX. INS. CODE §§ 843.336(c), 1301.137.  The issues raised by Ms. McVey involve a substantive analysis of the claims themselves rather than whether they contained all of the necessary data elements when submitted.  For example, whether the bill type 131 or 141 should have been used requires analyzing the patient's location and classification when the lab specimen was drawn, which is the type of information an insurer examines after a clean claim is submitted to determine whether it is payable. TEX. INS. CODE §§ 843.336(c), 1301.137.  The same is true for the 90-modifier and other codes that Ms. McVey claims Little River failed to use or used improperly.  These and other substantive points of dispute, such as BCBSTX's contentions that Little River engaged in improper pass-through billing, submitted insufficient documentation to support the procedures billed and submitted claims for services that were not medically necessary, are not the type of data points the TPPL

requires for a claim to be clean.[14] If such substantive issues required final adjudication—here, all the way through arbitration and potentially beyond—before the claims could be considered "clean," then the TPPL's entire timely-payment purpose would be thwarted. The Tribunal concludes that Little River submitted "clean" claims as the TPPL defines that term.

### c. BCBSTX did not comply with the TPPL audit provisions.

115. Once an insurer receives an electronic clean claim from a provider, it has 30 days to make a determination as to whether the claim is payable. If the insurer cannot determine whether the claim is payable within that time, the insurer may choose to audit the claim and invoke a 180-day investigatory period. TEX. INS. CODE §§ 843.338, 843.346, 1301.103; 28 TAC §§ 21.2802, 21.2807. This is the course that BCBSTX chose by its pre-payment review letter. Trial Ex. 48, p. 207: 19 (Tierney deposition) ("[p]repayment review is an audit process."). But it did not comply with the TPPL audit requirements. *Id*. The TPPL requires that an insurer notify the provider of its intent to audit claims. BCBSTX's pre-payment review letter notified Little River that it would conduct an audit based on 122 specific CPT codes. However, BCBSTX subsequently expanded the scope of its audit by adding claims throughout 2016 and eventually placing all of Little River's laboratory claims under review in 2017. BCBSTX provided no notice to Little River of the expanded scope of the audit, in violation of the TPPL notice requirements. *Id*. BCBSTX further violated the TPPL by failing to first pay 100% of the claims to be audited. Accordingly, BCBSTX had no right to invoke the TPPL audit provisions, including the 180-day investigatory period. TEX. INS. CODE §§ 843.340, 1301.105.

### d. BCBSTX is liable for TPPL penalties for failure to pay claims within the statutory timelines.

---

[14] If an insurer determines that an electronically submitted claim is deficient, it must notify the provider within 30 days of the claim's receipt. 28 TAC §§ 21.2808. To the extent any claims were not "clean," BCBSTX failed to notify Little River that they were deficient within the 30-day electronic submission timeline.

116.     BCBSTX failed to pay claims within the TPPL timelines, including thousands of claims pended for medical-records review.  The evidence shows that BCBSTX took more than the statutorily required 15 days to pay 98% of the claims. For the facts and reasons set forth above, and based on the testimony and evidence presented at the hearing, the Tribunal finds that BCBSTX violated the TPPL and Little River is entitled to damages, penalties and interest pursuant to Tex. Ins. Code §§ 843.342 and 1301.137 and Tex. Admin. Code 28 § 21.2815, together with attorneys' fees and costs pursuant to Tex. Ins. Code §§ 843.343, 1301.108 and Tex. Admin. Code 28 § 21.2817.

### 3.     Little River lacks standing to assert claims for unfair or deceptive insurance practices under Chapters 541 and 542 of the Texas Insurance Code (Counts VI & VIII).

117.     Little River asserts standing to pursue claims under Chapters 541 and 542 of the Texas Insurance Code on the ground that BCBSTX members "assigned their rights under their policies with [BCBSTX] to Little River."  Trial Ex. 1 at ¶ 115.  The assignments are contained in the patient consents and provide, in pertinent part, as follows:

> I understand that as a courtesy, Little River Healthcare and/or its authorized agents will make every reasonable effort to obtain reimbursement for ordered tests.  I understand that I am making an assignment of my insurance plan benefits to Little River Healthcare and/or its authorized agents.  I also authorize the release of any information continued in my records that is needed to file and process insurance or medical plan claims, to pursue appeals on any denied or partially paid claims, for legal pursuit as to any unpaid or partially paid claims, or to pursue any other remedies necessary in connection with same.

*See* Trial Ex. 247.  The documents also state:

> I understand that Little River Healthcare may file a claim for benefits on my behalf but, whatever my coverage, it is a personal contract between me and my insurance company.

*Id.*

118.    The assignments upon which Little River relies are not broad enough to encompass the extra-contractual remedies it seeks under the Texas Insurance Code.  The patients assigned their "insurance plan benefits" and the right to pursue remedies necessary in pursuing any unpaid claims.  The enhanced damages available under the Insurance Code are in addition to and beyond what is necessary to obtain the insurance plan benefits that are the basis of the assignment, and the Tribunal declines to imply from the patient consents derivative standing to assert Insurance Code violations on the patient's behalf.

119.    Moreover, unlike common law remedies, "statutory remedies under the Texas Insurance Code are personal and punitive in nature and the Insurance Code makes no provision for assignability." *Am. S. Ins. Co. v. Buckley*, 748 F.Supp.2d 610, 626 (E.D. Tex. 2010).  The Texarkana court of appeals has noted its agreement with the reasoning of three federal district courts applying Texas law that Insurance Code claims are not assignable for the reasons discussed in *PPG Industries, Inc. v. JMB/Houston Ctrs. Partners, Ltd*., 146 S.W.3d 79 (Tex. 2004).  *See Lee v. Rogers Agency*, 517 S.W.3d 137, 146 n. 3 (Tex. App.—Texarkana 2016, pet denied)(citing *Great Am. Ins. Co. v. Fed. Ins. Co*., Civ. No. 3:04-CV-2267-H, 2006 WL 2263312, at *10 (N.D. Tex. 2006) (stating "[E]ach and every policy argument articulated by the Texas Supreme Court [in *PPG Industries, Inc*.] against assignment of a DTPA claim applies with equal force to a claim brought under the Texas Insurance Code."); *Launius v. Allstate Ins. Co.*, Civ. No. 3:06-CV-0579-B, 2007 WL 1135347, at *6 (N.D. Tex. 2007)).  Though Little River contends these cases are factually distinguishable because they do not involve patient claims assigned to a healthcare provider, neither the statute nor the case law support such a distinction. The enhanced damages the Insurance Code affords are personal and punitive in nature, and the Tribunal concludes they may not be assigned for the reasons articulated in the above authorities.

Accordingly, Little River lacks standing to assert claims under the Insurance Code and its claims based thereon are denied.

### 4. The evidence was insufficient to support Little River's claims under the Texas Free Enterprise and Antitrust Act (Count VII).

120.    Little River contends BCBSTX violated the Texas Free Enterprise and Antitrust Act ("TFEAA") by conspiring to impose coordinated restrictions on rural hospitals, including Little River.  According to Little River, BCBSTX conspired with other insurers to eliminate competition and reduce the supply and availability of third-party laboratories in central Texas, and to fix prices by renegotiating their expensive POC contracts and transitioning them to substantially reduced standardized fee schedules.  Though Little River's Amended Demand alleged violations of TFEAA sections 15.05(a)(conspiracy) and 15.05(b)(monopolization), its Post-Hearing Brief withdrew the monopolization claim and added a claim for illegal price-fixing under section 15.05(i). TEX. BUS. & COM. CODE §§ 15.05(a),(i); Little River Post-Hearing Brief, p. 42 n. 235; p. 43 n. 246.

121.    In support of its TFEAA claims, Little River points to an external presentation BCBSTX made in July of 2017 to representatives of other third-party payors, such as Aetna, Cigna, Humana and United, directing them to target rural hospitals and move them from POC contracts to less-expensive standardized fee schedules, and to prohibit rural hospitals' use of reference labs. Trial Ex. 251.  Little River contends BCBSTX later shared the presentation with United Healthcare, which thereafter followed through on the scheme by demanding from Little River a lower fee-based schedule for laboratory services.  Trial Ex. 1229.  According to Little River this, and other evidence showing that BCBSTX's true intent was to disincentivize Little River's provision of laboratory services so that those services would be diverted to BCBSTX's

lower-cost contractor (Quest), establish the type of anticompetitive behavior that the TFEAA
was meant to prohibit.

122.    To prevail on an antitrust claim, a plaintiff must show, *inter alia*, an "antitrust
injury"—that is, that the alleged anticompetitive conduct decreased consumer choice or quality
of care, or increased consumer prices.  *See Ginzburg v. Memorial Healthcare Systems, Inc*., 993
F.Supp. 998, 1014-15 (S.D. Tex.1997)(citing, *inter alia*, *Doctor's Hospital of Jefferson v.
Southeast Med. Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997)).   The Tribunal has examined the
evidence presented and concludes that it is insufficient to demonstrate that BCBSTX's alleged
anticompetitive conduct decreased consumer choice or quality in available laboratory services in
a sufficiently defined area, or that it increased consumer prices.   *See* Trial Ex. 41 at 33-36
(McVey Rebuttal Report).   Because Little River failed to prove antitrust injury, it may not
prevail on its TFEAA claims.

### 5.  The evidence was insufficient to show that BCBSTX fraudulently induced Little River into the New Contracts (Count X).

123.    Little River claims BCBSTX fraudulently induced it into executing the New
Contracts, which caused it to suffer the loss of rates equal to 100% of billed charges as an out-of-
network provider.  Little River seeks recovery of $80.4 million under this count, together with
$371.3 million in lost enterprise value.

124.    To establish its fraudulent inducement claim, Little River must prove the elements
for fraud, which include, *inter alia*, that BCBSTX made a material misrepresentation it knew to
be false intending for Little River to rely on it.   *See Formosa Plastics Corp. USA v. Presidio
Eng'rs & Contractors, Inc*. 960 S.W.2d 41, 47 (Tex. 1998).  According to Little River, BCBSTX
exerted financial pressure on Little River to force its acceptance of the New Contracts by cutting
off its cash flow through pre-payment review and making false reports to the OIG.  Little River

alleges BCBSTX fraudulently induced its execution of the New Contracts in two ways: (1) BCBSTX concealed and misrepresented the reimbursement rate for the New Contracts; and (2) it gave assurances that, in exchange for Little River's acceptance of substantially lower reimbursement rates, BCBSTX would pay for all reference lab services where Little River performed at least one of the tests, even though it never intended to do so. BCBSTX's alleged misrepresentations concern a present fact (the payment rate) and a future act (that it would pay a claim if Little River performed at least one of the tests). Fraud based on a promise to do an act in the future is actionable when it is made with no intention of performing. *Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 434 (Tex. 1986). Intent is determined at the time the representation is made, but may be inferred from the party's subsequent acts. *Aquaplex, Inc. v. Rancho La Valencia, Inc*. 297 S.W.3d 768, 774-75 (Tex. 2009).

125. ~~The payment rate.~~ During renegotiation of the Old Contracts, BCBSTX was informed that Little River had a cost-to-charge ratio of ███.[15] Trial Tr. (Day 5) at 343:8-14 (Cripe). This meant that if Little River received reimbursement from a payor for less than ███ of its charges on a given patient, it would lose money. According to Little River, it communicated this rate to BCBSTX and BCBSTX represented that the New Contracts would provide rates exceeding this ratio. Trial Ex. 1108; Trial Tr. (Day 6) at 133:6-136:7 (Cripe). BCBSTX thereafter presented an offer that appeared to Little River to be consistent with that representation. In reality, Little River contends, BCBTX had manipulated its model to reduce the allowed amount to ███ guaranteeing that Little River would suffer a loss on BCBSTX patients. By not disclosing that calculation, Little River alleges, BCBSTX misled it into entering the New Contracts.

---

[15] Medicare pays Critical Access Hospitals an amount equal to 101% of their allowable cost by calculating what it terms the "cost-to-charge" ratio on a regular basis. *See* Trial Ex. 37 at 0029 n. 23 (Herbers Expert Report).

126.     BCBSTX counters that it determined from public records that Little River's CMS cost-to-charge ratio was in the ██ range, which is why the parties ended up at the lesser percentage that was ultimately agreed upon. Trial Tr. (Day 5) at 343:17-344:10 (Cripe). Little River challenges Mr. Cripe's testimony as not credible, pointing to documents in BCBSTX's possession that reflect Little River's ██ Medicare payment rate and to an incorrectly calculated ██ rate in BCBSTX's Demonstrative No. 6 by which Little River claims BCBSTX attempted to retroactively justify its prior misrepresentation. Little River acknowledges that BCBSTX's alleged misrepresentation, standing alone, may be insufficient to support a fraud claim because Little River admitted it would have been forced to accept a ██ contract rate. Little River Post-Hearing Brief, p. 28; Trial Tr. (Day 9) at 145:18-146:17 (Downton). But it contends BCBSTX's post hoc justification is evidence of BCBSTX's fraudulent intent, as is its acknowledgment that the new pricing model was intended to "disincentivize the billing that we were seeing for the lab services." *Id.*; Trial Tr. (Day 5) at 342:22-25 (Cripe).

127.     The Tribunal concludes that the evidence demonstrates BCBSTX negotiated the payment rate under the New Contracts aggressively in order to afford Little River the thinnest of margins, but it is insufficient to show that BCBSTX deliberately miscalculated Little River's cost-to-charge ratio or intended to pay Little River below its actual costs. Trial Tr. (Day 5) at 344:2-3 (Cripe); Trial Ex. 47 at 186:13-187:2 (Wilmington Deposition). Though BCBSTX was not willing to share with Little River what BCBSTX considered its proprietary modeling technique, Ms. Wilmington indicated a willingness to discuss the numbers with Little River at any time. Trial Ex. 1095. Mr. Cripe's and Ms. Wilmington's testimony that the intent was never for Little River to lose money under the New Contracts was credible, as it would not have been in BCBSTX's best interest to lose Little River as an in-network provider. Trial Tr. (Day 5) at

335:8-9 (Cripe).   Nor was the evidence sufficient to show that BCBSTX's modeling was performed with an intent to deceive rather than for the purpose of assessing the financial impact of the proposed reimbursement rates under the New Contracts.   The rate reduction was a business decision made by both parties, each of which had an independent right to terminate their contractual relationship without cause and renegotiate on whatever terms each deemed acceptable.

128.    Intent to perform.  Little River claims that BCBSTX's subsequent expansion of its pre-payment review audit on laboratory claims without notifying Little River, its failure to follow audit procedures under Texas law to pay first and then investigate, its refusal to pay after verifying that Little River was performing testing on campus, its improper pending and mass denial of claims, its inconsistent and arbitrary claims adjudication, its continued mass denial of claims even after Little River was removed from pre-payment review, and its improper accusations of fraudulent billing practices to CMS, all indicate that BCBSTX never intended to pay for laboratory services under the renegotiated contracts unless the volume decreased to an arbitrary level that BCBSTX would accept.  According to Little River, in the Fall of 2017, after it had drastically reduced its services and laid off the majority of its staff, BCBSTX resumed paying claims for the same services and even for some of the same patients for which it had previously denied over $32 million in claims, further evidencing that BCBSTX never intended to pay above a certain volume of laboratory claims.

129.    The Tribunal agrees with Little River that BCBSTX failed to abide by the Contracts in the above respects, and that its attitude toward the cash-flow problems Little River was experiencing was unsympathetic at best.  However, the mere failure to perform a contract is no evidence of fraud, *Formosa Plastics,* 960 S.W.2d at 48, nor is a breach, even a deliberate one,

sufficient proof that the promisor had no intent to perform when the contract was made.  Because BCBSTX had the right to terminate the contracts without cause at any time, BCBSTX had no incentive to falsely induce Little River into the New Contracts with promises to pay and no intent of performing.  By entering into the New Contracts, BCBSTX did not forego its right to examine Little River's laboratory claims to determine their compliance with BCBSTX's policies and procedures before making payment.

130.    Neither was the evidence sufficient to establish that BCBSTX's Case-Notification to the OIG accusing Little River of fraud was mere pretext, though BCBSTX was less than forthright by failing to convey Little River's explanation of its billing practices and its belief that they were fully compliant with CMS regulations. In light of widespread concerns in the industry at the time about potential fraudulent laboratory billing, BCBSTX's investigation into Little River's billing practices was not unjustified in light of the dramatic increase in the volume of Little River's laboratory testing.  BCBSTX's report to the OIG is no evidence that it did not intend to comply with the New Contracts at the time they were negotiated.

131.    In sum, the evidence demonstrated that, even under the New Contracts, the parties had a genuine disagreement over whether Little River's laboratory billing practices were permissible and was insufficient to establish that the New Contracts were procured by fraud. Little River's fraudulent inducement claim is denied.

**6.      Little River may not recover exemplary damages (Count XII).**

132.    Exemplary damages are not recoverable in an action for breach of contract. Because Little River may not prevail on its tort-based or applicable statutory claims, it is not entitled to an award of exemplary damages.

**7.      Little River's request for a declaratory judgment is denied (Count XIII).**

133.    Because Little River's claims in this proceeding are mature and involve the same parties and the same issues alleged in its request for a declaratory judgment, Count XIII is denied. *See Tucker v. Graham*, 878 S.W.2d 681, 683 (Tex. App.—Eastland 1994, no writ).

### C.    BCBSTX's Counterclaims

#### 1.  Little River complied with the contractual terms (Count I).

134.    BCBSTX contends Little River breached the Contracts in the following respects: (1) billing for services it did not render; (2) billing for services provided to non-patients; (3) failure to provide notice of its laboratory outreach program; and (4) subcontracting its duty to provide services.  BCBSTX Post-Hearing Brief, pp. 12-18.  According to BCBSTX, it is entitled to recover in excess of $69 million in damages for monies that it paid Little River when Little River was in breach of the Contracts. *Id*. at 31.

135.    The grounds for BCBSTX's breach-of-contract counterclaims are the same as those asserted in defense of Little River's claims.  For the reasons explained above, BCBSTX's counterclaims fail.

#### 2.  Little River did not commit fraud or fraudulent inducement (Counts II & III).

136.    BCBSTX contends Little River committed fraud by failing to disclose that it was billing for services it did not render and that were provided to non-patients.  BCBSTX Post-Hearing Brief, pp. 23-24.  The grounds for BCBSTX's fraud counterclaims are the same as those it asserted in defense of Little River's claims.  For the reasons explained above, these counterclaims fail.

### III.  Damages Award on Little River's Claims

137.    Pursuant to the Contracts between the parties, and for BCBSTX's violations of the Contracts and applicable law set forth above, Little River is entitled to damages for the breach of contract claims on which it has prevailed as follows.

### A.  Economic Damages

138.    Little River was directly damaged by BCBSTX's failure to pay for laboratory claims that were appropriately billed by Little River pursuant to the Contracts and applicable law.  In light of the voluminous number of claims, expert testimony was required to calculate the resulting total damages.

139.    On behalf of Little River, Mr. Herbers conducted an analysis of the laboratory claims files for the period January 1, 2016 through July 31, 2017.  Trial Ex. 37.  The Tribunal has reviewed and accepts the expertise of Mr. Herbers and the process by which he developed a claims database and applied filters to narrow claims to those at issue in this proceeding.[16]  Trial Ex. 37 at 0031-43.  The Tribunal also adopts Mr. Herbers' conclusions regarding the calculation of damages to the extent described in this Interim Award.

140.    Mr. Herbers divided his damage model into three periods:

| Period 1 | Pre June 1, 2016 | Claims prior to Prepayment Review Audit and under the Old Contracts |
|---|---|---|
| Period 2 | June 1-Nov. 15, 2016 | Claims under Prepayment Review Audit and under Old Contracts |
| Period 3 | November 16- May | Claims under Prepayment Review Audit but |

---

[16] As opposed to Ms. McVey, who relied on what she considered to be a statistically valid sample of 400 Little River claims, Dr. Barnett (BCBSTX) and Mr. Benton (Little River) had access to all of the 837 and 835 files in formulating their damage models, and were able to replicate each other's data sets to within 1%. Trial Ex. 43 at 0009 (Benton Expert Report); Trial Ex. 37 at 0031-40 (Herbers Expert Report); Trial Tr. (Day 4) at 211:20-212:6 (Herbers).  According to BCBSTX's expert, running an analysis of every claim is preferable to statistical sampling when it is possible to do so.  Trial Tr. (Day 7) at 333:25-334:67 (Benton).

17, 2017                                after New Contracts effective date

*Id*. at 37-0040.  Dividing his calculation into the above periods, Mr. Herbers calculated the total BCBSTX payment shortfall attributable to totally or partially denied claims at $47.755 million. The Tribunal accepts Mr. Herbers' calculation and awards Little River $47,755,000.00 in damages for the shortfall.[17]

141.  <u>Patient responsibility</u>.  "Patient responsibility" refers to co-insurance, deductible amounts and non-covered services that the subscriber, rather than BCBSTX, is responsible for paying.  Trial Ex. 37 at 0015 n. 13 (Herbers Expert Report).  The Contracts require Little River to bill patients for portions of a bill for which they are responsible within one year of the date of service.  Trial Exs. 57 at 0003; 59 at 0003.  While Little River was appealing BCBSTX's denials and providing records, it was unable to pursue collection of patient-responsibility amounts. Without finalized claims adjudication, Little River was unable to properly quantify the appropriate patient-responsibility amounts and thus could not pursue collection from responsible BCBSTX members.  Likewise, Little River could not bill patients for the claims at issue in this dispute because how the claims are resolved could reduce the patient-responsibility amounts.  As a result, Little River was denied the opportunity to collect from patients an additional aggregate amount calculated by Mr. Herbers at $17.348 million.  Trial Ex. 37 at 0043-45.  The Tribunal has reviewed, accepts and awards Mr. Herbers' patient-responsibility calculation.

### B. Prompt Payment Penalties

142.  The Tribunal has found that BCBSTX violated the Texas prompt-payment laws. *See supra* at III.B.2.  The Tribunal has reviewed and accepts, in part, the Expert Report of Mark

---

[17] BCBSTX identified billed charges of $1,935,643.23 to persons it alleges are not its insureds (Trial Exs. 406-408) and $529,072.44 it alleges were not medically necessary.  Respondent's Demonstrative 1.  Had BCBSTX timely adjudicated such claims, Little River would have had avenues to pursue collection that are no longer available.  *See* III.B.1.e., *supra*.  Accordingly, the Tribunal declines to credit these amounts against the damages award.

Herbers and related testimony regarding the calculation of prompt-pay penalties. Trial Ex. 37 at 0043-45 (Herbers Expert Report). According to Mr. Herbers' calculation, the total prompt-pay related penalties (including 18% interest on the base amounts calculated from each date of service through the date of the arbitration together with base penalties and interest) total $27 million. *Id*. These calculations, however, improperly assume that all claims are subject to the TPPL, when Little River is only entitled to recover penalties with respect to fully-funded, non-ERISA claims. *See supra* at III.B.2.a. BCBSTX's expert, Jeffrey D. Benton, calculated the amount of penalties attributable to the excluded groups at $8.1 million. Trial Tr. (Day 8) at 109:8–110:l1 (Benton); Trial Ex. 43 (Benton Expert Rebuttal Report). The Tribunal accepts Mr. Benton's calculation and concludes that Little River is entitled to recover $18.9 million under the TPPL. The parties are requested to submit their calculations of pre- and post-judgment interest on prompt-payment penalties together with their attorneys' fees and costs submissions pursuant to Section IV, *supra*.

## C. Consequential Damages

143. Little River contends BCBSTX's arbitrary and inconsistent adjudication of Little River's claims in 2016 and 2017 caused a severe liquidity crisis from which it ultimately could not recover and forced it into bankruptcy, for which it seeks to recover in excess of $371.3 million in lost enterprise value.

144. Consequential damages may only be recovered if they are proved to be "the natural, probable, and foreseeable consequence" of the defendant's breach." *Mead v. Johnson Group Inc.,* 615 S.W.2d 685, 687 (Tex. 1981). To be recoverable, the parties must have contemplated when they entered into the contract that such damages would be a probable result

of the breach, and the damages must be "directly traceable to the wrongful act and result from it." *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011).

145.    The Tribunal has given significant thought to Little River's claims for consequential damages alleged to have been caused by BCBSTX's breach of contract, and to the reports and testimony of the respective experts on the issue.  The evidence clearly showed that BCBSTX was aware of Little River's cash-flow problems and that it was at risk of filing for bankruptcy.  *See* Trial Exs. 1105, 1099, 1213-002.  However, that Little River's cash-flow position was dire is in itself insufficient to show that BCBSTX was the proximate cause of Little River's liquidity crisis or that, at the time the New Contracts were negotiated, BCBSTX could reasonably have anticipated that if it improperly adjudicated Little River's laboratory claims the destruction of Little River's entire enterprise would be the probable result.  There are many factors that can influence the viability of a healthcare company like Little River.  *See* BCBSTX Post-Hearing Brief at 37.

146.    Little River's causation expert, Mr. Herbers, opined that BCBSTX's inconsistent and arbitrary adjudication of Little River's claims, its delay in payments, and its recoupment of payments previously made "resulted in a severe liquidity issue from which [Little River] could not recover."  Trial Ex. 37 at 0014 (Herbers Expert Report).  He further opined that BCBSTX's "termination of initial Contracts and negotiation of the New Contracts further exacerbated [Little River's] financial condition forcing [Little River] to file for bankruptcy."  *Id.* at 37-0015. However, Mr. Herbers admitted that he considered no potential causes of Little River's bankruptcy other than its dispute with BCBSTX.  Trial Tr. (Day 4) at 305:18-23 (Herbers) (stating "I did not evaluate other possibilities.").  Though Little River counters that BCBSTX failed to prove there was any other cause, it was Little River's burden to rule out other potential

contributors or causes, which would have required some type of "forensic accounting review or financial review to determine the complete range of causes for [Little River's] liquidity issues." Trial Tr. (Day 8) at 20:2-10; 49:11-20; 72:2-7; 83:13-85:13 (Benton).

147.    There are many myriad factors that can affect a company's viability, such as management capability, market conditions, legislative or regulatory uncertainty, and any number of internal and external influences.  Mr. Herbers did not account for the expenses that Little River had, the investments that it was attempting to make, the costs involved in its aggressive expansion plans, including the Crockett Hospital and Georgetown surgery center, its access to capital, its credit arrangements and various other factors that could have contributed to or been the tipping point into Little River's bankruptcy filing. Moreover, BCBSTX was within its rights to terminate the initial Contracts, and the Tribunal has concluded that BCBSTX did not act fraudulently in renegotiating the New Contracts.  Accordingly, any extent to which these actions may have "further exacerbated" Little River's liquidity problems cannot be considered causative.

148.    The Tribunal does not consider the evidence sufficient to show that BCBSTX would have reasonably anticipated when the New Contracts were entered that future coverage disputes could rise to the magnitude of forcing Little River out of business or that the bankruptcy filing was "directly traceable to the wrongful act and result[ed] from it."  *Basic Capital*, 348 S.W.3d at 901.  Accordingly, Little River's request for consequential damages is denied.

### IV. Interest, Prompt Pay Penalties, Attorneys' Fees and Costs

#### A. Prejudgment Interest

149.    Asserting equitable and statutory bases, Little River seeks to recover two types of prejudgment interest—interest as interest, and interest as damages—with adjustments that it suggests are appropriate to avoid a double recovery.  As a preliminary matter, BCBSTX contests

any award of prejudgment interest to Little River in light of the prompt-payment penalties that are awarded. Because this presents a threshold issue on Little River's entitlement to prejudgment interest, the Tribunal will address it first.

### 1. The prompt-payment penalties assessed do not preclude an award of prejudgment interest.

150. According to BCBSTX, the decision to award prejudgment interest is a matter of discretion, and here the equities do not support any amount in light of the prompt-payment penalties and interest that are awarded. If prejudgment interest is awarded Little River will receive a double recovery, BCBSTX contends, citing *AMX Enterprises, LLP v. Master Realty Corp.*, 283 S.W.3d 506 (Tex. App.—Fort Worth 2009, no pet.) in support. Little River responds that the purposes for awarding penalties versus prejudgment interest differ and will be thwarted if BCBSTX's argument prevails, and distinguishes *AMX Enterprises* on a number of grounds.

151. The Tribunal agrees with Little River. The purpose of an award of prejudgment interest is to make a plaintiff whole for the lost use of money, not to punish the defendant. On the other hand, the Legislature intended prompt-payment penalties to be punitive in nature. Precluding or lessening a compensatory remedy because statutory penalties attach would undermine the Legislature's purpose. The statute before the court of appeals under which interest was awarded in *AMX Enterprises* was entitled "Interest on Overdue Payment," and provided that unpaid amounts would bear "interest" until paid or "the date a judgment is entered." *Id*. at 513. As such, the court concluded, the statute at issue concerned, "literally, prejudgment interest" to compensate "for the loss of use of the unpaid money" pending judgment and was thus intended to preclude an additional prejudgment interest award under the common law. *Id*. In contrast, the assessments mandated under the TPPL are described as a "penalty" and do not purport to provide interest on the damages awarded for BCBSTX's contractual breach.

Accordingly, the Tribunal rejects BCBSTX's request to deny Little River any award of prejudgment interest on the ground that mandatory prompt-payment penalties apply.

### 2. Little River may not recover interest as damages.

152.    Little River contends it is entitled to an award of interest as damages to compensate it for lost use of the money Little River was due between the accrual of its claims and the date of the judgment. As a result of BCBSTX's wrongful default on its payment obligations, Little River contends, it was forced to fund operations through loans and BCBSTX is liable for the interest Little River had to pay on that money.  According to Little River, it essentially provided a $65 million loan to BCBSTX since 2016, for which BCBSTX should be required to pay interest at Little River's 11.3% cost-of-capital rate until the date of its bankruptcy, and thereafter at the higher 15% default rate that applies to its secured debt. That the Tribunal did not award Little River lost-enterprise value as an element of damages for BCBSTX's breach says nothing, Little River argues, of its right to compensation for lost use of the $65 million that required it to borrow money for operating capital.  Once adjusted to ensure no double recovery, Little River seeks interest as damages as of June 10, 2020 in the amount of $28,056,087. *See* Ex. 1 to Little River's Post-Hearing Brief on Interest, Attorneys' Fees and Costs of Court ("Herbers Declaration").

153.    BCBSTX counters that Little River's attempt to recover interest as damages is a thinly veiled effort to recover consequential damages attributable to its alleged loss of enterprise value resulting from the bankruptcy, which the Tribunal denied.  Because Little River lost on its claim for consequential damages, BCBTX argues, it cannot now seek to recapture consequential damages under the guise of prejudgment interest.

154.    The interest Little River paid on indebtedness it was forced to incur as a result of BCBSTX's default would not constitute an excessive recovery or confer upon Little River an improper windfall, and is recognized as recoverable under Texas law.  *See Investors, Inc. v. Hadley*, 738 S.W.2d 737, 741 (Tex. App.—Austin 1987, writ den'd).  However, irrespective of whether or not the adjudication of Little River's claim to recover lost-enterprise value resolved the extent to which prejudgment interest as damages may be awarded, the same factors that precluded Little River's recovery of such value similarly militate against an award of interest as damages here.

155.    The premise of Little River's argument is that $65M of the $95M in debt it incurred was attributable to cash-flow shortages caused by BCBSTX's nonpayment.  But it points to no specific indebtedness that Little River was forced to incur to cover for BCBSTX's default. Just as "there are many factors that can influence the viability of a healthcare company like Little River," *see* ¶ 145, *supra*, there are many factors that can influence the extent to which a company decides to take on debt and a lender's decision to leverage it.  And just as the evidence is insufficient to demonstrate that BCBSTX was the cause of Little River's liquidity crisis, it is insufficient to show that BCBSTX was the cause of Little River's acquisition of debt or its high cost-of-capital rate.  *See* ¶ 146, *supra*.  No forensic analysis was presented that "account[ed] for the expenses that Little River had, the investments that it was attempting to make, the costs involved in its aggressive expansion plans, including the Crockett Hospital and Georgetown surgery center, its access to capital, its credit arrangements and various other factors" that could have contributed to the decisions it made over time to acquire debt and how much, and to the factors its creditors considered in determining the interest rate to charge. *Id*. Without such an analysis, the causative effect of BCBSTX's nonpayment on Little River's

decisions to incur debt and the interest rate it was required to pay is too speculative to support recovery.  Accordingly, Little River's request for an award of interest as damages is denied.

### 3.  Little River is entitled to an award of prejudgment interest as interest.

156.    Little River seeks recovery of prejudgment interest as interest at a rate of 6% pursuant to section 302.002 of the Texas Finance Code, which provides as follows:

> ACCRUAL OF INTEREST WHEN NO RATE IS SPECIFIED.  If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended beginning on the 30th day after the date on which the amount is due.  If an obligor has agreed to pay to a creditor any compensation that constitutes interest, the obligor is considered to have agreed on the rate produced by the amount of that interest, regardless of whether that rate is stated in the agreement.

TEX. FIN. CODE § 302.002.  Under this section, interest accrues on a claim-by-claim basis beginning 30 days after the amount is due.  Here, payment was due 30 days after Little River filed each claim with BCBSTX, meaning interest would begin to accrue 30 days thereafter—or 60 days after each claim was submitted.  Calculating interest in this manner yields a total amount due as of the scheduled June 10, 2020 final award date of $14,708,521.  *See* Exhibit 1 to Little River's Post-Hearing Brief on Interest, Attorneys' Fees and Costs of Court ("Herbers Declaration").

157.    BCBSTX contests the application of section 302.002 to determine an award of prejudgment interest, contending that, to the extent interest is awarded, section 304.003 controls.  BCBSTX further contends interest under section 304.003 should be calculated on a claim-by-claim basis and run from 180 days after the last of Little River's claims was submitted.  The Tribunal agrees with BCBSTX on the former point, but not the latter.

158.    Section 302.002 allows a "creditor" to charge an "obligor" "legal interest" when no rate has been specified.  TEX. FIN. CODE § 302.002.  The definition of "legal interest"

expressly excludes "judgment interest," *id*. at § 302.002(a)(8), which in turn is defined as "interest on a money judgment, whether the interest accrues before, on, or after the date the judgment is rendered," *id*. at § 302.002(a)(8). The term "creditor" is defined to exclude a "judgment creditor," *id*. at § 302.002(a)(3), and "obligor" to exclude a "judgment debtor," *id*. at § 302.002(a)(13). "Judgment creditor" is defined to mean "a person to whom a money judgment is payable," *id*. at § 302.002(a)(5), and "judgment debtor" to mean "a person obligated to pay a money judgment," *id*. at § 302.002(a)(6). By its plain language, section 302.002 does not apply to an award of prejudgment interest on the money judgment in Little River's favor. *See Cumberland Cas. & Sur. Co. v. Nkwazi, L.L.C.*, No. 03- 02-270, 2003 WL 21354608 (Tex. App.—Austin 2003, no pet.); *Walden v. Affiliated Computer Servs.*, *Inc.,* 97 S.W.3d 303, 330 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

159. Chapter 304 of the Texas Finance Code governs "Judgment Interest," and provides that the prejudgment interest rate is equal to the postjudgment interest rate applicable at the time of judgment. TEX. FIN. CODE § 304.103. The postjudgment interest rate is the prime rate, with a floor of 5% and a ceiling of 15%, compounded annually. TEX. FIN. CODE § 304.003, .006. Under the statute, prejudgment interest applies to "wrongful death, personal injury, and property damage cases." *Id*. at § 304.102. However, the statutory formulation has been held to apply under the common law and in calculating equitable prejudgment interest. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998). Accordingly, Little River is entitled to prejudgment interest at the current judgment interest rate of 5%. *See* https://occc.texas.gov/publications/interest-rates.

160. The starting date for prejudgment interest to accrue is the earlier of (a) 180 days after the date written notice is received, or (b) the date suit is filed. *Id*. at 531. Unlike section

302.002, which accrues interest on a claim-by-claim basis, section 304.104 provides that interest accrues "on the amount of a judgment." TEX. FIN. CODE § 304.104. The Legislature's use of the word "judgment" rather than "claim" or "damages," and adoption of the 180-day provision, comports with the compromise the Court struck in *Cavnar*, and cannot be ignored. *See Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554-55 (Tex. 1985)(recognizing that "damages are typically incurred intermittently throughout the prejudgment period" and "adopt[ing] a method of calculation that fairly compensates the plaintiff and avoids the difficulty of accruing prejudgment interest."). Although the Legislature has since amended the statute to preclude an award of prejudgment interest on future damages, it has not amended this provision. Accordingly, Little River is entitled to recover prejudgment interest "on the amount of the judgment" beginning 180 days after BCBSTX received "written notice of a claim." *Id.*

161.    Little River argues that the first claim for advanced lipid testing that BCBSTX denied occurred no later than May 20, 2015. Trial Ex. 3004. BCBSTX does not dispute Little River's first-claim-denied date, countering only that accrual should begin 180 days after the *last* of the dates that the claims at issue were submitted. Finding no support for BCBSTX's last-claim-submitted position, the Tribunal concludes that BCBSTX received written notice that Little River was claiming a right to compensation no later than May 20, 2015. *See Johnson & Higgins*, 962 S.W.2d at 531 (citing *Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex.App.—Austin 1995, writ denied) (stating claimant is not required to demand exact amount or list every element of damages). Accordingly, interest on the amount of the judgment began to accrue 180 days thereafter on November 16, 2015, for a total amount of $14,866,685.00 as of June 10, 2020.

### B.  Prompt Payment Penalties, Interest and Payee.

162.    The parties are in agreement as to the accruing amount of interest on prompt-payment penalties.  The Tribunal awarded penalties and interest up to the date of commencement of the hearing on August 5, 2019 in the principal amount of $18.9 million.  Statutory interest thereafter accrues at $9,320.55 per day through the scheduled June 10, 2020 final award date in the amount of $2,889,370.00, for a total of $21,789,370.  Thereafter, interest will continue to accrue at the rate of $9,320.55 per day until paid. The parties disagree, however, as to whom such amounts must be paid.  BCBSTX contends 50% of the penalties and interest awarded must be paid to the Texas Department of Insurance, while Little River asserts that the Tribunal has discretion to award 100% to Little River.  The Tribunal agrees with BCBSTX.

163.    The Texas Insurance Code provides that an insurer "shall pay 50 percent of the penalty amount computed under this section, including interest, to the institutional provider and the remaining 50 percent of that amount to the Texas Health Insurance Risk Pool."  TEX. INS. CODE §§ 1301.137(1)(PPO); 843.342(m)(HMO).  Texas closed the Risk Pool in 2014, but the Legislature has not amended the Insurance Code to delete reference to the program.  From this, and the obsolete rationale behind the risk pool's existence resulting from the Affordable Care Act in 2010, Little River urges the Tribunal to exercise its "equitable authority and broad discretion" to make Little River the sole payee on prompt-payment penalties.  However, the Texas Department of Insurance has made clear that after dissolution of the risk pool, 50 percent of the penalties must be paid to the department and that obligation may not be waived.  *See* TEX. ADMIN. CODE § 21.2815(5); August 31, 2018 TDI Notification, available at https://www.tdi.texas.gov/hmo/mcqa/promptpay.html; Commissioner's Bulletin # B-0005-19 (July 17, 2019) available at https://www.tdi/texas.gov/bulletins/2019/B-000519.html.  Pursuant to the clear terms of the statute and the Commissioner's authority, the Tribunal awards 50

percent of the penalties and interest to the department. Accordingly, Little River shall have and recover from BCBSTX the principal amount of $9,450,000.00 in penalties, together with $1,444,685.00 in interest through the scheduled June 10, 2020 final-award date, for a total award of $10,894,685.00, with interest to accrue thereafter in the amount of $4,660.27 per day until paid. BCBSTX shall pay a like amount to the Texas Department of Insurance.

### C. Attorneys' Fees

164.    The resolution of Little River's breach of contract claim is governed by the substantive law of Texas, which allows a prevailing party to recover reasonable and necessary attorneys' fees incurred in presenting it. *See* TEX. CIV. PRAC. & REM. CODE § 38.001; *Intercontinental Grp. P'ship v. KB Home Lone Star LP*, 295 S.W.3d 650, 653 (Tex. 2009). Attorneys' fees are also recoverable for prevailing parties under the Texas Prompt Pay laws. TEX. INS. CODE § 1301.108. BCBSTX does not contest Little River's right to recover attorneys' fees, at least to the extent on which it prevailed, but contends that aspects of Little River's calculations are excessive or unsupported, and that Little River's segregation of fees and lodestar calculations are improper.

165.    As a preliminary matter, Little River claims that BCBSTX is estopped from challenging the reasonableness of Little River's attorneys' fees because the Bankruptcy Court has approved all fees incurred through the end of post-hearing briefing in September 2019, and BCBSTX has not objected to Little River's hourly attorneys' fees. And because the Bankruptcy Court has approved the reasonableness of the Trustee's contingency-fee arrangements, Little River contends, the Tribunal should not revisit those issues here.

166.    The Tribunal will not second-guess the Bankruptcy Court's assessment of attorneys' fees either as to reasonableness or necessity, or as to the contingencies the Court

approved.  But the manner in which the Bankruptcy Court determines attorneys' reasonable and necessary compensation for representation of the estate, and the amounts it determines Little River is entitled to recover out of the estate's assets, have no bearing on what fees may be shifted to BCBSTX as a result of the award in this case.  In making that determination, the Tribunal will apply the fee-shifting rules applicable under Texas law.

## 1. Hourly Fee Award

167.  Hourly Rates.  BCBSTX does not contest the hourly rates charged by Duane Morris attorneys, but contends Mr. Downton's $770 per hour undiscounted billing rate is excessive.  BCBSTX argues that a 20% discount should apply to align Mr. Downton's rate more closely with the $625-$650 per hour[18] charged by Little River's lead trial counsel, Mr. Thompson. According to BCBSTX, the hourly percentage reductions that the bankruptcy court approved for Mr. Downton should apply to this discounted rate. The Tribunal rejects BCBSTX's challenge to Mr. Downton's hourly rate. The Bankruptcy Court has determined that Mr. Downton's standard hourly rate of $770 is reasonable, and based on the record presented in this arbitration the Tribunal has no reason to question, and accepts, that determination.

168.  Segregation.  Little River seeks to recover hourly attorneys' fees through April 6, 2020, in the total amount of $4,022,581, with $3,455,803 of this amount attributable to Duane Morris's hourly fees and $566,778 attributable to Mr. Downton's reduced hourly fees.  As the party seeking recovery, it is Little River's burden to segregate its attorneys' fees between claims for which such fees are recoverable and those for which they are not.  *See Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299 (Tex. 2006).  Little River has identified those portions of its fee request that it argues relate solely to a claim for which such fees are not recoverable or do not

---

[18] The rate Mr. Thompson charged Little River was discounted from his standard hourly rate of $650, $690 and $715 for 2017,-18, 2019 and 2020, respectively, and his hourly rate now stands at $735, which more closely comports with Mr. Downton's standard hourly rate.  *See* Declaration of Brad Thompson, ¶ 10; Supplemental Declaration, ¶ 3.

relate to the arbitration.  Specifically, Little River deducted time spent responding to BCBSTX's dispositive motion on claims for which Little River was ultimately unsuccessful, and for bankruptcy-related tasks not directly supporting the arbitration.  Little River also applied a 20% discount to its post-hearing briefing as attributable to unrecoverable claims.  Otherwise, Little River claims the hourly work performed by both Duane Morris and Ryan Downton was inextricably linked to the prosecution of its successful breach-of-contract and prompt-pay claims, and to the necessary corollary of defeating BCBSTX's affirmative defenses and counterclaims.

169.    BCBSTX contests Little River's segregation of fees.  Specifically, BCBSTX contends Little River insufficiently accounted for (a) Mr. Downton's vague and/or unsubstantiated time entries, (b) time spent on the DTPA claim before it was withdrawn, and (c) time spent on failed claims (breach of the covenant of good faith and fair dealing, unfair settlement practices, deceptive insurance practices, violation of the Texas Free Enterprise and Antitrust Act, fraudulent inducement, exemplary damages, money had and received, declaratory judgment, and that BCBSTX was the cause of Little River's bankruptcy), both at the arbitration hearing and in discovery and trial preparation.  BCBSTX also challenges recovery of fees and costs related to Little River's valuation expert, Mr. Hill, which it claims related solely to Little River's unsuccessful attempt to recover lost-enterprise value as a result of the bankruptcy.  For these reasons, BCBSTX contends Little River should have applied a discount of 20% to the entire amount of its billing invoices.

170.    The Tribunal agrees with BCBSTX that the reductions Little River applied do not adequately reflect the amount of fees attributable to the non-recoverable claims.  A significant portion of the discovery, the briefing and the arbitration hearing was focused on proving BCBSTX's alleged purposeful misrepresentations, fraudulent and anticompetitive conduct, and

causation and damages relating to Little River's bankruptcy—claims on which Little River did not prevail.  Mr. Hill's valuation expertise was similarly directed.  Taking notice of the course of the proceedings, and the discounts Little River has already factored, the Tribunal concludes that an additional 15% across-the-board reduction more closely approximates the work attributable to the non-recoverable claims, which includes attorney time spent working with Mr. Hill.  Applying this reduction results in a reasonable and necessary hourly fee award of $3,419,193.85, with $2,937,432.55 of this amount attributable to Duane Morris and $481,761.30 attributable to Mr. Downton.  A $45,864.52 reduction in costs attributable to Mr. Hill is factored into the cost award.  *See* ¶ 186, *infra*.

## 2.  Contingency Fee Award

### a.  Ryan Downton

171.    The Bankruptcy Court approved the Trustee's retention of Mr. Downton as an attorney for the estate based on a hybrid fee arrangement that included a reduced hourly rate and a 10 percent contingency fee on all damages "other than direct damages," which are defined as "money the Arbitrator finds BCBSTX should have paid Little River for healthcare services provided to BCBSTX insureds."  *In re Little River Healthcare Holdings, LLC*, Case No. 18-60526-rbk (W.D. Tex. Bankruptcy), Dkt. 887, Dkt. 1006. Presuming success on the arguments presented in its Post-Hearing Brief on Interest, Attorneys' Fees and Costs, Little River requests a contingency fee award in the amount of $6,914,490.[19]  *See* Supplemental Downton Declaration on Attorneys Fees, ¶ 12; Herbers Supplemental Declaration on Attorney Fees, ¶ 9.  According to

_____

[19] Little River arrived at this number by adding economic damages of $65,103,000, prejudgment "interest as damages" of $28,056,087, prejudgment "interest as interest" on the economic damages in excess of secured debt between bankruptcy and judgment of $1,713,385, prejudgment "interest as interest" on paid attorneys' fees of $238,057, and prompt pay penalties as of June 10, 2020 of $21,789,370, less $47,755,000 in "direct damages," resulting in a "net proceeds" calculation of 69,144,899, times 10%.  *See* Herbers Supplemental Declaration on Attorneys Fee, ¶ 7.

Little River, the reasonableness of the contingency should be measured against a lodestar of $2,535,148, which it calculates by multiplying Mr. Downton's current undiscounted hourly rate of $770 times the 3,292.4 hours he has worked on the case, which includes 1,375 hours that he worked while serving as Little River's Chief Legal Officer. *See* Downton Supplemental Declaration, ¶ 10.  That total through April 6, 2020 is $2,535,148.  *See* Herbers Supplemental Declaration, ¶ 9.  Comparing this lodestar to the total $7,481,268 hourly and contingency fee award Little River seeks yields a multiplier of 2.95, an amount Little River contends is well within the range that Texas and other courts have approved as reasonable.

172.    BCBSTX challenges Little River's contingency calculation on a number of grounds, contending Mr. Downton's in-house work is insufficiently supported and the hours billed and rates charged are excessive. Multiplying the 1,821.8 hours for which Mr. Downton has provided billing records times his stated $770 hourly rate, and applying a 20% reduction, BCBSTX contends an appropriate lodestar calculation is $1,122,229.  According to BCBSTX, this number is the total compensation due Mr. Downton through the combination of invoiced billable time ($549,081) and contingent fee ($573,148).

173.    The purpose behind fee shifting is to compensate the prevailing party for its reasonable losses resulting from the litigation process, not to replicate an attorney's fee arrangement with the client.  Thus, a client's contractual agreement to pay a particular amount to an attorney does not necessarily establish that fee as reasonable and necessary.  *See Rohrmoos Venture, et al. v. UTSW DVA Healthcare,* LLP, 578 S.W.3d 469, 487-88 (Tex. 2019).  Though an alternative fee arrangement may reflect a reasonable fee from the contracting parties' standpoint, the question of attorneys' fees must still be decided "specifically in light of the work performed in the very case for which the fee is sought."  *Id.* at 498 (citing *Arthur Andersen &*

*Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997)). Accordingly, the contingency fee arrangement between the bankruptcy Trustee and Mr. Downton is not determinative of reasonableness for purposes of shifting fees to BCBSTX under Texas law.

174.    The Texas Supreme Court has set out a list of factors to consider in determining how much of a fee may be shifted to a losing defendant.  *See id.*  In effect, the Court harmonized what were known as the "lodestar" method and the "*Arthur Andersen* factors," which the jurisprudence had sometimes confused as distinct approaches.    The "lodestar" method for calculating fees focuses on the reasonable amount of time expended by the attorneys multiplied by a reasonable hourly rate, the product of which is the lodestar.  *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012).   This approach requires "certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate charged by the person performing the work."  *City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013)(per curiam).    This type of calculation "provides an objective analytical framework that is presumptively reasonable."  *See Rohrmoos*, *id.* at 38 (citing *Montano*, 414 S.W.3d at 736).

175.    Courts have also looked to what are known as the "*Arthur Andersen* factors" in analyzing the reasonableness of attorneys' fees, which include the following non-exclusive considerations:

(1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)  the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)  the fee customarily charged in the locality for similar legal services;

(4)  the amount involved and the results obtained;

(5)  the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*See Arthur Andersen*, 945 S.W.2d at 818; TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04.

176.    In *Rohrmoos*, the Court clarified that the lodestar method was not meant to be a separate test but "a 'short hand version' of the *Arthur Andersen* factors."  The lodestar calculation "is a focused and objective analysis of whether the fees sought are reasonable and necessary, yielding a base figure that reflects most *Arthur Andersen* factors and is thus presumptively reasonable." *Rohrmoos*, 578 S.W.3d at 496.  That base figure is adjustable if other factors not accounted for rebut the presumption.  *Id*.  After *Rohrmoos*, it is clear that the starting point for calculating a fee award is determining the lodestar, that is, the reasonable hours worked multiplied by a reasonable hourly rate.

177.    Accordingly, the first step in analyzing the reasonableness of Mr. Downton's fee request is calculating the appropriate lodestar by which to measure it.  A key point of dispute in making that calculation concerns the estimated hours Mr. Downton spent working on the case in house as Little River's Chief Legal Officer.  Though BCBSTX contends such time should not be considered, under Texas law a corporate client can be awarded fees for representation by its in-house counsel.  *Rohrmoos*, 578 S.W.3d at 488 (citing *Tesoro Petrol Corp. v. Coastal Ref. & Mktg, Inc.*, 754 S.W.2d 764, 766-67 (Tex. App.—Houston [1st Dist.] 1988, writ denied).  That being the case, the Tribunal sees no reason why such time should not factor into the lodestar calculation.  However, the party seeking a fee award bears the burden of proof to support the award, and in-house counsel is not exempt from the same evidentiary burden borne by outside

counsel. *See, e.g., Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017). That burden requires a description of specific tasks, the time required for those tasks, and the rate charged by the person performing the work.

178.    Mr. Downton did not keep time records as an in-house attorney. However, contemporaneous billing records are not required to prove the reasonableness and necessity of a fee request. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012). Based on a review of his calendar and the tasks he worked on while in house, Mr. Downton provided a particularized description of the work he performed and an estimate of the time he spent each month on specific tasks totaling 1,375 hours. *See* Downton Supplemental Affidavit, ¶ 4-5. The Tribunal considers Mr. Downton's in-house estimate reasonable in light of the descriptions given and the breakdown of the specific tasks performed, which comports with the work Mr. Downton described in his testimony during the arbitration hearing. Accordingly, the appropriate number of hours for purposes of calculating the lodestar is 3,292.40.[20]

179.    The appropriate rate for in-house counsel should be calculated at the market rate for outside counsel. *See AMX Enters. LL v. Master Realty Corp.*, 283 S.W.3d 506, 519 (Tex.App.—Fort Worth 2009, no pet.). The Tribunal has accepted that rate for Mr. Downton at $770 per hour. *See* ¶ 167, *supra*. Multiplying the hours worked times the hourly rate yields a total of $2,535,148. Attributing 15% of Mr. Downton's time to work on nonrecoverable claims, *see* ¶ 170, *supra*, yields a total of $2,154,875.80, which the Tribunal concludes is the appropriate lodestar for evaluating Little River's fee request.

180.    The lodestar calculation "yield[s] a base figure that reflects most *Arthur Andersen* factors and is thus presumptively reasonable." *Rohrmoos*, 578 S.W.3d at 496. That base figure

---

[20] The evidence is insufficient to support adding hourly time for other legal staff that worked with him as Chief Legal Officer, or for factoring such time into determining an appropriate multiplier.

is adjustable if other factors not accounted for rebut the presumption. *Id.* However, "a[n] enhancement or reduction of the base lodestar figure cannot be based on a consideration that is subsumed in the first step of the lodestar method." *Id.* at 500. The parties agree that the base lodestar includes *Arthur Andersen* factors 1 (time and labor required, novelty and difficulty of questions involved, skill required to perform the legal service properly) and 7 (experience, reputation, and ability of the lawyer or lawyers performing the services). BCBSTX also contends factors 3 (fee customarily charged in locality for similar legal services), 4 (amount involved and results obtained), and 6 (nature and length of professional relationship with client) are similarly subsumed in the lodestar calculation. The Tribunal agrees that these elements are reflected in the rates and hours used for the lodestar calculation and thus may not be considered for purposes of enhancement. *See, e.g., id.* at 500 (stating the "results obtained" is generally factored into the lodestar calculation and should ordinarily not form the basis for enhancement). The same is true for factors 2 (likelihood lawyer's acceptance of particular employment will preclude other employment) and 5 (time limitations imposed by client or circumstances). *Id.*

181.    Little River primarily relies on factor 8 for an upward adjustment to the lodestar calculation, which considers "whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered." *Arthur Andersen*, 945 S.W.2d at 818. According to Little River, this is "by far, the most important factor in this case" in supporting a lodestar enhancement. Little River Post-Hearing Brief, p. 27-28. Though BCBSTX questions the necessity for the contingency element of Mr. Downton's compensation agreement in the first place, the Tribunal will not second-guess the Bankruptcy Court's approval of this arrangement, which is expressly authorized under federal law and is not uncommon in the bankruptcy context where, as here, estate assets are limited. *See* 11 U.S.C. § 328(a). However,

the jurisprudence is clear that considerations of "whether the fee is fixed or contingent on results obtained" and "the uncertainty of collection before the legal services have been rendered" are subsumed in the lodestar calculation. *Rohrmoos*, 578 S.W.3d at 492, 500-02 (citing *Arthur Andersen*, 945 S.W.2d at 818; *Burlington v. Dague*, 505 U.S. 557, 562-63 (1992) (disallowing enhancement for contingency as duplicative of considerations subsumed in lodestar calculation, as "[t]he risk of loss in a particular case (and, therefore, the attorney's contingent risk) . . . is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so.")).  And "considerations already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorney's fees." *Id*.  The "strong presumption" that the lodestar calculation is reasonable may only be overcome in "rare circumstances" when considerations not already accounted for in the lodestar "establish that the base lodestar figure represents an unreasonably low fee award, depriving fair compensation to the prevailing party's attorney." *Id*. at 502 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553-54 (2010)).  Because the evidence presented here does not override that strong presumption, the Tribunal denies Little River's request for enhancement of the lodestar calculation.

182.    Again, that the contingency portion of Mr. Downton's fee arrangement with the Trustee may not be shifted to BCBSTX under Texas law does not mean that, from the bankruptcy estate's standpoint, it does not reflect a reasonable fee.  Indeed, the Bankruptcy Court has approved the contingency as reasonable and necessary, and will ultimately decide what amounts Little River may be entitled to recover out of the estate's assets.  But under established Texas law, that decision has no bearing on what amount BCBSTX should pay as a fee award,

which must be decided "specifically in light of the work performed in the very case for which the fee is sought." *Id.* at 498 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997)). The Tribunal concludes that a reasonable and necessary fee attributable to Mr. Downton is $2,154,875.80, which includes the reduced hourly ($481,761.30) and contingent fee ($1,673,114.50) components.

### b. Mr. Studensky

183.    Little River seeks a fee award for the Law Office of James Studensky in the amount of $3,868,745 pursuant to a 3% contingency that it claims is authorized by federal statute and supported by Texas law. *See* 11 U.S.C. §326(a); Tex. Civ. Prac. & Rem. Code § 38.001; Tex. Ins. Code § 1301.108. According to Little River, the maximum contingency allowed by law is presumptively reasonable and cannot be reduced absent extraordinary circumstances. BCBSTX challenges Little River's fee request for Mr. Studensky on a number of grounds. Pointing to the Tribunal's conclusion that BCBSTX did not cause Little River's bankruptcy, it argues any fees associated with the bankruptcy must be borne by the estate. BCBSTX additionally claims that the statute on which Mr. Studensky relies sets a ceiling and does not reflect the amount that he will actually be compensated. Finally, BCBSTX contends Mr. Studensky has not met the requirements for fee shifting under Texas law.

184.    The Tribunal agrees with BCBSTX. The statute upon which Little River relies, which is entitled "Limitation on compensation of trustee," provides that in a case such as this the court "may" allow reasonable compensation for the trustee's services "not to exceed 3%" of the described recoveries. 11 U.S.C. §326(a). Mr. Studensky's fee has not been quantified under the statute, and any shifting of a prospective fee would be pure guesswork. In any event, whatever fee the Bankruptcy Court approves as reasonable and necessary for Mr. Studensky's

representation as Trustee for the estate is unrelated to the amount of his fee that may be shifted to BCBSTX under Texas law.   And determining that amount would be mere guesswork as well. Mr. Studensky submitted neither time records nor anything more than a vague and global description of the work that he performed.   Absent sufficient proof of at least some of the *Arthur Andersen* factors, the Tribunal "has no meaningful way to determine if the fees were in fact reasonable and necessary."   *Arthur Andersen*, 945 S.W.2d at 818-19.   The Tribunal concludes that, under Texas law, the evidence is legally insufficient to support an attorney's fee award for Mr. Studenksky.

### 3.  Prejudgment Interest on Paid Attorneys' Fees.

185.    Little River seeks an award of prejudgment interest, as interest, on paid attorneys' fees.   There is a split of authority on whether prejudgment interest is appropriate on attorneys' fees paid prior to the entry of judgment, which the Texas Supreme Court has not resolved.   At this point, as BCBSTX acknowledges, the weight of authority favors Little River's position.   *See* Little River Post-Hearing Brief, p. 11 n. 39; BCBSTX Post-Hearing Brief, pp.12-13.   Little River calculates 5% simple interest on its paid attorneys' fees in the amount of $238,057.00, and the Tribunal accepts that calculation for purposes of this award.    *See* Herbers Supplemental Declaration, ¶ 6.   Accordingly, Little River is entitled to recover $238,057.00 in prejudgment interest on its paid attorneys' fees.

### D.  Costs

186.    Little River has presented evidence of its reasonable and necessary costs in the amount of $1,151,790.   *See* Thompson Supplemental Declaration, ¶ 8.   BCBSTX's only objection to such costs concern those attributable to Mr. Hill, which the Tribunal has sustained.

*See* ¶ 170, *supra*.  Factoring in a $45,864.52 reduction in costs attributable to Mr. Hill yields a total cost award of $1,105,925.00.

### E.      Postjudgment Interest on Damages Other Than Prompt Pay Penalties

187.    Texas Finance Code section 304.003 governs the rate for post-judgment interest, which is currently 5% compound interest.  *See* https://occc.texas.gov/publications/interest-rates. Because Little River will continue to pay 15% interest on nearly $50 million in debt until the judgment is paid, it seeks consequential damages in the form of a daily post-judgment interest charge based on a 10% annual rate.  For the reasons described above, *see* ¶ 155, *supra*, the Tribunal denies an award of post-judgment interest in excess of the statutory rate.

## V.  Confidentiality

188.    BCBSTX requests that the Tribunal designate the Interim Award, Final Award, and the entire record of the arbitral proceeding as confidential, contending that such materials are protected from disclosure by (1) Little River's designation of its arbitration demand as "Confidential" (2) the agreed Protective Order (Arbitrator Order No. 2), and (3) Texas law governing alternative dispute resolution procedure.  Little River counters that (1) the contracts attached to its demand required that payment rates be kept confidential, hence the "Confidential" designation which did not sweep everything surrounding the arbitration into its purview, (2) the Protective Order was limited to preserving the parties' confidential information produced in discovery, not the results of the arbitration, and (3) Texas law does not protect arbitration awards from public disclosure.

189.    The AAA Statement of Ethical Principles provides as follows:

> An arbitration proceeding is a private process.  In addition, AAA staff and AAA neutrals have an ethical obligation to keep information confidential. However, AAA takes no position on whether parties should or should not agree to keep the proceeding and award confidential between themselves.

> The parties always have a right to disclose details of the proceeding, unless they have a separate confidentiality agreement.

The AAA commercial arbitration rules also provide that the arbitrator "shall maintain the privacy of the *hearings* unless the law provides to the contrary."  R-25 (emphasis added).  Thus, there is a distinction between the *privacy* of the process and the *confidentiality* of the proceedings and award.  While AAA staff and the Arbitrator are ethically bound to protect both, nothing in the rules or ethical obligations requires the parties to keep the pleadings, evidence or outcome confidential.  On the contrary, the parties are free to disclose such information unless they have a separate confidentiality agreement.

190.    There is nothing in the arbitration provisions of the Contracts at issue that requires the parties to keep the arbitral proceedings or outcome confidential. BCBSTX points to Little River's "Confidential" designation on its arbitration demand as evidence of such an agreement. However, there is nothing to indicate that the designation was intended to extend beyond the document on which it appears or constitute a "separate confidentiality agreement" in itself.  If that had been the case, there would have been no need for the parties to seek a protective order from the Arbitrator.  Little River's designation on its demand is insufficient to impose a duty of confidentiality on the entire proceeding or its result.

191.    Neither does the agreed protective order impose such a duty.  By its terms, the protective order applies "for the sole purpose of facilitating discovery and disclosures in the Proceeding."  Arbitrator Order No. 2, ¶ 1.  The protections conferred by the protective order extend to arbitral materials that either party designated as "Confidential" or "Confidential—Attorney's Eyes Only" pursuant to the order's terms.  The order provides a procedure for challenging such designations, which neither side has invoked.  *Id*. at ¶ 16.  Accordingly, the confidentiality protections that the protective order confers extends to documents and materials

that are properly so marked, and no more.  Importantly, the parties could have specifically agreed to more extensive confidentiality protections, and the AAA provides a ClauseBuilder tool for doing just that by opting to include the following language: "Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties."  *See* https://www.clausebuilder.org/cb/faces/welcome.  Absent some sort of agreement to this effect, and beyond the protective order's constrictions described above, there is nothing to preclude Little River's "right to disclose details of the proceeding," including its outcome.

192.    Finally, BCBSTX claims Texas law supports its position, citing Texas Civil Practice and Remedies Code section 154.073(b).  That provision, however, protects as confidential "any *record* made at an alternative dispute resolution procedure," not the outcome of that procedure.  Again, had the statute's import been so sweeping, there would have been no need for the parties to seek an agreed protective order.  BCBSTX also urges that maintaining the confidentiality of the Interim Award comports with the approach federal courts have taken with arbitration awards that contain sensitive business information by granting leave to file such documents under seal.  Because the Interim Award contains commercially sensitive contract terms, BCBSTX contends, it should be similarly protected from disclosure.  BCBSTX's request, however, does not isolate which specific portions of the Interim Award it considers to reveal sensitive or proprietary information, other than a global reference to contractual payment rates.  Absent such a specific request, the Tribunal declines to declare the award protected from disclosure *in toto*.  Nonetheless, Little River does not oppose BCBSTX's desire to protect the contractual payment rates contained in paragraphs 13, 14, 35, 101, 125 and 126 of the Interim, and now this Final, Award from disclosure.  Accordingly, the Tribunal directs that any disclosure

of the Interim and Final Awards shall be in a form that protects the contractual payment rates contained in the above-enumerated provisions from disclosure.  Beyond this, and the properly designated materials under the protective order, BCBSTX's request that the awards and all other arbitration material be protected as confidential is denied.  Of course, there is nothing to prevent BCBSTX from petitioning the Bankruptcy Court for a sealing order or for any other or further protections that the Bankruptcy Court may deem appropriate.

This Final Award, which incorporates the Interim Award, is in full settlement of all claims submitted in this arbitration.  All claims not expressly granted are hereby denied.

_____                    Date:   May 6, 2020
Hon. Harriet O'Neill, Arbitrator